# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

THE JOHN ERNEST LUCKEN REVOCABLE TRUST, and JOHN LUCKEN and MARY LUCKEN, TRUSTEES, and JOHN LUCKEN, Individually, and MARY LUCKEN, Individually,

Plaintiffs,

vs.

HERITAGE BANCSHARES GROUP, INC., HERITAGE BANK NATIONAL ASSOCIATION, THOMAS GEIGER and GARY GEIGER, directors of Heritage Bank, ROBERT MATHIASEN, Chief Credit Officer of Heritage Bank, and DOES 1-100,

Defendants.

No. C16-4005-MWB

**OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I.   **INTRODUCTION AND BACKGROUND** ............................................................. 2
     A.   *Factual Background* ................................................................................... 2
          1.   *Parties and principal actors* ......................................................... 3
          2.   *John Lucken* ................................................................................... 3
          3.   *Dirks Motor's Financing* .............................................................. 4
          4.   *Luckens' involvement in Dirks Motor's financing* .................... 6
     B.   *Procedural Background* ............................................................................. 8
II.  **LEGAL ANALYSIS** ................................................................................................. 9
     A.   *Summary Judgment Standards* ................................................................. 9
     B.   *Plaintiffs' Fraud Claim* ........................................................................... 11
          1.   *Elements of fraud claim* .............................................................. 11
          2.   *Plaintiffs' fraud claim* ................................................................ 11
          3.   *Analysis of claim* ......................................................................... 13
               a.   *Floor plan financing representations* ............................. 13

     *b.*    *Knowledge of falsity and with intent to deceive* ............................................................................ *13*

     *c.*    *Damages* ......................................................... *15*

  *C.*    *Bank Tying Claim* .................................................... *16*

  *D.*    *Officer and Director Liability* ................................. *18*

  *E.*    *Unjust Enrichment Claim* ........................................ *18*

  *F.*    *Breach of Duty to Disclose* ...................................... *21*

  *G.*    *Rescission Claim* ...................................................... *23*

*III.*   *CONCLUSION* ......................................................................... *26*

This case results from the fallout of the Great Recession on a longstanding rural Iowa automobile dealership and plaintiffs' last-ditch efforts to come to that dealership's financial rescue. Plaintiffs contend that the defendants, the automobile dealership's bank and its officers, committed a wide array of torts against them to shield the bank from the blowback of the automobile dealership's failure. Defendants now seek summary judgment on all of plaintiffs' claims against them.

## I.   INTRODUCTION AND BACKGROUND

### A.   Factual Background

I will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, I will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' Motion for Summary Judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. Additional factual allegations and the extent to

which they are or are not disputed or material will be discussed, if necessary, in my legal analysis.

### 1. *Parties and principal actors*

Plaintiffs John and Mary Lucken ("the Luckens") are Iowa citizens and residents of Akron, Iowa. The Luckens' home serves as the principal office of the John Ernest Lucken Revocable Trust ("The Trust").

Defendants Heritage Bank ("Heritage Bank") and Heritage Bancshares Group, Inc. ("Heritage Bancshares") are headquartered in Spicer, Minnesota. Prior to June 30, 2011, Heritage Bancshares owned and controlled Heritage Bank National Association, Holstein, Iowa ("Heritage Holstein") and Heritage Bank National Association, Spicer, Minnesota ("Heritage Spicer"). Heritage Holstein maintained a branch in Sioux City, Iowa ("Heritage Sioux City").

Defendant Robert Mathiasen is the Chief Banking Officer and Chief Loan Officer for Heritage Bank. In 2009, Heritage Sioux City's predecessor bank hired Sterling Crim ("Crim") as its lender and branch manager. After Heritage Bank acquired the Sioux City bank, Crim remained on staff there. He left Heritage Sioux City in October 2012, when he was terminated. Crim currently works as an agricultural and commercial lender for Pinnacle Bank.

Richard E. Dirks was the principal owner of Dirks Motor Company ("Dirks Motor") from 1960 until it was sold to Total Motors, a dealership in LeMars, Iowa. Dirks's father and two uncles started Dirks Motor in 1923, and the business remained in the Dirks family for 93 years. Dirks sold 50 percent of the business to his two sons in the late 1990's.

### 2. *John Lucken*

John Lucken lived in Akron, Iowa, until he graduated from high school in 1957. Following high school, he obtained a bachelor of science and masters' degrees in engineering. After college, he went to work for Mobil Oil in Casper, Wyoming. He subsequently provided consulting services to energy companies, as an exploration

geologist, in their search for oil. John Lucken also invested in MAJR, a company that bought and financed "Class B loans." The Luckens were employed by MAJR for a period. John Lucken's role with MAJR was to raise capital.

The Luckens moved back to Akron in April 2000. In 2004, John Lucken began investing in oil exploration with a group based in San Antonio, Texas. In addition to being fiscally sophisticated themselves, the Luckens have a financial adviser, CPA, and a business consultant, Bill Petersen. Since 1996, John Lucken has also invested with Petersen.

John Lucken currently has investments in Natural Innovative Renewable Energy ("NIRE"), an Iowa L.L.C., which was formed to build a plant that would produce biodiesel from animal waste. Lucken has also made loans to two local Akron businesses, and has donated a house and farmland to the City of Akron to enable it to build a new care center. He has made charitable donations to other Akron groups.

