IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

THE JOHN ERNEST LUCKEN                     No. C16-4005-MWB
REVOCABLE TRUST and
JOHN LUCKEN and MARY LUCKEN,
Trustees and Individually,

        Plaintiffs,                        Sioux City, Iowa
                                           April 10, 2018
    vs.                                    8:20 a.m.

HERITAGE BANCSHARES GROUP,                 **Volume 2 of 4**
INC., and HERITAGE BANK
NATIONAL ASSOCIATION,

        Defendants.
_____/


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
SENIOR UNITED STATES DISTRICT JUDGE, and a jury.

Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/27/18 Page 1 of 227

APPEARANCES:

For the Plaintiffs:     STANLEY J. THOMPSON, ESQ.
JASON RAY LAWRENCE, ESQ.
Davis, Brown, Koehn, Shors & Roberts
Suite 1300
215 Tenth Street
Des Moines, IA 50309

For the Defendants:     DAVID L. REINSCHMIDT, ESQ.
Munger, Reinschmidt & Denne
Terra Centre - Suite 303
600 Fourth Street
Sioux City, IA  51101

JEREMY J. CROSS, ESQ.
Cross Law Firm
Terra Centre - Suite 315
600 Fourth Street
Sioux City, IA 51101

Also present:     John Lucken
Bill Peterson
Robert Mathiasen

Reported by:     Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA  51101
(712) 233-3846

1              (Proceedings reconvened outside the presence of the

2     jury.)

3              THE COURT:  Please be seated.  Is there anything we

4     need to take up?

5              MR. REINSCHMIDT:  No, Your Honor.

6              THE COURT:  Okay.

7              MR. THOMPSON:  There is one thing I spoke to

8     Mr. Reinschmidt about this morning.

9              THE COURT:  Yes.

10             MR. THOMPSON:  We would like for the Court to take

11    judicial notice of a 2011 calendar that we'd like at least

12    published for the witness during his redirect.  I understand

13    defendants do not have any objection to that.

14             MR. REINSCHMIDT:  We don't.

15             THE COURT:  Want to just mark it as an exhibit or not?

16             MR. THOMPSON:  Yeah, that'd be --

17             THE COURT:  Do you have any objection to that?

18             MR. REINSCHMIDT:  No.

19             THE COURT:  Rather than explain what judicial notice

20    is?

21             MR. THOMPSON:  Yeah.

22             THE COURT:  Okay.  If you got a -- there should be

23    some exhibit stickers up here, and you can just make it the last

24    joint exhibit.

25             MR. REINSCHMIDT:  Sure.

1          THE COURT:  If you're willing to have it as a joint

2     exhibit.

3          MR. REINSCHMIDT:  Yeah, I am.

4          THE COURT:  Well, the jurors are here early, and

5     they're ready.  Are we all ready?

6          MR. REINSCHMIDT:  Maybe 30 seconds and I'm ready,

7     Judge.

8          THE COURT:  Sure.

9          MR. THOMPSON:  Mr. Lucken --

10         THE COURT:  Well, you know, you really ought -- I told

11    you more than once have your clients here early.  I like to

12    start early.

13         MR. THOMPSON:  We --

14         THE COURT:  Yep.  I know you can't control him,

15    particularly him.

16         MR. REINSCHMIDT:  Yeah, I can go, Judge.  I'm ready.

17         THE COURT:  Well, his client's not here.

18         MR. REINSCHMIDT:  Oh, okay.

19         THE COURT:  If he's not here at 8:30, we'll start.

20         MR. REINSCHMIDT:  Oh, that's right.  He's the man on

21    the witness stand.  I need him.

22         THE COURT:  It would be helpful.

23         MR. REINSCHMIDT:  I'm focused, Judge.  I'm too

24    focused.

25         MR. THOMPSON:  I'd be willing to substitute and sit in

1  if you want.

2        MR. REINSCHMIDT:  Just don't point at me.

3        (A discussion was held off the record.)

4        THE COURT:  Is he in the building?  Does anybody know?

5  Well, we're starting at 8:30, so you'll have to call another

6  witness.  And then when he comes back -- but I'm not keeping the

7  jury waiting for a party.  Remember my number-one rule:  Don't

8  keep the jury waiting ever for anything.

9        Mr. Thompson, did your client call you and tell you he

10  was going to be late?

11        MR. THOMPSON:  We've had no communication since

12  yesterday.

13        THE COURT:  Okay.

14        MR. THOMPSON:  So . . .

15        THE COURT:  Right.

16        MR. THOMPSON:  I saw him leave the parking lot and

17  confirmed he'd be here at 8:15 at the latest.

18        THE COURT:  That's all you can do.  Thank you.

19        MR. THOMPSON:  We did have a subpoenaed witness,

20  Sterling Crim, but at nine.  When our subpoenas were issued, I

21  think that's when the trial was starting.

22        THE COURT:  Here's what I'm going to do.  If you don't

23  have a witness to go at 8:30, I'm going to bring the jury in and

24  just have them sit here and tell them we're waiting for

25  Mr. Lucken to come in.

1          MR. THOMPSON:  I understand, Your Honor.

2          THE COURT:  And I'm not picking on him.  That's what I

3    always do.

4          MR. THOMPSON:  No, I understand.

5          THE COURT:  How much more cross do you have of him?

6          MR. REINSCHMIDT:  20, 25 minutes.

7          THE COURT:  Okay.  Bring the jury up.  It's past time.

8          (The jury entered the courtroom.)

9          THE COURT:  Good morning.  Thank you.  Please be

10    seated.  And good morning.

11          We're just waiting for our witness who's running a

12    little bit late but I've been told is on his way up in the

13    building.  I found that I like to bring the jury in right on

14    time, and then if a lawyer or witness is late and they walk in

15    and see the jury, it's usually the only time they're late.

16          (Mr. Lucken entered the courtroom.)

17          THE COURT:  You're late.

18          MR. LUCKEN:  I'm sorry, Judge.

19          THE COURT:  Mr. Lucken, you can resume your position

20    on the witness stand.

21        JOHN LUCKEN, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

22          THE COURT:  Sir, do you need a little bit of time to

23    adjust your hearing aids?

24          THE WITNESS:  Pardon me?

25          THE COURT:  Do you need a little bit of time to adjust

1    your hearing aids?

2              THE WITNESS:  Could I?

3              THE COURT:  Sure.  We want to make sure you hear.  We

4    want to make sure you're both here and can hear, h-e-r-e and

5    h-e-a-r.

6              THE WITNESS:  I think they're okay.

7              MR. REINSCHMIDT:  I'll try to do a better job of

8    speaking into the mike.  Can you hear me?

9              THE WITNESS:  I would appreciate that.

10             MR. REINSCHMIDT:  Okay.  May I proceed, Your Honor?

11             THE COURT:  You may, Mr. Reinschmidt.  Thank you.

12             MR. REINSCHMIDT:  Thank you.

13                       CONTINUED CROSS-EXAMINATION

14   BY MR. REINSCHMIDT:

15   Q.   Mr. Lucken, yesterday when we concluded I was just starting

16   to ask you about the promissory note you signed in January of

17   2012.  But just before we do that, I want to go back to a couple

18   things and ask you about that, about something else.  Did you --

19   after these notes that were in Exhibit 30, the notes that Dick

20   Dirks gave you and then on the first page then you wrote some

21   notes, did you ever formalize what you felt like was your deal

22   with Dick Dirks?  Other than having those notes, did you ever

23   formalize it?  Did you sign a contract or a note or anything

24   with Dick Dirks at that time in November 2011?

25   A.   Not in 2011.

1    Q.   Then after this meeting a few days later with Mr. Crim and

2    Mr. Dirks wherein you said that certain things were said in that

3    meeting, did you formalize the understanding that you had in

4    that meeting with -- formalize it either with Mr. Crim or

5    formalize it with Mr. Dirks after that meeting?

6    A.   In writing?

7    Q.   Yes.

8    A.   It wasn't in writing.

9    Q.   Okay.  That's what I thought.  I just wanted to clarify

10   that for the jury.  I think one thing yesterday you mentioned or

11   it sounded like you were a little upset about was that when you

12   paid off Ford Motor Credit on November 17, 2011, when you paid

13   them off, you also said part of that $250,000 went to Mr. Dirks,

14   correct, directly to Mr. Dirks, not to Ford?

15   A.   Mr. Reinschmidt, I trusted the bank to do what Crim said.

16   I was doing this to keep Dirks in business, and I -- you know

17   that I wired the money to an account in one of your banks.

18   That's where the money was disbursed from.  I didn't directly

19   pay Ford or Dirks.

20   Q.   Were you aware that Dirks was going to get some piece of

21   that money directly?

22   A.   Yes.

23   Q.   And, in fact, I want you to look at Exhibit 36.  And we'll

24   look at the top part.  That is a check that Heritage Bank wrote

25   on the same day that you wired money to the bank.  That's a

1  check they wrote him for $24,544.08; is that correct?

2  A.   I see that.

3  Q.   And when it was payable to Dirks Motors, did it go in -- do

4  you know whether it went to an account that Dirks had at

5  Heritage Bank?

6  A.   What?

7  Q.   Do you know where that money was deposited that was written

8  to Dirks Motors?  In other words, did Heritage retain control of

9  that money that went to Dirks?

10  A.   I assume it went to Dirks.

11  Q.   Well, let's look at the bottom of the check, the

12  endorsement portion.  Excuse me, not the -- maybe up a little

13  bit.  There we go.  If you look -- I'm going to circle it.  This

14  is the back of the check, and on the back of the check it's

15  deposited to Dirks' account at Security National Bank in Akron,

16  Iowa; is that correct?

17  A.   Yes.

18  Q.   And so Heritage -- you wired money to Heritage.  They used

19  the largest portion of that to then pay Ford Motor Credit;

20  correct?

21  A.   Yes.

22  Q.   And then the balance they sent to Dirks, and he deposited

23  it into his Security National Bank account upon which Heritage

24  had no control; correct?

25  A.   Yes.

1   Q.   Okay.  Fair enough.  All right.  Let's go back to -- let's

2   go back to the note that we started to look at yesterday which

3   is Exhibit 48, I believe.  Excuse me.  I misspoke.  It's 46.

4   And in 46 -- we'll just start at the upper right again just to

5   remind the jury in the upper right portion.  That is the loan

6   wherein you borrowed $250,000 from Heritage on January 19, 2012;

7   is that correct?

8   A.   Yes.

9   Q.   And then if we -- and then down below you'll see -- when I

10   say down below, still within that section you'll see the lowest

11   part there's an X in front of multiple advance.  Do you see

12   that?  I'll circle it.

13   A.   Oh, that right there.  Okay.

14   Q.   Yep.  What did that mean to you?

15   A.   That meant that the principal sum that could be advanced

16   was 250,000.

17   Q.   Well, in other words, is it like a -- is this like a

18   mortgage where $250,000 is loaned and then the person over a

19   period of time pays it back?  Or is it something where the

20   person can borrow up to 250, pay some of it down, then borrow

21   again?  Is that how -- which one was this?  Was it just one

22   advance of 250, or was it you could do it again and again?

23   A.   It should have been a revolver.

24   Q.   And when you say revolver, that's the same as multiple

25   advance?  Where it says multiple advance on this document, is

Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 10 of 227

1  that the same as a revolving line of credit?

2  A.    I'm not sure.

3  Q.    Okay.  Was this line of credit treated like a revolving

4  line of credit?  In other words, there were monies paid out.

5  Dirks would pay it back, monies paid out?

6  A.    I think so.

7  Q.    Okay.  Fair enough.  Then let's go down a little further on

8  it.  And in the middle portion it says payments, and then typed

9  in is monthly payments of accrued interest calculated on the

10  amount of credit outstanding beginning on 2-19, 2012, and

11  principal due on 10-23, 2012.  Did you read that at the time

12  that you signed the note?

13  A.    No.

14  Q.    Well, let's go down towards the bottom portion of the note.

15  And do you see the capped, bold-faced statement there that

16  begins with the letter -- or with the word "important"?

17  A.    Yes.

18  Q.    And I'm not going to read the whole thing, but the basic --

19  the first sentence says, "Important, read before signing."  Do

20  you see that?

21  A.    Certainly.

22  Q.    And do you normally read legal documents before signing?

23  A.    I don't recall.

24  Q.    You don't recall if you normally read documents, legal

25  documents, before signing them?

1  A.   I don't recall if I vetted this one.

2  Q.   Okay.  And then down here on security, it says that a CD

3  has been assigned from the John Lucken Trust as security on this

4  note.  Do you see that?

5  A.   Yes.

6  Q.   Are the words "backup collateral" anywhere stated there

7  under that security?

8  A.   I don't see any.

9  Q.   Are the words "secondary collateral" anywhere there?

10 A.   No.

11 Q.   Okay.  And here both you and Mary have signed both as

12 trustees of the trust and individually; is that correct?

13 A.   Yes.

14 Q.   Now, when you said that Mr. Crim called you in a panic

15 around the time that you signed this, what did he -- what did he

16 say?  What was the conversation with you?  Sounded like it was a

17 very short one, but tell me.

18 A.   He said he needed me to come to Sioux City to sign some

19 documents.

20 Q.   And so you came in, and you signed this exhibit we're

21 looking at, Exhibit 46, the promissory note.  And we'll look in

22 a minute at Exhibit 48 which is the assignment of CD.  Did you

23 sign those in his office if you remember?

24 A.   I don't remember.

25 Q.   Did you physically take -- whether you signed them there or

1    not, did you physically take those documents with you to your

2    home?

3    A.    I believe so.

4    Q.    And by the way, it's something that really hasn't been

5    talked about here.  I asked you in your deposition about your

6    wife, and I think your comment was that she's a very, very smart

7    woman.  Is that more or less what you told me in deposition?

8    A.    She is.

9    Q.    Okay.  And so when you took this home, did the two of you

10   talk about this document, Exhibit 46?

11   A.    A little bit.

12   Q.    And did you explain to her that this meant that you were

13   borrowing $250,000 from the bank so that it could be used so

14   that Dirks Motors could stay in business?

15   A.    No, I didn't.  I didn't understand it at the time.

16   Q.    Did you talk -- if you didn't understand it, did you talk

17   to anybody else who could have helped explain it to you, in

18   other words, a lawyer, an accountant, anyone?

19   A.    Mr. Crim didn't explain it, and I didn't go over it with

20   him.  He handed it to me.  I signed it, took it home to Mary,

21   and I trusted that it was going to be for backup collateral.

22   Q.    Well, right now I'm talking about this line of credit.

23   We're not talking about backup collateral.  This line of credit

24   me -- did you understand you were borrowing $250,000 from

25   Heritage?

1  A.  No.

2  Q.  All right.  And did you understand on Exhibit 48 when --

3  this is the -- this is the assignment of the CD.  And at the

4  very top it says that I'm assigning this CD to the -- to a loan.

5  Do you see that?

6  A.  Yeah, I do, uh-huh.

7  Q.  Do you know whether or not Mary read either Exhibit 46 or

8  48?

9  A.  I don't think so.

10 Q.  So both of you signed both individually and in your

11 capacities as trustees of the John Ernest Lucken Revocable

12 Trust, and you don't think either of you read these documents.

13 A.  I don't recall.

14 Q.  Let's look at Exhibit 50.  And this is the e-mail to you on

15 January 23 from Sterling Crim to you in which he attaches the

16 letter that's dated January 18, 2011, but we've already agreed

17 it really should be January 18, 2012.  I noticed something in

18 this e-mail.  He says -- he says here's the letter attached.  If

19 you concur, please sign and fax a copy back to me.  Did you then

20 read the attachment and concur?

21 A.  I read the attachment.  I spoke to Mr. Crim that I didn't

22 want the money to be used for anything but vehicles.

23 Q.  And then we talked about a couple of weeks later when it

24 was drawn upon -- or was asked of you could it be drawn upon to

25 pay the SBA loan, you didn't -- didn't particularly like that,

1  but you agreed to that ultimately.

2  A.   Can you show me the letter that he sent me, please?

3  Q.   I'm going to, but right now I'm asking another question.

4  A.   Okay.

5  Q.   My question is you said you only wanted it used primarily

6  for automobiles as we'll see in the letter.  But you've already

7  testified yesterday that whilst you didn't want it used for the

8  SBA loan, you did agree ultimately that there could be two

9  payments made to the SBA loan; correct?

10 A.   Yes.

11 Q.   Let's look at the -- let's look at the letter now which is

12 the second page of Exhibit 50.  And just for the time being, I'm

13 going to cross that out and write 2012.

14 A.   Well, you said that was an innocent mistake?

15 Q.   I said it was a mistake.

16 A.   If he did this on Microsoft and when I do a memo or a

17 letter on Microsoft, when I type in a month, it will help me put

18 the right date in.  I don't understand why he's still thinking

19 it's 2011.

20 Q.   Well, is there any dispute in this case that this was

21 really 2012?  Let's make sure that's cleared up.  That letter

22 wasn't written on January 18, 2011.

23 A.   No.  You're right.  Sure.

24 Q.   Okay.  All right.  And the -- you know, Mr. Thompson talked

25 about this with you yesterday.  But if we just emphasize the

1  first sentence in that letter, it says that it is establishing a

2  secured line of credit.  Does it say anywhere in there that --

3  anything about backup collateral?

4  A.    No.

5  Q.    Then we've already talked at some length about the primary

6  purpose is for automobiles.  I think we all agree on that.  And

7  the last one, the last sentence of that first paragraph says

8  that the trust authorizes Heritage Bank --

9          MR. REINSCHMIDT:  Why don't you highlight that if you

10  could, Ms. Liston.

11  Q.    Trust authorized Heritage to make advances from the line of

12  credit on behalf of Dirks Motors.  And then let's look at the

13  next sentence in the next paragraph.  Regardless of the date --

14  and I'm not talking about 2012.  I'm talking about that you I

15  think yesterday used the word -- maybe even your lawyer used the

16  word -- that this letter was backdated.  Regardless of the date

17  of the letter, did you agree with the contents of the letter?

18  A.    I signed it.  Yes.

19  Q.    Not only did you sign it, but Mary signed it as well.

20  A.    Yes.

21  Q.    Did you read the letter?

22  A.    Yes.

23  Q.    Did Mary read the letter?

24  A.    Yes.

25  Q.    And did you understand that -- when it said if the deal

1   between the trust and Dirks Motors, what's he referring to

2   there?

3   A.   What was Crim referring to?

4   Q.   Yeah.  Well, you signed the -- he wrote the letter for your

5   signature, but you're reading it, and you said you've understood

6   it.  What did that sentence mean to you?

7   A.   It says in the event the agreement between the trust and

8   Dirks Motors dissolves, the trustee will notify Heritage Bank in

9   writing of the intent to do so.

10   Q.   Well, what agreement is he referring to there about if it's

11   ever dissolved?

12   A.   I didn't dissolve any agreement that I had with Dick Dirks.

13   Q.   My question is he's saying if it is dissolved, so my

14   question to you is what is the -- he's referring -- he thought

15   apparently when he wrote this letter there was an agreement

16   between you and Dirk Motors.

17   A.   We had an agreement.

18   Q.   And what's the agreement between you and Dirks Motors?

19   A.   That I would provide a half a million dollars to keep Dirks

20   Motor in business.

21   Q.   And was the agreement that then Dirks Motors would

22   ultimately pay that money back?

23   A.   Yes.

24   Q.   Let's talk about then you said that you were -- that you

25   were surprised about the line of credit being in default;

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Brenda K. Wagner, Certificate Merit and Federal CSR*

Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 17 of 227

1 correct?

2 A.    Yes, sir.

3 Q.    Okay.  Let's look at Exhibit 117.  And we have -- I don't

4 need to show you each and every one of these.  We happen to have

5 three of these that were in the bank's files.  Do you know what

6 these are?

7 A.    Monthly statements from Heritage Bank.

8 Q.    And these would be monthly statements on your line of

9 credit?

10 A.    Yes.

11 Q.    And were these monthly statements sent to you?

12 A.    Yes.

13 Q.    And when I say sent to you, I don't mean to leave out your

14 wife.  They were sent to both of you at your -- is that your

15 correct address in Akron?

16 A.    Yes.

17 Q.    And this one happens to be -- it's -- the statement's cut

18 off over here, but in testimony that you've given us earlier

19 about a year ago I think we agreed that that was 7-5, 2012.

20 A.    Yes.

21 Q.    So -- all right.  And so as we're looking at that, that

22 shows you that it's a loan.  Type is commercial.  When it shows

23 the principal balance in this one on 7-5, 2012, of $249,559.71,

24 what does that mean to you?

25 A.    That means the money that was in the account, the principal

1  amount.

2  Q.    So that means that Dirks is the only person that could draw

3  upon this other than you.  Apparently Dirks has drawn on the

4  250.  He's almost topped out the 250; correct?  There's hardly

5  any more that can be drawn on.

6  A.    Yes.

7  Q.    Okay.  And then below that, it shows the interest rate;

8  correct?

9  A.    Yes.

10  Q.    Shows the -- shows the interest through July 5, 2012, of

11  $412.02; correct?

12  A.    Yes.

13  Q.    And obviously there's more things it shows on that

14  document.  It shows, okay, as of the date of this statement,

15  $740.89 is owed; correct?

16  A.    Yes.

17  Q.    You've -- did you start getting these payment -- excuse me.

18  Did you start getting these statements shortly after you signed

19  the documents on January 19, 2012?

20  A.    As I recall, yes.

21  Q.    What did you do with these statements when you received

22  them at your home?

23  A.    I took them to Dirks, and they took care of paying

24  interest.

25  Q.    Because you felt that that was their obligation to pay

1  interest and the loan.

2  A.   Yes.

3  Q.   So would you open -- would you open those and give those to

4  Mr. Dirks?

5  A.   Pardon me?

6  Q.   Would you open those statements and give those to

7  Mr. Dirks?

8  A.   Some of them initially I did because they were routinely

9  the same.  And I turned them over to -- mostly to Dave Dirks.

10  Q.   And Dave Dirks is the son of Dick Dirks Senior?

11  A.   Correct.

12  Q.   And, in fact, I'm reading -- I'm looking at your deposition

13  that was taken on January 26 and January 27, 2017.  And in there

14  you said -- when I asked you the same question, you said, "I got

15  monthly statements that I handed to -- most of them without

16  opening, I handed them to Dave or Dick Dirks, and they said they

17  would take care of the interest"; correct?

18  A.   That's right.

19  Q.   You depended upon the Dirkses to follow through with their

20  obligations; correct?

21  A.   Yes.

22  Q.   And if this loan was in default -- well, let me back up.

23       If you had opened your statements, you would have seen

24  if interest was not being paid on a monthly basis; correct?

25  A.   Pardon me?

1   Q.   If interest was not being paid on this loan, you would have

2   seen that the interest payments were in arrears.

3   A.   Yes.

4   Q.   But your testimony both a year ago, over a year ago, and

5   today is that you didn't even either look at the statements or

6   you would just not even open them and give them to the Dirkses

7   so they'd take care of it.

8   A.   Yes.

9   Q.   I want to look at something.  You're talking -- you talked

10  yesterday and today about what you felt that the deal was with

11  Mr. Crim, particularly with -- that there was a deal with

12  Mr. Crim.  I want to look at something that you wrote to

13  Mr. Dirks and ultimately didn't send to Mr. Dirks, but you wrote

14  it in January 2013 when you were so upset and you'd called and

15  spoken to Jenni Whipple at the bank and were upset.  Let's look

16  at Exhibit 1027.  And I'm just looking at the first -- the first

17  page is an e-mail to Bill Peterson; is that correct?

18  A.   Yes.

19  Q.   And it says -- actually it says William Peterson.  And when

20  it says William Peterson, is that who you commonly refer to as

21  Bill Peterson?

22  A.   Pardon me?

23  Q.   Is Bill Peterson William Peterson?

24  A.   Yes.

25  Q.   And Bill Peterson is here today on behalf of the trust?

1   A.   Right.

2   Q.   Okay.  And Bill Peterson was your friend and advisor in

3   2011, 2012, and 2013?

4   A.   He wasn't involved in this in 2012.

5   Q.   But you have sought his advice in 2011 and 2012.

6   A.   I could have.

7   Q.   So in 2013 you're now seeking his advice, and you say,

8   "Bill, would you be able to review this and give me a hand and

9   advise on this damned deal?  John."  Is that what you said there

10   in that e-mail?

11   A.   Yes.

12   Q.   Let's now look at the attachment to that e-mail.  And we'll

13   just start with the top and the first paragraph.  So this is a

14   proposed letter that you wanted to write to Dick Dirks; correct?

15   A.   Yes.

16   Q.   And in the first part you describe what you felt that the

17   deal was.  Is that what you're doing where you say recitation in

18   this part?

19   A.   That's my part.

20   Q.   Okay.  And your recitation is I'll pay off Ford Motor

21   Credit, and we know that that was around 224, 225,000, in that

22   neighborhood; correct?

23   A.   Yes.

24   Q.   And then you say -- so that's kind of number 1.  Then

25   number 2, you say operating capital.  Is that the $24,000 check

1  we talked about this morning that went directly to Dirks?  Is

2  that -- I asked you earlier this morning about a $24,000 check

3  that went to Dirks, and then he put it into his Security bank

4  account.  When it says for operating capital, is that where that

5  went?

6  A.    Yes.

7  Q.    Okay.  And then finally, number 3, a $250,000 CD placed at

8  Heritage that was to -- you call it -- here you call it a floor

9  plan.  Whether you call it a floor plan or line of credit, it's

10 250,000; correct?

11 A.    Correct.

12 Q.    Is there anywhere in that first paragraph where it talks

13 about a $600,000 floor plan or a one-million-dollar floor plan?

14 A.    No.

15 Q.    Let's go to the second paragraph.  And back to -- frankly,

16 this letter is -- really as you're going through it is your

17 issues with Dirks for not following through with what you felt

18 he promised he would do for you in his -- your deal with him;

19 correct?  Do you remember my question?

20 A.    What is it again?

21 Q.    My question was is this letter as we're going through it

22 your statements to Dick Dirks about these were the things you

23 promised me and you didn't follow through and do; correct?

24 A.    Yes.

25 Q.    All right.  Because you've earlier testified you didn't

1  have him sign any documents back in 2011; correct?

2  A.   Yes.

3  Q.   Did you have him sign any documents in 2012?

4  A.   I don't recall.

5  Q.   Did you -- we've already covered yesterday I believe that

6  you didn't ask for any financial documents from him at the time

7  in 2011.  Did you at any point in 2012 before this letter ask

8  for any financial documents from him, whether it be tax returns,

9  balance sheets, profit/loss statements?  Did you ever ask for

10 that from Dick Dirks?

11 A.   No.

12 Q.   And here you're saying, "I was to receive security for the

13 half million dollars by becoming a second secured party after

14 Heritage," and you were going to get -- you were going to get

15 second secured on some life insurance he had and also on a CD.

16 Is that what you say there?

17 A.   Yes.

18 Q.   And that didn't happen; correct?

19 A.   No.

20 Q.   All right.  Let's go to the next paragraph.  In addition,

21 you were going to become second secured party after Heritage on

22 the real estate.  And now, by the way, when you say -- earlier

23 in this case you said, well, that 850,000, that represented not

24 only real estate.  It represented also the value of the

25 franchise, the actual business.  You don't say that in this

Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 24 of 227

1   paragraph, do you?

2   A.    No.

3   Q.    And here you say that Dick Dirks estimated that that had

4   appraised at 850,000.  Did you ever see an appraisal to

5   corroborate him telling you that it was worth 850,000?

6   A.    Not at that time.

7   Q.    When you say at that time, have you ever seen an appraisal

8   other than once this litigation started?

9   A.    When the -- you're right.  When the litigation started,

10  then we got some information.

11  Q.    And when we got that infor -- when you got that

12  information, you realized it wasn't anywhere near $850,000 for

13  the value of that building and real estate.

14  A.    That was according to the appraisal that Heritage Bank had

15  done.

16  Q.    Right.  Which Dick Dirks had; correct?

17  A.    I assume.

18  Q.    And so when -- and that was an appraisal done back in --

19  back in 2009 when he got the SBA loan.  So he knew in 2009 that

20  his property was valued at 540,000, not 850,000.

21  A.    I didn't know that.

22  Q.    If you would have asked for the appraisal from Dick, then

23  you would have known that; correct?

24  A.    Well, I took his word at 850.

25  Q.    And then the next paragraph said that he was to sign

1    promissory notes, and you say plural, so I presume you mean that

2    he was going to sign a couple.  Were you going to have him sign

3    one for the first 250 and one for the second 250?  Is that what

4    you meant by saying promissory notes?

5    A.    I meant the first 250.

6    Q.    Well, I'm asking was your intention for him to sign more

7    than one note?

8    A.    No.

9    Q.    Okay.  Just one note for 500,000?

10   A.    Yes.

11   Q.    And when you say 4 percent API, what does API mean?

12   A.    Annual -- annual percentage interest rate.

13   Q.    Okay.  And you say -- and this is as of -- the date of that

14   letter is January 15, 2013.  So this is a year -- a year and two

15   or three months after you did the deal with Dick Dirks, and here

16   you're saying promissory notes have yet to be formalized.  By

17   that do you mean they'd never been signed?

18   A.    Hadn't been formalized yet.  That's what it says.

19   Q.    Had you ever given him a promissory note prior to January

20   15, 2013, to sign?

21   A.    I don't recall.

22   Q.    You also say updated life insurance values.  Oh, and here

23   we're getting to the point I asked you about real estate

24   appraisal.  You're saying you wanted updated life insurance and

25   updated real estate appraisals.  And you say he hasn't give --

1  you haven't given me those, Dick, correct, at that point?

2  A.    You have to repeat that.

3  Q.    He hasn't given you updated real estate or life insurance

4  values as of January 15, 2013, like he promised.

5  A.    I don't recall.

6  Q.    Okay.  Let's look at the next paragraph of Exhibit 1027.

7  This says that basically the $500,000 was going to be for a

8  year, and arrangements were being negotiated with other

9  financing opportunities to get floor plans of approximately a

10 million dollars to build up cars.  Is there any mention in that

11 paragraph that the financing opportunities were Heritage?

12 A.    No.

13 Q.    Had he told you he was looking for other financing

14 opportunities?

15 A.    Yes.

16 Q.    And apparently that didn't materialize.

17 A.    Correct.

18 Q.    And then the very last paragraph on that page, last two,

19 just basically there's no cars.  Your two sons have had to find

20 other work, and Dirks is trying to sell the company.  Heritage

21 has informed you that your CD's in default, going to be cashed

22 out, funds have exhausted, interest was due.  And then on the

23 next page of the letter the very last paragraph says pay me.  Is

24 that what it says basically?

25 A.    Yes.

1  Q.   And you're saying, hey, I wanted to keep a valuable

2  business in business in Akron, and you need to pay me; correct?

3  Is that correct?

4  A.   Yes.

5  Q.   Did you ultimately -- did he ultimately ever pay you, write

6  you a check for $500,000 or any amount between zero to $500,000?

7  A.   No.

8  Q.   That being said, you did settle with Dick Dirks; is that

9  correct?

10  A.   Correct.

11  Q.   Let's look at Exhibit 121.

12        MR. REINSCHMIDT:  Just wait, Ms. Liston.

13  Q.   That's a loan document.  We're not going to go through

14  paragraph by paragraph or page by page.  But I just want to

15  point out maybe the very top is the date.  And it's entitled

16  Conditional Assignment and Release Agreement, and it's dated

17  September 23, 2013.  Do you see that?

18  A.   Right.

19  Q.   And do you recognize the name of the document?

20  A.   Conditional Assignment and Release Agreement.

21  Q.   And I want to go to page 3 of that document and start

22  with --

23        MR. REINSCHMIDT:  Ms. Liston, just start with where it

24  says, "The three life insurance policies held by Heritage."

25  Let's boldface that.

1   Q.   And on that it's talking about that there are 2 policies,

2   one for $300,000 with MetLife and one for $250,000 with New York

3   Life; is that correct?

4   A.   Yes.

5   Q.   And if I understand correctly without walking through this

6   document paragraph by paragraph, Mr. Dirks gave you those two

7   policies; correct?

8   A.   Gave me what?

9   Q.   He gave you those two policies.

10   A.   He didn't give them to me.

11   Q.   Well, all right.

12   A.   Heritage held them.

13   Q.   All right.  Let's walk through it.  Heritage held those

14   policies; correct?  Those were collateral for Heritage on their

15   SBA loan.

16   A.   Yes.

17   Q.   Okay.  And there was cash value in those policies; correct?

18   A.   Yes.

19   Q.   And did Mr. Dirks -- and I believe that the two

20   beneficiaries on those policies were Mr. Dirks' two daughters?