### 3. Dirks Motor's Financing

In April 2007, Dirks Motor and/or Dirks and his two sons, took out loans from three local banks: First National Bank Akron, First American Bank, and People's Bank. Additional loans were taken out in 2008. By 2009, the balances on these loans totaled $1,412,739. In late 2008, or January 2009, Dirks approached Heritage Bank about obtaining a consolidation loan backed by a Small Business Administration ("SBA") guarantee.

Dirks worked with Crim in obtaining the loan backed by the SBA. On October 6, 2009, the SBA authorized an "SBA 7(a) Guaranteed Loan" to Dirks Motor for $1,775,000. The SBA loan had an interest rate of 6 percent and monthly payments of $13,900. The SBA loan required the following "collateral conditions" of Heritage Bank:

> Lender must obtain a lien on 100% of the interests in the following collateral and properly perfect all lien positions:
>
> 1. First mortgage (including due on sale clause, water rights, if any and assignment of rents) on land

and improvements located at 300 hwy 12 North, Akron. This property is commercial.

    a.     Subject to no other liens.

    b.     Evidence and title of priority of lien must be based upon:

        (1) Title and/or Lien Search or evidence of proper ownership and lien position.

2.    First Perfected Security Interest, subject to no other liens, in the following personal property (including any proceeds and products), whether now owned or later acquired, wherever located:

Equipment; Inventory; Accounts; Instruments; Chattel Paper; General Intangibles.

Defendants' App. at 234.

In addition to Heritage Bank's SBA loan, Dirks Motor had "floor plan" financing with Ford Motor Credit ("Ford Credit"). Under this plan, Ford Credit bought new vehicles from Ford and then shipped the vehicles to Dirks Motor where they were offered for sale. Once a vehicle sold, Dirks Motor was obligated to pay Ford Credit for the vehicle. Ford Credit's financing was secured by the vehicle on the lot itself. In April 2011, as bridge financing, Heritage Bank loaned Dirks Motor $193,100. Heritage Bank loaned Dirks Motor an additional $135,000 after gaining the SBA's approval.

By May 19, 2011, Dirks Motor was "out of trust" with Ford Credit, and Dirks Motor's floor plan financing was suspended.[1] Dirks sought additional time to not only pay off Ford Credit, but to find a new source of floor plan financing for his dealership. Ford Credit agreed to delay foreclosing on Dirks Motor. Dirks, however, could not find alternate financing and turned over his remaining inventory to Ford Credit for sale on September 9, 2011. Despite having no new car inventory for sale, Dirks again requested additional time

---

[1]Dirks Motor was considered "out of trust" because it was selling vehicles without repaying Ford Credit for them.

to find alternate financing. Ford Credit again agreed to forebear on foreclosing until December 30, 2011, but Dirks had to pay Ford Credit at least $177,386 — $122,154 of this amount was related to vehicles sold "out of trust." This payment resulted in the forfeited vehicles being returned to Dirks Motor, and it could obtain new vehicles provided that it had "a firm customer's order." Ford Credit Letter at ¶ 5; Defendants' App. at 293.

### 4. Luckens' involvement in Dirks Motor's financing

In "late summer or early fall of 2011," Dirks met with Crim to tell him that Dirks Motor "had to have floor planning." Dirks Dep. at 55-56; Plaintiffs' App. at 316. Dirks "remember[ed] something was done because supposedly we were getting floor planning." Dirks Dep. at 56; Plaintiffs' App. at 316. In early November of 2011, Dirks came to Lucken's office to "see if I would help finance the Heritage Bank/Crim proposal." Lucken Dep. at 73-74; Defendants' App. at 66-67. Lucken had bought cars from Dirks Motor. From his previous car purchases, and meetings during golf outings, Lucken was familiar with Dirks. Lucken, however, was "surprised" by Dirks's visit because he did not "expect to be asked to help him out." Lucken Dep. at 73; Defendants' App. at 67. Dirks and Lucken met for about 45 minutes, in which Dirks described a "three-point plan that would create a floor plan loan -- that the bank would create a floor plan loan, providing two principal conditions were met." Note at 1; Plaintiffs' App. at 167-68. Lucken's first two conditions, both concerning Heritage Bank, were: "One, being pay [sic] Ford credit off, which was around 225,000, and the second one was to put up a CD as collateral to an alleged floor plan loan that Crim promised but never delivered." Lucken Dep. at 75; Defendants' App. at 68. Lucken's third condition required Dirks to collateralize the $250,000 Lucken would loan Dirks to pay off Ford Credit. Lucken did not require collateral for the $250,000 in the CD, because he believed Heritage Bank would provide Dirks with a "real floor plan loan" and that Dirks Motor's inventory would collateralize that amount. Lucken Dep. at 76; Defendants' App. at 69.

Dirks recalls telling Lucken "what the deal was." Dirks Dep. at 55-56; Plaintiffs' App. at 315-16. Dirks and Lucken met with Crim three or four days after their initial discussion. At this meeting, Crim repeated the "exact proposal that Mr. Dirks had told me that . . . Two commitments. One was first 250,000 to pay off Ford Credit, and then there was going to be a second -- second 250,000 for a CD as backup collateral to a floor plan." Lucken Dep. at 108; Defendants' App. at 85. Dirks recalls that "Sterling proposed what we would have to have for them to do the floor planning. To the best of my knowledge, that's what it was." Dirks Dep. at 61; Plaintiffs' App. at 320. No specific amount of money required for floor financing was discussed at the meeting. At the time, Heritage Bank was providing the floor plan financing for Total Motors.