21   A.   Yes.

22   Q.   And Mr. Dirks -- go ahead.  Do you have something to say?

23   A.   They were either beneficiaries or they owned them.

24   Q.   Okay.  And I didn't mean that rudely when I said do you

25   have something to say.  I thought you wanted to finish your

1    answer.

2          So did Mr. Dirks negotiate with the bank to pay the

3    cash value for those policies with the understanding that he

4    wanted to retain those for the benefit of his daughters?

5    A.   I don't know.

6    Q.   You don't know what he told the bank?  I mean, if you don't

7    know, you don't know.

8    A.   I don't know.

9    Q.   All right.  Do you remember about how much the cash value

10   was?

11   A.   45,000.

12   Q.   And how did -- did Mr. Dirks ultimately pay the bank the

13   cash value for the policies?

14   A.   Did Mr. Dirks pay it?

15   Q.   Yes.

16   A.   No.

17   Q.   Who paid it?

18   A.   I did.

19   Q.   You did?

20   A.   Yes.

21   Q.   And so when you say you did, did you directly pay the bank,

22   or did you give the money to Mr. Dirks and then Mr. Dirks paid

23   the bank?

24   A.   I gave a check to as I recall Mary Caskey, his daughter,

25   and they were negotiating with the bank to get the policies

1    back.

2    Q.    So ultimately monies you provided allowed the Dirks family

3    to buy the policies back.

4    A.    Correct.

5    Q.    Once those policies were obtained, then was the owner and

6    beneficiary changed to you?

7    A.    Yes.

8    Q.    And there are two policies.  Is one of them what's called a

9    paid-up policy?

10   A.    (Witness nodded head.)

11   Q.    Is that -- you have to answer yes or no.

12   A.    Yes.

13   Q.    Which one of these two that we're looking at, the MetLife

14   or the New York Life, is the paid-up policy?

15   A.    The New York Life.

16   Q.    So -- and Mr. Dirks at this point is how old?

17   A.    Pardon me?

18   Q.    How old is Mr. Dirks?

19   A.    Eighty-eight, I believe, now.

20   Q.    Okay.  Right now you think he's 88?  He's about 10 years

21   older than you you think?

22   A.    Yes.

23   Q.    Okay.  And how old is -- the reason I ask how old his wife,

24   Helen Dirks, is is because of the first policy is a last-to-die

25   policy.  Do you see that, the MetLife policy?

1   A.   Yes.

2   Q.   What do you understand a last to die means?

3   A.   It means the insurance stays in effect until the last of

4   the two pass away.

5   Q.   So where it says insured under MetLife Richard E. Dirks and

6   Helen Dirks, until they both pass away, there will be no life

7   insurance to anyone; correct?

8   A.   Right.

9   Q.   And how old is she?

10  A.   I don't know.  She's a little bit younger than Dick.

11  Q.   In her 80s also?

12  A.   Yes.

13  Q.   And -- so on the New York Life -- to clarify, on the New

14  York Life, that is paid up so there's no premiums owed on that;

15  correct?

16  A.   I believe that's right.

17  Q.   And who is now listed as the owner and beneficiary of that

18  policy?

19  A.   My trust.

20  Q.   And then on the MetLife, is that paid up or not?

21  A.   No.

22  Q.   So there will be premiums owed on that?

23  A.   They begin this year.

24  Q.   Have you -- you bought those policies or you got those

25  policies for $45,000 in 2013?  I mean, when you did this deal

1  with Dick Dirks, is that when he was also able to buy them back

2  from the bank in 2013?

3  A.   I believe that's right.

4  Q.   So the jury's clear, for the last five years, you've not

5  had to pay any premiums to maintain the MetLife policy.

6  A.   Correct.

7  Q.   How much will the premiums be once you start to have to pay

8  premiums on the MetLife policy?

9  A.   About 5,000 a year.

10 Q.   Okay.

11        MR. REINSCHMIDT:  That's all I have, Your Honor.

12        THE COURT:  Thank you, Mr. Reinschmidt.

13        Why don't we give everybody a stretch break, and we'll

14 see if there's any redirect.

15        Please be seated.

16        Mr. Thompson, are you ready to proceed with your

17 redirect?

18        MR. THOMPSON:  I am, Your Honor.

19        THE COURT:  Okay.  Whenever you're ready.  Thank you.

20                      REDIRECT EXAMINATION

21 BY MR. THOMPSON:

22 Q.   Good morning, Mr. Lucken.

23 A.   Good morning, Stan.

24 Q.   Say, I would like to go back to some issues from yesterday.

25 And I believe there's some testimony about the date of the

1   meeting that just you and Mr. Dirks had.  Do you remember that?

2   A.   Yes.

3   Q.   And I think there was testimony about whether that was

4   November 11 or November 4.

5   A.   I believe it was November --

6   Q.   Just hold on.

7   A.   -- 4.

8   Q.   There was at least testimony on both of those.

9   A.   Yeah.  Okay.

10  Q.   Let's look at Exhibit 237.  And that's going to be your

11  Cabela's statement, Mr. Lucken?

12  A.   Correct.

13  Q.   And can you tell the jury what your Cabela's statement is?

14  A.   Well, it's my -- it's my monthly credit card bill with a

15  Visa card that I have with Cabela's, and that's what it is.

16  Q.   Let's go to the second page of Exhibit 237.  And if you

17  would want to look -- I'm going to circle this for your benefit.

18  See those -- the date of November 9?

19  A.   Yes.

20  Q.   Just as a point of reference, we're in 2011; is that

21  correct?

22  A.   Yes, it is.

23  Q.   And where were you on November 9, two thousand --

24  A.   I was on my way to Colorado, and that Bosselman Travel

25  Center in Wood River was where I gassed up.

1  Q.   And how about on November 10, 2011?  Where were you?

2  A.   Pine Bluffs, Wyoming, but I -- I have -- yeah.  Well,

3  that's what it says, but I'm sure it was on the 9th and they

4  didn't process the card until the day after.

5  Q.   Okay.  Let's go to --

6  A.   That would have been close to Cheyenne.

7  Q.   Let's go to the other side, the right side.  I'm going to

8  circle some dates up there.

9  A.   Okay.

10  Q.   And the top date, November 11, where were you at on

11  November 11?

12  A.   North Platte.

13  Q.   What state?

14  A.   Hampton Inn in North Platte.

15  Q.   What state is North Platte in?

16  A.   Nebraska.

17  Q.   And further down, two other entries, were you at a

18  La Quinta Inns and Suites, Loveland, Colorado, November 11?

19  A.   La Quinta Suites in Loveland.

20  Q.   And then on November 14 --

21  A.   I was in Golden, Colorado, staying at the Table Mountain

22  Inn.

23  Q.   November 15, where were you at?

24  A.   At the La Quinta in Loveland.

25  Q.   November 16 where were you at?

1  A.   On my way back to Iowa.   The last place I gassed up was at

2  the Coffee Cup Truck Stop at Highway 50 and 29.

3  Q.   November 17 has got a JR Tobacco of America.   Where was

4  that at?

5  A.   That's where I order my cigars.

6  Q.   Let's go to Exhibit 32.   Exhibit 32, and if you could look

7  at the --

8          MR. THOMPSON:   Blow up the top portion, please.

9  Q.   Now, we talked about this yesterday.   This money order's

10 dated November 17, 2011.   Do you see that?

11 A.   Yes, sir.

12 Q.   And just by way of summary, that was the date that you were

13 back in Iowa.

14 A.   Correct.

15 Q.   And you were --

16 A.   It was the first day back from the trip to Colorado.

17 Q.   And you went to Sioux City, and ultimately that money order

18 wasn't accepted and then a wire.   And you got the money, the

19 first 250,000, to Heritage on November 17; correct?

20 A.   Yes, it is.

21 Q.   Okay.   Now let's go back to Exhibit 237, second page,

22 please.   And I think the entries on the right-hand column, upper

23 portion for November 11, 2011, I think were in Nebraska and

24 Colorado; is that right?

25 A.   Yes, it is.

1   Q.   Now, if you testified yesterday you thought the meeting

2   with Mr. Crim and -- I'm sorry, the meeting with Mr. Dirks and

3   yourself, just the two of you, that first meeting where he hands

4   you that sheet of paper with some of his assets on it and then

5   you made some notes on it, if you testified the date of that

6   meeting was on November 11, based on this Cabela's statement,

7   would that be possible?

8   A.   I made a mistake.  It was during the late part of the week

9   before I left for Colorado that I met.

10  Q.   Let's go to Exhibit 152.  And let's highlight November

11  2011.  And you see that, Mr. Lucken?

12  A.   That's very helpful.  Thank you.

13  Q.   I'll let you get a little oriented.  The wire funds at

14  Exhibit 32 that we just talked about, November 17, what day was

15  that?  What day of the week was that according to the calendar?

16  A.   Thursday.

17  Q.   That was a Thursday.  And November 11 when you were either

18  in both Nebraska and Colorado, what day of the week was the 11th

19  of November, two thousand --

20  A.   On a Friday.

21  Q.   That was a Friday.  Now let's go back to Exhibit 237,

22  second page, please.  Let's go to the lower right-hand -- lower

23  left-hand column.  And what day did you start your trip to

24  Colorado, Mr. Lucken?

25  A.   I believe it was on the 9th of November.

1   Q.   So let's keep that date in mind.  Let's go back to Exhibit

2   152.  And what day of the week was November 9, two thousand --

3   A.   On a Wednesday.

4   Q.   That was a Wednesday.

5   A.   Yes, sir.

6   Q.   Now, with those points of reference, let me ask this.  I

7   think whenever this meeting with Mr. Dirks was you had asked for

8   some -- to see some life insurance policy information; is that

9   correct?

10  A.   Yes.

11  Q.   And was -- I think your testimony was whatever date that

12  was, that was over the weekend; is that right?

13  A.   Yes.

14  Q.   And after that weekend was when this Dirks-Crim meeting

15  with you took place; correct?

16  A.   Well, I believe that I met with Dick Dirks on Friday, the

17  4th.

18  Q.   Okay.

19  A.   He dug up the insurance policies.  I saw him over the

20  weekend, and I told him that I wanted to meet with Mr. Crim.

21  And I believe that took place on Monday or Tuesday, the 7th or

22  8th of November.

23  Q.   And then on the 9th you left on the Colorado trip.

24  A.   Yes.

25  Q.   Let's go to Exhibit 239 in the top portion, please.

Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 38 of 227

1  Yesterday and I think today you've had testimony about the two

2  conditions that had to be met to get the floor plan financing;

3  correct?

4  A.   Yes.

5  Q.   And I want to focus on these questions on the second of

6  those two conditions, the backup collateral.

7  A.   Okay.

8  Q.   Now, there was testimony I think yesterday in an exhibit,

9  portion of this that showed this.  Your CD was purchased, I

10  believe, November 23, 2011.  Does that sound right?  I'm just

11  talking about your CD, Mr. Lucken, when you bought the CD.

12  A.   What, Stan?

13  Q.   My question is -- let's go to Exhibit 225 just to pull that

14  up, 225.

15        MR. THOMPSON:  And if you could expand the top part.

16  Q.   By way of summary I believe your testimony yesterday was

17  that this portion of Exhibit 225 represents the 250,000 in funds

18  from Peoples Bank that was used -- that was sent to Heritage and

19  used to purchase the CD.

20  A.   Yes.

21  Q.   And the date that those funds were sent to buy the CD, if

22  you'd look at the document, what date did that happen on?

23  A.   November 23 of '11.

24  Q.   Now, when you buy a CD by itself without assigning it or

25  pledging it, basically that money just sits at the bank;

1    correct?

2    A.    Correct.

3    Q.    And it draws interest.

4    A.    Yes, it does.

5    Q.    Now, for the condition that that CD be used as backup

6    collateral, as you testified, did you expect something else

7    would have to take place?

8    A.    No.

9    Q.    Okay.  Let's look at Exhibit 48.  I believe this was

10   referred to this morning.

11          MR. THOMPSON:  And if you would highlight, please, in

12   the left-hand column date, then the assignment language.

13   A.    Yeah, that was January 19 of 2012.

14   Q.    And just as a point of reference, roughly 60 days from

15   November 23, 2011, when you bought the CD until this document,

16   Exhibit 48, was presented to you; is that correct?

17   A.    Yes.

18   Q.    And what did you understand the assignment of the deposit

19   or share account for the CD of 250,000 was doing?  Why was that

20   done?

21   A.    Well, I didn't understand that it was converting me to a

22   debtor, and that's what this is.

23   Q.    Now, if the second condition was -- it wasn't just that you

24   bought a $250,000 CD, was it?

25   A.    No.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Certified Realtime Transcription
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 40 of 227

1  Q.   What else was part of that second condition?

2  A.   There were two conditions, Stan.  First one was to provide

3  the money to pay off Ford Credit.

4  Q.   Okay.

5  A.   And give some operating capital to Dick Dirks.  And the

6  second condition that -- in my book second condition was to go

7  ahead and put a CD, a deposit -- a CD -- $250,000 for a CD as

8  backup collateral to a floor plan loan.

9  Q.   And I want to unpackage that statement a little bit more.

10  There had to be a $250,000 CD; right?

11  A.   Correct.

12  Q.   But not just that.  That $250,000 CD had to become backup

13  collateral; right?

14  A.   Yes.

15  Q.   And in Exhibit 48, was this assignment of that CD making it

16  backup collateral?

17  A.   Yeah, that's right.

18  Q.   On Exhibit 48, does it say anywhere that the bank is not

19  going to provide floor plan financing to Mr. Dirks?

20  A.   I don't believe so.  I don't -- no.

21  Q.   Let's go to Exhibit 239 again, please, top portion.  I

22  think this has been referred to, Mr. Lucken, as the line of

23  credit?

24  A.   Yes.

25  Q.   And I think Mr. Reinschmidt went through some of the points

1    there.  Did this line of credit anywhere say Heritage Bank is

2    not going to provide any floor plan financing?

3    A.   Absolutely not.

4    Q.   If the two exhibits we just looked at, 48 and 239, didn't

5    say that, when Mr. Crim called you on January 19, 2012, and

6    asked you to come in that day and you did --

7    A.   Yes, I did.

8    Q.   -- and you said he talked to you I think a little bit; is

9    that right?

10    A.   What's that?

11    Q.   I think you testified this morning that he talked to you a

12    little bit.

13    A.   Uh-huh, yes.

14    Q.   Did he tell you, "Mr. Lucken, I want you to sign these two

15    documents, and just to be clear, you understand the bank isn't

16    going to provide floor plan financing"?

17    A.   No, he didn't tell me that.

18    Q.   Was it -- was it your belief when you met with him on

19    January 19 of 2012 that the bank was going to provide floor plan

20    financing?

21    A.   Yes.

22    Q.   And that belief you had on January 19, 2012, was the same

23    belief you had from back in November of the 8th in --

24    A.   Yes, it was.

25    Q.   And when you left that meeting November 8, 2012 (sic),

1  Mr. Crim had told you the bank was going to provide floor plan

2  financing.

3          MR. REINSCHMIDT:  Objection, Your Honor.  Leading.

4          THE COURT:  Sustained.  Please rephrase.

5  BY MR. THOMPSON:

6  Q.   What was your understanding from what Mr. Crim told you --

7  let me just orient you.  I want to focus back on this meeting

8  November 8, 2011.

9  A.   Right.

10 Q.   And that's the one with Mr. Dirks, Mr. Crim, and yourself.

11 A.   Yes.

12 Q.   And this is the meeting where Mr. Crim -- well, at that

13 meeting did Mr. Crim discuss the two conditions that needed to

14 be met to get --

15 A.   Yes, he said it was going to require two events, and we've

16 been over this, but it was the 250 for paying off Ford Credit

17 and a $250,000 CD for backup collateral for a floor plan loan.

18 And that's what Mr. Crim promised.

19 Q.   And when you left that meeting on November 8, that's why

20 you provided the funds that you did.

21 A.   Yes, I did.

22 Q.   Now, on Exhibit 239 that's up on the screen that we've

23 talked about, I think you've indicated -- there's no indication

24 that Heritage Bank is not going to provide floor plan financing.

25 Is there -- is there any indication in Exhibit 239 that you were

1  going to get any lien rights to vehicles purchased by Dirks

2  Motors?

3  A.    No.

4  Q.    Let's go to Exhibit 48.  Was there anything in Exhibit 48

5  that said you were going to get lien rights against vehicles

6  purchased by Dirks Motors?

7  A.    No.

8  Q.    Let's go to Exhibit 50, second page, please.  Is there

9  anything in Exhibit 50 that says for this secured line of credit

10 with Heritage Bank for the purpose of providing funding for the

11 purchase of inventory for Dirks Motor Company of Akron, Iowa, is

12 there anything in there that indicated you were going to get

13 lien rights --

14 A.    No.

15 Q.    -- for vehicles?

16 A.    No.

17 Q.    Did the bank ever file anything on your behalf to get lien

18 rights for motor vehicles purchased by Dirks Motors through

19 these three documents we're talking about?

20 A.    No.

21 Q.    Is there anything in Exhibit 50 that says the bank is not

22 going to provide floor plan financing?

23 A.    No.

24 Q.    Is there anything in this letter that says this line of

25 credit is going to be the only source for Dirks Motors to buy

1  new vehicles?

2  A.    No.

3  Q.    Mr. Reinschmidt asked you I think yesterday and today about

4  due diligence.  Do you remember that?

5  A.    Yes.

6  Q.    And I want to go back to this meeting with Mr. Dirks,

7  Mr. Crim, and yourself when the two conditions were discussed

8  along with floor plan financing.  Was it -- did you believe

9  based upon your experience that if, if, the bank was going to

10  give floor plan financing that the bank would have done due

11  diligence?

12  A.    Oh, sure, absolutely.

13  Q.    And based upon your belief that the bank was going to do

14  due diligence for floor plan financing, what did that lead you

15  to believe?

16  A.    Well, I believed if the bank was going to provide that for

17  Dirks Motor Company that they would have vetted the deal, they

18  would have decided to go ahead and make that loan.  And I

19  trusted the bank to have done those due diligent issues.

20  Q.    Let's go to Exhibit 1027.  That was one that

21  Mr. Reinschmidt talked to you about this morning.  And just for

22  a point of reference, it's dated January 15, 2013.  Do you see

23  this?

24  A.    Yes.

25  Q.    And I think we'd talked about the call from Jen Whipple.

1  That was a couple of days before this just to give you a point

2  of reference.

3  A.   Okay.

4  Q.   At this point in time did you know that Heritage Bank did

5  not provide floor plan financing to Dirks Motors?

6  A.   Yes.

7  Q.   And you believed after the meeting on November 8 with

8  Mr. Dirks and Mr. Crim and then the money you put in, the

9  250,000 went to Ford and Dirks and the other 250,000 for the CD,

10 that after you'd done that Heritage was going to provide floor

11 plan financing.

12 A.   I absolutely believed it.

13       MR. REINSCHMIDT:  Your Honor, I was trying to make an

14 objection of asked and answered and leading.

15       THE COURT:  Overruled.

16 BY MR. THOMPSON:

17 Q.   And based upon that belief that Heritage Bank was going to

18 provide floor plan financing, through this lawsuit did you find

19 out if Heritage ever put one penny of its money into Dirks

20 Motors after you provided the CD and the money to pay off Ford

21 and the money that went to Dirks?

22 A.   The evidence shows that they did not.

23 Q.   And would it be fair to say that if Heritage did not put in

24 one penny after you put in that money that Heritage did not

25 provide floor plan financing?

Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 46 of 227

1   A.   That's correct.

2   Q.   Let's go to the second page of this exhibit.  And is it

3   fair to say at this time you're just trying to figure out what's

4   going on; is that correct?

5   A.   Yes.

6   Q.   I think you said Ms. Whipple thought you didn't understand

7   the deal; is that correct?

8   A.   Yes, she did.

9   Q.   Was she in the meeting with you and Mr. Crim?

10  A.   Pardon me?

11  Q.   Was she in the meeting with you and Mr. Crim?

12  A.   No.

13  Q.   I want to go to one part that Mr. Reinschmidt covered which

14  was on that recitation.  And it's that last sentence.

15       MR. THOMPSON:  If you could highlight that, please.

16  Q.   In the bottom part, the last portion of this has those two

17  conditions we've talked about; correct?

18  A.   Yes, it does.

19  Q.   And the word I want to focus on is the word "support."  Do

20  you see that?

21  A.   Yes.

22  Q.   You didn't say a 250,000 CD placed at Heritage to be a

23  floor plan financing, did you?

24  A.   No, I did not.

25  Q.   Why did you use the word "support" to describe what your CD

Contact Shelly Semmler at (712) 233-3846 or shelly_semmler@iand.uscourts.gov
Computer-aided transcription
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 47 of 227

1  was in relation to floor plan?

2  A.   Well, it was a requirement of Crim's to place that CD

3  there, so I used the word "support" hoping that all of that

4  would have happened.

5  Q.   Let's go back to the first page, please.  And once again, I

6  think you said this was the first time you're getting

7  Mr. Peterson involved?

8  A.   Yes, it is.

9  Q.   Let's go back to the second page.  Let's go to the

10  paragraph just below the one we just covered, I was to receive.

11  And I'm not going to spend a lot of time on this.  But you

12  talked about in that first sentence about becoming a second

13  secured party.  Do you see that?

14  A.   Yes.

15  Q.   Why did you say a second secured party?

16  A.   Well, because Mr. Dirks told me that Heritage had -- he had

17  pledged the policies to Heritage so they had a first lien

18  position on them.  And when I met with Mr. Crim, I brought up

19  the issue that I wanted to establish some second position on the

20  insurance for collateral, and he responded that he would try to

21  do that.

22  Q.   And is that why you wrote that sentence with second secured

23  party there?

24  A.   Yes.

25  Q.   All right.  Let's talk about the New York Life policy and

1  the MetLife policy.  I think the New York policy you said -- was

2  it paid up; is that correct?

3  A.    Yes.

4  Q.    Does -- that policy, once it's paid up, does it keep that

5  same value?

6  A.    No, because he had taken out significant loans against it,

7  against the cash value.  The death benefit will be reduced by

8  the amount of debt that he had in terms of the loans.

9  Q.    And do you have any memory of what that amount of debt is

10  against that policy?

11  A.    My recollection is that it's around 174,000.

12  Q.    And as time goes on, does that value stay the same, go up,

13  or go down?

14  A.    It goes up because there's interest on that money that was

15  borrowed, and that is -- that is added to the -- it is added

16  every year to reduce the actual death benefit by whatever that

17  interest rate is on that amount that is increasing each year.

18  Q.    Now, on the MetLife policy, I think you mentioned there are

19  premiums coming due this year.  What did you mean by that?

20  A.    Basically the cash value of that policy is going to be

21  exhausted.  It's been -- the same thing.  It's been being used

22  for paying -- paying premiums, and so this year the requirement

23  is that if it's going to stay in force that premiums have to be

24  paid.

25  Q.    And what do you recall is the amount of premiums that are

1  going to have to start being paid?

2  A.  They're approximately $4,000 -- I mean $5,000 a year.

3  Q.  And from whose pocket would that money later this year come

4  from?

5  A.  Mine.

6  Q.  So even though the face amount may show a number, you're

7  going to start paying out every year after that.

8  A.  That's correct.

9  Q.  How much did you pay to get those two policies?

10  A.  Roughly 45,000.

11  Q.  And, of course, the Dirkses are still alive.

12  A.  Yes, they are.

13  Q.  And you haven't received any money yet from those policies.

14  A.  That's correct.

15  Q.  And for the MetLife you may have to actually start paying

16  out more later this year.

17  A.  Yes.

18          MR. THOMPSON:  Nothing further.

19          THE COURT:  Any recross?

20          MR. REINSCHMIDT:  Very briefly, Your Honor.

21          THE COURT:  We'll see about that.

22                      RECROSS-EXAMINATION

23  BY MR. REINSCHMIDT:

24  Q.  Mr. Lucken, you mentioned about -- that you thought that

25  Heritage would vet Dick Dirks when you had that meeting, in

Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 50 of 227

1  other words, that I presume by vet you meant that they would

2  check him out for your benefit?  Is that what you meant more or

3  less?

4  A.    For the bank's benefit.

5  Q.    Well, how about for your benefit?  I mean, you're --

6  A.    Well, if I relied on the bank to have done that, yes.

7  Q.    You understand that there's a right to privacy between a

8  bank and its customers?

9  A.    Yes.

10 Q.    So in other words, if I'm your bank, I can't tell a third

11 party about anything about your financial situation.

12 A.    That's my understanding.

13        MR. REINSCHMIDT:  No further questions, Your Honor.

14        THE COURT:  You were right.  It was brief.  Thank you.

15        Any further questions?

16        MR. THOMPSON:  Even more brief:  None.

17        THE COURT:  Okay.  Thank you.  Now we'll see if any of

18 the jurors have any questions.  Doesn't look like it.  Okay.  No

19 questions from the jury.  You may step down.

20        THE WITNESS:  Thank you.

21        THE COURT:  And why don't we take our mid-morning

22 recess.  It is 5 minutes to 10.  We'll be in recess until 10:20.

23 We'll be in recess until 10:20.  Please remember keep an open

24 mind till you've heard all of the evidence.  Don't discuss it

25 among yourselves or let anyone discuss it with you.  Thank you.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Computerized Certified Transcription*
Case 5:16-cv-04005-MWB-KEM Document 137 Filed 05/07/18 Page 51 of 227

```
 1                    (The jury exited the courtroom.)

 2            THE COURT:  Please be seated.

 3            Anything else we need to take up at this time?

 4            MR. THOMPSON:  Can counsel approach the bench briefly,

 5    not as a bench conference?

 6            THE COURT:  Is it on the record or off the record?

 7            MR. THOMPSON:  Off the record.

 8            THE COURT:  Sure.

 9            (At sidebar off the record.)

10            (Recess at 9:58 a.m.)

11            THE COURT:  Ready to have the jury brought in?

12    Apparently one of the jurors had a question but didn't have time

13    to write it out, so can we -- we're done with Mr. Lucken; right?

14            MR. THOMPSON:  Yes.

15            THE COURT:  Yeah.  Mr. Lucken, why don't you go back

16    in the witness box, and we're going to have a question from the

17    jury.

18            (The jury entered the courtroom.)

19            THE COURT:  Please be seated.  I've been told by our

20    jury clerk, Suzanne Carlson, that one of the jurors had a

21    question but you didn't have time to write it out.  I didn't see

22    anybody, so I apologize, but why don't you take the time if you

23    haven't done it so far and write out your question, and we'll

24    see if it will be asked of Mr. Lucken.

25            JUROR BYL:  Can I ask -- it might come up later.
```

Case 5:16-cv-04005-MWB-KEM  Document 187  Filed 05/07/18  Page 52 of 227

1          THE COURT:  Okay.  Thank you.

2          You can step down.  Apparently there's no question at

3  this time.

4          Mr. Thompson, are you ready to call your next witness?

5          MR. THOMPSON:  We are.  We will call Sterling Crim,

6  Your Honor.

7          THE COURT:  Okay.  Thank you.

8          MR. THOMPSON:  We also would like to read part of the

9  pretrial stipulation.  Should I wait until he's --

10         THE COURT:  Yeah, why don't we wait till he's sworn in

11 and seated, and then you may.

12         Good morning.  If you'd just come up in the middle and

13 raise your right hand, please.

14             STERLING CRIM, PLAINTIFFS' WITNESS, SWORN

15         THE COURT:  Thank you.  Please be seated in the

16 witness box there.  Make yourself comfortable.  You can adjust

17 the chair and the two microphones so you can speak directly into

18 the microphones.  And would you please tell us your first and

19 last name and spell your last name for us.

20         THE WITNESS:  Sterling Crim, C-r-i-m.

21         THE COURT:  Thank you.

22         Mr. Thompson?

23         MR. THOMPSON:  Yes, Your Honor.  The parties have

24 stipulated to the following fact:  Sterling Crim was an employee

25 of Heritage Bank from January 1, 2008, until October 4, 2012.

1    He acted within the scope of his employment during that time.

2                          DIRECT EXAMINATION

3    BY MR. THOMPSON:

4    Q.   Good morning, Mr. Crim.  I'm Stan Thompson.  I'm the

5    attorney for Mr. Lucken.  Let me ask you when you were at

6    Heritage -- we just talked about that time period -- I believe

7    you were a vice president and a commercial lender?

8    A.   That is correct.

9    Q.   And did you also have the title as branch manager?

10   A.   That is correct.

11   Q.   And was part of your responsibilities to generate new

12   business for Heritage Bank in Sioux City?

13   A.   Correct.

14   Q.   And is it fair to say while you were there -- most of the

15   time that you were at Heritage Bank in Sioux City you were the

16   top -- top person?

17   A.   That is not correct.

18   Q.   Okay.  Within that office.

19   A.   That is correct.

20   Q.   And I believe the chain of command from you in that office

21   up to the next level was then a Mr. Wilkinson?

22   A.   One of the others.

23   Q.   And what was Mr. Wilkinson's position and title?

24   A.   He was president.

25   Q.   And then Mr. Mathiasen, where did he fit in in the chain of

1    command?

2    A.    He's a senior commercial lender.

3    Q.    Would Mr. Wilkinson be his boss or not?

4    A.    No.  There was -- there was a merger in there.

5    Q.    Okay.

6    A.    And so that convolutes that statement.

7    Q.    Did you ever -- you would report directly to Mr. Wilkinson?

8    A.    Yes, sir.

9    Q.    Would you ever report directly to Mr. Mathiasen?

10    A.    Yes.

11    Q.    I want to focus my questions on a time period in the fall

12    of 2011.  And just by way of reference, there had been the great

13    recession before that; is that correct?

14    A.    Yes.

15    Q.    And most people would say 2008, 2009.  Would you generally

16    agree with that time period?

17    A.    In regards to?

18    Q.    The great recession time period.

19    A.    Yeah, yes, nationally, not locally.

20    Q.    And just generally, that was a tough time for auto dealers

21    all across the country.

22    A.    That's what the newspaper said.

23    Q.    One of the bank's customers was Dirks Motor Company; is

24    that correct?

25    A.    That is correct.

1  Q.   And that was an auto dealer in Akron, Iowa.

2  A.   Yes, sir.

3  Q.   And by the fall of 2011, is it fair to say that Dirks Motor

4  Company was in serious financial difficulty?

5  A.   They were having financial difficulty.

6  Q.   We're going to put up on the screen here and I think you

7  look at the monitor Exhibit 145.  That will come up in just a

8  moment for you.  And I'm going to have that expanded, Mr. Crim.

9  Just for your reference, I believe this has been referred to

10  maybe as a CAD report.

11  A.   Yes.

12  Q.   Okay.  Are you generally familiar with CAD reports from

13  Heritage Bank?

14  A.   Yes.

15  Q.   And what was the purpose of a CAD report?

16  A.   To kind of outline what the status of a particular credit

17  was.

18  Q.   Okay.  So there would be CAD reports on various borrowers

19  of the bank.

20  A.   Yes.

21  Q.   Now, this CAD report I believe is dated September 28, 2011,

22  upper left-hand corner?

23  A.   Yes.

24  Q.   Okay.  And below that where it says borrower for Dick --

25  I'm sorry, Dirks Motors?

1  A.    Yes.

2  Q.    See that?  And then it lists ownership.  It's got Richard

3  Dirks Senior, Richard Dirks Junior, and David Dirks; correct?

4  A.    Correct.

5  Q.    And to the best of your knowledge, were those the ownership

6  percentages at that time?

7  A.    Yes.

8  Q.    And then what year was Dirks Motor Company established

9  according to the CAD report?

10  A.    1937.

11  Q.    So it had been a long-time dealer in the Akron community?

12  A.    Yes.

13  Q.    What franchises did Dirks Motor Company have at the time of

14  the CAD report?

15  A.    To the best of my recollection it was Ford and General

16  Motors.

17  Q.    Ford and General Motors?

18  A.    (Witness nodded head.)

19  Q.    And from your perspective as a lender at Heritage Bank, did

20  you view the Ford franchise to be valuable in terms of the

21  assets of Dirks Motor Company?

22  A.    Yes.

23  Q.    And then same question, Mr. Crim, regarding General Motors.

24  As a lender at Heritage Bank, did you consider the General

25  Motors franchise to be a valuable asset of --

1   A.   Yes.

2   Q.   -- Dirks Motors?  The next box to the right after the year

3   established says customer since December 2, 2009; is that

4   correct?

5   A.   Yes.

6   Q.   And we'll get into this just a little bit later.  Was that

7   in reference to an SBA loan?

8   A.   He had some short interim borrowings prior to that.

9   Q.   Is it fair to say that in 2009 there was some work on an

10  SBA?

11  A.   Yes.

12  Q.   Let's go down to the next part called credit facilities.

13  Do you see that?

14  A.   Yes.

15       MR. THOMPSON:  And then under product if you could

16  highlight that, Rebecca, in A1.  Thank you.