On September 29, 2011, Heritage Bank held a loan committee meeting to discuss Dirks Motor's SBA Loan. At that meeting, Dirks Motor's SBA Loan was downgraded from a '150' pass rating to a '7' substandard rating. Bank Minutes at 1, Defendants' App. at 295. Heritage Bank decided to "charge off" the "unguaranteed portion of the SBA loan." Bank Minutes at 1, Defendants' App. at 295. "Gary" and "Tom" Geiger attended the meeting, as did "Bob M." (Robert Mathiasen) and voted in favor of the SBA Loan downgrade, charge off, and the "potential prepayment from cashing in cds and possibly CSV of life insurance policies." Bank Minutes at 1, Defendants' App. at 295.

On the day before the loan committee meeting, September 28, 2011, Heritage Bank generated a "CAD" analysis of the SBA Loan with the "Purpose & Lender Rationale" to "Approve Downgrade from '150' pass rating to '7' substandard rating." CAD at 1, Plaintiffs' App. at 141. The document had a "Collateral Analysis" that found the loan was under-collateralized and had a negative collateral value of "-593,547 [sic]." CAD at 1-2, Plaintiffs' App. at 141-42.

On November 17, 2011, Heritage Bank's Board met, with all of the individual defendants in attendance. The minutes for that meeting reflect that "Dirks Motors may have a possible partner interested." Bank Board Minutes at 2; Plaintiffs' App. at 198. On

this same date, Lucken took a $250,000 cashier's check to Heritage Bank. Crim informed Lucken that he would have to wire the funds to Heritage Bank so the funds would be immediately payable to Ford Credit, since the cashier's check would not clear for ten days. Lucken then wired the money to Heritage Bank. Heritage Bank, in turn, paid Ford Credit a little more than $225,000 and wrote a check to Dirks Motor for the balance of $24,544.08. Lucken believed that the balance would be available for Dirks Motor to use for operating expenses.

On January 19, 2012, Heritage Bank's Board again met, with all individual defendants in attendance. The minutes reflect that "Dirks Motor investor cash injection, LOC, & floor plan paid off." Bank Board Minutes at 2; Plaintiffs' App. at 201. On this same date, Lucken executed the line of credit and related documents for the $250,000 backup collateral that he was providing.

At one point, Dirks Motor purchased over $500,000 worth of inventory on its revolving line of credit. Crim never told Dirks that he had a $250,000 line of credit cap. Dirks Motor had to be liquidated. On January 19, 2013, Total Motors entered into a letter of intent to purchase Dirks Motor. Heritage Bank notified Lucken, on February 19, 2013, that it had seized his CD as collateral for Dirks Motor's $250,000 revolving line of credit. On May 21, 2013, Heritage Bank notified the SBA that Dirks Motor was no longer a going concern and that it had liquidated $643,694.33 in CDs owned by Dirks and/or his family to apply to the SBA Loan balance and that it had additional collateral which could be liquidated.

### B.    Procedural Background

On January 14, 2016, plaintiffs the Trust and the Luckens, acting both individually and as trustees of the Trust, filed a Complaint against defendants Heritage Bancshares Group, Inc., the Bank's directors and chief credit officer, and John Doe defendants alleging claims for: 1) fraud through affirmative representations and omissions of material fact; 2)

violation of 12 U.S.C. § 1972 for a prohibited "Tying Arrangement"; 3) liability of the Bank's senior executive officers; 4) breach of the duty of disclosure; 5) unjust enrichment; and 6) contract rescission.[2]  These claims all arise from an agreement between the Trust and the Bank for the financing of Dirks Motor.

Defendants have filed a Motion for Summary Judgment, contending the plaintiffs' claims fail as a matter of law.  Plaintiffs have timely resisted defendants' Motion for Summary Judgment and defendants, in turn, filed a timely reply.

## II.     LEGAL ANALYSIS

### A.     Summary Judgment Standards

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323).  In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is

---

[2] Plaintiffs filed an Amended Complaint on March 1, 2017, asserting the same six claims against the same defendants.  The Amended Complaint contains additional factual details.

a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burden, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, —— U.S. ——, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weigh-ing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012). However, summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

With these standards in mind, I will address defendants' Motion for Summary Judgment.

## B.    *Plaintiffs' Fraud Claim*

### 1.    *Elements of fraud claim*

As the Iowa Supreme Court has explained, to establish a claim at law for damages for fraudulent misrepresentation, "a plaintiff must prove (1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001); *In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999) (defining the elements of fraud as including (1) misrepresentation or failure to disclose when under a legal duty to do so, (2) materiality, (3) scienter, (4) intent to deceive, (5) justifiable reliance, and (6) resulting injury or damage). The "knowledge of falsity" and "intent to deceive" elements distinguish an action at law for damages for fraud from an equitable action to rescind a contract, because "even innocent misrepresentations may be sufficient to support an action for rescission," but they are not sufficient to support a fraud action at law for damages. *Hyler*, 548 N.W.2d at 872. Plaintiffs must prove the elements of fraudulent misrepresentation by clear and convincing evidence. *In re Marriage of Cutler*, 588 N.W.2d at 430; *see also Ralfs v. Mowry*, 586 N.W.2d 369, 373 (Iowa 1998) (describing the burden as proving the existence of fraud "by clear, satisfactory, and convincing evidence") (citing *Benson v. Richardson*, 537 N.W.2d 748, 756 (Iowa 1995)).