17  Q.   Does that indicate for product that the -- is that the

18  asset value that's listed, that number?

19  A.   Yes.  That would be the loan amount.

20  Q.   The loan amount, okay.  And what is -- what was the loan

21  amount at that time?

22  A.   $1,675,109.

23  Q.   And if we move over to the right under the previous column,

24  what is the figure?

25  A.   It had originally been 1,775,000.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Computerized Verbatim Transcription*
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 58 of 227

1  Q.   And the figure -- there's roughly $100,000 difference

2  between the previous and the one under the product line?

3  A.   Yes, roughly 90,000.

4  Q.   And what -- what would that difference be attributed to

5  generally?

6  A.   The -- since it's been about a year, is that right, it

7  would be from making regular monthly payments.

8  Q.   And then in the box below in the product column we see SBA

9  guarantee?

10  A.   Yes.

11  Q.   And what is that figure?

12  A.   1,508,750.

13  Q.   And do you recall how that figure was computed or

14  determined?

15  A.   It's 85 percent of the loan amount.

16  Q.   Explain that just a little bit to the jury about that part

17  of the SBA guarantee.

18  A.   An SBA guarantee is a guarantee from the federal government

19  to guarantee our loan amount up to --

20         JUROR EPPINGA:  Can you speak up a little bit?

21  A.   An SBA guarantee is a guarantee from the Small Business

22  Administration to guarantee the -- a portion of the balance of

23  the loan meaning that if the loan was to go into default, the

24  Small Business Administration would pay the bank that amount.

25  Q.   Now, if the loan amount was at -- I'm going to call it

1  1.675 million, then you multiply that amount by 85 percent.

2  That should equal the SBA guarantee figure that you have?

3  A.   I believe so, yes.

4  Q.   I don't have a calculator, but that would generally be at

5  least how it would work.

6  A.   Yes.

7  Q.   Now, we talked a little bit about the column called

8  "previous."  There's a column next to that called "proposed."

9  In relation to this CAD report for Dirks Motor, what did -- what

10  did proposed mean?

11  A.   I don't recall what the difference is between those two

12  categories.

13  Q.   Okay.

14  A.   Yes, I do.  I'm sorry.

15  Q.   Okay.

16  A.   The previous amount would have been the original amount

17  maybe at the last time of the review.  And then the proposed is

18  the current balance.  So you originally had a loan for

19  1,775,000, and then under the proposed through amortization it

20  had been reduced to 1,675,000.  And then, of course, the

21  guarantee portion under that of 1,508,000 has also changed

22  because the loan dollar has declined.

23  Q.   And under previous in the bottom -- and I'm going to just

24  circle this one.  That figure, is that the difference between

25  the original loan amount at 1.775 million less the SBA guarantee

1   of a little over 1.5 million?

2   A.   I'm not following your question.

3   Q.   I'm going to put a one year.  And that's next to the 1.775

4   million.  Do you see that?

5   A.   You're asking me what the 266,250 represents?

6   Q.   Yes.  Do you know what that represents?

7   A.   It represents the unguaranteed portion of the SBA loan.

8   Q.   Thank you.

9        MR. REINSCHMIDT:  Your Honor, I'm having a little hard

10  time hearing too.

11       THE COURT:  Okay.  Can you pull that second

12  microphone, see it over there and pull it into the center, pull

13  them both into the center.  Right.  Adjust your chair

14  accordingly, and get a little bit closer, and try and speak a

15  little louder.

16       THE WITNESS:  I can't see the screen then very well.

17  Okay.

18  BY MR. THOMPSON:

19  Q.   And just so I understand what you had just said, so if we

20  look -- and we're in the previous column.  You take the 1.775

21  million, the original loan amount, minus the 1.5 million roughly

22  for the SBA guarantee, and when you subtract the 1.5 million

23  number, the difference is the 266,250 figure.

24  A.   Yes.

25  Q.   And that part's just the math; correct?

1    A.    Yes.

2    Q.    And what that 266,250 represents is what the bank is at

3    risk if the SBA guarantee pays out and there's a default.

4    A.    That's not entirely accurate.

5    Q.    Okay.  What part was not entirely accurate?

6    A.    This would be assuming that we would -- the bank would have

7    to charge off the full balance of 1,675,000, but in relation

8    there would be assets that would normally be liquidated that

9    would reduce that amount.

10   Q.    What was the purpose in your CAD report for having that sum

11   of 266,250?

12   A.    I don't understand the question.

13   Q.    Well, we have a column for previous.  We went through the

14   math.  I'm assuming there's a purpose, a reason, to put those

15   figures in and come up with that 266,250.  Do you know why

16   that --

17   A.    We're trying to calculate if we have adequate reserves on

18   the loan.

19   Q.    Now let's go over to the next column on proposed.  And I

20   think you'd indicated that, you know, the loan amount had gone

21   down; is that correct?

22   A.    Yes.

23   Q.    Then when you applied the 85 percent in the proposed

24   column, you get roughly the 1.4 million; is that right?

25   A.    Yes.

1  Q.   And then we do the math exercise, and we get to the 259,641

2  and some cents; is that correct?

3  A.   Correct.

4  Q.   And would that have been the exposure reserved if I'm

5  understanding you correctly at the time of this CAD report,

6  September 28, 2011?

7  A.   That's our calculated gross exposure.

8  Q.   But it would have been as of this September 28, 2011?

9  A.   Yes.

10  Q.   In the very bottom left corner of this part that's --

11         MR. THOMPSON:  Yes, if you could highlight that.

12  Q.   -- it says, "CAD purpose and lender rationale."  Then it

13  says, "1, approve downgrade from 150 pass rating to 7

14  substandard rating."  Do you see that?

15  A.   Yes.

16  Q.   What -- what does that mean?

17  A.   We're making a note internally that this credit may be in

18  trouble and that that would increase our reserve amount for that

19  loan.

20  Q.   And if we go back to the larger document and then expand

21  the bottom portion where the names are, for the approvals one of

22  those persons was yourself; is that correct?

23  A.   Correct.

24  Q.   And then Mr. Dave Hegarty?

25  A.   Yes.

1   Q.   And then Mr. Bob Mathiasen.

2   A.   Yes.

3   Q.   Let's go to the second page of this CAD report.  And in the

4   bottom portion there is a part called "collateral analysis."

5   We'll pull that up for you.  Let me know after you've looked at

6   those figures.

7   A.   All right.

8   Q.   Have you had a chance to generally refresh your memory on

9   that?

10  A.   Yes.

11  Q.   And there are basically three CDs held at Heritage Bank;

12  correct?

13  A.   Correct.

14  Q.   Two of them have the same amount, 219,742; correct?

15  A.   Yes.

16  Q.   And then there's one for 60,000; correct?

17  A.   Yes.

18  Q.   And were those CDs being held as collateral by Heritage

19  Bank in case of a default by Dirks Motor Company?

20  A.   Yes.

21  Q.   Let's go to the next page.

22       MR. THOMPSON:  Go to the next page, please.  There we

23  go.  If you'd expand that.

24  Q.   And orient yourself to this, and let me know when you're

25  ready.

1  A.   All right.

2  Q.   On this one we see three cash values for life.  I'm

3  assuming those are life insurance policies?

4  A.   Yes.

5  Q.   And there are varying amounts for those policies; is that

6  correct?

7  A.   The face -- the cash value of those policies.

8  Q.   And what's the difference between -- is there a difference

9  between the term face value for a policy and the cash value for

10  a policy?

11  A.   Face value's normally the death benefit as the cash value

12  would have cash if you surrendered it.

13  Q.   And just generally at least on the CAD report, if those

14  three policies would happen to have been cashed on that day,

15  that's at least what the bank believed they would be worth.

16  A.   That's correct.

17  Q.   And then the last entry under collateral is a first lien

18  CRE.  I assume that's commercial real estate?

19  A.   Yes.

20  Q.   And would that generally be the Dirks Motor building?

21  A.   Correct.

22  Q.   And grounds?  And that was valued at 540,000 at that time.

23  A.   Yes.

24  Q.   And then we have the total collateral amount if we could

25  highlight that in the middle of the page.  So we went through

1   that collateral.  So I assume mathematically if we add up the

2   right-hand column of those CDs and the life policies and the

3   real estate we get to 1,081,562; that is correct?

4   A.   Yes.

5   Q.   And then we subtract that loan amount that we've talked

6   about, that 1.675 million approximately number; correct?

7   A.   Correct.

8   Q.   And then there's a column called "excess collateral"; is

9   that correct?

10  A.   That's correct.

11  Q.   Now, from the lender's perspective, the reason why it says

12  excess is you certainly want to have, all things being equal,

13  more collateral than the loan amount.

14  A.   Generally.

15  Q.   And here when we do the math between the total collateral

16  value at a little over a million and the loan amount at over 1.6

17  million, there is a deficit.

18  A.   That's correct.

19  Q.   And the deficit is $593,547.

20  A.   Yes.

21  Q.   And is it fair to say that what this represents would be

22  that if all the values listed are accurate as of that time and

23  if there was a default and those assets were liquidated, that at

24  least would be the expected value that the bank would receive.

25  A.   Yes.

1    Q.   From those assets.

2    A.   That's correct.

3    Q.   And then you'd offset the loan amount, and there would be

4    almost a $600,000 deficit on the collateral.

5    A.   That's correct.

6    Q.   Let's go to Exhibit 146, please.

7         MR. THOMPSON:  And if you'd highlight the upper

8    portion.  Thank you.

9    Q.   Now, this is called a loan charge-off form.  Do you see

10   that?

11   A.   Yes.

12   Q.   And at Heritage Bank what was a loan charge-off form used

13   for?

14   A.   As an authorization to decrease the loan balance.

15   Q.   And what would the purpose of that accomplish?

16   A.   If we felt that there was -- the loan was a default.

17   Q.   And this loan charge-off form I believe is the same date as

18   the CAD form, September 28, 2011; is that true?

19   A.   That's correct.

20   Q.   And it looks like at least this form was prepared by two

21   other persons at the bank, Jennifer Whipple and Dave Hegarty?

22   A.   Yes.

23   Q.   And on the right-hand column where it says, "Risk rating,"

24   do you see that?

25   A.   Yes.

1   Q.   And it's 200/7.  What does that mean?

2   A.   200 represents the classification of the loan.  In the

3   previous document it indicated it was a 150, so it was

4   downgraded to 200.  I don't recall what the 7 stands for.

5   Q.   In terms of risk ratings for the bank, is a higher number

6   like 200 better for the bank being less at risk?

7   A.   No.

8   Q.   Just the opposite.

9   A.   Correct.

10   Q.   So the bank wants a low risk rating, and they would prefer

11   between 150 and 200 to have 150.

12   A.   Yeah, every bank has a different risk rating.

13   Q.   Sure.

14   A.   But that's generally . . .

15   Q.   And is the risk rating being changed for the Dirks loan at

16   this time?

17   A.   Yes, it is.

18   Q.   Is it fair to say that the loan compared to what it was

19   previously has become more risky to the bank?

20   A.   We -- as the bank we are stating that we feel that the loan

21   has a greater -- that it may default.

22   Q.   Let's go to the portion in the middle called collateral

23   analysis.  And I just want to go under collateral analysis in

24   the last line under that where it says loan is also an 85

25   percent SBA GTY.  Do you see that?

1    A.    Yes.

2    Q.    What does that mean?

3    A.    It means there's an 85 percent SBA guarantee on any amount

4    after the liquidation.

5    Q.    We talked about how that mathematically played out on the

6    earlier --

7    A.    Yes.

8    Q.    -- document?

9          MR. THOMPSON:  Let's go pull up at the bottom of the

10   page under action plan and then the signatures.

11   Q.    Under action plan on that second sentence, bank to check

12   with SBA on liquidation procedure, what did that mean?

13   A.    We wanted to make sure that we followed the standard

14   operating procedures to begin the liquidation on the credit.

15   Q.    And is it fair to say that it's important to follow those

16   procedures to make sure the guarantee stays in place?

17   A.    It's important to follow the guidelines.

18   Q.    And whether the SBA would not honor the guarantee or honor

19   it if there's some variation, there's at least risk on the bank

20   side that if the procedure isn't followed the SBA may not

21   provide the guarantee amount.

22   A.    There's always risk.

23   Q.    And was that something you were particularly aware of on

24   the Dirks Motor loan in September of 2011 to make sure that SBA

25   guarantee was not jeopardized?

1  A.    No, we were not concerned about that.

2  Q.    Then the next sentence says the bank will first cash out

3  CDs, and I assume is that cash value of life insurance?

4  A.    Yes.

5  Q.    And then likely foreclose on the commercial real estate and

6  make an SBA claim.

7  A.    That's correct.

8  Q.    So basically we talked about those assets, the CDs, life

9  insurance, and foreclosure, and that's what that's indicating.

10  A.    Yes.

11  Q.    And then the last sentence says this process will start in

12  the fourth quarter of 2011; is that correct?

13  A.    Yes.

14  Q.    And would that generally be October 1 through the end of

15  the year 2011?

16  A.    Correct.

17  Q.    So that's just a couple days away, October 1 from September

18  18.

19  A.    To the first -- to the fourth quarter, yes.

20  Q.    Yeah.  And then this loan charge-off form I believe is

21  signed by you; is that correct?

22  A.    Yes.

23  Q.    And yours is the upper left hand?

24  A.    Yes.

25  Q.    And then is Mr. Hegarty the one -- top one on the right?

1  A.   Correct.

2  Q.   Then Mr. Wilkinson, the president we talked about earlier

3  this morning, he also signed it.

4  A.   Yes.

5  Q.   And do you know why all three of you signed it?

6  A.   I think that was policy.

7  Q.   Fair to say that you as the branch manager under your

8  policy couldn't just sign it by yourself.

9  A.   That's correct.

10  Q.   And it's fair to say that if this plan of liquidation was

11  going to take place it was going to involve more people than

12  just you at the bank.

13  A.   That's correct.

14       MR. THOMPSON:  Let's go to Exhibit 27 if you can

15  expand all of that, please.  Thank you.

16  Q.   So I believe this is the day after the CAD report and the

17  loan charge-off form that we just talked about; is that correct?

18  I'll let you read first.  I'm sorry.

19  A.   Are you asking me if this was the day after?  It would

20  appear that.

21  Q.   I'm sorry.  Please read the document, and let me know when

22  you're ready for a question.

23  A.   Okay.

24  Q.   Amongst the people that attended -- those are listed at the

25  top -- was both Mr. Mathiasen and yourself present according to

1　the minutes for this meeting?

2　A.　Yes.

3　Q.　And the purpose of this minute was in relation to Dirks

4　Motor Company as a borrower, the bank was requesting internal

5　approval for the following credit actions; is that correct?

6　A.　That's correct.

7　Q.　And there was going to be a downgrade.  We talked about

8　that a little bit.

9　A.　Yes.

10　Q.　And there are three bullet points.  One, the reason of the

11　downgrade was lack of financials provided; is that correct?

12　A.　Correct.

13　Q.　And that was basically Dirks Motors was not bringing in the

14　financials of the Dirks Motor Company that the bank wanted.

15　A.　Yes.

16　Q.　And the second bullet point involved the payment history of

17　the loan, and this would be on that SBA loan; is that right?

18　A.　Yes.

19　Q.　It indicates the loan, so that would be in effect Dirks had

20　paid as agreed with no late payments in the first year; is that

21　correct?

22　A.　Yes.

23　Q.　And does that basically for the most part take us

24　through -- if the loan was 2009 through at least some part of

25　2010?

1  A.  Yes, the first year.

2  Q.  So that -- everybody's good then.  And then it says,

3  however, in 2011, some late payments have started to show.

4  A.  That's correct.

5  Q.  Now, for a lender why is that -- why is that a concern?

6  A.  Any time you start having late payments, it's a general

7  concern of the health of the business.

8  Q.  And at that time it said the loan is currently over 20 days

9  past due; correct?

10  A.  Yes.

11  Q.  Now, in relation to other general loans at the bank, was 20

12  days past due a particularly short period or a long --

13  A.  There's generally not concern until it hits over 30.

14  Q.  And is it fair to say that if the financials had been

15  provided and those looked satisfactory that being 20 days late

16  by itself would not have been reason to downgrade at this time?

17  A.  That's correct.

18  Q.  And then the third reason, borrower -- so that would be --

19  was it Dick Dirks Senior, do you remember, on the third bullet

20  point, borrower?

21  A.  Yes.

22  Q.  That'd be Mr. Dirks Senior?

23  A.  Yes.

24  Q.  He comes in on Friday, September 23 -- so that'd be a few

25  days earlier -- and speaks presumably with you?

1   A.   Yes.

2   Q.   And he provided you with a default letter that had come

3   from Ford Motor Credit to Dirks Motor; correct?

4   A.   Yes.

5   Q.   Out of those three points, was there one of those that was

6   more important in your mind for the downgrade than the others?

7   A.   The default letter.

8   Q.   Is it fair to say that if there was no default letter from

9   Ford that while the other two aren't unimportant it probably

10  would not have led to a meeting of this nature, a charge-off

11  form and a downgrade like this?

12  A.   Not necessarily.  I don't recall what the payment history

13  had been prior to this.

14  Q.   Well, if the payment history had been, you know, spotless

15  the first year and it was only 20 days late, would that be

16  reason to have a downgrade request at this time?

17  A.   No, it would not.

18  Q.   Let's go to the next part.  It says Dave Hegarty presented

19  the credit.  Do you see that?

20  A.   Yes.

21  Q.   And why at the bank was it Dave Hegarty that presented the

22  credit as opposed to yourself?

23  A.   He's the credit manager, so he would analyze the credits.

24  Q.   And then according to the bullet point, we, the bank, will

25  charge off the unguaranteed portion of the SBA loan

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Transcription
Case 5:16-cv-04005-MWB-KEM  Document 107  Filed 05/07/18  Page 74 of 227

1  approximately 259,000; correct?

2  A.   Yes.

3  Q.   And was that approved by ten out of ten people voting?

4  That's at the very bottom.

5  A.   Yes, it was.

6  Q.   Do you remember any discussion by any of the persons there

7  not to proceed with this action plan?

8  A.   I don't recall.

9  Q.   And that $259,000 figure I think you said earlier shows up

10  in the loan loss reserves; is that correct?

11  A.   We calculate in order to make sure we have adequate

12  reserves on hand.

13  Q.   And when you calculate a reserve like that, does that get

14  reported to any government agency?

15  A.   It would appear on the call report.

16  Q.   And what is a call report?

17  A.   It's the federal -- it's -- every bank has one.  You can

18  find them online.  It's the financial statements for the bank.

19  Q.   And what federal agency would have responsibility for

20  oversight of a bank like Heritage and its call reports?

21  A.   I believe it was a national bank, so it would have been the

22  OCC.

23  Q.   And what if you know does OCC stand for?

24  A.   Office of Comptroller of Currency.

25  Q.   And that's a United States government agency?

1   A.   Yes.

2   Q.   Is it fair to say that at some point for any bank if loan

3   loss reserves would get to a certain level it would -- could

4   become a concern for the OCC?

5   A.   Certainly.

6   Q.   Now, once this downgrade was approved for Dick -- I'm

7   sorry, for Dirks Motors, would the bank notify Dirks Motors of

8   that action the bank had taken?

9   A.   Generally not.

10  Q.   Okay.  And is there a reason why the bank doesn't do that?

11  A.   It's a bookkeeping.  It's an internal bookkeeping

12  procedure.

13  Q.   And when it talked about starting this foreclosure in the

14  fourth quarter of 2011, does the bank let the borrower know that

15  it's going to start doing that or not?

16  A.   Of course.

17  Q.   Okay.  And do you recall if Dick Dirks or someone at Dirks

18  Motors was made aware in the fourth quarter of 2011 that the

19  bank was going to start pursuing this foreclosure plan?

20  A.   We would have communicated that in writing.

21  Q.   Is it fair to say that one of the next steps in the process

22  for this foreclosure was to do a UCC lien search through the

23  Iowa Secretary of State's office?

24  A.   I wouldn't say it was the next step, but it's -- there

25  would be possibly a step.

1  Q.   How about a step?

2  A.   A step.

3  Q.   And do you know if that step was taken that there was a UCC

4  lien search done through the Iowa Secretary of State's office?

5  A.   Yes.

6  Q.   Let's go to Exhibit 24, 24.  I'm sorry.  28.  I misspoke.

7  If you'd like to take a moment and orient yourself with this

8  exhibit and let me know when you're ready.

9  A.   All right.

10 Q.   And at the top it says Iowa Secretary of State, Uniform

11 Commercial Code search report October 6, 2011; correct?

12 A.   Yes.

13 Q.   And just as a point of reference, that's roughly one week

14 after the CAD report loan charge-off and then the minutes we

15 just talked about.

16 A.   Correct.

17 Q.   Who did this search?  Do you know?

18 A.   I do not know.

19 Q.   Would it have been somebody at the Heritage branch in Sioux

20 City?

21 A.   I can't answer that.

22 Q.   Okay.  Did you do it?

23 A.   I could have.  I do not know.  I don't know who did it.

24 Q.   Would you agree with me that this Iowa Secretary of State

25 UCC search report is the first search report that shows up in

1  the Dirks Motor loan file with Heritage Bank?

2  A.   You're asking me if this is the first UCC search report?

3  No, it would not have been.

4  Q.   And what I'm specifically asking you, is this the first

5  search report as a document that's in the loan file at Heritage

6  Bank for Dirks Motor?

7  A.   I don't understand what you're asking me.  I'm sorry.

8  Q.   Is it your belief that the loan file from Heritage should

9  have had a piece of paper similar to this at some time prior to

10  October 6, 2011?

11  A.   Yes, there would have been.

12  Q.   And do you have a firm memory of seeing such a search

13  report?

14  A.   Yes, I do.

15  Q.   And do you recall what the purpose of that earlier search

16  report would have been?

17  A.   We would be required to do search reports on all new

18  commercial loan customers.

19  Q.   Would that be part of the SBA loan?

20  A.   Any loan.

21  Q.   And do you have any knowledge if there has been such a

22  search report produced by the bank from the Iowa Secretary of

23  State for a UCC search report at any period of time in 2009?

24  A.   Ask me that again, please.

25  Q.   Sure.

1          MR. THOMPSON:  Could you read that back, please?

2          (The requested portion of the record was read.)

3    A.   Yes, there would have been.

4    Q.   And you're not here saying there should have been.

5    A.   No, there would have been.

6    Q.   You're saying there was.

7    A.   Yes, there was.

8    Q.   As part of your experience in banking before Heritage and

9    at Heritage, is this type of information from the Secretary of

10   State the type of thing that you would look at as part of your

11   job?

12   A.   Yes.

13   Q.   I want to walk through this a little bit with you.  So it

14   comes back from the Secretary of State as acknowledgment of

15   filing.  Do you see that heading in the middle?

16   A.   Yes, yes.

17   Q.   And the search report that's being done is for the debtor,

18   Dirks Motor Company; correct?

19   A.   Correct.

20   Q.   And is it fair to say that what the bank's purpose in this

21   search report in October of 2011 was was to find out what other

22   creditors are out there?

23   A.   That's correct.

24   Q.   And did Heritage file -- well, is the way that a lender

25   bank protects itself against other creditors to file a UCC-1

1  with the Secretary of State?

2  A.    It's one of the ways.

3  Q.    And when you file a UCC-1 with the Secretary of State, do

4  you generally fill in what collateral that lien is going to

5  cover?

6  A.    I -- yes.

7  Q.    Just generally.  And do you understand the purpose of a

8  lender filing a UCC-1 with the Secretary of State that describes

9  what its lien is on is so that if other creditors do a search

10  they can find out who's ahead of them perhaps?

11  A.    That's correct.

12  Q.    And is it your understanding and experience that with UCC

13  filings that cover the same collateral, the first filed wins in

14  terms of getting paid first on a liquidation of that collateral?

15  A.    The first filings would be a superior lien to subsequent

16  files behind them.

17  Q.    And here one of the secured parties we see is Ford Motor

18  Credit Company; is that correct?

19  A.    Yes.

20  Q.    And I'm assuming in the lending business you'd probably

21  encountered Ford Motor Credit Company before.

22  A.    No.

23  Q.    Never?

24  A.    No.

25  Q.    When you saw that -- well, let me ask you, did you at some

1  point in time see this exhibit?

2  A.   I would have seen the UCC searches, yes.

3  Q.   I mean, is it fair to say when you saw that you would have

4  known that Ford Motor Credit was somebody you weren't surprised

5  to see as a creditor for Dirks Motors?

6  A.   Since they sell automobiles, no, I would not be surprised.

7  Q.   And what -- if you know, what franchises did Dirks Motor

8  Company have at this time, 2011?

9  A.   I believe, again, it was GM and Ford.

10  Q.   Now, under the -- about the middle of that box, we see file

11  number and type.

12  A.   Yes.

13  Q.   File time?  See that?  That first entry on financing

14  statement, what generally is a financing statement?

15  A.   It's a document that's going to outline the collateral.

16  Q.   That's where at least for this entry Ford Motor's going to

17  let other creditors know what its lien covers.

18  A.   Correct.

19  Q.   Of Dirk -- Dirks Motors.

20  A.   That's correct.

21  Q.   And the Ford Motor Credit lien started on July 23, 1987;

22  correct?

23  A.   It would appear so.  I would have thought they would have

24  had one much sooner than that.

25  Q.   Okay.  Well, at least according to this report, that's when

1   it first started.

2   A.    Yes.

3   Q.    And Heritage Bank's SBA loan was in 2009.

4   A.    Yes.

5   Q.    And at some point during 2009, is it your memory that

6   Heritage Bank would have filed one of these UCC-1s with the

7   Secretary of State?

8   A.    Yes.

9   Q.    And would the Heritage description of the collateral be

10  what may be called a blanket security interest?

11  A.    That's correct.

12  Q.    And a blanket security interest means it's covering

13  everything.

14  A.    Covers everything behind other lenders.

15  Q.    So even though Heritage filed one of these blanket security

16  interests that covered everything, it was still just timewise 22

17  years later than Ford Motor Credit.

18  A.    Correct.

19  Q.    So if there's anything that Ford Motor Credit had a lien on

20  that's in its UCC-1 that's also in your Heritage blanket, if the

21  liens are both good, Ford would win.

22  A.    They would have a superior lien position.

23  Q.    And the other entries on this page reflect, among other

24  things, continuations.  Do you see that?  I think there's four

25  of those.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Transcription Service
Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 82 of 227

```
1   A.   Yes.
2   Q.   Are you generally familiar with the continuation process
3   with UCC-1 filings?
4   A.   Yes.
5   Q.   And does that process generally say you need to renew every
6   five years?
7   A.   I don't recall what the time period is, but gen -- yes, it
8   has to be renewed within a certain time period or it lapses.
9   Q.   And that renewal has to take place in another six-month
10  period?  Do you remember that or not?
11  A.   No, I don't recall that.  I don't think that's true.  I
12  think it has to -- if they file a financing statement on
13  September -- July 23, it's gotta be filed within 5 years prior
14  to that anniversary date.
15  Q.   Okay.  Let me just ask you this.  If it's a five-year
16  period -- and I'm going to take that off the screen here.  Here
17  we go.  So if we go from the financing statement in 1987, 5
18  years later is 1992.  Do you agree with that?
19  A.   Yes.
20  Q.   Then 5 years later's 1997.
21  A.   Correct.
22  Q.   And 5 years later is 2002.
23  A.   Yes.
24  Q.   And 5 years later's 2007.
25  A.   Yes.
```

1  Q.   And, and, if the 2007 is valid, then that's going to last

2  until 2012.

3  A.   That's correct.

4  Q.   And looking at that page on Exhibit 28, do you think Ford

5  had a prior lien to Heritage as of October 6, 2011?

6  A.   Yes.

7  Q.   Is it fair to say that as a lender, particularly one that's

8  going to be doing a foreclosure, that all other things being

9  equal, if you get the choice to be the first secured lender or

10 the second secured lender, which position do you want to be in?

11 A.   The first.

12 Q.   And why in a foreclosure or liquidation do you want to be

13 first?

14 A.   You'd have the -- you'd have the ability to liquidate

15 and -- the entire -- all the assets.

16 Q.   And anybody behind you downstream has to follow your dance

17 lead, so to speak.

18 A.   Basically, yes.

19 Q.   It's a control thing; right?

20 A.   Pardon me?

21 Q.   It's a control thing on how the foreclosure's going to take

22 place?

23 A.   Yes.

24 Q.   Let's go to Exhibit 11.

25         MR. THOMPSON:   And if you'd highlight the -- pull up

1  the top, please.  Thank you.

2  Q.   This is a SBA guaranteed loan authorization?

3  A.   Correct.

4  Q.   And this is for Dirks Motor Company, October 6, 2009;

5  correct?

6  A.   Correct.

7  Q.   So now we're going back a couple years before the

8  foreclosure plan that we've talked about in those minutes and

9  the CAD report.  Did you prepare this authorization?

10  A.   The SBA prepares the authorization.

11  Q.   Okay.  Were you working as the lead person at Heritage Bank

12  on this?

13  A.   Yes.

14  Q.   Okay.  And then let's go to the last page of this

15  authorization.  This authorization is signed by Pamela L.

16  McGuffin for the SBA.  Did you know that person?

17  A.   No.

18  Q.   Below that signature -- you don't have any question that

19  that's an authentic signature of someone from the SBA, do you?

20  A.   No.

21  Q.   And below that SBA signature on this authorization it says

22  in consideration of the SBA's guarantee of the loan to be made

23  by the lender which is Heritage Bank; correct?

24  A.   Correct.

25  Q.   To the borrower which is Dirks Motor; correct?

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Verbatim Court Transcription
Case 5:16-cv-04005-MWB-KEM  Document 107-6  Filed 05/07/18  Page 85 of 227

1  A.    Correct.

2  Q.    Lender, Heritage Bank, accepts the above conditions.

3  A.    Correct.

4  Q.    And then you signed that.

5  A.    Yes.

6  Q.    And obligated the bank to meet the terms of this

7  authorization.

8  A.    Correct.

9  Q.    Let's go to the second page of this authorization.  Then in

10  the middle there's something called contingencies.  Do you see

11  that?  Let me know when you've had a chance to orient yourself

12  to the exhibit.

13  A.    Okay.

14  Q.    Under the contingencies it says the SBA issues this

15  authorization in reliance on representations in the loan

16  application including supporting documents.  The guarantee is

17  contingent upon the lender, and then it lists six conditions; is

18  that correct?

19  A.    Yes.

20  Q.    And did you understand that those six conditions had to be

21  met to keep the guarantee in place?

22  A.    Those are conditions of the authorization.

23  Q.    If one of those contingencies was not met, then the

24  guarantee could become contingent.

25  A.    Could become.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Certified Transcripts
Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 86 of 227

Q.   And number 6 on the contingencies required the bank to
satisfy all of the conditions in this authorization; is that
correct?

A.   That's what it says, yes.

Q.   Let's go to page 4, and at the bottom we have collateral
conditions.  Let me know after you've had a chance to look at
that.

A.   Okay.

Q.   The collateral condition says -- that's part of the
agreement that the lender must obtain a lien on 100 percent of
the interests in the following collateral and properly perfect
all lien positions.  Do you see that?

A.   Yes.

Q.   And one of those is to have a first mortgage; is that
correct?

A.   That's correct.

Q.   And did Heritage have a first mortgage on the Dirks
commercial real estate?

A.   Yes.

Q.   The next one is first perfected security interest subject
to no other liens in the following personal property.  Do you
see that?

A.   Yes.

Q.   And that personal property would be equipment; correct?

A.   Wr -- not correct.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer-Aided Transcription
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 87 of 227

1  Q.   Okay.  Well, let's look at what it says.  The first

2  perfected security interest subject to no other liens in the

3  following personal property including any other proceeds and

4  products whether now owned or later acquired wherever located,

5  equipment, inventory, and then other items.  Do you see that?

6  A.   Yes, I see that.

7  Q.   And if I was a auto dealer like Dirks Motors and I had new

8  and used vehicles on my lot, would that be inventory?

9  A.   Yes, it is, but it's not personal property.

10 Q.   Would you agree -- I'm going to ask you to make an

11 assumption --

12 A.   Uh-huh.

13 Q.   -- that if personal property does mean motor vehicles that

14 were on the Dirks lot new and used -- I know you don't agree

15 with that.  But I'm asking you to assume that that is true --

16 would you agree that Heritage did not have a first perfected

17 security interest because Ford had one on those vehicles 22

18 years earlier?

19 A.   You're asking if I can -- that -- if we're assuming that

20 vehicles are personal property, but they're not personal

21 property, but if I'm assuming they are personal property, that

22 Ford would have a superior lien on the vehicles.

23 Q.   Let's go to the third page of the authorization.  And at

24 the very bottom it says use of proceeds.  Do you see that?