### 2.    *Plaintiffs' fraud claim*

Plaintiffs base their fraud claim on several representations and/or omissions. First, plaintiffs claim that Crim misrepresented to Lucken "that the Bank would give a Bank floor plan loan to Dirks Motor so Dirks Motor could stay in business if Lucken paid Ford Credit and transferred $250,000 into a CD." Amended Compl. at 61. Second, plaintiffs allege that Crim misrepresented to Dirks that the Bank would defer three monthly $13,900 SBA

loan payments. Amended Compl. at ¶ 62). Third, plaintiffs allege that Crim misrepresented to Lucken:

> in November 2011 that the Bank's SBA Loan Account–where Lucken wired the 1st $250K–[wa]s a Dirks Motor account, and in January 2012 that the Lucken Credit Line note and assignment were documents the Bank needed in connection with the pretext Bank floor plan to Dirks Motor "as discussed in November", and the Lucken Credit Line Authorization Letter for the purpose of electronic transfers for the pretext Bank floor plan loan to Dirks Motor.

Amended Compl. at ¶ 63. Plaintiffs further allege that Mathiasen's representations to Lucken:

> on and after January 2013 (1) denying the Bank Contract; (2) representing the matter is "strictly between Dirks and Lucken"; (3) denying Lucken a full accounting, and (4) misrepresenting the Bank would engage in a good faith mediation, constituted material misrepresentations the Defendants knew to be false when made, and which were made with the intent Lucken rely on those representations so the Bank could complete its deceitful scheme and realize unjust enrichment at Lucken's expense.

Amended Compl. at ¶ 64. Finally, plaintiffs allege that:

> Crim and Mathiasen concealed from Lucken. . . (1) the SBA Loan was in default and the Bank would not defer any payments to the end of the loan, (2) the magnitude of Dirks Motor debt and insolvency, (3) the fact Dirks Motor could not remain in business because the Bank had to sell/liquidate Dirks Motor business assets to recover on the collateral dependent SBA Loan asset, (4) the fact the Bank could not approve a new floor plan loan to insolvent Dirks Motors in violation of Bank policy and regulatory requirements, (5) the fact Lucken was substituted as a borrower (not guarantor) on the Lucken Credit Line that was not secured by the vehicle inventory, only the Lucken CD, (6) the fact there were no sources of repayment or security for Lucken funding transferred to the Bank, and (7)

the fact the Bank had a self-interest in the use of Lucken funding for the Bank's financial benefit of $500,000, or more.

. . .

Amended Compl. at ¶ 65.

### 3.     *Analysis of claim*

#### a.     *Floor plan financing representations*

Defendants argue that plaintiffs cannot prove that Crim represented that Heritage Bank would provide Dirks Motor with floor plan financing. Plaintiffs have generated several genuine issues of material fact precluding summary judgment on this assertion. Specifically, there is a clear dispute between the testimony of Lucken and/or Dirks and that of Crim. Both Lucken and Dirks testified in their depositions that Crim represented at a meeting in November, 2011, that Heritage Bank would provide Dirks Motor with floor plan financing. This conflict between Crim's testimony, and that of Dirks and Lucken, generates a genuine issue of material fact as to whether Crim made the alleged representations concerning Heritage Bank providing floor plan financing.

Defendants argue that Lucken contradicted himself, in his deposition, by testifying at one point that his line of credit was to be used to purchase vehicles. This argument misstates Lucken's testimony. Lucken did not testify that the CD was to be used for the direct purchase of inventory, but as "collateral." Lucken Dep. at 75-76; Defendants' App. at 68-69. While it is true that aspects of Lucken's testimony could be viewed as somewhat inconsistent, it is not "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005) (citations omitted). Accordingly, because the matter of crediting the testimony of these witnesses must be left to the jury, this portion of defendants' Motion for Summary Judgment is denied.

#### b.     *Knowledge of falsity and with intent to deceive*

Defendants also contend that "Plaintiffs have not shown sufficient evidence to prove Crim's knowledge and intent to deceive Lucken." Defendants' Br. at 26. Plaintiffs contest

this assertion and argue that a jury could find that Crim made false representations that Heritage Bank would provide Dirks with floor plan financing with knowledge of his statements falsity and with the intent to deceive.

"Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Cornelia I. Crowell GST Trust v. Possis Med. Inc*., 519 F.3d 778, 782 (8th Cir. 2008). "The relevant inquiry is 'whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any allegation, scrutinized in isolation, meets that standard." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308 (2007)). The Eighth Circuit Court of Appeals has cautioned that "[w]here mental state or intent (particularly willfulness) is at issue, summary judgment must be granted with caution, as usually such issues raise questions for determination by a factfinder." *U.S. v. One 1989 Jeep Wagoneer, V.I.N. 1J4GS5874KP105300*, 976 F.2d 1172, 1176 (8th Cir. 1992) (citing *Pfizer, Inc. v. International Rectifier Corp*., 538 F.2d 180, 185 (8th Cir. 1976)). This is precisely the situation here.