25 A.   Yes.

1    Q.   And then we'll have to go to the top of the next page.  And

2    generally does use of proceeds mean that if the SBA approves a

3    loan that the money that's disbursed from Heritage can be used

4    to pay those things that are listed; is that correct?

5    A.   Yes, that's correct.

6    Q.   And I don't want to go through all those.  I do, though,

7    want to go through number 6 which is 194,000 to pay the

8    outstanding debt to Heritage Bank.  Do you see that?

9    A.   Yes.

10   Q.   And at least according to Exhibit 11, the authorization,

11   Heritage was only authorized out of the loan amount to pay

12   itself 194,000; correct?

13   A.   There is some variance within operating procedure for that.

14   Q.   Let me just ask this question limited to what the document

15   itself says.  Would you agree with that statement I made, that

16   according to the authorization that we're looking at the most

17   Heritage could pay to itself from the SBA proceeds was $194,000?

18   A.   That's what was allocated.

19   Q.   Let's go to Exhibit 13, please.  And this is a settlement

20   sheet; is that correct?

21   A.   Yes.

22   Q.   And this one involves a disbursement of 279,000; is that

23   correct?

24   A.   Yes.

25   Q.   And let's go to the bottom, please, of that exhibit.

```
 1              MR. THOMPSON:  Actually if you could include -- if you

 2    go up to the payoff -- I'm sorry -- middle of the page down to

 3    the bottom.  Thank you.

 4    Q.   That 279,000 is for Peoples Bank; is that correct?

 5    A.   Yes.

 6    Q.   And that's signed by you, and it's signed by Mr. Dirks; is

 7    that correct?

 8    A.   That's correct.

 9    Q.   And for this settlement sheet, that's authorizing with

10    these signatures that those funds would be allocated in that

11    fashion.

12    A.   Yes.

13    Q.   If those signatures would not be there on this document,

14    would it have been proper to disburse those funds, 279,000, to

15    Peoples Bank?

16    A.   Would it have been proper?

17    Q.   Yep.

18    A.   I don't know if I would use proper but . . .

19    Q.   Let's go to page 9 of this exhibit.

20              MR. THOMPSON:  If you would highlight that

21    information.

22    Q.   We just talked about Peoples Bank at 279,000.  Do you see

23    that, Mr. Crim?

24    A.   Yes.

25    Q.   And at the top it says loan proceeds.  That's the 1,775,000
```

1  we've been talking about; correct?

2  A.    That's correct.

3  Q.    And it's saying out of that 1,775,000 here's the way it's

4  to be disbursed, and the total of those payoffs is a little less

5  than the full amount of the loan proceeds; correct?

6  A.    Yes.

7  Q.    And for the Peoples Bank amount, we saw a settlement sheet

8  that was signed by Heritage Bank and by Dick Dirks for that

9  amount; correct?

10 A.    Correct.

11 Q.    For HBNA.  Is that Heritage?

12 A.    It's Heritage Bank, yes.

13 Q.    Now, in Exhibit 11, that authorization, I think that number

14 if I'm recalling was about 194,000?

15 A.    That's correct.

16 Q.    And now that's -- on this document has gone up, hasn't it?

17 A.    Yes, it has.

18 Q.    About 135,000?

19 A.    Yes.

20        MR. THOMPSON:  And let's go to page 8 if you could

21 blow that up, please.  Let's do the top first, please.  Sorry.

22 Q.    And this is a settlement sheet for Heritage; is that

23 correct?

24 A.    That's correct.

25 Q.    And it's that 329,490 we just saw; is that correct?

1    A.    That's correct.

2    Q.    And let's go to the bottom of the page.

3           THE COURT:  Before we do that, I'd like to give

4    everybody a stretch break.  Thank you.

5           MR. THOMPSON:  Okay.

6           MR. LAWRENCE:  Your Honor, might we take a few extra

7    minutes for Mr. Lucken to use the restroom?

8           THE COURT:  Sure.  Well, how about waiving his

9    presence?  He's already testified.  Well, we didn't make a

10   record on it, so did he communicate to you his acquiescence in

11   waiving his presence during the remaining part of this

12   examination?

13          MR. LAWRENCE:  I suppose he would like to come back in

14   as soon as he's done but . . .

15          THE COURT:  Well, that isn't my question.

16          MR. LAWRENCE:  Okay.  No, he did not explicitly waive

17   his --

18          THE COURT:  Okay.

19          MR. LAWRENCE:  -- presence.

20          THE COURT:  Please be seated, and we'll wait for him.

21   Or if anybody wants to continue stretching, you can stretch

22   until Mr. Lucken comes back.

23          Okay.  Everybody can be seated, and as soon as

24   Mr. Lucken is seated, you can renew your direct examination.

25   BY MR. THOMPSON:

Case 5:16-cv-04005-MWB-KEM   Document 107   Filed 05/07/18   Page 92 of 227

1  Q.   Mr. Crim, we were talking about this settlement sheet for

2  the Heritage Bank amount, and at the bottom of this sheet, we

3  don't see any signature for Heritage, do we?

4  A.   No, we don't.

5       MR. THOMPSON:  Let's go to Exhibit 144 and actually

6  the third bullet point that says, "Dick," if you could capture

7  all of that.  There you go.  Thank you.

8  Q.   I'd represent to you that Exhibit 144 is an admitted

9  exhibit in this case that came from Ford Motor Credit.  And I'd

10 like to have you focus on that third bullet point that says,

11 "Dick stated."  Do you see that?

12 A.   Yes.

13 Q.   And this is April 7 of 2011.  So once again, this is maybe

14 five, six months before the loan charge-off, CAD report, and

15 those minutes we talked about.  Do you remember meeting with

16 Mr. Dirks on or about that time, April?

17 A.   No, I do not.

18 Q.   He said he stated he did not want to use Heritage again.

19 Heritage is the administrator of his other SBA note.  However,

20 he was advised by several other banks it was best to go to the

21 same bank he obtained the first loan from.

22       Did Mr. Dirks ever tell you that he was not wanting to

23 be with Heritage again?

24 A.   I don't believe so.

25 Q.   Okay.  And how about the second part of that sentence?  He

1  was advised by several other banks it was best to go to the same

2  bank he obtained the first note from. And my question for you

3  is if that's the advice he got -- and I'm not saying it was or

4  it wasn't, but would you generally agree with that advice if

5  that's what other banks were telling him?

6  A.    Probably.

7  Q.    He says Sterling at the bank advised they have limits on

8  how much lending they can provide on SBAs. Therefore, he would

9  like -- he would have to see if they have the ability or room to

10 provide more.

11 A.    Okay.

12 Q.    Do you ever remember saying anything of that nature to

13 Mr. Dirks?

14 A.    I do not.

15 Q.    Okay. Is it possible that you did and you don't recall

16 that?

17 A.    I don't recall.

18 Q.    It goes on to say Dick stated Sterling advised him if they,

19 Heritage, have room they would be open to lending Dirks more

20 money. Was that a true statement? If there was more room at

21 Heritage, would they have been open to lending Dirks more money

22 at that time?

23 A.    I don't recall making that statement.

24 Q.    Whether you made the statement or not, would it be true

25 that at least as of that time, April of 2011, the bank, if they

1  had room to do so, would have been open to doing it?

2  A.   I don't recall what the relationship was at that time.

3  Q.   Dick stated he's looking for approximately 200 to 300,000.

4  Do you see that?

5  A.   Yes.

6  Q.   Did he ever tell you that at that time?

7  A.   That he was looking for additional funding?

8  Q.   Yeah.

9  A.   I remember him needing additional funding.

10 Q.   You knew that whether he told you or not.

11 A.   I knew that whether he told -- no.

12 Q.   Okay.  My question is do you remember him telling you that

13 in April 2011 that he was --

14 A.   I remember him telling me that he needed funds.

15 Q.   Okay.  Do you agree with the amounts that are set forth in

16 this Ford Motor Credit note?

17 A.   Yes.

18 Q.   200 to 300,000?

19 A.   Yes.

20 Q.   Let's go to Exhibit 31.  And just to orient you to this

21 exhibit, at the top this is dated November 3, 2011.  So this

22 would be in that fourth quarter period after -- after the CAD

23 report and the minutes that we've talked about is when this

24 letter was sent.  Do you see that?

25 A.   Yes.

1    Q.   Okay.  And it basically says to Mr. Dirks you're in default

2    for $1,697,164.71.  You can cure by paying that amount by

3    December 3, 2011, basically a month later.  Was that part of

4    that foreclosure liquidating plan that was taking place that

5    we've talked about?

6    A.   Yes.

7    Q.   And this notice to Mr. Dirks came from you?

8         MR. THOMPSON:  Show the bottom, please.

9    A.   Yes.

10   Q.   Did you ever have any discussions after the date of this --

11   well, did you have any discussions with Mr. Dirks in 2011 that

12   indicated that the bank wanted the Ford Motor Credit lien paid

13   off?

14   A.   No.

15   Q.   You never said that at all.

16   A.   No.

17   Q.   Do you remember Mr. Dirks ever telling you that he wanted

18   to get the Ford Motor Credit lien paid off?

19   A.   He needed to get it paid off.

20   Q.   My question is did he ever tell you that?

21   A.   That he needed?

22   Q.   Yes.

23   A.   Yes, he told me that he needed to have it paid off.

24   Q.   Did you know what the -- in November of 2011, did you know

25   approximately or actually what that amount was that Dirks Motors

1  owed to Ford Motor Credit?

2  A.   I don't believe he told me that he owed Ford until after

3  this period.

4  Q.   Did you have any idea, guesstimate, range what that amount

5  might be that he owed to Ford Motor, Dirks Motor?

6  A.   I don't believe so.

7  Q.   Now, Ford was in a first position with its lien on

8  inventory and other things.  Wouldn't that have been concern to

9  you on how much collateral might be there?

10  A.   No, because we didn't have inventory as collateral, as

11  primary collateral.

12  Q.   During 2011 did you ever tell Mr. Dirks that he needed to

13  come up with a $250,000 CD as additional collateral?

14  A.   No, I did not.

15  Q.   And more specifically did you ever tell him that he needed

16  to get a certificate of deposit with Heritage Bank to serve as

17  backup collateral?

18  A.   I did not tell him that.

19  Q.   Do you recall meeting with Mr. Dirks and Mr. Lucken?

20  A.   Yes.

21  Q.   Do you remember when that took place?

22  A.   No, I do not remember the date.

23  Q.   If there's been some evidence that that was November 8,

24  2011, would you have any reason to disagree with that date?

25  A.   No, I would not.

```
 1    Q.    Do you remember that meeting?

 2    A.    I remember meeting John Lucken and Dick Dirks.

 3    Q.    Where was the meeting?

 4    A.    At our office in Sioux City.

 5    Q.    And who was present?

 6    A.    John Lucken, Dick Dirks, and myself.

 7    Q.    No one else from the bank was present?

 8    A.    I don't recall if there was anybody else there.

 9    Q.    Was that an office or a conference room?

10    A.    Would have been in an office.

11    Q.    And is that a walled office with a door?

12    A.    Yes.

13    Q.    Do you remember if the door was open or closed during the

14    meeting?

15    A.    I don't recall.

16    Q.    Would it be your practice that if you're meeting with a

17    borrower like Dirks Motor, Mr. Dirks, and he had Mr. Lucken with

18    him whether you'd keep the door open or shut?

19    A.    I would generally keep it open.

20    Q.    And on this one you have no particular memory.

21    A.    Pardon me?

22    Q.    On this particular meeting you don't have --

23    A.    No, no.

24    Q.    Do you have a memory of how long the meeting lasted?

25    A.    No.  I don't believe it was very long, though.
```

1   Q.   Do you remember any discussion about $250,000 being needed

2   to pay off Ford Motor Credit?

3   A.   I knew that Dirks needed money to be able to pay off the

4   lien.  It was brought up at that time.

5   Q.   And my question's a little more specific.  Do you remember

6   at that meeting with Mr. Dirks and Mr. Crim discussion of the

7   amount of $250,000 that needed to be used to pay Ford Motor

8   Credit?

9   A.   I don't recall there -- no.  I knew that Ford was demanding

10  money.

11  Q.   And just so I'm clear, if Mr. Lucken testifies that --

12  testified that at that meeting that specific amount of 250,000

13  to pay off Ford was discussed, you would say never happened.

14  A.   I don't recall if it was discussed, if the dollar amount

15  was discussed.

16  Q.   You don't recall any discussion that the amount to Ford

17  Motor Credit would be something in the neighborhood of $225,000?

18  A.   It may have.  I don't -- I do not recall specifically the

19  dollar amounts.

20  Q.   Do you recall any discussion at that meeting November 8,

21  2011, with Mr. Dirks and Mr. Lucken about if there's any amount

22  left over from that 250,000 the balance would go to Dirks Motor

23  Company?

24  A.   Okay.  No.

25  Q.   And if there's been testimony that that was discussed, you

1 would say that just didn't happen.

2 A.   That the difference between what was owed to Ford and what

3 was owed -- and the 250,000 would go to Dirks Motors.  I don't

4 recall if that was -- that was not discussed in the office.

5 Q.   And just so I'm clear, on this 250,000, I'm talking about

6 money that would come from John Lucken, not the bank.  Do you

7 remember any discussion at this meeting about 250,000 from John

8 Lucken?

9 A.   I remember John discussing making a capital injection into

10 Dirks.

11 Q.   Do you remember the amount?

12 A.   Not specifically the amount.

13 Q.   Do you remember the discussion about out of that amount

14 that Ford Motor Company would be paid off?

15 A.   Dirks -- or John Lucken was going to pay Ford Motor

16 Company.

17 Q.   Do you remember any discussion out of those funds that

18 Mr. Lucken was going to provide that any excess would go to

19 Dirks Motor?

20 A.   John was driving the bus on that, so I don't know.

21 Q.   Do you remember any discussion at that meeting about a

22 $250,000 certificate of deposit being obtained?

23 A.   No.

24 Q.   And if you don't remember the CD, I'm assuming there was no

25 discussion about that CD that you recall being backup

1    collateral.

2    A.    Not in that meeting.

3    Q.    Did it come up at a later meeting?

4    A.    Not as additional collateral on the Dirks Motors loans.

5    Q.    When do you recall that coming up again?

6    A.    It was, I believe, several weeks.  Ten days later maybe.

7    Q.    And who was present for that conversation?

8    A.    I believe it was Dirks and Lucken and myself.

9    Q.    And what's your specific memory at this second meeting of a

10   discussion about a certificate of deposit?

11   A.    There was no -- it was not specifically about the

12   certificate of deposit.  It was about John Lucken borrowing

13   money to help Dirks Motor.

14   Q.    And where was that meeting at?

15   A.    I believe in our office in Sioux City.

16   Q.    And how long did that meeting last?

17   A.    Half hour, 45 minutes.

18   Q.    Is that about the same time as this meeting, this first

19   meeting we're talking about?

20   A.    It may have been.  It may have been the same meeting.  I

21   don't recall.

22   Q.    So as you're sitting here, you're thinking there's two

23   different meetings, but now you're saying --

24   A.    They may have been the same meeting, is that John and Dirks

25   came in and Mr. Lucken wanted to help Dirks Motors.

1   Q.   At that meeting whether it's one meeting on November 8 --

2   let's focus on that one.  At the meeting on November 8 with

3   Mr. Dirks, Mr. Crim, whether it's the only meeting or the first

4   meeting, did you discuss whether Heritage Bank would or would

5   not provide floor plan financing?

6   A.   We had told him that we were not going to do floor

7   planning.

8   Q.   Do you remember floor plan financing being discussed in

9   that meeting on November 8, 2011?

10  A.   It was not discussed that the bank would provide floor

11  planning for Dirks Motor Company.

12  Q.   So if there's been testimony that there was discussion at

13  that November 8, 2011, meeting about floor plan financing, your

14  testimony is that just didn't happen.

15  A.   If it was discussed, it was discussed in that John Lucken

16  would provide backing for that.  We could not provide any

17  additional funding.

18  Q.   Can I -- I want to focus you on the question.  Whether the

19  bank said it would provide floor plan or John Lucken did, what I

20  want to know is do you remember any discussion about floor plan

21  financing?

22  A.   I don't recall any discussion about floor planning.

23  Q.   If there is testimony that at that November 8, 2011,

24  meeting that there was discussion about floor plan financing

25  regardless of who it's from, is it your testimony that that just

1 didn't happen at all?

2 A.   I do not recall that there was discussion about floor

3 planning.

4 Q.   And I appreciate that, that you don't recall.  Can you say

5 it just didn't happen?

6 A.   Yeah, I can say it didn't happen.

7 Q.   Do you remember saying at that meeting that the bank was

8 not going to provide any more funds to Dirk -- Dirks Motors?

9 A.   We had indicated that to him prior to that.  I don't

10 believe it would have been discussed at that meeting.

11 Q.   Do you remember being deposed on January 24, 2017?

12 A.   Yes.

13 Q.   And at page -- I'm going to start at page 154, line 22.

14 Question, Did you make a proposal to Mr. Lucken as to how he

15 could help Mr. Dirks?  And your answer was no.  Question, What

16 did you discuss?  Basically that we were going to be unable to

17 provide additional financing on his behalf.  Question, On

18 Mr. Dirks' behalf?  Answer, Yes, that is correct.  Question, And

19 so was that at the end of the meeting?  Answer, To my knowledge,

20 to my recollection, yes.

21      Now, didn't you testify previously that during the

22 meeting you did say the bank was going to be unable to provide

23 additional financing to Dirks Motors?

24 A.   Yes, I did.

25 Q.   And the bank has confidentiality policies, doesn't it,

1   Mr. Crim?

2   A.   All banks do.

3   Q.   And Mr. Lucken was not a customer of the bank during that

4   meeting on November 8, 2011, was he?

5   A.   No, he was not.

6   Q.   And if you told him in that meeting on November 8, 2011,

7   that the bank was not going to give any more money to Mr. Dirks,

8   that violated the bank's confidentiality policy, didn't it?

9   A.   Mr. Dirks was there, and he allowed us to talk freely.

10  Q.   Do you remember Mr. Dirks saying you could talk freely at

11  the meeting?

12  A.   He was discussing his financials at the time or not his

13  financials but his business.

14  Q.   Now, so I understand the bank's confidentiality policy, if

15  Mr. Dirks had not been at the meeting, you would not have said

16  that to Mr. Lucken.

17  A.   That is correct.

18  Q.   I'd like to show Exhibit 143.  And I'm sorry.  Page 5 at

19  the bottom.  And, Mr. Crim, this is another part of those notes

20  from Ford Motor Credit Company.

21       MR. THOMPSON:  Bottom third, please.

22  Q.   Do you see where it says December 2011, final status report

23  as a heading?

24  A.   Yes, yes.

25  Q.   And in the second paragraph it says, "On November 8, 2011,

1  Mr. Dirks advised the select regional BDM that an acquaintance

2  in town, Mr. John Lucken, was coming to his assistance by paying

3  off Dirks' SBA loan."  Do you see that?

4  A.  Yes.

5  Q.  Dirks did not provide much on Mr. Lucken's background other

6  than he was a geologist, nor did he provide any information on

7  Mr. Lucken becoming a partner in the dealership.  Do you see

8  that?

9  A.  Yes.

10  Q.  Then it says, "Mr. Dirks also advised on November 16 that

11  General Motors was giving him until November 28, 2011, to obtain

12  an offer for wholesale financing or they, GM, would terminate

13  Dirks Motors' franchise."  Do you see that?

14  A.  Yes.

15  Q.  Did you know that, that GM was going to terminate his

16  franchise by November 28, 2011, if it --

17  A.  I was aware of that action but not of the date.  I don't

18  recall the dates.

19  Q.  And then if we go to the next paragraph, it says the CSBC

20  received a certified check November 18, 2011, from Heritage Bank

21  in the amount of $225,455.92 to pay the full amount of the SOT,

22  loss on the sale of the vehicles sold at Manheim Kansas City,

23  wholesale charges through October 31, 2011, and PAS onsite

24  monitoring fees from August 15, 2011.  Do you see that?

25  A.  Yes.

1  Q.   And the funds that were used to make that payment were

2  wired to Heritage Bank from Peoples Bank, John Lucken trust

3  account; correct?

4  A.   That's correct.

5  Q.   And once Heritage received those funds, it then sent the

6  check in that $225,000 amount to Ford; correct?

7  A.   That is correct.

8  Q.   Could Mr. Lucken have just had Peoples Bank send that money

9  to Ford?

10  A.   He could have, yes.

11  Q.   Did Heritage Bank require that those funds be wired to

12  Heritage Bank?

13  A.   For us to issue a cashier's check, they would have had to

14  have been wired.

15  Q.   Was there any other reason that Heritage Bank had for

16  requiring those funds of 250,000 to be wired to Heritage as

17  opposed to letting Mr. Lucken use his own bank?

18  A.   John Lucken came to our office on an earlier date and

19  requested that -- bringing us a check and asked us on his behalf

20  to send those to Ford.  I explained to him that I could not wire

21  or send a cashier's check on his funds drawn on his personal

22  check, that he would need to have those funds wired to the bank

23  in order for us to be able to do that.

24  Q.   Did you tell him, Mr. Lucken, why don't you just have

25  Peoples do it?  Heritage -- this isn't our deal.  This is you

1   and Mr. Dirks.  We loan to Dirks.  We don't want to be a part of

2   this.  If you want to help him out, go for it.  Don't be sending

3   any money to us.

4   A.   He had stated that he wanted it to be out of Akron.

5   Q.   The funds to come from outside --

6   A.   He wanted -- he didn't want Peoples Bank to necessarily

7   know that he was assisting Dirks Motors.

8   Q.   Did Mr. Lucken bank at Security Bank in Sioux City?

9   A.   I don't recall if he did, but I think Peoples Bank is owned

10  by Security, but I'm not sure.

11              THE COURT:  Mr. Thompson, I'd like to take our noon

12  recess now.

13              Members of the jury, it's about 10 minutes to 12.

14  We'll be in recess till 1:00.  And remember to keep an open mind

15  until you've heard all the evidence.  Don't discuss this case

16  among yourselves.  And we'll see you back here at 1:00.  Thank

17  you.

18              (The jury exited the courtroom.)

19              THE COURT:  Please be seated.  Anything we need to

20  take up, counsel?

21              MR. THOMPSON:  No, Your Honor.

22              MR. REINSCHMIDT:  Maybe just one thing, Your Honor.

23  At this point we talked about since Mr. Crim is a hostile

24  witness for Mr. Thompson that I would first do cross-examination

25  and then at some point I'd switch hats and do direct.  And I

1  understand I have more leeway on cross.  I can ask leading

2  questions which I can't on direct.

3           Because of the method in which Mr. Thompson's asking

4  questions, I'm much more linear, if you will.  And some of his

5  started in 2011 and then went to 2009.  I'm wondering if I could

6  just start with direct and just do my direct on Mr. Crim rather

7  than addressing the issues that were brought up in direct by

8  Mr. Thompson and then switching to my direct.  I don't want to

9  have to do cross and then d --

10          THE COURT:  You mean switch into your cross.

11          MR. REINSCHMIDT:  Pardon?

12          THE COURT:  You said direct twice.  You said you want

13 to do direct and then switch to your direct.

14          MR. REINSCHMIDT:  I'm sorry.  I misstated.

15          THE COURT:  So you want to start with direct.

16          MR. REINSCHMIDT:  And just do direct.

17          THE COURT:  Why don't you just say that, I'd like to

18 start with direct and switch to cross, rather than the lengthy

19 explanation?

20          MR. REINSCHMIDT:  I should have said that.

21          THE COURT:  Right.  Yes.

22          MR. REINSCHMIDT:  Thank you.

23          THE COURT:  Okay.  Thanks.  We'll be in recess.

24          (Lunch recess at 11:53 a.m.)

25          THE COURT:  We'll see if the jurors are ready.

```
 1   Everybody ready?
 2            MR. REINSCHMIDT:  Yes, Your Honor.
 3            THE COURT:  Thank you.
 4            (The jury entered the courtroom.)
 5            THE COURT:  Thank you.  Please be seated.  Good
 6   afternoon.
 7            Okay.  Is Mr. Crim here?  There he is.  You can come
 8   on in and resume your spot on the witness box.
 9            MR. THOMPSON:  Is the camera activated for the screen?
10            THE COURT:  Denise, is the camera -- you mean the
11   projector?
12            MR. THOMPSON:  Projector.
13            THE COURT:  Yep.
14            THE CLERK:  I don't see any issues.  Let me get Shane.
15            THE COURT:  I think it's just warming up.  I think
16   we're fine.
17            THE CLERK:  Got it?
18   BY MR. THOMPSON:
19   Q.   Mr. Crim, I can certainly ask you as -- when we left off, I
20   was talking to you about some notes from Ford Motor Credit, and
21   I believe there's an entry about General Motors had given Dick
22   Dirks until November 28 to get wholesale financing or else GM
23   was going to terminate his franchise.  Do you remember that?
24   A.   I do, yes.
25   Q.   And that'd be a big deal because if Dirks Motors lost its
```

1  GM franchise, that would be really tough to stay in business,

2  wouldn't it?

3  A.   Yes, sir.

4  Q.   Now, at the bottom of page 145 there's a paragraph.  It's

5  about in the middle of that blown-up section that says the CSBC.

6  Do you see that?

7  A.   Yes.

8  Q.   Actually I want to go to the middle of that paragraph where

9  it starts with "Mr. Dirks advised."  It says Mr. Dirks -- well,

10  as back-up we had talked about on November 18, 2011, the bank's

11  check that came from Lucken's funds was received.  It paid off

12  basically the amount owed by Dirks Motors to Ford Motor Credit.

13  And then the Ford notes indicate this.  Mr. Dirks advised -- the

14  BDM I think is basically a Ford acronym.  Mr. Dirks advised Ford

15  he obtained an offer for wholesale financing from Heritage Bank

16  but requested if Ford Credit would consider reopening his

17  wholesale lines.  Do you see that?

18  A.   Yes, sir.

19  Q.   Now, it's fair to say at least Mr. Dirks thought that

20  Heritage Bank had made an offer for floor plan financing to him

21  in November of 2011.  Would you agree with that?

22  A.   I can't speak for what he thought.  This indicates he said.

23  Q.   Let's go to Exhibit 38.  It's the same day as that note.

24  And this is an e-mail from you back to Mr. Lucken that says

25  sorry for the delay.  Here's a listing of the information we

1  will need to send.  Do you see that?

2  A.    Yes.

3  Q.    Was there anything in there that said that what the purpose

4  of the information was that you wanted in the e-mail?

5  A.    There's nothing in the e-mail to indicate that.

6  Q.    There's certainly no indication in the e-mail that this

7  information is needed for a line of credit, is there?

8  A.    No.

9  Q.    And if we look on the next page of this exhibit --

10          MR. REINSCHMIDT:  Actually the page after that.  I'm

11  sorry.  Page 3.  Okay.  Do you remember the information that was

12  sent, whether that included tax returns from John Lucken, Lucken

13  family entity, and the Lucken revocable trust?

14  A.    Do I recall if it included that?

15  Q.    Yes.

16  A.    Yes.

17  Q.    Let's look at Exhibit 225.  This is November 23, 2012.

18  This is the funds from Peoples Bank, John Lucken, that went to

19  Heritage Bank to buy that CD; is that right?

20  A.    I do not know where the funds -- what the funds were used

21  for.

22  Q.    Do you remember John Lucken sending funds from Peoples Bank

23  to open up a $250,000 CD?

24  A.    Yes, I do.

25  Q.    And let's go to page 2 of this exhibit.  And is this an

1  account agreement that involves a CD with the John Lucken

2  revocable trust?

3  A.   Yes.

4       MR. THOMPSON:  Let's go to page 7 of this exhibit if

5  you'd highlight that.  Thank you.

6  Q.   This is a tax form, correct, form 2848?

7  A.   Yes.

8  Q.   And it involves the Lucken power of attorney for the trust;

9  correct?

10  A.   I am not familiar with IRS form 2848.

11  Q.   Okay.  Let's go to the next page.  And at the top do you

12  see the signatures of John and Mary Lucken on this form 2848

13  February of 2011?

14  A.   Yes.

15  Q.   And this Exhibit 225 once again involves the payment of 250

16  for the CD at Heritage, the Heritage CD agreement, and some

17  trust information about the tax return of the trust; correct?

18  A.   Repeat that, please.

19  Q.   Sure.  This Exhibit 225 contains the $250,000 CD that was

20  wired from Peoples to Heritage Bank.  It contains the trust

21  agreement opening up a CD at the bank in the trust name and

22  includes tax returns, part of the tax information from the

23  trust; correct?

24  A.   Yes.

25  Q.   Now, based upon that, wouldn't you agree with me that it

1  would be reasonable for John Lucken to think the information

2  that you wanted from him in that e-mail that he sent to you was

3  to be used in part to open up this CD?

4  A.  We wouldn't need financial statements to open a CD.

5  Q.  I understand that.  But you certainly used the trust tax

6  return as part of your documentation for the CD, didn't you?

7  A.  Wouldn't have requested tax returns on the trust.

8  Q.  But as part of your documentation in your files for the CD,

9  you had Lucken trust information tax forms.

10  A.  No.

11  Q.  We just looked at form 28 --

12  A.  I don't know why we would have tax returns to open a

13  certificate of deposit.

14  Q.  Let's go to Exhibit 40.  And once again, you knew that by

15  November 28, 2011, if there was not floor plan financing in

16  place GM was going to pull the plug on the franchise with Dirks

17  Motors; right?  We just talked about that.

18  A.  Yes.

19  Q.  Now, let's look at the top on this letterhead if we could,

20  please.  This is on Heritage Bank letterhead; is that right?

21  A.  Correct.

22  Q.  And let's go to the second page if we could to where your

23  signature's at on the middle.  That's dated November 25, 2011;

24  correct?

25  A.  Correct.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Sioux City Federal Court Reporter/Transcriber

Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 113 of 227

1   Q.   So just to build a little timeline here, the CD from John

2   Lucken comes in in a wire form November 23, 2011.  The GM

3   deadline to pull the franchise which is a big deal was November

4   28, and right in the middle of those two events is this letter;

5   right?

6   A.   Correct.

7        MR. THOMPSON:  Let's go back to page 1, and let's

8   highlight the commitment.

9   Q.   This is Heritage Bank sending to General Motors a

10  commitment to pay General Motors for the sale of certain

11  vehicles; is that right?

12  A.   It looks like we're indicating that he has access to funds

13  to purchase vehicles.

14  Q.   And he, you mean Dirks Motor Company.

15  A.   Correct.

16  Q.   You don't mean John Lucken; right?

17  A.   That looks correct.

18       MR. THOMPSON:  Now let's look at the first sentence on

19  the first paragraph if you could highlight that, please.

20  Q.   Says we, Heritage Bank, have been asked and authorized by

21  the above named dealer, Dirks Motors, to finance Dirks Motors'

22  purchase of new and used motor vehicles and chassises which are

23  acquired from General Motors, LLC, and/or its parents,

24  affiliates, and direct or indirect subsidiaries from time to

25  time, the vehicles.  We, Heritage Bank, agree to pay GM the full

*Contact Shelly Semmler at (712) 233-3846 or shelly_semmler@iand.uscourts.gov*
*EMployees can obtain complete transcript*
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 114 of 227

1 invoice amount of all vehicles hereafter sold to Dirks Motors in

2 accordance with the terms of sale agreement in effect between GM

3 and the dealer as may be amended from time to time.  Did I read

4 that correctly?

5 A.   Yes, you did.

6 Q.   That's a floor plan financing commitment, isn't it,

7 Mr. Crim?

8 A.   It's indicating that we had 250,000 available to purchase

9 vehicles.

10 Q.   Regardless of the amount, it's a floor plan financing

11 commitment, isn't it, Mr. Crim?

12 A.   I do not know.  I can't -- he had 250,000 available to

13 purchase vehicles.

14 Q.   Let's put the amount aside for now.  This commitment to pay

15 General Motors for the sale of certain vehicles is a floor plan

16 financing commitment from Heritage Bank to General Motors for

17 Dirks Motors to buy new and used cars; right?

18 A.   It's showing that he has money to purchase vehicles.

19 Q.   And it's a floor -- that's what you would use for floor

20 plan financing, isn't it, Mr. Dirks -- or Mr. Crim, I'm sorry?

21 A.   It's indicating that he has funds available.

22 Q.   And the purpose of this letter getting to General Motors

23 before November 28, 2011, would be to prevent General Motors

24 from pulling the franchise; right?

25 A.   Yes.

1  Q.   And when you sent this letter on January -- or on November

2  25, that was your purpose for Heritage Bank to in effect stave

3  off General Motors pulling the franchise plug on Dirks Motors.