Construing the facts in the light most favorable to plaintiffs, as the non-moving parties, *see Reeves*, 530 U.S. at 150; *Anderson,* 477 U.S. at 255, a jury could conclude that Crim and Heritage Bank had the motive and opportunity to defraud Lucken and that they possessed the requisite intent to deceive Lucken. The jury could conclude that Crim, because of his inexperience with SBA loans, did not understand that the SBA required Heritage Bank to be the first lienholder on all of Dirks Motor's "personal property," which included its inventory. Because Ford Credit possessed a senior lienholder position on all of Dirks Motor's assets, including its new car inventory, Heritage Bank could not meet the SBA Loan guarantee's requirements. Accordingly, a jury could reasonably conclude that Crim and Heritage knew that the SBA would discover their failure to comply with the terms of the loan guarantee if Dirks Motor went under and Ford Credit seized Dirks Motor's new

14

car inventory. A reasonable jury could further conclude that Crim and Heritage Bank determined that, if Ford Credit was paid off, Heritage Bank would be senior lienholder with respect to Dirks Motor's personal property. However, Lucken likely would not have funded Dirks Motor if the dealership did not have floor plan financing to maintain its new car inventory. Therefore, a reasonable jury could further conclude that Crim and Heritage Bank promised floor plan financing to entice Lucken to provide funds necessary to pay off Ford Credit, but never intended to go through with the floor plan financing. A reasonable jury could also conclude that such actions establish that Crim and Heritage intended to deceive and defraud Lucken. Accordingly, this portion of defendants' Motion for Summary Judgment is also denied.

### c.     *Damages*

Defendants contend that "Plaintiffs also cannot prove that the representation caused [Lucken's] damages." Defendants' Br. at 28. However, I conclude that a reasonable jury could, upon finding that Crim and Heritage Bank made fraudulent misrepresentations to Lucken concerning floor plan financing, further find that these fraudulent misrepresentations caused Lucken damages because, absent those misrepresentations, Lucken would not have made the loan or the CD deposit.[3] Accordingly, this portion of defendants' Motion for Summary Judgment is also denied.

---

[3] Defendants' argument that Lucken has received "death benefits that total $550,000, more than he loaned Dirks Motors," defendant's Br. at 27, is unpersuasive. The "death benefits" is apparently in reference to two life insurance policies, one on Dirks individually, and one as a last-to-die policy on both Dirks and his wife. Since these are life insurance policies which are payable only upon the death of the insured, and those contingencies have not yet happened, Lucken has not yet received any monetary benefit from them.

### C.    Bank Tying Claim

Defendants also seek dismissal of plaintiffs' claims based on the anti-tying provision of the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1972.[4] Section 1972 of the BHCA was intended to "prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." *McCoy v. Franklin Sav. Ass'n*, 636 F.3d 172, 175 (7th Cir. 1980) (quoting SENATE BANKING AND CURRENCY COMMITTEE REPORT No. 91–1084, 91st Cong., 2d Sess. (1970)).    Thus, the BHCA prohibits banks from engaging in certain practices that "require bank customers to accept or provide some service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54, 58 (5th Cir. 1978).  A private plaintiff, as opposed to a government regulator, can bring a suit to recover treble damages for the so-called anti-tying violations, provided he qualifies as a "person who is injured in his business or property by reason of anything forbidden in [§ ] 1972 . . . ." 12 U.S.C. § 1975.

To establish an anti-tying claim, "'[t]he plaintiff . . . must show that the bank imposed a tie, that the practice was unusual in the banking industry, that it resulted in an anticompetitive arrangement, and that it benefitted the bank.'"  *Mamot Feed Lot and Trucking v. Hobson*, 539 F.3d 898, 902 (8th Cir. 2008) (quoting *Doe v. Norwest Bank*

---

[4] Title 12 U.S.C. § 1972(1)(A) provides:

> (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—
>
>> (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service[.]

12 U.S.C. § 1972(1)(A).

*Minnesota*, 107 F.3d 1297, 1304 (8th Cir. 1997), overruled on other grounds by *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999)). Thus, to prove a violation of § 1972(1), a plaintiff must prove the following four elements: (1) "that the bank imposed a tie," (2) "that the practice was unusual in the banking industry," (3) "that it resulted in an anticompetitive arrangement," and (4) "that it benefitted the bank." *Hobson*, 539 F.3d at 903–04 (quoting *Doe,* 107 F.3d at 1304).

Defendants assert that plaintiffs' BHCA claim fails because Lucken was not a customer of Heritage Bank at the time he paid off Ford Credit. Because a reasonable jury could determine that Lucken was acting as the guarantor of Dirks Motor's SBA loan when he made the CD deposit, such a finding would establish that Lucken was a customer of Heritage Bank. *See Swerdloff*, 584 F.2d at 60; *Continental Illinois National Bank & Trust Co. of Chicago v. Stanley*, 585 F. Supp. 1385, 1388 (N.D. Ill. 1984).

Plaintiffs, however, fail to establish the existence of an illegal "tie-in," which is "an arrangement by one party to sell one product (the 'tying product'), but only on the condition that the buyer also purchase a different ... product (the 'tied product'), or at least agree that he will not purchase that product from another supplier." *Davis v. First Nat'l Bank of Westville*, 868 F.2d 206, 208 (7th Cir. 1989). Put another way, "the law requires a showing of two distinct products: a tying product, in the market for which defendant has economic power, and a tied product, which defendant forces on consumers wishing to purchase the tying product." *McGee v. First Fed. Sav. & Loan Assoc.*, 76 F.2d 647, 648 (11th Cir. 1985). According to plaintiffs, the "tying product" was Heritage Bank's agreement to extend credit to Dirks Motor, and the "tied product" was Lucken's payment to Ford Credit. These aren't two separate products of Heritage Bank. Ford Credit required payment to prevent it from carrying through with its threatened liquidation of Dirks Motor. Thus, plaintiffs have not established an anti-competitive tying arrangement. Accordingly, defendants' Motion for Summary Judgment is granted as to plaintiffs' BHCA claim.