4  A.   We were indicating that they had funds available to

5  purchase vehicles.

6  Q.   Let's look at the second paragraph.  And I want to start

7  with that second sentence.  We, Heritage Bank, are not required

8  to pay amounts which exceed $250,000 for vehicles shipped in any

9  one week; correct?

10  A.   Yes.

11  Q.   It does not say we, Heritage, are not required to pay

12  amounts which exceed $250,000, period, does it?

13  A.   No, it does not.

14  Q.   So if in week 1 Dirks Motors had orders for vehicles that

15  were shipped that were $200,000 let's say, Heritage with this

16  agreement to GM, this commitment to pay, would pay it; right?

17  A.   Up to 250,000.

18  Q.   In any one week.  So my hypothetical is week 1, 200,000 of

19  vehicles are shipped; correct?

20  A.   Okay.

21  Q.   That's within the terms; right?

22  A.   Yes.

23  Q.   Week 2, another $200,000 of vehicles are shipped.  That's

24  within that term also, isn't it, Mr. Crim?

25  A.   It is but not within the line of credit terms.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Mary Poppins, the Heritage Bank*
Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 116 of 227

1  Q.   Well, whoa, whoa, whoa.  We're talking about the commitment

2  that you gave -- your bank gave to GM, and you just said I think

3  with my hypothetical that's right.

4  A.   That's the way the letter reads, yes.

5  Q.   That the bank would be obligated to pay $400,000 on my

6  hypothetical to GM; right?

7  A.   Yes.

8  Q.   Let's look in the bottom corner of this document.  There's

9  something called an EFT account number.  Do you see that,

10 Mr. Crim?

11 A.   Yes.

12 Q.   And what is an EFT account number?

13 A.   Electronic funds transfer, I would assume.  I don't recall.

14 Q.   And what is that number?  Is it 100881?  Is that what

15 that's going to be?

16 A.   I just see the last 4 where it says 0881.

17 Q.   Do you know what account that was?

18 A.   No, I do not.

19 Q.   Let's look at Exhibit 239.  Let's go to the top.  This is

20 that line of credit.  Is that the same loan number?

21 A.   Yes, it is.

22 Q.   And when -- when was this -- this line of credit by

23 Mr. Lucken was signed what?  January 19, 2012?

24 A.   Correct.

25 Q.   And it says it's going to mature October 23, 2012?

1  A.   Correct.

2  Q.   All right.  So this is January 19, 2012.  Let's go back to

3  Exhibit 40.  At the time that you sent for Heritage Bank Exhibit

4  40, November 25, 2011, and represented account 100881 was going

5  to be the account number, John Lucken had not yet been presented

6  with the line of credit in January of 2012, had he, Mr. Crim?

7  A.   He would have had to have been because if I recall those

8  account numbers were generated by the system.  You wouldn't be

9  able to put an account number on there that hadn't been

10 generated yet.  So was there a subsequent document note prior to

11 this?

12 Q.   So do you remember that's what happened?

13 A.   No, I don't remember what I'm saying, but what I'm saying

14 is we can't reference an account number that hasn't been

15 generated yet.

16 Q.   No, I'm with you on that.  That should --

17 A.   So was there another loan prior to that that would have

18 been renewed?

19 Q.   Let me ask you this.  Suppose there wasn't another loan

20 yet.  Just hold on.  Supposing there wasn't another loan yet.

21 Supposing John Lucken didn't see any loan documentation on this

22 line of credit till January 2012.  And further, Mr. Crim,

23 suppose that when John Lucken looked at this line of credit in

24 January of '12 and he said I ain't signing this, the bank would

25 have been in pretty hot water, wouldn't it, with GM if it

1  represented this floor plan financing from Heritage was coming

2  from an account that didn't even exist; right, Mr. Crim?

3  A.   I believe there would have been a way to revoke the line of

4  credit.  It would have stated in there.

5  Q.   So you think GM -- after setting a deadline of November 28,

6  2011, it was pulling the franchise just before the nick of

7  midnight on that deadline and get your bank's floor plan

8  financing letter, you think GM's going to be happy about that?

9  A.   I don't know.  But if it's referencing an account number,

10 that account number would have already had to have existed.

11 Q.   Well, it may have existed within Heritage Bank, but John

12 Lucken may not have known about it.  Would you agree with me on

13 that?

14 A.   No, because the loan number is generated at the time they

15 board the note or shortly thereafter.

16       MR. THOMPSON:  Let's go to Exhibit 41.  Highlight the

17 top, please.  Actually where it's from, please.  Thank you.

18 Q.   This is another Heritage Bank document; is that correct?

19 A.   Yes.

20 Q.   And this one says it's a letter of credit authorization

21 from dealer's bank; is that correct?

22 A.   Yes.

23 Q.   And this one is to Ford Motor Company; is that correct?

24 A.   Yes.

25 Q.   And let's go to the second page, and let's look at the

1  middle where your signature is and the number.

2         MR. THOMPSON:  Thank you.

3  Q.  So the last letter that was a commitment by Heritage to pay

4  GM was on November 25, 2011, I believe.  This letter is four

5  days later; correct?

6  A.   Yes.

7  Q.  And you're telling Ford the same thing you told GM, that

8  the account number is this 100881; right?

9  A.   Yes.

10        MR. THOMPSON:  Let's go to page 1 and the last

11  sentence of the first paragraph, actually second paragraph

12  there.  Thank you.  That's it.

13  Q.  You indicate by this letter of credit Heritage Bank

14  authorizes you, Ford, to ship motor vehicles to Dirks Motors and

15  agree to pay you therefore by paying at par upon presentation

16  your cash drafts or automated clearinghouse electronic funds

17  drawn on us, which is Heritage Bank, covering motor vehicles; is

18  that correct?

19  A.   Yes.

20  Q.  And basically what that's saying is, look, if Dirks Motors

21  buys vehicles from Ford, doesn't pay, this letter of credit

22  will.

23  A.   Yes.

24  Q.  And then you tell Ford until further notice, Heritage

25  Bank's authorization and Heritage Bank's commitment under this

1  letter of credit are limited to drafts presented totaling no

2  more than 250,000 on any one day; correct?

3  A.    Yes.

4  Q.    It didn't limit it to 250,000, period, did it, Mr. Crim?

5  A.    No, it did not.

6  Q.    So let's use my hypothetical.  Suppose Dick Dirks on day 1

7  on the Ford letter of credit buys vehicles for 200,000.  That's

8  within that term; correct?

9  A.    It is, but also hypothetically he could pay -- basically

10 buy $200,000 a day for 365 days.  Ford Motor Credit and GM are

11 going to know that there's -- there has to be another form

12 limiting the total amount that he would have available to him.

13 Q.    I appreciate that, but let's walk through my hypothetical.

14 Day 1, Dirks gets vehicles from Ford for 200,000.  That's within

15 the letter of credit; right?

16 A.    Uh-huh.

17 Q.    Is that a yes?

18 A.    Yes.

19 Q.    Day 2, Dirks gets vehicles from Ford for another 200,000.

20 A.    Correct.

21 Q.    That's within the letter of credit; correct?

22 A.    Yes.

23 Q.    Now it'd be 400,000; correct?

24 A.    Yes, it would.

25 Q.    And if he did that same 200,000 for 5 days in 1 week,

1   that'd be a million dollars.

2   A.   Correct.

3   Q.   And under this letter of credit, Heritage Bank would be

4   obligated to Ford to pay that amount if Dirks Motors didn't;

5   correct?

6   A.   In the documentation that's here, yes.

7   Q.   Did you ever present these two commitments to GM and letter

8   of credit to Ford to any of your superiors?

9   A.   I don't recall.

10  Q.   You ever talk to Mr. Mathiasen about this?

11  A.   I don't recall.

12  Q.   You ever talk to Mr. Wilkinson about this?

13  A.   I don't recall.

14  Q.   Do you remember anyone at Heritage Bank being particularly

15  upset with you --

16  A.   No.

17  Q.   -- about the wording here that could have exposed Heritage

18  for more than a million dollars to Dirks Motors to Ford and the

19  same amounts to GM under these commitments and letters of

20  credit?

21  A.   No.

22  Q.   No one at Heritage ever criticized you for that.

23  A.   No.

24  Q.   Did anyone at Heritage ever talk to you about that?

25  A.   It never came up.

1      MR. THOMPSON:  Let's go to Exhibit 1, please.

2   Q.   At the top this is in regarding the Dirks SBA loan with

3   Heritage; is that correct?

4   A.   Yes.

5      MR. THOMPSON:  I want to go to the bottom of the page

6   if we could.

7   Q.   And there's two entries I'd like to talk about.  There is

8   the November 28 regular payment of 21,000 and extra amount and

9   then December 8, 2011, regular payment.  Do you see that?

10  A.   Yes.

11  Q.   And that's over $23,000; is that correct?

12  A.   Yes.

13  Q.   And isn't it true that the source of funds for those two

14  payments can be traced back to the $250,000 that John Lucken

15  wired to Heritage Bank, part of which Heritage Bank used to cut

16  a check to Dirk Motors for about 24,000, and then when that went

17  in Dirks Motors' account, the bank, Heritage Bank, took almost

18  all of that money to pay itself?

19  A.   We were authorized.

20  Q.   I understand that, but that's what happened.

21  A.   We were told that's what to do.

22  Q.   Did John Lucken, when he met with you on November 8, give

23  you specific instructions that if I provide 250,000 to pay off

24  Ford I'm fine with the balance going to Dirks, but I want it

25  going to operating capital for Dirks?

1   A.   He didn't specify.  We were just to give it to Dirks.

2   Q.   Now, if he testified he did want it just to go to operating

3   capital -- just assume that to be true -- those payments on

4   Heritage Bank's loan would not have been for operating capital.

5   A.   We surrendered it to Dirks, so I don't know what he did

6   with it after that.

7   Q.   Let me ask this.  Operating capital as a definition would

8   not include debt payments to a lender.

9   A.   Correct.

10  Q.   Let's go to Exhibit 48.  This is the assignment of the CD

11  that we've talked about.  In the left column under date it's

12  January 19, 2012.  That's the same date as that line of credit.

13  A.   Yes.

14  Q.   Would you agree with me that $250,000 CD that John Lucken

15  set up at Heritage Bank about 60 days earlier could not be used

16  as collateral for anything else without some extra documentation

17  taking place?

18  A.   Would the CD be able to be used as collateral without other

19  documentation?

20  Q.   Correct.

21  A.   No.

22  Q.   Bad question by me.  I think you answered my question the

23  right way.  I just had a bad question.

24          When Mr. Lucken bought a CD on January -- I'm sorry,

25  on November 23, 2011, and that CD's at Heritage Bank, that CD at

1  that point had not been pledged or assigned for any other

2  purpose; correct?

3  A.    I believe that is correct.

4  Q.    Thank you.  This document, Exhibit 48, then took that CD

5  and did make it collateral; correct?

6  A.    Correct.

7  Q.    And it made it collateral for the line of credit; correct?

8  A.    Correct.

9  Q.    Now, the line of credit would be used to support Dirks

10 Motors; correct?

11 A.    That was Mr. Lucken's intention.

12 Q.    Now, if Mr. Lucken was thinking from the meeting he had

13 with you on November 8 of 2011 that one of the two conditions

14 was that he provide the $250,000 CD to Heritage Bank that's

15 going to be used as backup collateral for Dirks Motors, wouldn't

16 it be reasonable for Mr. Lucken to think that this assignment in

17 Exhibit 48 and the line of credit were accomplishing that

18 condition?

19 A.    No.  The CD was never used in relation to Dirks Motors'

20 line of credit.  It was securing a line of credit to John

21 Lucken.

22 Q.    Understand.

23 A.    That allowed Dirks to use it.

24 Q.    You understand at least from testimony that Mr. Lucken

25 believed there were two conditions to get floor plan.  And I

1  know you disagree with this.  But if Mr. Lucken was thinking to

2  get floor plan from Heritage he had to provide a $250,000 CD to

3  Heritage that was used for backup collateral for Dirks Motors,

4  if that's what he thought, this assignment would be consistent

5  with what he thought he needed to do and what would happen to

6  his CD; correct?

7  A.   If he thought they were conditions, but they weren't

8  conditions.

9  Q.   I understand you disagree with it.  I think you're saying

10  if that's what John Lucken believed, yes, then this assignment

11  would be consistent with that.

12  A.   We were offering John Lucken the line of credit secured by

13  a certificate of deposit.

14  Q.   I understand that, and I appreciate that.  But you agree

15  with me that if John Lucken believed he was providing a $250,000

16  CD that was going to be backup collateral for Dirks Motors, that

17  this assignment of that CD would be consistent with what he was

18  thinking.

19  A.   I can't speak for John and what he thinks.

20  Q.   Well, just for a reasonable person --

21  A.   Because it wasn't backup collateral.

22  Q.   For a reasonable person, would that be --

23  A.   I don't -- I don't know.  I can't get inside his head.

24  Q.   Well, how about for you?  Suppose you put up a $250,000 CD

25  and you want to use it as backup collateral and you sign this --

1  A.   But it's not backup collateral.  It's the primary

2  collateral for the line of credit.

3  Q.   But this -- to make that CD backup collateral, you're going

4  to have to assign it somewhere; correct?

5  A.   If we're offering a line of credit to a customer that's

6  secured by a CD, there has to be an assignment of the CD.

7  Q.   Let's go to Exhibit 50.  And this is the e-mail that you

8  sent to Mr. Lucken about a week after the CD assignment and the

9  line of credit.  And let's go to the second page, please.  I

10 think we've established the actual date was January 18, 2012; is

11 that correct?

12 A.   Yes.

13 Q.   Now, even changing the date, the date is still backdated

14 from the date of your e-mail; correct?

15 A.   Yes.

16 Q.   And the reason you backdated this letter to the Luckens is

17 you wanted it to appear in the loan file that this letter

18 happened the day before the CD assignment and the line of credit

19 were created, didn't you, Mr. Crim?

20 A.   No.  I would say the letter was probably printed off and

21 e-mailed later.

22 Q.   There is no mention in this letter of Heritage Bank not

23 providing floor plan, is there?

24 A.   No.  It says that this has established a secured line of

25 credit.  So this letter's -- this letter's indicating that the

1  secured line of credit is already in place.

2  Q.  And if someone signed a letter like this, you could have

3  this sort of a purpose for use of a secured line of credit, and

4  also there could be separate floor plan financing provided;

5  correct?

6  A.  Could be.

7  Q.  Let's go to Exhibit 2.  Let's cover the top, please.  This

8  is the Lucken line of credit; is that correct?

9  A.  Yes.

10  Q.  An accounting of that?

11  A.  Yes.

12  Q.  And the CD that secured this line of credit matured, I

13  believe we established, October 23, 2012; is that right?

14  A.  Yes.

15  Q.  Let's go to the bottom of page 1.  Let's go from the middle

16  of the page to the bottom, please.  Sorry.  On the far

17  right-hand column we see that this is the principal balance;

18  correct?

19  A.  Yes.

20  Q.  And it's at 188,000.  It goes up to 225,000.  And then it

21  goes up to 266,000; correct?

22  A.  That is correct.

23  Q.  Now, the CD was for 250,000; correct?

24  A.  That's correct.

25  Q.  And the line of credit was only for 250,000.

1   A.   That's correct.

2   Q.   Correct?  And for all the other entries we see other than

3   one, it goes well above 250,000.

4   A.   That's correct.

5   Q.   In fact, it steadily goes from 263,000 on March 7, and 2

6   weeks later at the bottom of the page it's up to 476,000;

7   correct?

8   A.   Yes.

9   Q.   Almost double the line of credit.

10  A.   I see that.

11  Q.   Now, if Dirks Motors wouldn't have paid anything on that,

12  the bank would have had the exposure above the 250.

13  A.   That's correct.

14          MR. THOMPSON:  Let's go to the next page and at the

15  top half, please.

16  Q.   That amount that the bank was exposed to on March 23 over

17  that 2-week period gets to be more than 265,000 when it hits

18  515,000; correct?

19  A.   Yes.

20  Q.   And at that point you found out about that; right?

21  A.   I would -- yes.  We were probably notified by somebody.

22  Q.   And that's when -- that's when you contacted Dirks Motors

23  and said, hey, you gotta sell those cars you just bought pronto;

24  you gotta get that down to under 250,000.

25  A.   Correct.

1  Q.   So when Dirks was selling those cars that he bought to get

2  that down under 250,000, we see that happen by somewhere around

3  April 3; is that correct?

4  A.   That's from March 23 to April 3, yes.

5  Q.   So roughly a 10- or 11-day period.

6  A.   That's correct.

7  Q.   He's -- he's getting rid of new vehicles he's bought at any

8  price to get rid of them.  And he lost money on that, didn't he?

9  A.   I don't know.

10  Q.   It certainly wouldn't have helped Dick Dirks' business to

11  buy new cars during the middle of March and then because your

12  bank didn't monitor the limit have him have to go out at a fire

13  sale and get rid of those and take a loss.

14  A.   If memory serves me right, he transferred those to other

15  dealers.

16  Q.   Now, when that happened I'm sure you set up procedures so

17  it wouldn't happen again; right?

18  A.   Yes.  And in all honesty I can't -- I don't know how it

19  happened to begin with in the first place.

20  Q.   Now, when it did happen, because it went over the 250, did

21  you contact John Lucken and say, hey, we had a major problem on

22  your line of credit?

23  A.   I don't recall.  I would assume I probably would have, and

24  he would have received notices.

25  Q.   That would have been protocol.

1  A.   Yes.

2  Q.   And if he didn't receive notices or a call, that would not

3  be consistent with bank policy; correct?

4  A.   That's correct.

5  Q.   Let's go to the last page of this document.

6       MR. THOMPSON:  And if you would, yeah, highlight that,

7  please.

8  Q.   We see entries on October 11 towards the bottom and

9  November 7.  Do you see that?

10  A.   Yes.

11  Q.   And right smack dab in the middle is when that CD matured,

12  October 23, 2012.  Do you agree with that?

13  A.   Yes.

14  Q.   Do you know if Mr. Lucken ever renewed that CD or not?

15  A.   I do not know.

16  Q.   And after that CD matured, would there be a notice given to

17  Mr. Lucken of that?

18  A.   That the CD has matured?  Of course.

19  Q.   And then we see on December 3 it went over 250 again,

20  didn't it?

21  A.   Yes.  A day.

22  Q.   Even though it had more than doubled in March and April,

23  you put in procedures to make sure it didn't happen, it happened

24  again.

25  A.   But I don't know the timing on that with cutoff and

1    everything if he had brought checks in that day but just after

2    the cutoff of business.

3    Q.    Did anyone from Heritage Bank ever discuss with you that

4    this line of credit went over the 250 and they were not happy

5    about that?

6    A.    No, they never did.

7    Q.    Were you terminated from Heritage Bank?

8    A.    Yes, I was.

9    Q.    And that was in October of 2012?

10   A.    That's correct.

11           MR. THOMPSON:  Nothing further.

12           THE COURT:  Thank you, Mr. Thompson.

13           Cross-examination, Mr. Reinschmidt?

14           MR. REINSCHMIDT:  Yes, Your Honor.

15           THE COURT:  Why doesn't everybody stand and take a

16   short stretch break first, please.

17           MR. REINSCHMIDT:  Your Honor?

18           THE COURT:  Yes.

19           MR. REINSCHMIDT:  If we take a stretch break, can I

20   take a one-minute bathroom break?  I apologize.

21           THE COURT:  Well, we've had more bathroom breaks than

22   I've had in three-month trials, but go ahead.

23           I'll tell you what, tonight I'll stop by Shopko and

24   buy a couple packages of Depends for the lawyers and parties.

25           MR. REINSCHMIDT:  We appreciate it.

1          THE COURT:  I just wanted to explain what's going to

2    happen now.  Mr. Crim, the witness, was listed by both parties.

3    So they have a right to call him in their case.  Mr. Reinschmidt

4    was kind enough not to have to recall the witness later on this

5    week when he gets to his case, so he's going to both start off

6    with a direct examination of him and then get into his

7    cross-examination based on the testimony that was elicited by

8    the plaintiff.

9          Just to kind of summarize, when a lawyer calls a

10   witness on their direct examination, they're not allowed to ask

11   leading questions, but then on cross-examination they primarily

12   lead.  So Mr. Reinschmidt will start off without leading

13   questions hopefully, but then when he gets to his portion of the

14   cross, he's allowed to lead under the rules of evidence.

15          Mr. Reinschmidt, any time you're ready to roll.

16          MR. REINSCHMIDT:  Thank you, Your Honor.  I am.

17                     CROSS-EXAMINATION

18   BY MR. REINSCHMIDT:

19   Q.   Mr. Crim, sometimes I haven't been speaking into the mike

20   enough.  If I am not, let me know.

21          You left the bank in October of 2012?

22   A.   That's correct.

23   Q.   And when you left the bank -- and you said you were

24   terminated -- were you told why you were terminated?

25   A.   No, I was not.

```
 1   Q.   Did you ask why you were terminated?

 2   A.   I did.

 3   Q.   And what was the --

 4   A.   I'd have to contact HR.

 5   Q.   And did you do that?

 6   A.   No.

 7   Q.   Do you have any reason to believe that your termination had

 8   anything to do with this loan?

 9   A.   No, I do not.

10   Q.   Since you -- without going into your entire work history,

11   just how long have you been in the banking industry?

12   A.   Since 1990.

13   Q.   And how old are you now?

14   A.   Fifty-five.

15   Q.   And since you left Heritage Bank, how long did it take you

16   to find a job after you left Heritage Bank?

17   A.   Two days.

18   Q.   And to whom did you start working, for whom?

19   A.   Siouxland National Bank where I had worked prior.

20   Q.   Then how long did you work there?

21   A.   For three years.

22   Q.   In the same capacity as you did at Heritage?

23   A.   Yes, sir.

24   Q.   And then so that would take us till some time in 2015?

25   A.   Appro -- yes.
```

1   Q.   And then did you voluntarily leave that bank?

2   A.   I did.

3   Q.   And why did you leave that bank?

4   A.   It was a fairly small bank, and it was family owned.  And

5   they had hired me just as -- because we'd had a history in the

6   past.  And Bart knew that it was only going to be temporarily.

7   Q.   And so where did you then find a job?

8   A.   At Pinnacle Bank.

9   Q.   And is that in the Sioux City area?

10  A.   Yes.

11  Q.   Is it in Sioux City or South Sioux City?

12  A.   It's in Sioux City.

13  Q.   Okay.  And what is your title there?

14  A.   I'm a lender there.

15  Q.   Is it -- I know there's some different titles here.  I

16  think here at Heritage you were vice president.

17  A.   That's correct.

18  Q.   Is it about the same?

19  A.   Yes.

20  Q.   Level?

21  A.   Uh-huh.

22  Q.   Okay.  Do you recall when you met Dick Dirks first?

23  A.   2009 I believe.

24  Q.   Okay.  Now, we know from the documents that we've looked at

25  that the loan was -- actually documents we've looked at in this

1  trial that the document was consummated, the loan was

2  consummated, in October of 2009.  We haven't looked at when it

3  started.  Do you remember about when it started?

4  A.   I don't recall.

5  Q.   If I showed you documents that you started conversation --

6  A.   Might have been late 2008.

7  Q.   Okay.  Fair enough.  I was holding you up.  I was going to

8  say something, but you spoke exactly what I wanted to find out.

9  Who con -- did you con -- you were in charge of getting business

10 I think you were asked?

11 A.   Correct.

12 Q.   Did you find Mr. Dirks, or did he find you?

13 A.   He found me.

14 Q.   And when he found you in perhaps late 2008, what was the

15 conversation?

16 A.   He was looking for a refinance of his existing loans.

17 Q.   And when you say a refinance of existing loans, what type

18 of loans did he have at that point?

19 A.   He had loans on real estate and some operating notes at

20 Peoples Bank in Akron.

21 Q.   So when Mr. Thompson was showing you, for example, the

22 payoff to Peoples Bank out of the SBA loan guarantee, that's one

23 of the loans that he had?

24 A.   It was like a debt consolidation under the SBA terms.

25 Q.   While he had those loans with various banks, did he also

1  have floor plan arrangements with any entity?

2  A.   I would assume he had it with Ford and GM.

3  Q.   And why do you say you assume that?

4  A.   Because we didn't approach a floor plan line with him.

5  Q.   To your knowledge -- you've worked at several banks now in

6  your career -- do banks typically do floor plan loans?

7  A.   No.

8  Q.   Why do commercial banks not typically do those?

9  A.   They're labor intensive, and they don't -- you don't get

10  paid very much for them.  They're a lot of work.

11  Q.   They're what?

12  A.   They're a lot of work.

13  Q.   When you say labor intensive, like just give us a sense.

14  What are you talking about?

15  A.   Go out in the middle of winter and count cars and look at

16  VIN numbers once a month.

17  Q.   To make -- why do you do that?

18  A.   To make sure that your inventory is in place that

19  collateralizes your loan.

20  Q.   And when you -- when you started this process with Mr. --

21  with Mr. Dirks, did you understand -- well, rather than

22  understand, what were you doing?  Were you just consolidating

23  the long-term debt, or were you also consolidating floor

24  planning?

25  A.   We did just long-term debt.  We didn't have anything to do

1   with his floor plan.

2   Q.   And I want to look at Exhibit 23 if we could and maybe just

3   take the top part and blow it up.  And this is a -- this is a

4   document -- I was just trying to find a date on it, and I

5   couldn't s -- oh, there it is.  Upper right.  March 10, 2009.

6   Do you see that?

7   A.   Yes.

8   Q.   What is this?  It's entitled credit proposal summary sheet.

9   What is that?

10  A.   It's a brief history of the business and what they're

11  requesting from the bank.

12  Q.   Who's we or they?  Who's they?

13  A.   I am proposing a loan.

14  Q.   To who?

15  A.   On behalf of Dirks to our loan committee.

16  Q.   Okay.  And as you go through that, if you go --

17          MR. REINSCHMIDT:  Ms. Liston, if you go down towards

18  the bottom of that document in the bottom few boxes.

19  Q.   It says that the purpose of the borrowing is for 1.775

20  million of new funds; correct?

21  A.   That's correct.

22  Q.   And what was -- what was the point of the refinancing?  Was

23  it going to be able to -- would it lessen his monthly payments?

24  A.   Yeah.  He had several loans out to several different banks.

25  Q.   And why -- why use the -- or use.  Why call upon the SBA

1   for -- as a guarantor?

2   A.   Because we were short of collateral.

3   Q.   Is that typically when SBA steps in or is helpful?

4   A.   There are other reasons, but mitigating a weakness within

5   the credit could indicate that you need help from the SBA.

6   Q.   And then if we go to the -- if -- as you're making this

7   proposal to -- internal proposal to the bank, when we look on

8   the third page of it under this portion where it's talking about

9   balance sheet, without -- I mean, the jury can see that and can

10  read that, but can you just explain that to the jury a bit

11  about -- it's talking about long-term debt, and then it's also

12  talking about liabilities of the business include dealer floor

13  plans with Ford and GM listed at 1.1 million right there.  Can

14  you explain what that paragraph means?

15  A.   The liabilities of the business include dealer floor plans.

16  Well, he's providing a balance sheet, and it's indicating that

17  in that balance sheet it lists his assets and his liabilities,

18  liabilities being the debt that he owes, and it's indicating

19  that he had dealer floor plan in the amount of 1.149 with those

20  two manufacturers.

21  Q.   And then he also had the 1.8 million long-term debt.  Is

22  that what Heritage was going to get after and refinance?

23  A.   Yes.

24  Q.   And that's what you were able to -- by doing that over

25  time, you're able to refinance that at 1.775 million?

1  A.    Yeah.  Most of it will be refinanced in the SBA loan.

2  Q.    And then as you began talking to SBA -- when I say talking,

3  I don't know that you actually did any talking.  I think it was

4  either generally through e-mails; is that correct?

5  A.    Generally through -- yes.

6  Q.    Okay.  Let's look at Exhibit 8.  And Exhibit 8 is a letter

7  in September of two thousand -- September 19, 2009, to a woman

8  named Connie Lovsletten; is that correct?

9  A.    Could be.

10  Q.    We'll just call her Connie, okay, Connie.  And you're

11  writing that --

12          MR. REINSCHMIDT:  Maybe blow the top part of it up a

13  little better so it's easier to read.

14  Q.    And in there apparently when you say per our conversation,

15  was that an oral -- telephonic conversation?

16  A.    We must have had a telephone conversation.

17  Q.    Okay.  And so she apparently -- when you say a 7(a) loan

18  request, does that mean the SBA loan?

19  A.    Correct.

20  Q.    And you're just going through there and doing a number of

21  different -- answering a number of different questions she had?

22  A.    Uh-huh, yes.

23  Q.    And I want you to go to the second page of that letter

24  where you're answering a number of letters, and I particularly

25  want to look under enumerated paragraph 6 on the second page of

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*computer-aided transcription*
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 140 of 227

1  Exhibit 8.  And in there you're discussing -- you're discussing

2  about floor planning, correct, talking about greatly reduced

3  floor planning last year and what you expect?  I think you go on

4  to say Ford Motor Credit will allow for GM and Ford floor

5  planning upon dealer financial stabilization.  Do you see that?

6  A.   Yes, I do.

7  Q.   And what was the gist of what you were saying in that

8  paragraph to Ms. -- or to Connie?

9  A.   I think they were telling him -- if I remember, they were

10 telling him that he needed to strengthen his balance sheet or

11 reamortize his existing debt.  Some of his debt was on single

12 pay notes and that in order to pay -- once he got the long-term

13 debt reamortized or it was restructured, then they would

14 increase his floor plan amount.

15 Q.   So this is about a month or so before the loan was

16 finalized.  So as it's coming to a conclusion, Ms. Lovsletten is

17 aware that there is floor planning out there that he has;

18 correct?

19 A.   That's correct.

20 Q.   And then I'm going to ask you to look at Exhibit 10.  In

21 Exhibit 10 I'd like you to look at enumerated paragraph 2.  But

22 before we do -- well, just as my paralegal blew it up, I want

23 you to go back to show the date.  The date is October 2, 2009?

24 A.   Yes.

25 Q.   And obviously this must be another letter back and forth

1  between you and Ms. Lovsl -- well, now it's Lovsletteh

2  apparently.  All right.  I was saying n, but it's Lovsletteh.

3  Now if we go down to that second enumerated paragraph, is this

4  again in response to apparently questions that she's had?

5  A.  Yes, and it's outlined in that -- after number 2,

6  explanation of Dirks Motors' ability to achieve profitability

7  and goals.

8  Q.  Okay.  And I particularly want to focus on this.  And this

9  portion is going to be literally if I looked at the -- we'll

10  look at the loan authorization in a minute but I think maybe a

11  week or two weeks max before the loan.  What are you saying

12  here?  What are you alerting her to here?

13  A.  That their gross sales hadn't achieved past historical

14  numbers due to the reduced line of -- dealer floor plan line of

15  credits provided by GM and Ford.

16  Q.  And you're saying here, particularly if I --

17        MR. REINSCHMIDT:  Maybe if you -- Ms. Liston, if you

18  could focus on from "in 2008," in that paragraph, just blow that

19  up.  And highlight "in 2008" on.  Okay.  And I'm looking at the

20  "in 2008 Dirks" further down.  Thank you.

21  Q.  So it says he was able to floor plan 50 vehicles in 2008.

22  It's reduced to 15 but upon refinancing.  When you say upon

23  refinancing, you're talking about your SBA refinancing.

24  A.  That's correct.

25  Q.  Upon that they -- Ford and GM have announced they will

1   increase unit floor planning -- and then we'll have to go to the

2   next page -- that GM and Ford will increase floor planning to

3   mid 2008 levels.  Do you see that?

4   A.   Yes.

5   Q.   So was Miss Lovsletteh aware that there was going to be

6   floor planning in addition to -- or as a parallel to the large

7   loan that you were loaning Mr. Dirks?

8   A.   That GM and Ford were going to maintain their -- or provide

9   dealer floor planning, yes.

10  Q.   On Exhibit 11, one thing in particular on Exhibit 11 I want

11  to point out to you, if you will look at the very first page on

12  Exhibit 11 -- well, first of all, before we get to that, Exhibit

13  11, is that the authorization wherein the -- this is the loan.

14  The loan's been consummated?

15  A.   Is this Exhibit 11?

16  Q.   Yes.

17  A.   Yes, this is the SBA authorization.

18  Q.   Okay.  And there's a word that sometimes is used,

19  boilerplate.  Do you know what boilerplate means?

20  A.   Absolutely, yes.

21  Q.   What -- tell the jury what that means.

22  A.   A boilerplate is stan -- or standard document and that is a

23  boilerplate; that's what they use for everybody, but then they

24  may modify that boilerplate to meet the specific needs or issues

25  of a credit.