### D. Officer and Director Liability

Defendants also seek summary judgment on plaintiffs' claims for personal liability against defendants Thomas Geiger, Gary Geiger, and Robert Mathiasen for alleged fraudulent corporate acts. These defendants are liable as officers of Heritage Bank for the fraudulent acts they participated in or committed. *See Haupt v. Miller*, 514 N.W.2d 905, 909 (Iowa 1994) (a corporate officer can be liable for personally taking part in the commission of a tort); *Briggs Transp. Co., Inc. v. Starr Sales Co., Inc*., 262 N.W.2d 805, 808 (Iowa 1978) ("A corporate officer is individually liable for fraudulent corporate acts which he or she participated in or committed."). Plaintiffs point to Mathiasen's membership in Heritage Bank's "special assets team" and these defendants' attendance at the September 29, 2011, loan committee meeting. That committee voted to pursue a "charge off" which in turn lead to a liquidation "action plan" for Dirks Motor. Plaintiffs argue that these actions demonstrate that Heritage Bank and these defendants knew that Dirks Motor could not remain in business, and any subsequent discussions regarding Heritage Bank supplying floor plan financing for Dirks Motor were fraudulent. The rub, here, is that none of these defendants are alleged to have been involved in these subsequent fraudulent activities. Plaintiffs do not point to any other actions that these three defendants undertook. Therefore, defendants Thomas Geiger, Gary Geiger, and Robert Mathiasen are entitled to summary judgment on the claims against them on the ground that they cannot be held individually liable for Heritage Bank's acts.

### E. Unjust Enrichment Claim

Defendants also seek summary judgment on plaintiffs' unjust enrichment claim. Defendants argue that, because plaintiffs have pled an at-law remedy of fraud for monetary damages, any inequity caused by defendants' actions will be adequately compensated at law. Plaintiffs respond that, because there are disputed issues of material fact as to whether

and how defendants unjustly enriched themselves at plaintiffs' expense, summary judgment is not appropriate on this claim.

The Eighth Circuit Court of Appeals has explained, "To recover for unjust enrichment [under Iowa law], [the plaintiff] must show: '(1) [the defendant] was enriched by the receipt of a benefit; (2) the enrichment was at the expense of [the plaintiff]; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances.'" *Lakeside Feeders, Inc. v. Producers Livestock Mktg. Ass'n*, 666 F.3d 1099, 1112 (8th Cir. 2012) (quoting *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 149 (Iowa 2001)); *see E– Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 666 (8th Cir. 2012) (holding that "[t]o establish a claim of unjust enrichment under Minnesota law, a plaintiff must show the defendant 'knowingly received or obtained something of value for which the defendant in equity and good conscience should pay.'") (quoting *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 553–54 (8th Cir. 2008)).  As the Eighth Circuit Court of Appeals has further explained, in a case applying Iowa law,

> "Unjust enrichment is a doctrine that 'evolved from the most basic legal concept of preventing injustice.'"  *In re Estate of Roethler*, 801 N.W.2d 833, 845 (Iowa 2011) (quoting *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 149 (Iowa 2001)). "The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation." *Palmer*, 637 N.W.2d at 154.

*Lakeside Feeders, Inc.*, 666 F.3d at 1112; *Waldner v. Carr*, 618 F.3d 838, 848 (8th Cir. 2010) ("The theory of unjust enrichment 'is premised on the idea that it is unfair to allow a person to benefit from another's services when the other expected compensation.' *State Pub. Defender v. Iowa Dist. Court for Woodbury County*, 731 N.W.2d 680, 684 (Iowa 2007).  Such implied contracts do not arise from the traditional bargaining setting but 'rest on a legal fiction arising from considerations of justice and the equitable principles of

unjust enrichment.' *Hunter v. Union State Bank*, 505 N.W.2d 172, 177 (Iowa 1993).").
The Iowa Supreme Court has explained that "unjust enrichment is a broad principle with
few limitations." *State ex rel. Palmer*, 637 N.W.2d at 155.

Thus, as noted above, "[t]o recover for unjust enrichment [under Iowa law], [the
plaintiff] must show: '(1) [the defendant] was enriched by the receipt of a benefit; (2) the
enrichment was at the expense of [the plaintiff]; and (3) it is unjust to allow the defendant
to retain the benefit under the circumstances.'" *Lakeside Feeders, Inc*., 666 F.3d at 1112
(quoting *State ex rel. Palmer*, 637 N.W.2d at 149); *Waldner*, 618 F.3d at 648 (stating the
elements in a similar way (quoting *State ex rel. Palmer*, 637 N.W.2d at 154–55)). Iowa
courts, including this one, have sometimes added a fourth element, that there must be no
at-law remedy available to the plaintiffs. *See Union Pac. R. Co. v. Cedar Rapids and Iowa
City R. Co*., 477 F. Supp.2d 980, 1003 (N.D. Iowa 2007) (citing *Iowa Waste Sys., Inc. v.
Buchanan Cnty*., 617 N.W.2d 23, 30 (Iowa Ct. App. 2000)). However, the Iowa Supreme
Court has explained,

> The adequacy of a legal remedy is a general limitation on the
> exercise of equity jurisdiction and is properly considered when
> restitution is sought in equity, but no independent principle
> exists that restricts restitution to cases where alternative
> remedies are inadequate. *See I Palmer*, § 1.6, at 33–34.