1   Q.   I wanted to draw your attention to -- and I'll just focus

2   first on this part, and then I want to refer you to a second

3   part.  On this first part of the loan, it says that there's a

4   guarantee fee of slightly over $53,000.  Do you see that?

5   A.   Yes, sir.

6   Q.   And then below it, though, it says payment of the guarantee

7   fee will be made by SBA subject to section 501 of the American

8   Recovery and Reinvestment Act of 2009.  Do you see that?

9   A.   That's correct, yes.

10   Q.   So did the -- did the bank or Dirks have to pay that

11   $53,187.50?

12   A.   No.  Under the American Recovery and Investment Act, those

13   SBA fees, guarantee fees, were waived.

14   Q.   Now, if we go to page --

15         MR. REINSCHMIDT:  Let's go to page 2 of Exhibit 11,

16   and I'm going to have you blow this portion up under E,

17   contingencies.

18   Q.   And I particularly want you to focus on this portion.  I

19   think you were asked by Mr. Thompson if the bank had to comply

20   with each and every contingency under E, contingencies, and you

21   said, well, yes, we have to.  Do you remember that?

22   A.   Yes.

23   Q.   Would you call E1 through 6 boilerplate items listed under

24   there?

25   A.   I would -- yes, I would consider 1 through 6 -- is that

1  what you said?

2  Q.   I did.

3  A.   Items 1 through 6 would be boilerplate because there is no

4  full guarantee fee on this particular loan.

5  Q.   So -- yes.  So if we reflect and look at number 2 saying

6  you've got to pay the full guarantee fee under E, sub 2, that's

7  not true according to the first part of the document which said

8  it's waived.

9  A.   Yes.

10  Q.   Okay.  I want you to look just for a moment at UCC

11  searches.  You were asked earlier in this case by Mr. Thompson

12  about a UCC search that you did in 2011 after the bank said

13  we're going to exit this loan.  And you were asked if there were

14  earlier searches, and I believe your answer was I believe there

15  were; correct?

16  A.   Correct.

17  Q.   And I want you to look at Exhibit 1003.  And we'll look at

18  the top portion of that.  On 1003 -- well, actually you know

19  what?  Before we look at the very top portion of it, I think

20  what we might do is look at the very bottom of it.  On the very

21  bottom -- well, first of all, do you know, is this a Heritage

22  document?

23  A.   Yes, it is.

24  Q.   And at the very bottom it says review officer initials

25  D.R.P.  Do you know who did that or not?

```
1   A.   I -- he was the senior -- senior lender, and I don't

2   recall.

3   Q.   Okay.

4   A.   I think.  I don't -- he was one of the senior lenders.

5   Q.   Who is he?

6   A.   D.R.P.

7   Q.   Okay.

8   A.   Dick.  I don't remember Dick's last name.

9   Q.   Okay.  Well, let's go back up.  This is saying a number of

10  things about the SBA loan.  But at the very top right here under

11  documentation it shows a UCC-1 filed on 12-24-09.  Do you see

12  that?

13  A.   Yes.

14  Q.   And that would have been after the SBA loan was authorized

15  and concluded.

16  A.   Yes.

17  Q.   And then just above it it shows a UCC search on 3-11-10;

18  correct?

19  A.   Correct.

20  Q.   And when you were talking with Mr. Thompson about the

21  October 6, 2011, UCC search that showed Ford having a superior

22  lien to Heritage on cars, would that also have shown up on a UCC

23  search on 3-11-10?

24  A.   Yes, it would have.

25  Q.   And is this standard operating procedure for the bank to
```

1  periodically do UCC searches?

2  A.   Yes, it is.

3  Q.   All right.  And then I want you to also reflect upon

4  Exhibit 56, and there's going to be testimony later that this is

5  a punch list completed by somebody named HL Lender Resources

6  which is owned by Mr. Harbison and Mr. Langin, and Mr. Harbison

7  will testify later in this case.  And in that case -- and I

8  think -- I'm going to have to do the whole -- do this.  In that

9  case he's got a punch list of quite a number of items.  And in

10  that -- in those items listed there's going to be testimony in

11  this case that in June of 2012 they came in and did a -- did a

12  review or an audit.  Do you remember them doing that?

13  A.   Yes, I do.

14  Q.   And when they did their review and audit, I see that

15  they've checked UCC-1 and UCC-2 filings right here.  And then

16  off to the right-hand side there's dates written.  It's a little

17  hard to read.  I think Mr. Harbison will testify -- well, he

18  will testify.  Tell me the best you can read it for our purposes

19  now.

20  A.   12-13 of '11 and 2-14 of 2010.

21  Q.   Okay.  Mr. Harbison may testify it's 5, but whether it's 2

22  or 5 --

23  A.   Yeah, might be 5.

24  Q.   Okay.  Might be 5-14, 2010?

25  A.   Yes.

1  Q.   And, again, that would be well before the bank made a

2  decision to exit this loan.

3  A.   That's correct.

4  Q.   So at this point we know we've got a March 11, 2010, check

5  that would have shown the lien, the Ford superior lien, a 5-4,

6  2010.  And now let's look at another one.  Let's look at Exhibit

7  2 -- excuse me, Exhibit 1036.  And in Exhibit 1036, this is

8  dated 10-14, 2010.  And under this area financing statement

9  county or state, it lists UCC search, and that shows one done on

10  5-24, 2010.  Do you see that?

11  A.   Yes.

12  Q.   And again, that would mean that according to the documents

13  contained in the bank's files that there were three searches

14  prior to your search on 10-6, 2011.

15  A.   That's what it would indicate, yes.

16  Q.   Were you ever concerned that Ford had a superior lien on

17  vehicles to you?

18  A.   No.

19  Q.   Did you -- were you concerned that in any way you had

20  violated the SBA loan guarantee?

21  A.   No.

22  Q.   By the way, when we talked about that loan guarantee -- and

23  I might pull the exhibit up for you, but basically I just want

24  us to be clear about this.  When -- and -- well, actually let's

25  take a look at it right now.  Let's look at Exhibit -- I think

1    it's 27.  I'm jumping ahead just a little bit here.  We'll come

2    back to this again.  But there's an 85 percent loan guarantee.

3                MR. REINSCHMIDT:  Go to the very bottom.  I think

4    there's a little more here.  Oh.  Just go up a little bit,

5    Ms. Liston.  Right here.

6    Q.   Okay.  This part here where he says -- where it said

7    approximately 259M, that means thousand; is that correct?

8    A.   Yes.

9    Q.   So 259,000 in September of 2011, the unguaranteed portion

10   of the SBA loan.  Does that -- how -- again, how is that number

11   arrived at?  You've got a loan at that point that I think was

12   about 1.6 million?

13   A.   Less that 85 percent SBA guarantee, so this would be the

14   unguaranteed portion as it states there in that bullet point.

15   Q.   So that's if you liquidated it but didn't get any payments

16   or what?

17   A.   No.  That would be just the face amount of the loan minus

18   the 85 percent guarantee.

19   Q.   Okay.  Okay.

20   A.   Which this number would be less once you removed the

21   certificates of deposits and the cash value life insurance.

22   Q.   This is -- the bank internally is treating this as if they

23   have no collateral.

24   A.   That is correct.

25   Q.   Like we're just having to write everything off.  We go to

```
 1   SBA, say pay 85 percent of the 1.6 million or so, and then we're

 2   left for 259,000.

 3   A.   That's correct.

 4   Q.   But we know the bank had lots of collateral.

 5   A.   Cash collateral.

 6   Q.   So this is actually -- this is worst-case scenario of every

 7   asset's worth zero.

 8   A.   Yes.

 9   Q.   Okay.  Were you aware by April 2011 that Dirks Motors was

10   out of trust?

11   A.   I don't know if I was or not.

12   Q.   Did you know prior to -- we're going to talk about a letter

13   that you wrote to Dick Dirks in summer of 2011, in July of 2011,

14   where you said we can't give you any more money and certainly

15   none for floor planning.  But before we get to that letter, did

16   you know prior to that that he was out of trust?

17   A.   I knew that he owed money, and I don't know at what point I

18   knew this, but I knew he had told me that he owed money to Ford

19   and he had to pay that.

20   Q.   Did you know whether or not in spring and summer of 2011

21   whether he was seeking financing from other banks for floor

22   planning?

23   A.   I don't recall that.

24   Q.   Did he tell you whether he was or not?

25   A.   No.
```

*Contact Shelly Semmler at (712) 233-3846 or shelly_semmler@iand.uscourts.gov*
*Mary Mennega, Official Court Reporter — Sioux City, Iowa*
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 150 of 227

1    Q.   Did he ultimately approach you in July of 2011 asking you

2    whether or not Heritage could provide floor plan financing?

3    A.   He did approach us.  I don't recall when that was, but he

4    approached us about doing a line of credit.

5    Q.   Okay.  I'd like you to look at Exhibit 138.  And this is a

6    letter written on July 14, 2011; is that correct?

7    A.   Yes.

8    Q.   And this is specifically identified -- it's a request for

9    dealer floor plan line of credit.  Do you see that?

10    A.   Yes, it is.

11    Q.   And it's a pretty straightforward letter.  You asked us

12    about dealer floor plan.  What do you mean in that second

13    sentence here where you say -- that begins with "as I

14    indicated"?  When you talk about current loan limit, that seems

15    pretty obvious, but what does that mean in terms --

16    A.   That we've reached the maximum amount that we can go with

17    him.

18    Q.   You've got -- at that point he owes you about 1.6 million

19    roughly?

20    A.   Yes, yes.

21    Q.   And you just can't loan him any more money even if it's --

22    even if you take interest and the collateral in the cars?

23    A.   That's correct.

24    Q.   Did you have the authority to loan him more money on your

25    own?

```
 1   A.   No, I would not have.

 2   Q.   Would you have lost your job immediately if you had done

 3   that?

 4   A.   I would assume so, yes.

 5   Q.   And did you -- did anything change on the loan limits

 6   between that letter on July 14, 2011, and this supposed offer

 7   you made in November of 2011 to do floor plan financing?

 8   A.   We merged with our Minnesota division which may have

 9   changed our legal lending limit, but I don't recall the

10   specifics of that.

11   Q.   Okay.  Did you ever revisit this issue with Mr. Dirks?

12   A.   Not until later that fall.

13   Q.   Relative to near to this meeting?

14   A.   Yes.

15   Q.   Okay.  And we'll get to that meeting shortly.  At the time

16   when he asked you if you would do a floor plan for him or floor

17   planning financing for him, did Heritage Bank in Sioux City do

18   any floor planning?

19   A.   We had one floor -- two floor plan lines.

20   Q.   Who did you do that for?

21   A.   Total Sales and Service in LeMars and a small used

22   dealership here in Sioux City.  But that one here in Sioux City

23   actually was secured by certificates of deposit, so I don't know

24   if I would treat it as a floor plan line.

25   Q.   Okay.  Might -- it almost sounds more like what Mr. Lucken
```

1  did.

2  A.    Yeah.

3  Q.    And the Total Motors one, when you did that -- or, well,

4  actually I say when you did that.  Did you personally do that,

5  or is that somebody else in the bank?

6  A.    I originated the loan, but we had other people servicing

7  the loan, or we serviced it as a team.

8  Q.    On that floor plan, did that have a limit as to how much

9  the borrower, in this case Total Motors, could go up to?

10 A.    Yes, it did.

11 Q.    And what was that limit?

12 A.    I don't recall what that was.

13 Q.    Is there always a limit on floor planning?

14 A.    There's always a limit on floor plans.

15 Q.    Why does there need to be a limit if the car is your

16 collateral?  In other words, you've always got your asset.  You

17 can always sell your asset.  Why can't you have an almost

18 infinite --

19 A.    Well, you'd have regulatory reasons, and you'd have

20 financial reasons.  Regulatory reasons, you can only loan so

21 much to one borrower.  Financial reasons is that a borrower

22 might not have the ability to be able to service.  Be like

23 giving somebody a hundred thousand dollar line of credit when

24 they only make 20,000 a year.

25 Q.    Right.  Okay.  So you're always going to want to know what

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Rebecca E. Williams, CRR, RPR, Official Court Reporter
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 153 of 227

1   the -- how long -- how long it lasts and how much it is?

2   A.   Correct.

3   Q.   If Dick Dirks on behalf of Dirks Motors couldn't get new

4   floor planning and he was having issues with Ford Motor Credit,

5   what would happen to his business?

6   A.   It would go under.

7   Q.   And when he's talking to you in July of 2011, were you

8   encouraging him, discouraging him about -- we understand what

9   you did on behalf of the bank.  But -- for doing floor planning

10  for him, but were you encouraging him or discouraging him to do

11  something else, to go find somebody else?

12  A.   We had talked -- I had suggested perhaps he find an

13  investor who would be willing to help him.

14  Q.   Why didn't you suggest another bank?

15  A.   Or other finance -- other financing.

16  Q.   Okay.  Okay.  And did you give him some guides or, well,

17  here's -- I know this wealthy investor or --

18  A.   No.

19  Q.   -- anything like that?

20  A.   No.

21  Q.   You didn't cross -- cross-fertilize like banking customers

22  and --

23  A.   No.

24  Q.   Okay.  All right.  And by that I meant if there's like a

25  banking customer that said I'm looking for investments.

1  A.   No.

2  Q.   Okay.  All right.  And by August and early September, is he

3  having major issues?

4  A.   Yes.  If we go back and look at that history, I think he

5  was having late payments by that point.

6  Q.   Okay.  Actually we can pull that up a little b -- well,

7  we'll take your word for it for now.  We're going to -- we'll

8  look at that -- his loan in a minute.  But by -- I want you to

9  look at Exhibit 25 for a moment.  And I believe there were two

10  letters identical.  One was written directly to Dirks, and one

11  was written to Heritage Bank on September 19, 2011.  I'm just

12  looking at this exhibit which was written to Heritage Bank.  And

13  what was that exhibit number again?  That's Exhibit 25.  On

14  Exhibit 25 Ford is saying that what?  The vehicles they floor

15  planned they're selling?

16  A.   Yes.

17  Q.   Okay.  And we don't have the attached schedule, but do you

18  know at that point if he had many vehicles left?

19  A.   I don't believe he did.  We had made a site visit just

20  prior -- right around this time.

21  Q.   And do you know at that point if Ford actually had brought

22  somebody on site to monitor sales of cars?

23  A.   I don't recall if that was the case.

24  Q.   Okay.  All right.  Maybe Dick Dirks can speak to that.  So

25  did you do anything with this letter on behalf of the bank?

1    A.   This would have been at the time when we started

2    downgrading the credit, considering downgrading the credit, I

3    believe.

4    Q.   And I want you to look at -- well, before we leave that

5    Exhibit 25, when you got that letter, did that letter concern

6    you about your own security with the SBA loan?

7    A.   No, it did not.

8    Q.   Did it concern you?

9    A.   It concerned -- yes, because you have a viable business

10   that is losing its backing.

11   Q.   And then let's look at -- let's look at Exhibit 27.  And

12   that's the kind of internal memorandum on September 29 that was

13   talked about earlier.  And really those three bullet points, do

14   they all work in conjunction?  I mean, in other words, are those

15   all -- are those equally important, or one's more important than

16   the other?  How would you describe them?

17   A.   They're all concerns.

18   Q.   On that lack of financials provided, what financials would

19   you typically ask anyone who had a loan of that magnitude to

20   bring in?

21   A.   Annual tax returns, profit and loss statements, balance

22   sheets, maybe quarterly profit and loss statements, and balance

23   sheets.

24   Q.   Okay.

25   A.   Certainly tax returns.

1   Q.   You preempted my question.  I was going to ask you about

2   that.  So you're talking not just yearly, but maybe you might

3   want quarterly P and Ls.

4   A.   Yes.

5   Q.   You want to be able to monitor their business.

6   A.   That's correct.

7   Q.   And annual tax returns, this loan was completed in October

8   2009.  Did you get 2009 tax returns?

9   A.   I would have to go back and look at that CAD.  It would

10  probably indicate that if we had it on there.

11  Q.   And did you get -- I presume you must not have gotten 2010.

12  A.   I would assume not, but I can't guarantee that.

13  Q.   Okay.  But at least -- so when it says financials, does it

14  mean just tax returns or it means all --

15  A.   Means everything.

16  Q.   Everything.

17  A.   Whatever was requested.

18  Q.   And when you say requested, are you the primary contact

19  that Dick Dirks has with Heritage?

20  A.   Yes.

21  Q.   And did you request this through e-mails, phone calls, on

22  site?

23  A.   We would send out letters on an annual basis and then

24  follow up with those on a regular basis until they were --

25  Q.   And you -- sorry.

1  A.   -- until the request was satisfied.

2  Q.   And do you recall following up?

3  A.   Yes.

4  Q.   And what was Dick Dirks' response when you would follow up

5  asking for financials?

6  A.   Just that he hadn't completed them yet.

7  Q.   And was that always his response?

8  A.   Yes.

9  Q.   And then the payment history, by -- I think we'll see by in

10 August he started to pay -- he was late, in August of 2011; is

11 that correct?

12 A.   That's correct.

13 Q.   And then it talked about the unguaranteed portion, 259,000.

14 We talked about that.  All right.  Then you did the search on

15 10-6-11.  We won't bring that up again.  I mean I won't show the

16 exhibit, but the point is you did the search and saw Ford was

17 ahead of you on cars; correct?

18 A.   Yes.

19 Q.   And parts.

20 A.   Uh-huh.

21 Q.   Is that right?  Yes?

22 A.   That's correct.  Yes.  That's correct.

23 Q.   Again, did that concern you?

24 A.   No, it did not.

25 Q.   And during this time was Mr. Dirks seeking a purchaser for

1  his business?

2  A.   He'd indicated that he was.

3  Q.   Okay.  And I could bring up the exhibit, but there's an

4  exhibit that shows in early November 2011 -- it's Exhibit 218 --

5  that Total Motors was -- had thrown out a letter of intent to

6  purchase this business.  Do you know about that?

7  A.   No, I was not aware of that.

8  Q.   How did you know that he was seeking purchasers?

9  A.   He had mentioned that he was talking to --

10 Q.   Did he always share that information with you about a

11 specific purchaser or just tell you I'm looking?

12 A.   I knew that it was Total Sales.

13 Q.   Okay.  That he just was talking and talking to Total Sales.

14 A.   Yes, but he was telling me that.  I never discussed it with

15 Total Sales.

16 Q.   All right.  And then you sent this -- or you've done the

17 downgrade of the -- I say you.  Heritage.  Heritage had

18 downgraded his loan in late September 2011.  You've checked the

19 UCC, and then you sent a default letter to him in -- on

20 October -- excuse me, on November 3, 2011, which is Exhibit 31.

21          MR. REINSCHMIDT:  Blow that up a bit.  And actually

22 blow up the very top right just to show the date first.

23 Q.   So November 3, 2011, that was sent.  And now go ahead.  And

24 is this actually starting foreclosure, or sometimes bankers

25 say -- sometimes they say exiting the loan?  How would you

1  describe it?

2  A.   I would say we're advising him of his rights that he has

3  to -- in the terms of his note that he has to pay us off, that

4  he is in default under his loan.

5  Q.   Does he have to just bring payments current, or he owes the

6  whole amount?

7  A.   It looks like we're requiring the full amount.

8  Q.   Okay.  Okay.  So after this happened, after November 3,

9  2011, who contacted you about getting together?

10  A.   Dick did.

11  Q.   Dick Dirks.

12  A.   Yes.

13  Q.   And there's been testimony, and the dates have moved around

14  a bit, but relative to November 3, I mean, is there anything

15  that sticks in your mind that you can kind of tie down a general

16  time period?  I don't really care about the exact date but just

17  generally if you know.

18  A.   There's nothing I can tie to the specific date.

19  Q.   Okay.  When -- what did Dick Dirks say to you?

20  A.   I -- when he made his meeting to come in with Mr. Lucken?

21  Q.   Yes.

22  A.   I don't recall specifically.

23  Q.   Well, what did you recall -- did you know that he was going

24  to bring someone with him?

25  A.   Yes, he mentioned he was bringing somebody in with him.

1  Q.   Did he mention Mr. Lucken's name?

2  A.   No, not to my knowledge.

3  Q.   And did he say why he was bringing this person with him?

4  A.   That he had somebody who was going to help him with his

5  business.

6  Q.   Okay.  And again, did you understand the purpose was like

7  help as in help relative to the SBA loan guarantee, help

8  relative to floor planning?

9  A.   May have used the word investor.

10 Q.   Okay.  All right.  And so how long do you recall between

11 the time of the phone call and the time that Mr. Lucken and

12 Mr. Dirks --

13 A.   Dick Dirks usually called me and showed up that afternoon,

14 so it would have been probably right away.

15 Q.   Okay.  And so he showed up with Mr. Lucken?

16 A.   Both of them together.

17 Q.   And we've heard that it was in your office.

18 A.   Uh-huh.

19 Q.   Can't remember if the door was open or closed.  Without

20 repeating all that testimony, let me ask it this way.  Who do

21 you re -- was there a person who was sort of in charge of the

22 meeting, if you will, or who spoke the most?

23 A.   I would say Mr. Dirks probably.

24 Q.   Well, you're the banker.  Weren't you doing any speaking?

25 A.   Well, yes.  We had a loan that was -- that had been

1  downgraded, and Dick had asked us for additional funding which

2  we were not able to provide.

3  Q.   You're talking about back in July.

4  A.   Yes.  And that he needed to be able to pay Ford for the

5  vehicles that were sold out of trust and the dealer floor plan

6  issue, that they were going to remove his franchise agreement

7  and that Mr. Lucken was willing to help him with that.

8  Q.   And what did he -- and then did Mr. Lucken say what he was

9  willing to do, or did Mr. Dirks speak on behalf of Mr. Lucken?

10 A.   I think they had formulated that plan before they got to my

11 office.

12 Q.   And what plan did you understand had they formulated when

13 they came to your office?

14 A.   That Mr. Lucken was going to loan him money to pay Ford.

15 Q.   And what would happen if -- at that point if Ford Motor

16 Credit had not been paid in early November, what would have

17 happened to Dirks' business?

18 A.   I assume they would have started the process of pulling his

19 franchise agreements.

20 Q.   At that point did he have -- to your knowledge did he have

21 any cars on the lot?

22 A.   I think he had -- he may have had some used inventory at

23 that point, and that's it.

24 Q.   And so, again, you were asked about the first 250,000.  And

25 did you -- do you know why -- I think you said earlier that

1  Mr. Lucken didn't want maybe his bank, Peoples Bank, in Akron to

2  know that he was loaning money in Akron?

3  A.   He came down with a check for 250,000 and wanted us to send

4  it to Ford.  And we couldn't do that based on a personal check.

5  Q.   Oh.  Was it a check written out to Ford?

6  A.   He brought a personal check to us the first time, I

7  believe.

8  Q.   Well, hang on.  I'm not sure I'm clear.  Was it a check

9  written out to Heritage or a check written out to Ford?

10  A.   To Heritage Bank.

11  Q.   And he wanted you in turn to write a check to Ford?

12  A.   That's correct.

13  Q.   And you've earlier testified you couldn't do that.  What's

14  the word in banking?  It wasn't something funds?

15  A.   Funds hadn't cleared.

16  Q.   Okay.

17  A.   Weren't guaranteed funds.

18  Q.   So in other words, his check -- you didn't -- you don't

19  know him.  His check could -- even if you did know him, his

20  check could bounce, and you'd be out 250 you'd sent to Ford?

21  A.   That's correct.

22  Q.   In terms of the numbers, there was that, you know, very

23  specific number owed Ford.  It wasn't a round number.  It was

24  like 224,000 some odd dollars.  It's in -- oh, it's in early

25  exhibits here.  Well, we can look at Exhibit 1 -- it's a later

```
 1    exhibit.  We can look at Exhibit 143.  Actually I'm going to
 2    have you look at an earlier one.  It was an earlier one.  Look
 3    at Exhibit 35.
 4            MR. REINSCHMIDT:  If you would, Miss -- pull that up,
 5    Miss Liston.
 6    Q.   And this is a cashier's check to Ford for $225,455.92.
 7    Who -- where did that number come from?
 8    A.   Mr. Dirks.
 9    Q.   Did you -- did you have correspondence with Ford so you
10    knew what the number was?
11    A.   No.  We were only acting as a -- on behalf of Dirks.  We
12    did not orchestrate any of this.  Dick asked us to put together
13    a cashier's check payable to Ford.
14    Q.   And then there's a remaining amount of that 250 which is in
15    Exhibit 36.  And that is a cashier's check that you then made
16    payable to Dirks for $24,544.08.  Do you see that?
17    A.   Yes.
18    Q.   Was Mr. -- in the course of Mr. Dirks orchestrating this,
19    did you have any guidance from Mr. Lucken as to the fact that
20    the balance, this 24,500 and some dollars, could be sent
21    directly to Dirks as opposed to --
22    A.   Completely.
23    Q.   -- the bank or something?
24    A.   Completely.
25    Q.   And what guidance did you get?
```

1   A.   He would have authorized us to give the remaining funds to

2   Dirks.

3   Q.   When did he authorize that?

4   A.   It would have been that same day.

5   Q.   Mr. Lucken?

6   A.   Yes.

7   Q.   And would that have been in a phone call or e-mail or

8   otherwise?

9   A.   I think he was there.

10   Q.   That he was physically where?

11   A.   He came in and he brought us the ca -- didn't he bring us a

12   cashier's check made payable?

13   Q.   I think --

14   A.   And we in turn changed that cashier's check over to -- part

15   of it to Ford and then part of it back to Dirks.

16   Q.   And you're saying during that process of no, we need a wire

17   from your bank that he physically stayed at your bank,

18   Mr. Lucken did, or at l -- or gave you guidance before --

19   A.   Yes, he had given us guidance.

20   Q.   Okay.

21   A.   He had indicated how he wanted us to . . .

22   Q.   And then earlier in this case I think with Mr. Lucken I

23   showed him the bottom of this check in terms of the deposit, and

24   the deposit, if you go and focus on the top middle part that I'm

25   going to circle, it shows that it was deposited by Mr. Dirks at

1    Security National Bank; correct?

2    A.    That is correct.

3    Q.    Once that money went to him, did you control those monies?

4    A.    No, we did not.

5    Q.    Did you order or direct him that as soon as you get those

6    monies you need to immediately pay the arrear -- the amount that

7    you're in arrearage on the SBA loan?

8    A.    No, we did not.

9    Q.    He used those money to pay that, but he could have used it

10   for other things?

11   A.    Yes.  It was out of our control.

12   Q.    Well, and when I say he could have used it for other

13   things, do you know how much money he had at Security National

14   Bank?

15   A.    Had no idea.

16   Q.    So he could have had $50,000 at Security National Bank and

17   used 24,000 of it to pay -- to pay you, to pay the SBA.

18   A.    Correct.

19   Q.    Okay.  Fair enough.  You heard -- oh, by the way, so we've

20   had conversations about -- we've had conversations about that

21   this -- I think this morning Mr. Lucken settled on he thought

22   that the meeting had been on -- I think 11-8-11 maybe was the

23   first meeting with just Dirks and then a few days later with

24   you.  This is an internal memo from Ford and where Ford -- on

25   November 18.  And so according to Mr. Lucken's testimony this

1  morning, this would have been after -- several days after the

2  meeting with you and Dirks.

3       And in there this says Julie Hammitt at the top is

4  sending an e-mail to John Perry both at Ford Motor Credit saying

5  about a conversation she had with Dick Dirks.  And in it she's

6  saying that -- basically that Dick Dirks is paying him, correct,

7  in that first -- in that first paragraph there?  Says you're

8  getting paid.

9       And then it goes on to say -- down here says that he's

10  in negotiations with Heritage Bank to obtain floor planning.

11      Now, this is days after he's -- Mr. Lucken has

12  testified that an agreement was reached for Heritage Bank to do

13  floor planning.  Did you ever even have negotiations let alone

14  an agreement for floor planning with Mr. Dirks?

15  A.   No, we did not.

16  Q.   I want you to look at after that meeting in mid November

17  you then asked for documents from Mr. Lucken, and I'm going to

18  particularly look at Exhibit 38, and in 38 -- we've talked about

19  this quite a bit with Mr. Lucken -- you talk about here's a list

20  of the information we'll need to send.  And then on the second

21  page of that same document which is now -- now two days, it's

22  dated November 21, your last e-mail.  That's two days before he

23  purchases the CDs.  And you say thank you, John, for sending.

24  When can we get together to discuss?  And the discussion -- I

25  mean, I don't know -- I'm going to ask you what the discussion's

1   about.  Here he says he's provided tax returns for three years,

2   and we've also got another exhibit where it shows profit and

3   loss statements, balance sheets for four different entities,

4   four different Lucken entities.  Do you remember receiving those

5   profit and loss --

6   A.   Yes, I do.

7   Q.   -- and balance sheets?  What were you going to get together

8   to discuss from November 21?

9   A.   John wanted to borrow money on -- to be used for Dirks

10  Motors.

11  Q.   Okay.  And had that come up in the meeting or not in the

12  meeting?

13  A.   Yes, it had come up in the meeting, and that's why he is

14  sending me this information.

15  Q.   Well, if he's going to ultimately purchase a CD, why do you

16  need this information?

17  A.   I believe we originally had not brought up the CD secured

18  loan, that that came up at a later date.

19  Q.   That reminds me, if you would look at the -- if you would

20  look at Exhibit 46, I believe.  It's either 46 or 48.  And 46 is

21  the correct one.  That is the -- that is the note.  And by the

22  way, we'll get -- we'll get to the exhibits about GM and Ford.

23  But in the upper right where it has the loan number, what we can

24  see is 0881.

25  A.   Yes.

1  Q.   Is that the line of credit?

2  A.   That is the line of credit.

3  Q.   And when -- when we look at this note, this is on -- it's

4  written on January 19, 2012.  On January 19, 2012, Heritage Bank

5  charged an interest rate of 3.7 percent.  Is there anything that

6  strikes you about that interest rate?

7  A.   Well, the interest rate's extremely low.

8  Q.   And why is that interest rate so low?

9  A.   Because it's secured by a certificate of deposit.

10 Q.   How does the bank calculate the interest rate?

11 A.   As a margin over what we're paying on the CD.

12 Q.   And what would the margin typically be?

13 A.   Two percent would be industry standard.

14 Q.   So you would anticipate that the CD's probably about 1.7

15 percent?

16 A.   Yeah, maybe 2, 2 1/2 percent.

17 Q.   If that had not been secured by a CD but instead by some

18 other asset listed on the long balance sheets on the various

19 Lucken entities, would that interest rate have been higher?

20 A.   Significantly higher.

21 Q.   And what is significantly higher?

22 A.   At the time in '12, 6 1/2, 7 percent.

23 Q.   And that would have been -- on a $250,000 line of credit,

24 that would have been a significant amount of extra interest per

25 year that Mr. Dirks would be paying back to the bank on behalf

1  of Mr. Lucken; correct?

2  A.    That is correct.

3  Q.    Did you have a conversation with Mr. Lucken about the value

4  of using one type of security versus another type of security?

5  A.    Yes, we did.

6  Q.    And when did that occur, and what was said?

7  A.    I don't recall if it was -- must have been after he sent

8  his financials or before.  I don't recall.  But the idea is that

9  if you have a certificate of deposit, we almost can make a loan

10  within 24 hours based on a CD-based loan because really all

11  we're doing is loaning your money back to you at a much cheaper

12  rate than it would be if it was tied to some other asset.

13  Q.    Mr. Lucken testified that your request for financial

14  information was part of your deceit.  Do you agree with that?

15  Was it part of a deceit on your part?

16  A.    No.  It's general loan underwriting.

17  Q.    Once you -- once he had provided the CD as security, did

18  you ever ask for any more financial information from Mr. Lucken?

19  A.    No.

20  Q.    Did you need any more financial information from --

21  A.    No.  If we have a CD-secured loan, you don't require any of

22  the ongoing financial information.

23  Q.    There was conversation about shortly after -- not long

24  after the meeting, not long after the purchase of the CD on

25  11-23, then there were these commitments made to General Motors

1    and to Ford by Heritage.  Do you remember that conversation?

2    A.    Yes.

3    Q.    And I believe one is 40 and the other was 41.  And in

4    Exhibit 40, that's the -- maybe -- that's the one to General

5    Motors.  And there is a -- if we went back to the entire

6    document at the very top of the document, that is a Heritage

7    letterhead; correct?

8    A.    That's correct.

9             MR. REINSCHMIDT:  Let's go down to the body of the

10   letter now, Ms. Liston.  Thank you.