*State ex rel. Palmer*, 637 N.W.2d at 154 n.2 (noting the addition of this fourth element in
*Iowa Waste Sys., Inc*., 617 N.W.2d at 30). Thus, I conclude that the absence of an adequate
remedy at law is not an element of a claim for unjust enrichment under Iowa law.
Defendants have cited no authority that disturbs this conclusion. It follows that plaintiffs
are not required to establish an absence of an adequate remedy at law to survive a summary
judgment motion on their claim for unjust enrichment. Accordingly, this portion of
defendants' Motion for Summary Judgment is also denied.

### F.     Breach of Duty to Disclose

Defendants further seek summary judgment on plaintiffs' breach of duty disclose claim.  Defendants argue that they owed plaintiffs no duty to disclose information concerning Dirks Motor's financial condition because plaintiffs were not customers of Heritage Bank and plaintiffs were fully capable of discovering Dirks Motor's financial condition.  Plaintiffs counter that they reasonably relied on Heritage Bank to disclose its assessment of Dirks Motor's SBA loan and Dirks Motor's economic viability.

Ordinarily, the duty to disclose exists only when there is a fiduciary relationship, and not when the parties are dealing at arm's length.  In order to prevail on a breach of fiduciary duty claim, plaintiffs must prove:  "'(1) the existence of a fiduciary relationship; and (2) that the [actions taken by the fiduciary] were not beneficial to his or her interests.'" *Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 52 (Iowa 2003) (quoting *Rothwell v. Chubb Life Ins. Co.*, 191 F.R.D. 25, 32 (D.N.H.1998)); *see Kurth v. Van Horn*, 380 N.W.2d 693 (Iowa 1986) (observing that a breach of fiduciary duty claim requires proof of the existence of a fiduciary duty owed by the defendant to the plaintiffs, breach of that duty by the defendant, and damages to the plaintiffs proximately caused by the breach).  The Iowa Supreme Court has defined a fiduciary duty as follows:

> "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) (citing RESTATEMENT (SECOND) OF TORTS § 874 cmt. a (1979)). We have also noted,
>
> > a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind. . . . The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done.  [The][p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."

> *Hoffman v. National Med. Enters., Inc.*, 442 N.W.2d 123, 125
> (Iowa 1989) (quoting *Oehler v. Hoffman*, 253 Iowa 631, 635,
> 113 N.W.2d 254, 256 (1962)). . . .

> . . . .[W]e are cognizant of the fact that "[b]ecause the
> circumstances giving rise to a fiduciary duty are so diverse, any
> such relationship must be evaluated on the facts and
> circumstances of each individual case." *Kurth*, 380 N.W.2d at
> 696.

*Wilson v. IBP, Inc.*, 558 N.W.2d 132, 138 (Iowa 1996); *see Economy Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 647–48 (Iowa 1995) (also recounting indicia of a fiduciary relationship); *Anderson v. Boeke*, 491 N.W.2d 182, 188 (Iowa Ct. App. 1992) ("'A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship,'" quoting *Kurth*, 380 N.W.2d at 695, in turn quoting RESTATEMENT (SECOND) OF TORTS § 874 cmt. a). "'Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another.'" *Anderson v. Boeke*, 491 N.W.2d 182, 188 (Iowa Ct. App. 1992) (quoting *Irons v. Community State Bank*, 461 N.W.2d 849, 852 (Iowa Ct. App. 1990)); *accord Zumaris*, 538 N.W.2d at 647-48 ("A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other."). These standards are echoed in the Iowa Model Civil Jury Instructions, which direct that:

> [A] fiduciary relationship is a relationship of trust and
> confidence on a subject between two persons. One of the
> persons is under a duty to act for or give advice to the other on
> that subject. Confidence is placed on one side, and domination
> and influence result on the other.

> Circumstances that may give rise to the existence of a fiduciary relationship include the acting of one person for another, the having and exercising of influence over one person by another, the placing of confidence by one person in another, the dominance of one person by another, the inequality of the parties, and the dependence of one person upon another. None of these circumstances is more important than another.

Iowa Model Civil Jury Instruction 3200.2 (2002).

The Iowa Supreme Court has held there is typically no fiduciary relationship between a bank and its customers. *Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 294 (Iowa 2001) (citing RESTATEMENT (SECOND) OF TORTS § 874 cmt. a, at 300 (1979)); *Engstrand v. West Des Moines State Bank*, 516 N.W.2d 797, 799 (Iowa 1994). Rather, for a fiduciary relationship to exist there must be evidence of "domination and influence" and "a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other." *Weltzin*, 633 N.W.2d at 294 (citations omitted).

Here, Lucken did not bank at Heritage Bank and did not have any history of conducting other business with it. Indeed, Lucken and Heritage Bank were strangers to one another who were brought together by the intervention of a third party, Dirks. Plaintiffs have not directed my attention to facts in the summary judgment record which would provide a basis for concluding that a confidential or fiduciary relationship existed between these parties to an arm's length transaction which would give rise to a duty to disclose. Accordingly, defendants' Motion for Summary Judgment is granted as to plaintiffs' breach of duty to disclose claim.