11   Q.    Did you write this letter?

12   A.    This was a boilerplate agreement.

13   Q.    Produced by Heritage?

14   A.    GM.

15   Q.    And similarly --

16   A.    Or Ford.

17   Q.    I'm sorry, sir.  Go ahead.

18   A.    GM or Ford.

19   Q.    And similarly, if we went to the Ford one --

20   A.    Yes.

21   Q.    -- was that a template by Ford?

22   A.    Yes.

23   Q.    Could Dick Dirks purchase any vehicles -- well, let me

24   restate that.

25             If Dick Dirks wanted to -- like if Mr. Lucken had

1    simply given Dick Dirks $250,000 and Dick put it into his

2    Security National Bank account or Heritage, whichever --

3    whatever bank, and could -- could Dick Dirks just write a check

4    any time he wanted a car from Ford or from GM?

5    A.   I think they needed electronic funds, ability to be able to

6    authorize -- to transfer it out electronically.

7    Q.   Electronically meaning wiring money.

8    A.   Yes.

9    Q.   Not waiting for a check or the check's in the mail; right?

10   A.   Exactly.

11   Q.   And, I mean, that's just not the way American commerce

12   works I assume these days.

13   A.   That's correct.

14   Q.   Okay.  And are banks the only entities that have the

15   ability to use electronic funds?

16   A.   No.

17   Q.   Well, does the average --

18   A.   You use a debit card every day.

19   Q.   Oh.  Thank you.  Yes.  Good point.  But other than that,

20   other than using a debit card to buy a Ford vehicle, would you

21   have to use a bank in order to buy the Ford vehicle if you're a

22   dealer?

23   A.   I guess it wouldn't necessarily have to be bank.  I suppose

24   there are other lending institutions that would provide dealer

25   floor plans that aren't banks.

1   Q.   Okay.  Fair enough.  Some form of lending institution.

2   A.   Yes.

3   Q.   All right.  And did -- and you said that the 250,000 on

4   each one was tied in to the EFT account number there?

5   A.   Yes.

6   Q.   And I've circled it.  Does that mean that you had created

7   the line of credit at that point for Mr. Lucken?

8   A.   The line of credit would have had to have been completed

9   prior to have that EFT number, that 0881.

10  Q.   Okay.  And he just didn't sign the promissory note for

11  another couple of months.

12  A.   I don't recall how that would have -- the dates on that

13  would have lined up, but the line of credit would have had to

14  have been in place.

15  Q.   Okay.  Well, there's plenty of testimony, and we've looked

16  at the promissory note many times.  It's dated January 19, 2012,

17  so roughly 2 months later's when the actual note was signed.

18  A.   Uh-huh.

19  Q.   Is that a yes?

20  A.   Yes.

21  Q.   Okay.  But let's look at -- let's just look at the actual

22  loan.  Let's go to Exhibit -- Exhibit 2 which is the Lucken line

23  of credit.  And on Exhibit 2 --

24         MR. REINSCHMIDT:  Let's just blow up the top third or

25  so if we could.

Contact Shelly Semmler at (712) 233-3846 or shelly_semmler@iand.uscourts.gov
computer aided transcription
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 173 of 227

1   Q.   And this shows in the upper left the same number; is that

2   correct?

3   A.   Yes, yes, it does.

4   Q.   And then relative to -- so you do these -- the GM and the

5   Ford letter in late November 2011.  No monies are drawn on this

6   line of credit until when?

7   A.   January 24.

8   Q.   So this one right here was the first principal advance;

9   correct?

10  A.   Correct.

11  Q.   And this says it can be -- I think the letter, Exhibit 50,

12  says it can be used primarily for cars which means it can be

13  used for some other things too but primarily cars.  Do you know

14  what it means when it says principal advance?  Is that for a car

15  or --

16  A.   Yes, we did an advance off the loan that was in the amount

17  of $27,828.

18  Q.   So when you sent -- when you sent that e-mail to Mr. Lucken

19  on January 23 and said would you please -- if you concur sign

20  this letter, January 18, you didn't -- you had not advanced

21  funds before then; correct?

22  A.   No, we had not.

23  Q.   Mr. Dirks had never purchased any cars from GM or Ford in

24  roughly about two months until the line of credit was put into

25  place.

*Contact Shelly Semmler at (712) 233-3846 or shelly_semmler@iand.uscourts.gov*
*Sioux City, Iowa Federal Courthouse*
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 174 of 227

1    A.   That's correct.

2    Q.   And, you know, there was this kind of a harsh word used or

3    phrase, backdating.  Did you -- do you know what backdating

4    means?

5    A.   Yes.

6    Q.   What is a backdated document?

7    A.   I'm writing a letter today, but I'm actually dating it from

8    four days ago.

9    Q.   Okay.  Do you do that?

10   A.   No.

11   Q.   Why don't you do that?

12   A.   It would -- it wouldn't be honest to do that.

13   Q.   So how do you explain to the jury that you sent an e-mail

14   on January 23 but the letter that was attached was dated January

15   18?

16   A.   Probably say that it probably got printed and was not sent

17   out and so we attached it in an e-mail.

18   Q.   Has the date of that letter ever been an issue?

19   A.   No.

20   Q.   Did you know whether or not -- whether or not Mr. Dirks was

21   seeking floor planning in December 2011 and January 2012?

22   A.   I be -- I did know that, yes.

23   Q.   And, in fact, I'm going to have you reference Exhibit 206

24   if you would.  And then I'm about to stop looking at exhibits

25   with you.  On 206 this is -- this is in the Heritage files.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Marnie Powers, Certified Realtime Reporter
Case 5:16-cv-04005-MWB-KEM Document 167 Filed 05/07/18 Page 175 of 227

1    First of all, it says January 27, 2011.  Just take a moment to
2    read the letter to yourself, and then you can perhaps tell us
3    whether or not that should be 2011 or 2012 based upon what you
4    know.
5    A.   It should be 2012.
6    Q.   Okay.  And why do you know that it should be 2012?
7    A.   Based on other documents that you've shown.
8    Q.   Okay.  And so you and Dave Hegarty -- that's your colleague
9    there at Heritage?
10   A.   Correct.
11   Q.   And you went out to -- went out to Dirks' business?
12   A.   Yes.
13   Q.   Why did you go -- did you go on regular site visits?
14   A.   It's not uncommon, but we had several customers up in
15   Akron.
16   Q.   And what was the purpose of going to Dirks?
17   A.   Well, we'd had -- just some questions had arisen about his
18   business, and we wanted to make sure that we showed up there and
19   be able to document that we had been there.
20   Q.   And in there you talk about -- he still apparently -- I'm
21   beginning right here.  He's still talking to investors or
22   buyers; correct?
23   A.   That's correct.
24   Q.   How would you describe Dick Dirks' personality?
25   A.   Forceful.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Transcript of the Record
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 176 of 227

1    Q.   Well, we'll meet him shortly, but can you explain it before

2    we meet him?

3    A.   I mean, he knows what he wants, and he goes after it.

4    Q.   And how would you explain John Lucken's personality?

5    A.   Fairly easy going.

6    Q.   And you met him how many times?

7    A.   Two, maybe three times.

8    Q.   And talks about there'd have to be a sale to GMC -- or have

9    to be a stock sale in order to retain the franchises, stated he

10   was in discussion with a private investor.  Did he tell you who

11   this potential private investor was?

12   A.   No, he did not.

13   Q.   Would you describe Dick Dirks as a overly optimistic

14   person, overly pessimistic?  How would you describe?

15   A.   I'd say optimistic.

16   Q.   I said overly optimistic.

17   A.   I'd say just optimistic.

18   Q.   All right.  Fair enough.  Now I want to focus on this.

19   What about that?

20   A.   I don't -- I don't recall anything about that.

21   Q.   Okay.  But you've -- do you know if you wrote this, or did

22   Dave Hegarty write this?

23   A.   I think I wrote this.

24   Q.   But apparently at the time he must have told you something

25   such that --

1  A.   Something that there would become available floor plans.

2  Q.   Why would -- okay.  We'll set aside -- obviously do you

3  think it would make any sense for him to be looking at floor

4  planning if he had floor planning with you?

5  A.   He didn't have floor planning with us.

6  Q.   But the argument's been that he did.  Would it make any

7  sense for him to continue to look for floor planning if he'd

8  gotten it two months earlier with you?

9  A.   Yes, because our floor plan or our line of credit that we

10 had was only with 250,000.

11 Q.   The line of credit with Mr. Lucken.

12 A.   Yes, yes.

13 Q.   So it'd make sense for him to try to get a bigger line of

14 credit.

15 A.   Yes.  As you pointed out, he had had a substantial line of

16 credit prior.

17 Q.   Right.  And when I say bigger, I mean, for example, with

18 Total Motors, do you remember -- maybe you've already told me,

19 and bear with me.  Did you remember what the total was on that?

20 A.   No, I don't.  I don't recall.

21 Q.   For a typical small-town car dealer, how much would they

22 need for a floor plan to have an active inventory?

23 A.   500,000 at a minimum, at a minimum for a small-time dealer.

24 Q.   All right.  And even in -- even in January of 2012, you

25 said the dealer lot had very limited inventory.  Did you know

1    that he was talking to somebody in December of 2011 for floor

2    planning called Diligenz?

3    A.    I don't recognize that name.

4    Q.    Filed -- Diligenz filed a UCC-1 in December of 2011?

5    A.    No, I'm not familiar with that.

6    Q.    I'm just going to ask you to look just one time at Exhibit

7    50, and then I think we've -- I think we'll have talked about 50

8    plenty.

9            MR. REINSCHMIDT:  Go to the second page of 50.

10   Q.    Why was this -- and again, there's testimony, you've

11   testified, Mr. Lucken's testified, that this should have been

12   January 18, 2012.  Do you agree with that?

13   A.    Yes.

14   Q.    Why did you -- we know what the letter says.  We don't need

15   to go over it again.  But why did you write this letter for them

16   to sign?

17   A.    Mr. Dirks was trying to do draws on that line of credit,

18   call us up and say we need you to draw on that line of credit.

19   And we couldn't draw on the line of credit because it didn't

20   belong to Mr. Dirks.  It belonged to John and Mary Lucken.  So

21   we had requested kind of a blanket authorization:  You've set up

22   this line of credit; he wants to use this to be able to purchase

23   vehicles; are you allowing us to do that?

24           MR. REINSCHMIDT:  If you go back -- Ms. Liston, if you

25   go back to the prior page, the e-mail.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Computerized transcription by eScribers*
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 179 of 227

1    Q.    When you sent that e-mail, you say, "John, attached is the

2    letter that I spoke with you about."  And you sent this on

3    Monday, January 23, at 3:26 p.m.  Had you spoken to him about

4    that letter earlier in the day or not?

5    A.    The letter was dated January 21?

6    Q.    The letter's dated January 18.

7    A.    18?  What was the date of the first draw?

8    Q.    The date of the first draw was January 24.

9    A.    I believe Dick had contacted us about doing a request,

10   doing an advance, and we're like, we can't do an advance.  It's

11   not your authorization.  We need something from John indicating

12   that you can do this.  So that would have been the reason we

13   sent that e-mail out.

14   Q.    But you would have spoken to John about that.

15   A.    Yes, we would have spoken about it, yes.

16   Q.    Just what you just told the jury about?

17   A.    Pardon me?

18   Q.    Just what you just told the jury about.

19   A.    Yes, yes.

20   Q.    All right.  And then you sent this to him, and you told him

21   what the gist of what the letter would say?

22   A.    We said we need your authorization to make these -- make

23   these advances.

24   Q.    Mr. Lucken described in his testimony yesterday that you

25   were in a panic when you called him about signing the note, the

1    promissory note, the assignment of CD, and this letter.  Is that

2    an accurate statement?

3    A.    No.

4              THE COURT:  Mr. Reinschmidt, can we take our afternoon

5    recess at this time?

6              MR. REINSCHMIDT:  Sure.

7              THE COURT:  Okay.  I just got some bad news for the

8    jurors, particularly the female jurors.  It looks like I'm going

9    to have to buy a lot of extra Depends tonight.  Apparently the

10   two bathrooms in the jury room are either closed now or

11   momentarily will be closed because there's a pipe leaking sewage

12   into the first floor.  And so this is a great building, but it's

13   got old infrastructure.  So there are bathrooms down the hall.

14   So when you go out in the hallway, you go to the left down by

15   Indian Health.  But there's one women's restroom with two

16   stalls.  So I'm going to give you a little bit of an extra

17   break.  We're going to be in recess until 3:20 and then come

18   back and go till 4:30.  And remember the cautionary instruction

19   about keeping an open mind till you've heard all of the

20   evidence.  Thank you.

21             (The jury exited the courtroom.)

22             THE COURT:  Okay.  Please be seated.

23             Anything we need to take up?

24             MR. REINSCHMIDT:  No, Your Honor.

25             MR. THOMPSON:  No, Your Honor.

1            THE COURT:  Okay.  Yesterday you seemed optimistic

2    that we were ahead of schedule.  I can't believe we're still

3    ahead of schedule.

4            MR. THOMPSON:  We are.

5            THE COURT:  Really.

6            MR. THOMPSON:  Yeah.

7            THE COURT:  Okay.  That's all.  That's good.  Thanks.

8            (Recess at 2:56 p.m.)

9            THE COURT:  Please be seated.  We're going to give the

10   jurors a few more minutes.

11           THE CLERK:  They're ready, Judge.

12           THE COURT:  Okay.

13           (The jury entered the courtroom.)

14           THE COURT:  Thank you.  Please be seated.

15           Mr. Reinschmidt, you may continue your examination.

16           MR. REINSCHMIDT:  Thank you, Your Honor.

17   BY MR. REINSCHMIDT:

18   Q.   Mr. Crim, would you look at Exhibit 13, page 8, and it's a

19   little small.  We'll blow it up for you.  That's the payoff to

20   Heritage Bank that was the start of the big $1,775,000 loan; is

21   that correct?

22   A.   Yes.

23   Q.   And go down to the bottom of that page.  And that is signed

24   by Mr. Dirks; is that correct?

25   A.   That is correct.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized transcription
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 182 of 227

1    Q.    And then if we go up back to the very top, this is an SBA

2    form?

3    A.    Yes.

4    Q.    Does this go to the SBA?

5    A.    They just -- I believe they just have to be retained in the

6    file.

7    Q.    Is the SBA aware of who got paid what amounts?

8    A.    They provide the guidance as outlined in the authorization,

9    but there's room for -- those can be approximate amounts.

10   Q.    Well, when I say approximate amounts, we're not talking

11   about a hundred-thousand-dollar difference amounts.

12   A.    No, huh-uh.

13   Q.    All right.  So if you're off by a few dollars, that's okay.

14   A.    Yes, uh-huh.

15          MR. REINSCHMIDT:  All right.  That's all I have, Your

16   Honor.

17          THE COURT:  Thank you, Mr. Reinschmidt.

18          Any redirect?

19          MR. THOMPSON:  Yes, Your Honor.

20          THE COURT:  Okay.  Thank you.

21                    REDIRECT EXAMINATION

22   BY MR. THOMPSON:

23   Q.    Mr. Crim, I'd like to start off with our discussion we had

24   about that Iowa Secretary of State UCC search report.

25   A.    Yes.

1  Q.   And we're going to have that report put up.

2  Mr. Reinschmidt showed I think three checklists, and I think all

3  three of the dates on those checklists were 2010; correct?

4  A.   I believe so.

5  Q.   Okay.  And my questions to you about Exhibit 28 was that

6  the first actual search report in the bank's file was this one

7  from October 6, 2011.  And those three checklists, those aren't

8  search reports, are they?

9  A.   They were review of the file indicating that those

10  documents are in the --

11  Q.   Yeah.  I mean, I understand that, but they're not a search

12  report.

13  A.   No, they're not.

14  Q.   It's just like I've got four boys, and when they were

15  growing up, if I ask them did you do your homework and they said

16  yes, that may be the truth, and it may not have been the truth.

17  And the way I would know is if I checked the homework; right?

18  A.   Yes.

19  Q.   And those checklists, while they have a date typed in, they

20  don't have the homework behind them, do they?

21  A.   I would assume those searches are in the file.

22  Q.   Well, I understand that.  But they're not exhibits in this

23  case.

24  A.   Okay.

25  Q.   And they haven't been produced as far as you know, have

1   they?

2   A.   Not as far as I know, no.  But those checklists are by

3   multiple different people.

4   Q.   And on those checklists, they were all three -- for the UCC

5   searches all indicating there were checks done in 2010; correct?

6   A.   Yes.

7   Q.   There was no checklist that had a date in 2009; correct?

8   A.   That is correct.

9   Q.   And the loan was issued in 2009; correct?

10  A.   Correct.

11  Q.   So at the time of the loan, there had not even been done a

12  checklist entry let alone an actual search report.

13  A.   I would say that was incorrect.

14  Q.   There's been no search report in this case from -- dated

15  2009.

16  A.   Okay.

17  Q.   Correct?

18  A.   There has not been one in the exhibits.

19  Q.   And none of the checklists that Mr. Reinschmidt showed had

20  any 2009 dates; correct?

21  A.   That's correct.

22  Q.   Another topic, if I understood your testimony, I thought

23  you said one of the reasons that Mr. Lucken used Heritage Bank

24  is he didn't want Peoples Bank to know.  Is that --

25  A.   Maybe not know is not the correct.  He just didn't want it

1  to be common knowledge that he was assisting Dick Dirks, Dirks

2  Motors.

3  Q.  Now, if we go to Exhibit 32, Peoples certainly know -- knew

4  that a bank money order for the Lucken Trust went to Heritage

5  Bank; correct?

6  A.  Not necessarily.  It's -- oh, it is payable to Heritage

7  Bank, so yes.  But he could have been opening a CD.

8  Q.  And if we go to Exhibit 37 -- and I don't believe I spoke

9  with you earlier, but if we could pull the top up, this is

10  called fed payments manager funds.  And basically this shows the

11  wire that we talked about from Peoples to Heritage; correct?

12  A.  That's correct.

13  Q.  And that involved Peoples also, didn't it?

14  A.  Yes, but nowhere does it indicate Dirks Motors on it.

15  Q.  Let's go to Exhibit 140.  This is one that Mr. Reinschmidt

16  talked to you about.  This is a Ford Motor Credit e-mail dated

17  November 18, 2011.  And in the bottom, bottom paragraph,

18  Mr. Reinschmidt made the point that -- I believe that the

19  negotiations with Heritage Bank for floor plans were going on as

20  of November 18, 2011; correct?

21  A.  That's what he's indicating in this letter, and that's

22  what's indicated here.

23  Q.  Now, by November 18, 2011, the CD that we talked about had

24  not been obtained yet from Heritage, had it?

25  A.  I believe that's correct.

1  Q.   The CD was five days later; correct?

2  A.   Yes.

3  Q.   And your commitment letter to GM had not yet been obtained

4  by the date of this e-mail either, had it?

5  A.   No.

6  Q.   That was five days -- seven days after the date of this

7  e-mail.

8  A.   Yes.

9  Q.   And the Ford letter of credit was even a few days later

10 than the GM commitment letter.

11 A.   Yes.

12 Q.   And Mr. Dirks, by saying he was still in negotiations with

13 Heritage, certainly could have meant that there were two

14 conditions to get floor plan financing, that Ford be paid off --

15 and that had occurred by this date -- but there's also to be a

16 CD as backup collateral that hadn't been obtained, and once that

17 was obtained is when the floor plan would occur; correct?

18 A.   No, I don't believe that is correct.

19 Q.   Let me back up.  Mr. Lucken has testified that there were

20 two conditions, and one of those was that a $250,000 CD be

21 obtained before Heritage had a floor plan financing obligation.

22 Now, I know you disagree with that.  But assume that to be true.

23 The CD had not been obtained by the date of this memo, Exhibit

24 140; correct?

25 A.   That is correct.

```
 1   Q.   And the letters that you issued to GM and Ford had not been
 2   obtained by the date of this memo.
 3   A.   That's correct.
 4   Q.   So if by negotiation with Heritage Mr. Dirks was referring
 5   to the fact there still needed to be a CD and there still needed
 6   to be letters from Heritage, that would be perfectly consistent
 7   with Exhibit 140, wouldn't it?
 8   A.   Our loan was contingent on a CD with John.
 9          THE COURT:  Sir, can you get a little bit closer to
10   the microphone?
11   A.   Our loan wasn't contingent on that at that time.
12   Q.   I understand what you're saying about your loan, but what
13   I'm asking about is what Mr. Lucken testified to be the
14   conditions, one of which was a CD, and then once there's a CD,
15   then the bank would provide floor plan financing.  And as I
16   said, I know you don't agree with that.  But if that's the case
17   and the CD was after the date of this memo and the letters were
18   after the date of this memo, then it would be consistent to say
19   there was still negotiation with Heritage before those --
20   A.   We were not in negotiations with Dick Dirks on a dealer
21   floor plan line of credit.
22   Q.   Let's go to Exhibit 2 which is the Lucken note.  That's
23   that 100881.  And if I understand your testimony, you said that
24   that had to be opened up by the time that the letter to GM,
25   commitment to pay GM, was issued which was, I believe, November
```

1  25, 2011.  Is that consistent with your memory?

2  A.   Yes.

3  Q.   Okay.  And my question is if -- if you're right that there

4  had to be a note before you sent the commitment letter, under

5  the loan to date, wouldn't you expect the first entry to be

6  November 25, 2011, original rate?

7  A.   I don't follow you.

8  Q.   Well, if your testimony is that I could not have sent the

9  letter to GM on November 25 using account number 881 unless

10  account 881 was set up, wouldn't you expect the first entry on

11  Exhibit 2 on the original rate to be that date in November?

12  A.   The original loan was opened on January 19.

13  Q.   Right.  And to set up an account, I assume you need a

14  signature by the customer, don't you?

15  A.   Certainly.  And that would have been obtained on or around

16  that time.

17  Q.   January of 2012.

18  A.   Yes.

19  Q.   And if there was no signature by Mr. Lucken for an account

20  in November of 2011, then your letter to GM should not have

21  referenced that account number; correct?

22  A.   That's correct.  That's why I don't understand those dates

23  because the account number didn't exist.

24        MR. THOMPSON:  Thank you.

25        THE COURT:  Thank you.

```
 1            Mr. Reinschmidt, any recross?

 2            MR. REINSCHMIDT:  No, Your Honor.

 3            THE COURT:  Okay.  Thank you.  You may step down.  Oh,

 4   no, I'm sorry.  Let's wait and see.  Do the jurors have any

 5   questions for this witness?  Okay.  There are some, so pass

 6   them.

 7            Denise, would you gather the questions up, please?

 8   Thank you.  Thank you, Denise.

 9            Okay.  Why don't the lawyers come up and take a look

10   at the questions.

11            (At sidebar on the record.)

12            THE COURT:  Any objection?

13            MR. THOMPSON:  No, Your Honor.

14            MR. REINSCHMIDT:  No.

15            THE COURT:  Okay.  Thanks.

16            (The sidebar was concluded.)

17            THE COURT:  Okay.  We've got a couple of questions.

18   Here's what's going to happen.  I'm going to read the

19   question -- the questions one at a time, and then you'll be

20   allowed to answer them.  And then the lawyers will have an

21   opportunity to ask any follow-up questions.

22            So first question:  Why would you visit Dirks Motors

23   on January 27 of 2012 when you had John Lucken's line of credit?

24            THE WITNESS:  We just wanted to make a site visit to

25   kind of see what's going on in the business and visit with Dick
```

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Shelly Semmler, RMR, CRR - Official Court Reporter*

Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 190 of 227

1   as far as the delinquency's concerned, his past delinquency, and

2   what he was planning on doing about it.

3           THE COURT:  Any follow-up questions?  I guess we'll

4   start with Mr. Thompson.

5           MR. THOMPSON:  Should I go to the podium?  Should I go

6   to the podium, Your Honor?

7           THE COURT:  You can do it from wherever you want.

8                  FURTHER REDIRECT EXAMINATION

9   BY MR. THOMPSON:

10   Q.   If --

11           THE COURT:  But only if you wear Depends.

12   Q.   If you went there to look for that inventory, there really

13   wouldn't have been any reason to do that.

14   A.   No.  We didn't go to look for inventory.  We were just

15   doing a site visit.

16   Q.   Under -- okay.  You went there January 12 to do the site

17   visit.  But at that point your exposure on the line of credit

18   was nothing because it had a CD backing it up; correct?

19   A.   Yes, but we had the SBA loan, and I believe the SBA

20   requires us to make site visits.

21   Q.   And there were no delinquencies at that point because the

22   line of credit was there that was paying interest amounts.

23   A.   Yeah.

24   Q.   Right?

25   A.   But he had been delinquent in the past.

```
1   Q.   Yeah, in the past, but 2012 he hadn't been delinquent;
2   correct?
3   A.   I don't recall.  Yeah.  I mean, the history of the note
4   would say that.
5   Q.   Thank you.
6   A.    It's not uncommon to make site visits to ongoing customers.
7            MR. THOMPSON:  Thank you.
8            THE COURT:  Okay.  Mr. Reinschmidt?
9            MR. REINSCHMIDT:  Thank you.
10                         RECROSS-EXAMINATION
11  BY MR. REINSCHMIDT:
12  Q.   I think we'll put up -- to clarify that, maybe we can put
13  up Exhibit 1 which is the SBA loan, and we'll look at the bottom
14  of the first page.  And you can see in -- if -- it looks to me
15  like in November he's catching up on some payments for September
16  and October; is that correct?
17  A.   Yes.
18  Q.   Is he totally caught up in November of 2011?
19           MR. REINSCHMIDT:  And go back up.  If you go back like
20  to August 24 --
21  A.   On August 24 he's making his August payment.
22  Q.   So that is the normal payment, $13,900.40?
23  A.   That is correct.
24  Q.   And then he's getting late charges because he hasn't paid
25  for September?
```

1    A.   He didn't make a payment in September, October, and

2    November.

3    Q.   Okay.  So then he partially makes it up in November;

4    correct?

5    A.   Yes.

6    Q.   No payments in December other than the $4,100 payment at

7    the bottom?

8    A.   December there's a 1,750 payment and then a 4,119 payment.

9    Q.   Right.  I missed the 1,750.  Let's go to the next page of

10   Exhibit 1 into January of 2012.  And then that shows that he

11   didn't make any payments in January; correct?

12   A.   That is correct.

13   Q.   So he was behind a fair bit by the time you guys went out

14   on January 27?

15   A.   If you go back to the previous page, you can reconcile how

16   many that loan -- June, July, August.  If you add up 21,973 plus

17   1,750 plus 4,119, divide that by 1,390, it will tell you how

18   many payments he made on December 13 which it looks like it

19   would have been about 2 payments.  So August, September,

20   October.

21   Q.   And then he hadn't --

22   A.   Yeah, I would say he was past due.  I don't want to

23   speculate exactly, but he was past due.

24        MR. REINSCHMIDT:  Okay.  That's all I have on that.

25        THE COURT:  Anything, Mr. Thompson?

1          MR. THOMPSON:  I do, Your Honor.

2                   FURTHER REDIRECT EXAMINATION

3    BY MR. THOMPSON:

4    Q.   Floor plan lenders check inventory, don't they?

5    A.   Yes, yes, sir.

6    Q.   And two days before you and Mr. Hegarty went to Dirks

7    Motors on January 27, 2012, or two months before that you had

8    already issued the commitment to GM, November 25, 2011; correct?

9    A.   I'd have to go back and look at those dates on that

10   document.

11   Q.   If Exhibit 40, the GM -- commitment to GM was November 25,

12   2011, that would have been in place at the time that you went

13   out to Dirks Motors on January 27 --

14   A.   Yes.

15   Q.   -- 2012.

16   A.   Yes, that is correct.

17          MR. THOMPSON:  Nothing further.

18          THE COURT:  Mr. Reinschmidt, anything further?

19                   FURTHER RECROSS-EXAMINATION

20   BY MR. REINSCHMIDT:

21   Q.   He hadn't drawn on that line of credit whatsoever from

22   November until January of -- January 24 of 2012; correct?

23   A.   That's correct.

24   Q.   So that GM and Ford commitment, it hadn't been activated,

25   if you will.

```
1   A.   There was no -- there was no inventory at that time.

2             MR. REINSCHMIDT:  Thanks.

3             MR. THOMPSON:  Nothing further.

4             THE COURT:  Mr. Thompson?  Okay.  Next and last

5   question.  In January -- on January 27 of 2012, was the Ford

6   franchise still in trouble after they had been paid off in late

7   2011?

8             THE WITNESS:  What was that date?  January 27?

9             THE COURT:  Right.

10            THE WITNESS:  And when did we remit that check?

11            THE COURT:  Well, you don't get to ask questions, so

12  it doesn't work that way.

13            THE WITNESS:  I can't answer that.

14            THE COURT:  Everybody else can ask questions, but you

15  can't.

16            THE WITNESS:  I can't answer that.

17            THE COURT:  You just have to answer them.  So you want

18  me to read it to you again?

19            THE WITNESS:  I don't know the date that we submitted

20  the funds to -- on their behalf.

21            THE COURT:  Okay.  The lawyers may ask you clarifying

22  questions.

23            THE WITNESS:  Okay.

24            THE COURT:  Okay?  Thank you, Mr. Crim.

25            Mr. Thompson?
```

1          MR. THOMPSON:  Yes.

2                    FURTHER REDIRECT EXAMINATION

3    BY MR. THOMPSON:

4    Q.   If the record shows that the funds were wired -- the first

5    250,000 was wired November 18 and the checks were issued to Ford

6    on or about that date and I believe there was an exhibit that

7    confirmed in November of 2011 that Ford had received the full

8    225,000 and that was all before January 27 of 2012, was the Ford

9    franchise still in trouble then?

10   A.   As far as the monies that were sold out of trust, that were

11   owed due to the sold out of trust, I would say no.  I don't know

12   what Ford and GM's agreement was with them in regards to getting

13   a dealer floor plan line, though.

14          MR. THOMPSON:  Nothing further.

15          THE COURT:  Mr. Reinschmidt?

16          MR. REINSCHMIDT:  Nothing, Your Honor.

17          THE COURT:  Okay.  Thank you.  You may step down.

18          Everybody can take a stretch break.

19          And ready to call your next witness?

20          Good afternoon.  Would you raise your right hand,

21   please.

22            WILLIAM TANK, PLAINTIFFS' WITNESS, SWORN

23          THE COURT:  Thank you.  Please be seated in the

24   witness box there.  And you can adjust the chair and the

25   microphones so that you can be comfortable and so that you can

1  speak directly into the microphones.  And would you please tell

2  us your first and last name and spell your last name, please.

3          THE WITNESS:  William Tank, T-a-n-k.

4          THE COURT:  Thank you.

5          Mr. Lawrence?

6                        DIRECT EXAMINATION

7  BY MR. LAWRENCE:

8  Q.   Good afternoon, Mr. Tank.  Can you hear me all right?

9  A.   I can.

10 Q.   Very good.  I'd like to pull up Exhibit 136 which is your

11 résumé.  About how many years have you spent in the banking

12 industry?

13 A.   Thirty-seven years.

14 Q.   Okay.

15         MR. LAWRENCE:  And can we go to the second page?  And

16 let's just get the top two-thirds or so.  Down a little further.

17 I'm sorry.  Even more.

18 Q.   And your first job listed here, that was at Bankers Trust

19 Company in Des Moines?

20 A.   Yes.

21 Q.   And what did you do while you were there?

22 A.   I was a -- I started out as a trainee.  Then I moved on to

23 a retail bank manager, and I ended up a commercial loan officer.

24 Q.   And then what does being a commercial loan officer entail?

25 A.   Sure.  We would originate loans and actually originated

1  real estate loans, lines of credit, loans secured by personal

2  property, loans secured by stocks, CDs.  We'd do some SBA

3  lending.  We'd do some USDA lending.  Those would both be credit

4  enhancements.

5  Q.   So let's focus on the SBA lending.  What were you doing

6  with SBA loans at the time you were at Bankers Trust as a loan

7  officer?

8  A.   I would have been originating those SBA loans, so I would

9  have been meeting with customers, analyzing their loan requests,

10  writing up the analysis, taking that information to the loan

11  committee to get it approved.  Once the loan was approved, I

12  then would meet with the client.  I would draw up the documents

13  needed or required to close the SBA loan.  I would then in turn

14  close it, advance the funds, and then I would monitor that

15  throughout the life of the loan.

16  Q.   And then next you moved on to Norwest Bank in Iowa, and

17  that was from 1985 to 1995; correct?

18  A.   Yes.

19  Q.   And I see you were a vice president of different levels.

20  Can you explain what those different positions entailed?

21  A.   Sure.  I ended up as senior vice president, regional credit

22  officer at Norwest Bank Iowa.  In that function I had three or

23  four different teams reporting to me.  I had a loan operations

24  group, a loan workout group, a loan documentation group, a loan

25  review group.  And I also served as chairman of the loan

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Shelly Semmler, RMR, CRR Official Federal Court Reporter*
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 198 of 227

1    committee and was a loan approver.

2    Q.    I heard the word loan a lot in there.  So did any of that

3    involve SBA loans?

4    A.    Yes.

5    Q.    And I'd like to focus on the credit process review bit and

6    the loan workout bit.  What did that entail?

7    A.    Sure.  First of all, credit process review was a team of

8    lenders that I trained and were -- reported directly to me that

9    would go in and review loans closed to make sure that the loans

10   were closed properly in the condition that they were approved.

11         They would also take a look at the loans to make sure

12   that they had the proper risk rating which is the level of risk

13   in the loan.

14         And they then would issue individual written reports

15   back to lenders that would talk about how the loan was

16   documented, how it was analyzed, in effect give that lender a

17   grade for how they were handling that particular loan.

18   Q.    And what about the loan workout group?

19   A.    So loan workout group would be a group of individuals, and

20   I did some of that myself, some of the larger deals, where we

21   would be given loans that the bank had originated, and

22   throughout the life of the bank for some reason the loan had

23   deteriorated, so we would take that loan away from the loan

24   officer who originated it.  We'd have that individual pass that

25   to the workout group, and then the workout group would meet with

1   the borrower and try to find a resolution as to how we would get

2   paid.

3   Q.   Okay.  So would it be fair to characterize that as you were

4   working with troubled loans or loans that weren't performing,

5   bringing in payments to the bank any longer?

6   A.   Yes, yes.

7   Q.   I'd like to move up.  The First Business Bank of Iowa in

8   Des Moines, can you tell us just a little bit about that?

9   A.   Sure.  I -- myself and another gentleman had a dream.  We

10  wanted to start our own bank, and so we spent a little over a

11  year and a half trying to -- trying to realize that dream from a

12  stock offering to a board of directors, to getting FDIC

13  insurance.  And we spent a year and a half in that effort, and

14  turned out we were unsuccessful in getting that opened.

15  Q.   And then moved on to Liberty Bank and Trust in Des Moines;

16  is that right?

17  A.   Yes.

18  Q.   Okay.  And then I see under that it was acquired by

19  Commercial Federal Bank.

20  A.   Correct.

21  Q.   Okay.  So I'd like to go over to the first page briefly

22  here at the bottom.  Now let's focus on the Commercial Federal

23  Bank.  This is from 1996 to 2003; correct?

24  A.   Yes.

25             MR. LAWRENCE:  Now can we go back to the second page

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized transcription by eScribers
Case 5:16-cv-04005-MWB-KEM  Document 167  Filed 05/07/18  Page 200 of 227

1  and the top two items.

2  Q.   So this would have been the time you were at Liberty Bank

3  before it was acquired and then after it was acquired; correct?

4  A.   Correct.

5  Q.   Okay.  And then at Liberty Bank you were the president and

6  CEO?

7  A.   Yes.

8  Q.   And then in your duties as president and CEO, did you still

9  oversee and make decisions on SBA loans that originated with

10 your bank?

11 A.   Yes, I did.

12 Q.   And then up here looks like you moved on to -- after you

13 were acquired to the president, state of Nebraska.  I thought

14 they had a governor.  But could you tell us just a little bit

15 about what that entailed.

16 A.   Sure.  Commercial Federal was a savings and loan which

17 their main business was originating residential loans.  They

18 understood and realized that for them to be successful they

19 needed to get into the commercial lending area.  So as part of

20 the acquisition, I was recruited to start commercial lending

21 activities throughout the state of Nebraska and to implement a

22 community banking structure such that they could originate

23 commercial loans including SBAs, lines of credit, and stock

24 secured loans.

25 Q.   And then I see after that if we can go back to the first

1 page, it's very briefly at the bottom here. You moved on there

2 to be the director of retail residential lending. And was that

3 just for Nebraska or for the entire bank?

4 A. That was for the entire bank. So we were in 8 states and

5 had 50 mortgage loan originators reporting to 6 state -- state

6 directors.

7 Q. And then finally I'd like to go up to your last position,

8 QCR Holdings. And up there where it says 2003 to present, this

9 résumé isn't -- at the time you produced it was up to date, but

10 now how long -- instead of present, what should that year be?

11 A. Yeah. I retired from QCR in 2015.

12 Q. Okay. And what did you do at QCR?

13 A. I was a chief credit officer, so similar to what I did at

14 Norwest. I managed credit administration, the loan approval

15 function, loan operations, credit department, loan system

16 administration. We had an appraisal review function. I did

17 some loan workout and also managed the loan workout group. And

18 then I established and created the loan policy for -- for the

19 holding company. We were a -- at the time a three-bank holding

20 company. And then I had seven direct reports.

21 Q. And were SBA loans part of the commercial loans you worked

22 with while you were at QCR?

23 A. Yes.

24 Q. Now, today are the opinions you are going to give given to

25 a reasonable degree of certainty as they pertain to the banking

1  industry?

2  A.   Yes.

3  Q.   I'd like to move on now to Exhibit 128 very briefly.  And

4  then did you review this document previously in preparation for

5  your testimony?

6  A.   Yes.

7  Q.   I'd like to go to page 6 very quickly.  And do you

8  understand this to be part of Heritage Bank's policy related to

9  substandard loan administration?

10  A.   Yes, including problem loan administration.

11  Q.   Okay.  I'd like to move on to Exhibit 27.  It's been

12  testified earlier that these are minutes from a committee

13  meeting that Heritage had on September 29, 2011.  Did you review

14  this document in preparation for your testimony today?

15  A.   Yes.

16  Q.   Okay.  And I'd like to focus on the third bullet point

17  there under number 1, that the borrower came in to speak with a

18  loan officer.  Do you understand who the borrower was on the SBA

19  loan at issue in this case?

20  A.   Yes, Dirks -- Dirks Motors.

21  Q.   Okay.  And do you understand who the loan officer would

22  have likely been in this case?

23  A.   Yes, Crim.

24  Q.   Okay.  And it says that the borrower, so Dirks Motor,

25  provided the lender with a default letter that they got from

1  Ford Motor Credit on or around Friday, September 23.  Now, as a

2  banker, if you were the loan officer for an SBA loan, would you

3  be concerned if the party you lent the money to came in with a

4  default letter from another lender?

5  A.   Yes.

6  Q.   Okay.  And if we go back up to point number 1, at this

7  meeting they apparently approved a downgrade from 150 pass

8  rating to a 7 substandard rating.  Do you see that?

9  A.   I do.

10 Q.   And if your loan -- if your loan client had received a

11 default letter from another lender, would you have downgraded

12 the loan at that point in time as well?

13 A.   Yes.

14 Q.   All right.  Now I'd like to move on to Exhibit 145.  And

15 it's been testified earlier today that this is what is called a

16 CAD form, that this was an internal Heritage document.  Have you

17 reviewed this document in preparation for your testimony today?

18 A.   Yes, I have.

19 Q.   Okay.  I'd like to go to page 2 at the bottom, please.  And

20 here where it says collateral analysis, does this look like what

21 you would understand to be a collateral analysis?

22 A.   Yes, it does.

23 Q.   Okay.  And you can see what looks like descriptions of

24 Dirks Motors' collateral in this grid; correct?

25 A.   Yes.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
United States District Court -- Northern District of Iowa
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 204 of 227

1          MR. LAWRENCE:  Can we move on to page 3?

2  Q.    And in this grid we see additional collateral; correct?

3  A.    Yes.

4  Q.    Now I'd like to move down to where it says excess

5  collateral.  Do you see that?

6  A.    Yes.

7  Q.    And the value there is negative 593,547.  What does it mean

8  if a loan has a negative excess collateral value?

9  A.    There'd be a loss to the bank, in this case almost

10  $600,000, based on -- based on the collateral.

11  Q.    And I notice we looked at the different collateral.  The

12  SBA, the amount the SBA guaranteed was not listed as collateral;

13  right?

14  A.    Correct.

15  Q.    And a guarantee from the SBA is not collateral for a loan,

16  is it?

17  A.    That's correct.

18  Q.    Okay.  I'd like to move on to Exhibit 146.  I'll tell you

19  it's been testified to that this is a loan charge-off form from

20  Heritage Bank.  Did you review this document in preparation for

21  your testimony today?

22  A.    Yes.

23  Q.    And I'd like to focus on point number 2, the amount of

24  charge-offs as recommended and, (a), the principal, 259,641.56.

25  Could you explain to the jury what that means?

A.   Means the bank has recognized a loss in the loan and they're charging that off.  So it would hit their income statement reducing their income, and I think in this particular case it was the unguaranteed amount of the SBA loan.  So they're charging off a hundred percent of that.

Q.   Now, would a loss of nearly $260,000 be significant for a smaller, more regional bank like some of the ones you worked for?

A.   Yes.

Q.   Okay.  So at this point in time we're right at the end of September 2011, the start of October 2011.  And we've just seen that Heritage Bank is charging off nearly $260,000 on an SBA loan that it originated for Dirks Motor and that Dirks Motor brought in a letter of default from another lender it had, Ford Motor Credit.  Based on these facts, what would it tell you about Dirks Motor, its financial health and prospects for doing continued business?

A.   Yeah.  It would tell me that basically Dirks Motors was going out of business; they probably weren't going to make it; they shouldn't make it because their floor plan was being taken away.  Current bank had recognized a $260,000 loss.  They moved the credit to substandard, so clearly was moving in a workout situation where the bank would begin to try to collect whatever they could on the loan.

Q.   Okay.  And at this time you saw the default letter from

1    Ford Credit.  Are you aware that Dirks Motor was what they call

2    out of trust with Ford Credit?

3    A.    I was aware of that.

4    Q.    And can you explain to the jury what it means to be out of

5    trust with your floor plan lender?

6    A.    Sure.  So the way a floor plan works is the dealer orders a

7    car.  The manufacturer ships the car to the dealer.  The

8    manufacturer in turn sends a draft to the bank asking for

9    payment on that car.  The bank then advances on the floor plan

10   to pay the manufacturer and then -- advances on Dirks Motors to

11   pay the manufacturer.  And then when that car is sold the man --

12   or Dirks Motors is required to pay that advance off, the advance

13   that was for that specific car.

14         And then the bank as part of their floor planning

15   would go out to Dirks Motors on a regular basis.  They count --

16   they take a look at all the cars on the lot.  They'd compare

17   that back to the bank's records.  And if they couldn't find cars

18   that they still had records for, then there would be an out of

19   trust situation meaning cars were sold, the proceeds from those

20   sales did not come in to reduce the line of credit.

21         So in Dirks' situation he would have sold cars.  When

22   he got the proceeds from the sale of cars, instead of reducing

23   his loan at the bank, the floor plan because the floor plan is

24   car by car, he would keep that -- those funds.

25   Q.    Okay.  So I want to break this down just a little bit.  You

talked about going out -- that the floor plan lender would go to

the site periodically and match up the inventory with their

records of money that they've advanced -- the cars they've

advanced money for; right?

A.   Yes.

Q.   And does the floor plan lender have a security interest in

those cars while they're on the lot?

A.   Yes.

Q.   And so the floor plan lender has advanced money.  It's out

of pocket, say, $25,000 for a car that went to be on the

dealer's lot; right?

A.   Yes.

Q.   So that car, as long as it's on the lot, is it sort of

security?  It's wh -- it could come and take it back, and that's

what guarantees it will be repaid; right?

A.   Yes.

Q.   Okay.  So if that car actually -- if someone comes and buys

it and it actually drives off the lot, the floor plan lender has

a problem if they don't get paid back out of the money the

customer paid to buy that car, don't they?

A.   That's correct.

Q.   And to be clear, I want to understand that that problem

would be the thing which is securing that $25,000 just ended up

in the hands of a customer, and, you know, it's not there on the

lot for them to come in and take it if they need to to get paid

1  back; right?

2  A.    That's correct.

3  Q.    Okay.  Now, in your time working in the banking industry,

4  did you deal with the Uniform Commercial Code?

5  A.    I did.

6  Q.    Okay.  And specifically did you deal with -- we call it

7  Article 9, secured transactions, under the Uniform Commercial

8  Code?

9  A.    Yes, I did.

10  Q.    Okay.  And you understand that to perfect a security

11  interest you need to file something called a financing

12  statement; right?

13  A.    Correct.

14  Q.    Okay.  And have you reviewed documents in this case that

15  have showed -- that show that Ford Credit had filed a financing

16  statement to secure its interests in the cars that it sold to

17  Dirks Motor under a floor plan loan?

18  A.    Yes, I have.

19  Q.    Okay.  And do you have an understanding of whether you can

20  renew or continue the financing statement you file?

21  A.    I do.  You can renew every five years, and you have six

22  months prior to expiration -- up to six months prior to renew

23  the financing statement.

24  Q.    Okay.  So let's just keep this very easy as a hypothetical.

25  If I file a financing statement on January 1 of this year, 2018,

1  that would be good for 5 years; is that correct?

2  A.    Correct.

3  Q.    So it would expire on December 31 of, you know, 2023 or

4  January 1 of 2024.

5  A.    Yes.

6  Q.    Okay.  And then your testimony is that I have six months

7  before it expires to file what's called a continuation.

8  A.    Yes.

9  Q.    And if I file that continuation within that six-month

10  window, what happens?

11  A.    Then the financing statement is in effect renewed for five

12  years from its original date.

13  Q.    So that would be the January 1 date; correct?

14  A.    Correct.

15  Q.    So if I file the continuation statement, say, in October or

16  November the year prior, that doesn't start my five-year period,

17  does it?

18  A.    Correct.

19  Q.    Okay.

20         MR. LAWRENCE:  Can we please pull up the Ford

21  demonstrative?

22  Q.    All right.  So just taking a look at this, you know, our

23  artwork isn't going to get into the comics section in the paper,

24  but here on the left you see 7-23, 1987.  Is that your

25  understanding of when Ford Credit filed its original UCC

1  financing statement in this case?

2  A.   Yes.

3  Q.   Okay.  So that would have lasted until July 23 of 1992

4  unless it was extended; correct?

5  A.   Right, five years.

6  Q.   So now we go ahead to 1992.  There's a 6-month window going

7  back from July 23, 1992, for Ford to have filed a continuation

8  statement; right?

9  A.   Yes.

10 Q.   Okay.  And if you look up there, if you assume that Ford

11 filed its extension on January 24, 1992, would it have been

12 timely filed?

13 A.   Yes.

14 Q.   And when would the continuation period, the next five-year

15 period, have started to run?

16 A.   Well, it'd be 5 years from the original filing, so January

17 23 of '97.

18 Q.   January 23 or July 23 if the original filing was on July

19 23?

20 A.   Yeah, so it'd be July 23 of '97.

21 Q.   Okay.

22       MR. LAWRENCE:  Can we go on to the next slide?

23 Q.   So then if that financing statement was filed, would you

24 agree that this is the next five-year period that would be

25 covered by Ford Credit's --

1    A.    Yes.

2    Q.    Okay.  And if we go on to the next slide, again, the same

3    6-month window would be the case from January 23 to July 23,

4    this time 5 years later in 1997; correct?

5    A.    Yes.

6    Q.    So if you assume that a UCC continuation statement was

7    filed on January 27, 1997, would that have been timely filed?

8    A.    Yes.

9    Q.    And when would this next five-year period begin to run?

10   A.    July 23 of '97 until July 23 of 2002.

11   Q.    So now we see that period here.  And then if you assume

12   that another extension was filed on February 4, 2002, would that

13   have been timely filed?

14   A.    Yes.

15   Q.    And when would the next five-year continued period have

16   run?

17   A.    So it'd be 5 years from July 23 of '02, so July 23 of '07.

18   Q.    Okay.  So that would be that period; correct?

19   A.    Yes.

20   Q.    And then finally, if an extension was filed on March 5 of

21   2007, would that have been a timely filed extension to continue

22   the statement that would expire on July 23, 2007?

23   A.    Yes, it would have been within the six months.

24   Q.    Okay.  So then when would the next period expire?

25   A.    So that'd be 5 years from July 23 of '07, so July 23 of

1   '12.

2           MR. LAWRENCE:  Just bring up everything on the final

3   slide.

4   Q.   Okay.  So this final slide that shows extensions on

5   1-24-92, 1-27-97, 2-4, 2002, and 3-5, 2007, it's your opinion

6   that these extensions were all timely filed.

7   A.   Yes, they're all filed within the six-month period.

8   Q.   Okay.  And would it also be your opinion that at no point

9   during that time Ford's original and then continued financing

10  statement and security interest in Dirks Motors property ever

11  expired.

12  A.   Correct.

13  Q.   Thank you.  Now, if you were a lender and you real -- you

14  had a client with an SBA loan and you realized that there was

15  another creditor out there with first position, a higher

16  security interest in collateral that you had secured as part of

17  that SBA loan, would you be concerned?

18  A.   Yes, I would.  I'd be very troubled.

19  Q.   Okay.  I'd like to pull up Exhibit 25.  This is a letter

20  sent on September 19, 2011, from Ford Credit to Heritage Bank.

21  Did you review this document in preparation for your testimony

22  today?

23  A.   Yes, I did.

24  Q.   Okay.  And what -- this letter, it's a notice of private

25  sale related to Dirks Motor Company; correct?

1  A.   Yes.

2  Q.   Okay.  And if you read that first sentence, would you agree

3  that Ford Credit is giving Heritage notice that it's going to

4  sell vehicles in an attached schedule some time after September

5  29, 2011?

6  A.   Yes.

7  Q.   Now, is it your understanding that Heritage had a blanket

8  UCC filing statement filed that would have covered the vehicles

9  that would be listed in this attached schedule?

10  A.   Yes.

11  Q.   But Ford had the senior lien on this; correct?

12  A.   Correct.

13  Q.   So if you're a lender -- if you're the lender on this that

14  had originated the SBA loan to Dirks and you got a letter from

15  Ford Credit as a senior creditor telling you we're going to sell

16  some inventory, some cars, that you have a security interest in,

17  would you be concerned?

18  A.   Yes, I would from a couple of perspectives.  One, it would

19  be further indication that my borrower was suffering financial

20  difficulties and probably was getting close to going out of

21  business.  Secondly, I would be worried about my lien position

22  in any collateral that might be available to the bank.

23  Q.   Okay.  So if cars are being taken from a car dealership,

24  they aren't going to have inventory to sell, are they?

25  A.   Correct.

1  Q.   And if you don't have inventory to sell, you can't make

2  money, can you?

3  A.   Correct.

4  Q.   Okay.  Now I'd like to go to Exhibit 11.  And this is the

5  SBA loan authorization related to the loan between Heritage Bank

6  and Dirks Motor Company.  Have you reviewed this document in

7  preparation for your testimony today?

8  A.   Yes, I have.

9  Q.   Okay.  I'd like to go to the last page of the document.

10  And let's look at collateral conditions.  Did you review this

11  section in preparation for your testimony today?

12  A.   Yes, I did.

13  Q.   Okay.  Now let's look at this very first sentence at the

14  top.  The lender, is that Heritage Bank?

15  A.   Yes.

16  Q.   And it says they must obtain a lien on 100 percent of the

17  interests in the following collateral and properly perfect all

18  lien positions.  Is that what it says?

19  A.   Yes.

20  Q.   Now, based on your understanding in working with SBA loan

21  documents, would a second or junior lien position be a properly

22  perfected lien position?

23  A.   It would not.

24  Q.   Okay.  And based on your experience working with the SBA,

25  when it says 100 percent of the interests, did the SBA really

1  mean 85 or 80 or 93 or 50 or some other percent of the

2  interests?

3  A.   No.  They'd mean a hundred percent, in other words, all of

4  the -- all of the interests, all of the asset.

5  Q.   Okay.  And then let's look at these two items.  The first

6  one is a first mortgage on land and improvements; right?

7  A.   Yes.

8  Q.   And you did residential lending.  So -- and that relates to

9  what we call real estate or real property; correct?

10  A.   Correct.

11  Q.   Okay.  And then there's another type of property than real

12  property; right?

13  A.   Yes.

14  Q.   And do you know what that is?

15  A.   Personal property.

16  Q.   Okay.  And what is personal property then?

17  A.   Personal property would be anything other than real estate.

18  It would include accounts receivable, inventory, machinery,

19  general intangibles, anything that isn't titled.

20  Q.   Okay.  So the -- so the building and the lot Dirks Motors

21  Company sat on, that's real property; correct?

22  A.   Correct.

23  Q.   Now, Dirks Motors franchise, would that be real or personal

24  property?

25  A.   Be personal property.

1  Q.   Okay.  The lifts they had in their garage and the spare

2  parts they used to repair cars, real or personal property?

3  A.   Personal property.

4  Q.   Okay.  The vehicles sitting on the lot, would those be real

5  or personal property?

6  A.   Personal property.

7  Q.   Okay.  Now, here Heritage is the lender.  Do you understand

8  whose personal property this is talking about?

9  A.   Sure.  It'd be Dirks Motors' personal property.

10  Q.   I want to make a distinction here.  We're talking about

11  Dirks Motor, the company, not Mr. Dirks, the individual;

12  correct?

13  A.   Correct.

14  Q.   Okay.  So this isn't about, you know, the piano in his

15  front room or his china or bed or washer and dryer.  This is

16  about the company's actual property; correct?

17  A.   Correct.

18  Q.   And if you look at number 2, the SBA is requiring Heritage

19  as the lender to have the first perfected security interest

20  subject to no other liens in the following personal property

21  whether now owned or later acquired wherever located, and it

22  gives us a list:  Equipment, inventory, accounts, instruments,

23  chattel paper, and general intangibles; is that correct?

24  A.   It is.

25  Q.   Okay.  So, again, just to recap, Dirks Motors franchise

1  would be one of these items listed here under number 2; correct?

2  A.   Yes.

3  Q.   And that's both the Ford and the GM franchise.

4  A.   Correct.

5  Q.   The lifts, the parts in the garage, that would be covered

6  under this; correct?

7  A.   It would.

8  Q.   And the new and used cars both on the lot would be covered

9  by this; correct?

10  A.   It would.

11  Q.   Okay.  At the time -- we just saw Exhibit 25.  So in your

12  opinion as of two thousand -- the end of September 2011, was

13  Heritage Bank in compliance with this provision of the SBA loan

14  guarantee?

15  A.   They were not because Ford Motor Credit had a first

16  security interest in the personal property.

17  Q.   Okay.  And not just that but Ford Motor Credit was actually

18  exercising and using that security interest and giving Heritage

19  notice of that; correct?

20  A.   Correct.

21        THE COURT:  Why don't you try some nonleading

22  questions.

23        MR. LAWRENCE:  Thank you, Your Honor.

24  BY MR. THOMPSON:

25  Q.   Now, in your opinion was Heritage at risk for not complying

1   with this provision of the guarantee?

2   A.   The risk that they would have in not complying, they could

3   lose their SBA guarantee in its entirety.  They could end up

4   repairing or renegotiating with the SBA.  The original SBA had a

5   85 percent guarantee, and they could negotiate with the SBA and

6   settle that guarantee down to a lower percentage, could be down

7   to 30, 40, or 50 percent of the guarantee.  So yes, they'd be at

8   risk.

9   Q.   So if you think about that charge-off form we looked at

10  where the bank charged off the unguaranteed portion of the loan,

11  what would the consequence be on that charge-off form if the

12  ba -- if the SBA reduced the amount of its guarantee?

13  A.   So if they reduced the amount of the guarantee, in addition

14  to the 259,000 that was charged off, the remaining balance of

15  1.3 million or whatever factually that number is, instead of

16  being paid 85 percent of that 1.3, they would end up being paid

17  the negotiated, let's say for ease of math, 50 percent.  So

18  instead of -- they'd be paid 650,000 instead of the higher

19  amount at 85 percent.

20  Q.   Okay.  And are there any other problems that you found with

21  the SBA loan authorization?

22  A.   I guess not that -- not that I'm recalling.  They

23  didn't . . .

24          MR. LAWRENCE:  I'd like to go to page 12 again.  And

25  let's highlight the top.  I'm sorry.

1  Q.   Now, do you see item number 6 where Heritage -- the SBA

2  authorized a payment of $194,000 of outstanding debt to Heritage

3  Bank?

4  A.   Yes.

5  Q.   Now, based on your review of documents and what you know

6  about this case, do you know if Heritage was actually paid

7  $194,000 or not?

8  A.   They were.  It was included in the SBA financing, so in a

9  sense they were able to take a loan of 194,000 that they had

10  some risk and exposure to, and they were able to move that into

11  the SBA loan and, therefore, receive an 85 percent guarantee on

12  that amount.

13  Q.   Okay.  Do you recall if Heritage only received 194,000 or

14  if Heritage received more than that?

15  A.   Yeah.  There was another -- there was another 125,000 that

16  basically acted as capital into Heritage that was also part of

17  the SBA financing package.

18  Q.   And do you see that $125,000 referenced in this portion of

19  the authorization?

20  A.   I do not.

21  Q.   In your opinion would Heritage have properly closed the SBA

22  loan if instead of taking $194,000 for outstanding debt it would

23  have taken $329,000 for outstanding debt?

24  A.   That would not be proper.

25  Q.   Okay.  Now, let's go ahead to November -- the time period

1    November 2011.  Do you have an understanding of what happened at

2    meetings between Mr. Lucken, Mr. Crim, and Mr. Dirks?

3    A.    I do.

4    Q.    And what is your understanding?

5    A.    That Mr. Lucken and Mr. Dirks met with Crim, and Crim

6    indicated that if Ford Motor Credit would be paid off and if

7    Lucken would provide a CD in the amount of 250,000, that they

8    would in turn provide floor plan financing to Dirks Motors.

9    Q.    Okay.  And was it important for Ford to be paid off?

10   A.    Well, Ford was in a first lien position, so for the bank to

11   provide financing and have the security and have the ability to

12   realize on those assets in a liquidation scenario if it got to

13   that, Ford Motor Credit needed to be paid off.  And when Ford

14   Motor Credit was paid off, Heritage Bank moved into the first

15   lien position.

16   Q.    Okay.  What do you think based on your experience in the

17   banking industry Ford would have done had it not been paid off?

18   A.    Ford --

19            MR. REINSCHMIDT:  Objection, Your Honor.  Speculation.

20            THE COURT:  I'm going to sustain it on lack of

21   foundation.  If you can lay a better foundation for it so it's

22   not speculative.

23            MR. LAWRENCE:  Let's pull up Exhibit 200.

24   BY MR. LAWRENCE:

25   Q.    Have you reviewed this document in preparation for your

1  testimony today?

2  A.    Yes.

3  Q.    And what do you understand this document to be?

4  A.    Well, to be the Ford sales and service agreement.

5  Q.    And do you know who this agreement was with?

6  A.    With Dirks Motors.

7  Q.    Okay.  And I'd like to go ahead a few pages.  It's section

8  6(d).

9          THE COURT:  Actually that's not the foundation I'm

10 looking for.  You can't have an expert just review a document

11 and all of a sudden they're an expert on what somebody would do

12 that's a party to the document.  He's gotta have prior

13 experience with Ford.

14 Q.    Have you worked with auto dealerships in the course of your

15 lending history?

16 A.    Yes.

17 Q.    Okay.  And have you had experience based on working with

18 auto dealerships in understanding what dealerships do if they

19 aren't -- and what dealer credit arms do if they aren't paid?

20 A.    I have.

21 Q.    Okay.  And what -- based on that experience, what would a

22 dealership or a dealer's credit arm do if there were outstanding

23 amounts owed to it and they haven't been paid for some time?

24 A.    Yeah.  They'd put everybody on notice, and they'd come in,

25 and they'd take an inventory.  They'd notice people.  They'd

1    provide -- they'd start selling autos after the notification

2    period.

3    Q.    And after they did all of that, what would they do?

4    A.    Then they would rely on whatever collateral was left

5    available to them which would be the personal property,

6    receivables, inventory, parts, those types of things.

7    Q.    And then if they get to the point where they've taken all

8    the collateral and sold it and there's still a debt, there's

9    nothing left, what would they do based on your experience?

10    A.    They'd -- they'd shut the dealership down and try to sell

11    the franchise rights to another dealer.

12    Q.    Okay.  Thank you.  So let's go back to the meeting in this

13    November time frame.  Do you have an understanding if Mr. Lucken

14    complied with the two conditions that you understand were asked

15    of him?

16    A.    Yes.  He wired -- well, he sent a cashier's check to the

17    bank for the payoff of Ford Motor Credit.  The bank didn't

18    accept that check.  They asked Lucken to wire those funds which

19    he did.  Those funds ended up in a general ledger account, and

20    the bank then took the funds out of their account, paid off Ford

21    Motor Credit.  Lucken then executed a line of credit that was

22    secured by a $250,000 CD.

23    Q.    Okay.  Now, do you have an understanding with that first

24    $250,000 how that money was allocated?

25    A.    Sure.  Most of it was for the Ford payoff.  I think close

1 to 225,000 went to Ford.  25,000 that was remaining went into

2 Dirks Motors' checking account at Heritage.

3 Q.   Okay.  So at this stage of the transaction, Dirks Motors

4 has $25,000; correct?

5 A.   Correct.

6 Q.   Okay.  And would $25,000 based on your experience in

7 working with auto dealerships be enough to keep a car dealership

8 in business?

9 A.   It would not be.  In fact, Dirks Motors was behind on

10 interest payments.  The 25,000 would have been roughly 2

11 principal and interest payments that Dirks owed Heritage.

12 Q.   Okay.  So if Dirks Motors used that $25,000 to keep its SBA

13 loan current, that money would not then have been available to

14 Dirks Motors as operating capital; correct?

15 A.   Correct.

16 Q.   Okay.  Now, let's assume that this -- you know, you

17 mentioned the line of credit.  Let's assume that Mr. Lucken

18 provides the CD as backup collateral.  Would $250,000 alone in

19 your experience working with car dealerships be enough for the

20 dealership to continue operations as a going concern?

21 A.   Yeah.  It would not be.  If we said an average car costs

22 around 30 or 35,000, then it'd probably be -- the 250 would

23 probably buy 6 or 7 cars.  Those 6 or 7 cars, when they're sold,

24 the profit margin might be around 10 percent.  So if 250,000

25 were sold, 10 percent would be 25,000.  25,000, again, would be

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Mary Pat Z---  --- Computer-Aided Transcription*
Case 5:16-cv-04005-MWB-KEM   Document 167   Filed 05/07/18   Page 224 of 227

1   2 monthly payments that Dirks Motors is required to pay,

2   therefore, leaving Dirks Motors without any additional cash flow

3   or revenue to support the business, to keep the business in

4   existence.

5   Q.   So based on your experience in the banking industry and

6   working with car dealers, would you have even considered

7   extending a $250,000 line of credit to a car dealership like

8   Dirks Motors if there was no additional funding or financing

9   available to it at that time?

10  A.   Yeah.  I would not.

11  Q.   I'd like to move on now to talk about the Lucken line of

12  credit that you mentioned.

13          THE COURT:  Well, we can do that first thing tomorrow

14  morning.

15          MR. LAWRENCE:  Very good.  Thank you, Your Honor.

16          THE COURT:  Thank you very much, Mr. Lawrence.

17          Members of the jury, that's going to conclude the

18  testimony for today.  Please remember keep an open mind until

19  you've heard all of the evidence, had a chance to hear the

20  lawyers' closing arguments, and begin discussing this case among

21  yourselves during your deliberations.  Don't discuss this case

22  with anybody else or let anybody talk to you about the case.

23  And we'll see you tomorrow morning at 8:30.  Thank you very

24  much.

25          (The jury exited the courtroom.)

1          THE COURT:  Please be seated.

2          You may step down, Mr. Tank.

3          Anything else we need to take up before we adjourn for

4    the day?

5          MR. THOMPSON:  No, Your Honor.

6          MR. REINSCHMIDT:  No.

7          THE COURT:  Okay.  Thank you.  We'll be in recess.

8    Thank you.

9          (The foregoing trial was

10         adjourned at 4:32 p.m.)

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21         I certify that the foregoing is a correct transcript

22    from the record of proceedings in the above-entitled matter.

23

24

25    ___S/Shelly Semmler_____          __4-28-18___
      Shelly Semmler, RMR, CRR                Date

**INDEX**

**WITNESS:**                                                          **PAGE:**

JOHN LUCKEN
                MR. REINSCHMIDT                          212
                MR. THOMPSON                             238
                MR. REINSCHMIDT                          255

STERLING CRIM
                MR. THOMPSON                             259
                MR. REINSCHMIDT                          338
                MR. THOMPSON                             388
                MR. THOMPSON                             396
                MR. REINSCHMIDT                          397
                MR. THOMPSON                             399
                MR. REINSCHMIDT                          399
                MR. THOMPSON                             401

WILLIAM TANK
                MR. LAWRENCE                             402

* * * * *