### G.    *Rescission Claim*

Finally, defendants seek summary judgment on plaintiffs' rescission claim. Defendants contend that, because plaintiffs cannot establish their fraud claim, their rescission claim also fails. As I explained previously:

Under Iowa law, fraudulent misrepresentation in the inducement to contract gives rise to three distinct actions: (1) a cause of action at law for money damages; (2) a defense to a breach-of-contract claim; and (3) a ground for rescission of a contract in an action in equity. *See Gunderson v. ADM Investor Serv., Inc*., 85 F. Supp.2d 892, 919 (N.D. Iowa 2000); *Oeltjenbrun v. CSA Investors, Inc*., 3 F. Supp.2d 1024, 1050 (N.D. Iowa 1998); *Utica Mut. Ins. Co. v. Stockdale Agency*, 892 F. Supp. 1179, 1191 (N.D. Iowa 1995). . . . .

Generally, in Iowa, "fraudulent misrepresentations leading to the creation of a contract give[s] rise to a right of rescission." *Robinson v. Perpetual Servs. Corp*., 412 N.W.2d 562, 568 (Iowa 1987); *see First Nat'l Bank in Lenox v. Brown*, 181 N.W.2d 178, 182 (Iowa 1970) ("It is a well settled principle of equity that misrepresentations amounting to fraud in the inducement of a contract, whether innocent or not give rise to a right of avoidance on the part of the defrauded party."). Under Iowa law, five elements must be proven where a party seeks to rescind a contract based on a fraudulent misrepresentation: (1) a representation, (2) falsity, (3) materiality, (4) an intent to induce the other to act or refrain from acting, and (5) justifiable reliance. *City of Ottumwa v. Poole*, 687 N.W.2d 266, 269 (Iowa 2004); *Rubes v. Mega Life And Health Ins. Co., Inc*., 642 N.W.2d 263, 269 (Iowa 2002); *Hyler v. Garner*, 548 N.W.2d 864, 872 (Iowa 1996): *Swihart v. Universal Underwriters Life Ins. Co*., 669 N.W.2d 260 (Table), 2003 WL 21361008 at *3 (Iowa Ct. App. Jun. 13, 2003); *Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286, 292 (Iowa 1975); *see also Dishman v. American General Assurance Co.*, 193 F. Supp.2d 1119, 1123 (N.D. Iowa 2002); *Gunderson*, 85 F. Supp.2d at 920; *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp*., 2000 WL 33915816 at *5 (N.D. Iowa Nov. 20, 2000); *Utica*, 892 F. Supp. at 1193. Importantly, proof of scienter, which is required to sustain an action at law for fraudulent misrepresentation, is notably absent. *See Hyler*, 548 N.W.2d at 871 (noting that rescission can be obtained absent proof of scienter and pecuniary damage); *Wilden Clinic*,

*Inc*., 229 N.W.2d at 292 (recognizing that in equity, relief from fraud can be granted absent a showing of scienter or pecuniary damage). As this court thoroughly discussed in *Utica Mutual Insurance Company v. Stockdale Agency*, 892 F. Supp. 1179 (N.D. Iowa 1995), lack of the element of scienter is a historical distinction between the proof required to sustain an action in equity to rescind the contract and that required to sustain an action at law for fraudulent misrepresentation. *See id*. The Iowa Supreme Court recently discussed this important distinction:

> An action to rescind a contract is regarded as less severe, and hence less demanding in its proof requirements, than an action at law for damages based on fraud. *Hyle*r, 548 N.W.2d at 871. In an equitable rescission action, it is not the knowledge of falsity that is at issue but "whether misrepresentations induced the complaining party to contract." *Utica*, 892 F. Supp. at 1195. As this court stated in *Hyler*, injecting an "intent to deceive" element in a rescission case would reintroduce the concept of scienter, "making the elimination of this requirement in equity cases illusory."

*Hyler*, 548 N.W.2d at 872; *see Rubes*, 642 N.W.2d at 269. In order to uphold the historical distinction between at law and in equity relief for fraudulent misrepresentation, the concept of scienter must never enter the equation in determining whether a party is justified in pursuing the equitable relief of rescission-therefore, the intent necessary to sustain an equity action is merely the intent to induce the complaining party to contract. *Utica*, 892 F. Supp. at 1195; *Rubes*, 642 N.W.2d at 269; *Hyler*, 548 N.W.2d at 871. In an equity action for fraudulent misrepresentation, fraud may be inferred from the circumstances, words and actions in evidence. *Utica*, 892 F. Supp. at 1197; *accord Wilden Clinic*, 229 N.W.2d at 292 ("Fraud may arise from facts and circumstances, and an intent to defraud may properly be inferred from circumstances, words, and actions shown in evidence.").

*Schmidt v. Fortis Ins. Co*., 349 F. Supp.2d 1171, 1191 (N.D. Iowa 2005).

For the reasons discussed above, because genuine issues of material fact have been raised as to the falsity of defendants' actions, which thereby raise genuine issues of material fact as to whether plaintiffs are entitled to rescission, this portion of defendants' Motion for Summary Judgment is also denied.

### III.    CONCLUSION

For the reasons discussed above, defendants' Motion for Summary Judgment is granted in part and denied in part.   Defendants' motion is granted as to plaintiffs' BHCA claim, breach of duty to disclose claim, and claims of personal liability against defendants Thomas Geiger, Gary Geiger, and Robert Mathiasen.  Defendants' motion is denied as to the remainder of plaintiffs' claims.

**IT IS SO ORDERED**.

**DATED** this 15th day of August, 2017.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA