IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

THE JOHN ERNEST LUCKEN                   No. C16-4005-MWB
REVOCABLE TRUST and
JOHN LUCKEN and MARY LUCKEN,
Trustees and Individually,

        Plaintiffs,                      Sioux City, Iowa
                                         April 11, 2018
     vs.                                 8:21 a.m.

HERITAGE BANCSHARES GROUP,               **Volume 3 of 4**
INC., and HERITAGE BANK
NATIONAL ASSOCIATION,

        Defendants.
_____/


                   TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE MARK W. BENNETT
        SENIOR UNITED STATES DISTRICT JUDGE, and a jury.

```
APPEARANCES:

For the Plaintiffs:        STANLEY J. THOMPSON, ESQ.
                           JASON RAY LAWRENCE, ESQ.
                           Davis, Brown, Koehn, Shors & Roberts
                           Suite 1300
                           215 Tenth Street
                           Des Moines, IA 50309


For the Defendants:        DAVID L. REINSCHMIDT, ESQ.
                           Munger, Reinschmidt & Denne
                           Terra Centre - Suite 303
                           600 Fourth Street
                           Sioux City, IA  51101

                           JEREMY J. CROSS, ESQ.
                           Cross Law Firm
                           Terra Centre - Suite 315
                           600 Fourth Street
                           Sioux City, IA 51101


Also present:             John Lucken
                          Bill Peterson
                          Robert Mathiasen


Reported by:              Shelly Semmler, RMR, CRR
                          320 Sixth Street
                          Sioux City, IA  51101
                          (712) 233-3846
```

1          (Proceedings reconvened outside the presence of the

2    jury.)

3          THE COURT:  Good morning.  Please be seated.  Anything

4    we need to take up before we bring the jury in?

5          MR. THOMPSON:  No, Your Honor.

6          MR. REINSCHMIDT:  No.

7          THE COURT:  Okay.  Thanks.  I don't think the minutes

8    are right, and had I known at the pretrial what I know now, I

9    would have cut your time in half for the trial.  But I think it

10   has to do with that extra 85 minutes that we gained on the first

11   day.  But we'll recompute it.  I just don't think it's right

12   because now it shows us ending after the original estimate, and

13   you should be ahead of schedule.  So we'll try and get a

14   corrected version to you.

15         Ready to have the jury brought in?

16         MR. THOMPSON:  Yes, Your Honor.

17         (The jury entered the courtroom.)

18         THE COURT:  Good morning.  Please be seated.

19         And let's see.  We left off with Mr. Tank on the

20   stand.  So, Mr. Tank, you can resume your position in the

21   witness box.  You're still under oath.

22         I did want to remind the jurors of one thing.  We took

23   a couple bathroom breaks that were unexpected, and that happens.

24   You know, you can't always anticipate your bladder or other

25   biological functions.  But I -- you know, I expect the lawyers

1  and parties to be able to not have -- need breaks because they

2  should be used to it.

3          But anyway, I don't want you to think that if you need

4  a break you can't have it so -- because, you know, my whole

5  approach to judging is to elevate the jurors and do everything I

6  can to make your job easier.  So I don't want anybody worried

7  about a bathroom break.  If you absolutely need one, we'll take

8  it, and I'll do it with a smile.  How's that?  Okay.  Great.

9          Mr. Lawrence, you may resume your examination of

10 Mr. Tank.  Thank you.

11         MR. LAWRENCE:  Thank you, Your Honor.

12         WILLIAM TANK, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

13                   CONTINUED DIRECT EXAMINATION

14 BY MR. LAWRENCE:

15 Q.  Now, Mr. Tank, based on your experience in the banking

16 industry, would a bank like Heritage Bank be subject to

17 government regulation?

18 A.  Yes, they would.

19 Q.  And what would the government entity be that would regulate

20 a bank like Heritage?

21 A.  Well, there'd be two.  There'd be the FDIC insurance, and

22 then there'd be the Office of the Comptroller of the Currency

23 known as the OCC.

24 Q.  And what is the Office of the Comptroller of Currency?

25 A.  It's a federal body that regulates federal banks throughout

1    the entire country to make sure the banks operate in a safe and

2    sound manner.

3    Q.    Okay.  Now, yesterday we looked at the charge-off sheet for

4    Heritage Bank's SBA loan with Dirks Motors.  Do you recall that?

5    A.    Yes.

6    Q.    Now, would that information, based on your experience in

7    the banking industry, be something that would be reported by

8    Heritage to the OCC?

9    A.    Yes.  The OCC, when they would conduct their examination,

10   they would see that information.

11   Q.    Now, yesterday you discussed that if Heritage was found to

12   not be in compliance with the SBA loan guarantee that the

13   guarantee could be totally abrogated or reduced.  I want you to

14   assume for the sake of these questions that the loan guarantee

15   would be totally negated.  What impact would a total negation of

16   the SBA guarantee have on that amount we saw on the loan

17   charge-off sheet?

18   A.    Well, it would increase by the remaining balance of the

19   loan less any collateral that would be available.

20   Q.    And you recall that we looked at a different exhibit, the

21   CAD exhibit, that showed the loan was undercollateralized by

22   $593,000 or so; correct?

23   A.    Yes.

24   Q.    So if I understand your testimony correctly, that amount

25   would be added to the charge-off amount?

1   A.   Yes.

2   Q.   And if the bank and -- if the OCC saw, instead of 260,000,

3   add another five, you know, almost six hundred thousand, about

4   850,000, in your experience in the banking industry, would that

5   be something that the OCC would pay close attention to?

6   A.   Yes, they'd be concerned about the -- well, the

7   underwriting and the risk that the bank took in not perfecting a

8   first security interest in the collateral thereby causing the

9   SBA guarantee not to be in force resulting in a much larger

10  loss.

11  Q.   Now, based on your experience in the banking industry, does

12  the OCC from time to time take actions after they review a bank

13  to enforce their regulations or -- yeah, to enforce their

14  regulations?

15  A.   Yes, they sure do.  They examine banks on different

16  schedules, anywhere from six months to a year and a half based

17  on the prior examination and the amount of risk that they see in

18  the bank.  In Heritage's case, they did provide an enforcement

19  action against the banks on a couple of occasions for unsafe and

20  unsound lending including limiting the amount of dividends the

21  bank could pay, requiring the bank when they renewed certain

22  substandard loans over certain dollar amounts, that they needed

23  to get the government or the OCC's approval to renew those

24  loans.

25  Q.   Now, since you mentioned that agreement, I want to ask, are

1  you aware that in or around June of 2011 that that agreement --

2  the OCC released Heritage from that agreement?

3  A.   Right.  It was terminated June of '11.

4  Q.   Now, based on your experience in the banking industry,

5  since that agreement was terminated in June of 2011 and the

6  charge-off forms and the events we're looking at are, you know,

7  into the third quarter, fourth quarter 2011, do you believe or

8  is it your opinion that a banker would be sensitive to that

9  recent termination and the impact any charge-off on loans could

10  have on the OCC scrutiny?

11  A.   Yeah, absolutely.  They would have gone through that prior

12  year up to June of '11 with the oversight of the OCC on troubled

13  loans and would have been criticized for how they -- how they

14  managed those -- those assets.  So certainly after it was

15  terminated the OCC would be back in to review the bank again.

16  And when they do come back in, the bank would want to

17  demonstrate that they continue not to be required to be under an

18  enforcement letter.

19  Q.   And for a bank the size of Heritage, based on your

20  experience in the banking industry, would it be your opinion

21  that a write-off that could be -- or a charge-off that could be

22  as great as about 850,000 would be an amount that the OCC would

23  pay close attention to?

24  A.   Sure.  That'd be a significant charge-off amount.

25  Q.   I want to go back to where we left off yesterday moving

1  into January of 2019 -- or sorry, 2012 where Mr. Lucken signed

2  the Lucken line of credit on January 19 of 2012.  Was the Lucken

3  line of credit a floor plan financing loan?

4  A.   It was not.  It was a line of credit to Mr. Lucken secured

5  by a certificate of deposit.  So it didn't have any of the --

6  any of the criteria that a floor plan financing would have.

7  Q.   And what are those criteria again?

8  A.   Well, certainly there'd be requirements that as cars were

9  sold that those funds would come in to reduce the line of

10  credit.  There'd be requirements that the bank would go out and

11  do an inventory check on a regular basis to make sure the cars

12  were there that they had financed.  It would be secured by the

13  vehicles.  In the case of Lucken, the line of credit was not

14  secured by vehicles.  It was secured by his certificate of

15  deposit.

16  Q.   Okay.  Thank you.  And you understand that the Lucken line

17  of credit was available for Dirks Motor Company to purchase

18  vehicles.

19  A.   Yes.

20  Q.   And in your experience in the -- based on your experience

21  in the banking industry, is it your opinion that that would be a

22  usual way to finance a car dealership's purchase of vehicles or

23  an unusual way?

24  A.   It'd be -- it'd be very unusual because the normal way to

25  do that would be through floor plan financing.

1    Q.    Mr. Tank, in your experience in the banking industry, have

2    you had experience with anti-tying laws that banks are subject

3    to?

4    A.    Yes, I have.

5    Q.    And what is that experience?

6    A.    Well, the experience would go back to when I first started

7    in commercial lending at Bankers Trust.  I would have been at

8    some training sessions where the topic was covered.

9    Additionally then when I moved to Norwest, we would have had a

10   couple of seminars that would have covered anti-tying.

11          So anti-tying is kind of a knowledge situation.  Once

12   you understand the knowledge, be sim -- very similar to when you

13   lend money, you have to have a note that's signed.  Well, you

14   know that once for the rest of your career.

15   Q.    And could you give the jury just sort of a very generic

16   example of what would be a tying arrangement?

17   A.    Sure.  Specifically in this case, a floor plan loan which

18   is what was desired would be the tying event, and the tied event

19   would be the fact that Lucken was required to provide a line of

20   credit and a CD secured by that line of credit.

21          Another example would be if a bank would provide a

22   loan and as part of that -- as part of providing that loan they

23   would require that the customer bring their trust business to

24   the bank.

25          Certainly another situation might be when someone is

1  asking a bank for a loan, the bank agrees to provide the loan if

2  the individual or the business would purchase insurance from the

3  bank.

4  Q.   I want you to assume that Mr. Lucken's versions -- version

5  of events are correct in that the bank offered floor plan

6  financing to Dirks Motor based on the condition that Mr. Lucken

7  provide a CD and pledge it as backup collateral for that floor

8  plan financing loan. In your opinion, based on your knowledge

9  of tying and anti-tying, would that event constitute a tying

10  event?

11  A.   It would.

12  Q.   Now, Mr. Tank, I want you to assume that Heritage Bank

13  required Mr. Lucken to have the CD that was pledged as

14  collateral for the Lucken line of credit at Heritage Bank.

15  Based on your experience in the banking industry, would that

16  lessen competition or could that lessen competition between

17  Heritage Bank and other banks in the marketplace?

18  A.   Sure, because certainly Lucken could have a CD at another

19  bank, and if Heritage requires that, then the other banks would

20  not have that opportunity.

21  Q.   Now, Mr. Tank, if you assume that Heritage Bank did not

22  allow Dirks Motor Company to draw more than $250,000 on the

23  Lucken line of credit and that there was a $250,000 cash CD as

24  collateral on the Lucken line of credit, did Heritage Bank,

25  based on your experience in the banking industry, have any real

1 risk of not being paid on the Lucken line of credit?

2 A. That would be a risk-free loan because obviously they could

3 cash the CD in to pay off the loan and they'd have no -- no

4 loss.

5 Q. Now, are -- other lenders in the marketplace, would they

6 have been able to loan money on a line of credit or on a floor

7 plan financing loan risk free to Dirks Motor?

8 A. They would not be able to do that because of the collateral

9 being the vehicles which they'd have to -- number one, they'd

10 have to find them, and, secondly, they'd have to sell them. And

11 depending on what they got when they sold them, they may or may

12 not have a loss.

13 Q. Now, based on your experience in the banking industry, if

14 you could make risk-free loans when other banks couldn't, would

15 that put you in a better competitive position than other banks?

16 A. Certainly.

17 Q. Finally, did Heritage Bank benefit from having the offer of

18 floor plan financing tying the Lucken line of credit?

19 A. Sure. They basically ended up with a risk-free -- with a

20 risk-free loan that they collected interest on without really

21 any exposure or risk exposure.

22 Q. Now, I want you to assume that Ford was about -- Ford and

23 GM were both about to foreclose on Dirks Motor and pull their

24 franchises in late November of 2011. I now want you to assume

25 that Dirks Motor eventually was able to be sold to another

1  business which included the sale of those franchise rights and

2  that the proceeds of that sale went to further pay down Dirks

3  Motors' SBA loan debt to Heritage Bank.  Based on your

4  experience in the banking industry, did keeping Dirks Motors in

5  some semblance of operation from November of 2011 until its

6  eventual sale benefit Heritage Bank?

7  A.   It did, because it provided the appearance that Dirks

8  Motors was a operating entity as opposed to a entity that had

9  shut its doors and was not able to operate.

10 Q.   Finally, I want you to assume that the Lucken line of

11 credit was used to make approximately $70,000 in loan payments

12 to Heritage Bank on the Dirks Motor SBA loan.  Would that have

13 been to Heritage Bank's benefit based on your experience in the

14 banking industry?

15 A.   Yes, certainly would be.

16          MR. LAWRENCE:  Nothing further, Your Honor.

17          THE COURT:  Thank you, Mr. Lawrence.

18          You may cross-examine.

19          MR. REINSCHMIDT:  Thank you, Your Honor.

20                     CROSS-EXAMINATION

21 BY MR. REINSCHMIDT:

22 Q.   Mr. Tank, Mr. Lawrence talked to you about a lot of

23 assumptions in this case, didn't he?  In other words, he kept

24 saying assume this hypothetical.

25 A.   Yes.

```
1   Q.   Okay.  If we talk about what did happen here or what the
2   bank's position is what happened here, bank's position is they
3   accommodated Dirks and Lucken by having Lucken set up the line
4   of credit so that he could finance Dirks.  If they wanted to set
5   up a risk-free loan, that would involve security attached to
6   that line of credit; correct?
7   A.   Yes.
8   Q.   And Dirks didn't have any security to attach to that line
9   of credit.  I mean, if Dirks was going to put up the security,
10  he didn't have any more, did he, if you know?
11  A.   I don't -- I don't know.
12  Q.   Okay.  Let's go back to the SBA.  Let's just start at the
13  beginning about this loan.  In terms of the SBA's awareness of
14  Ford's involvement in floor planning, from all the documents
15  you've looked at, are you aware that -- are you aware that the
16  SBA was aware that Ford Motor Credit was floor planning Dirks
17  Motors?
18  A.   No.  I'm not sure that I'm aware that the SBA was aware of
19  that.  Certainly Ford Motor Credit was providing the floor plan
20  financing.
21  Q.   We looked at some correspondence exchange between Mr. Crim
22  and a lady named Connie Lovsletten or Lovsletteh from SBA
23  yesterday in which Mr. Crim is talking about Ford floor
24  planning.  Have you seen those letters?
25  A.   I don't recall seeing them, but if indeed they're there
```

1   which sounds like they are, then the SBA would have that

2   knowledge.

3   Q.   And I also want to show you what has been marked as Exhibit

4   76D.  And the first page of 76D, that's an OIC.  Do you see

5   that?

6   A.   Yes.

7   Q.   And that's from Dick Palmatier on behalf of Heritage Bank;

8   correct?

9   A.   Yes, certainly.

10  Q.   And what is an OIC?

11  A.   Offer in compromise.

12  Q.   And is that something where Heritage on behalf of Dirks is

13  asking the -- is asking the SBA if they'll take a little bit --

14  if they're agreeable to take something less in liquidation?

15  A.   So are you asking me what an offer in compromise is?

16  Q.   Yes, yes.

17  A.   Yes, an offer in compromise would be to take less than

18  what's owed.

19  Q.   Okay.  So the bank will take less; and, therefore, by

20  extension, the SBA will get less; is that correct?

21  A.   Yes.

22  Q.   Okay.

23       MR. REINSCHMIDT:  And then if you'll go, Ms. Liston,

24  to page -- page 5 of 76D -- well, actually go to the very first

25  page.

1   Q.   This is the very first page so you know what this document

2   is, sir.  The very -- when I say the very first page, I mean

3   page 2 of 9.  And it's called information sheet.  Can you

4   describe to the jury what that is if you've seen one before?

5   A.   The only thing I'm looking at is the bank name, the SBA

6   number, the contact, and then it says on business -- ongoing

7   business concern, no.  Who is making offer?

8   Q.   Is this an information sheet going to the SBA attached to

9   this OIC?

10  A.   I guess I can't tell that.  It certainly could be something

11  that would be attached.

12  Q.   Go ahead.  Maybe you can see it a little better there.

13  Does that help you more?

14  A.   I guess, yes, this could be something that would be

15  included in an offer in compromise to the SBA.  Certainly.

16  Q.   All right.  Let's look at page 5 of that offer in

17  compromise information sheet to the SBA, and let's look at the

18  very top portion.

19          MR. REINSCHMIDT:  Maybe if you could highlight that

20  top portion, Ms. Liston, just the very top.

21  A.   This says page 4.  Did you want page 5 or -- I'm sorry.

22  Q.   It says page 4 at the top, but on our documents it's page

23  5, so bear with me.

24  A.   All right.

25          MR. REINSCHMIDT:  And then if you could highlight that

1  too.

2  Q.   And in there is Heritage explaining what happened as to the

3  reason that the loan failed?

4  A.   Yes.

5  Q.   And so in terms of the -- certainly the SBA even well after

6  the fact, well after the loan, and when -- this is when the

7  guarantee is also being applied for; correct?  This is in 2013,

8  and the guarantee's being applied for?

9  A.   Okay.

10 Q.   Well, I'm asking you.  I mean, the OIC is within the

11 context of asking for the loan guarantee; correct?

12 A.   Yes.

13 Q.   Okay.  And Heritage is telling the bank -- excuse me,

14 Heritage is telling the SBA about here's what happened with the

15 floor plan.  Ford pulled it.  Had issues with inventory.  So

16 SBA's aware at this point in -- I think his letter was May --

17 Dick Palmatier's letter was May 2013.  So as of May 2013 they

18 were certainly aware; correct?

19 A.   Yes.

20 Q.   And have you -- you've talked about your lengthy experience

21 in banking.  Have you -- when you have loaned money in the past,

22 has your bank been a floor plan lender?

23 A.   Yes.

24 Q.   Have you loaned money to -- and for floor plans, is that

25 primarily for automobile dealers, or is it other areas too?

1    A.    There'd be other areas.

2    Q.    How about automobile dealers?  Do you remember specifically

3    automobile dealers that you've done?

4    A.    Yes.

5    Q.    Okay.  Yes as in yes, you've had automobile dealers.

6    A.    Yes.

7    Q.    Okay.  Fair enough.

8              THE COURT:  Mr. Tank, could you please get a little

9    closer to the microphones?

10             THE WITNESS:  Sure.

11             THE COURT:  Thank you.

12   BY MR. REINSCHMIDT:

13   Q.    And when you lent money through a floor plan -- and this is

14   what you would call a classic floor plan where you finance the

15   inventory and then when the car dealer sold the car you were to

16   get the proceeds from the car?

17   A.    Yes.

18   Q.    And when you did that -- let's use a car dealer as an

19   example that you can think of -- did that car dealer also have

20   other loans?

21   A.    They certainly could, not necessarily in every case, but

22   they certainly could.

23   Q.    Well, let's think about an example where they did have a

24   loan.  In your mind do you remember a case where they had other

25   loans in addition to your floor plan loan?

1    A.    Okay.

2    Q.    When you lent money via the floor plan, did you take a

3    subordinate or second interest to those other loans, or did you

4    take a primary interest in the cars and the parts that you were

5    financing?

6    A.    So for the floor plan loan we'd take a primary first lien

7    interest in that inventory.  If --

8    Q.    Go ahead.

9    A.    If we would provide another loan, perhaps let's say for

10   real estate, for perhaps the building that they were operating

11   out of, we would take a mortgage for that real estate loan.

12   Q.    Did you ever participate in an SBA loan where another

13   entity was providing floor planning to a car dealer or some

14   other business?

15   A.    Not that I recall.

16   Q.    If there was an SBA loan to a particular customer and a

17   floor planner came along to floor plan that customer, would a

18   floor planner ever take a subordinate interest in its cars --

19   A.    No.

20   Q.    -- to that other -- they would always want to be first;

21   correct?

22   A.    Yes.

23   Q.    So would there ever be an SBA loan guaranteed to any

24   entity?  If the -- if the floor planner said we've gotta have

25   first, SBA documents say no, this loan over here has to be

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Court Reporting Transcription
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 18 of 221

1    first, you've got a direct conflict; correct?

2    A.    Yes.

3    Q.    What would happen in that direct conflict?

4    A.    Well, in a situation like that, you would go to whoever had

5    the first lien, first security position, and you'd negotiate a

6    subordination of that position to the floor plan lender such

7    that the floor plan lender would be in a first lien position.

8    Q.    Floor plan lender would always want to be first.

9    A.    Yes.

10   Q.    And -- and that's what Ford was in this case.

11   A.    Yes.

12   Q.    And, in fact, I think part of the pitch or the argument in

13   this case by plaintiff is that Mr. Crim discovered that Ford was

14   in first lien after the bank thought about foreclosing upon

15   Dirks.  Do you know that that's their claim or not?

16   A.    Yes.

17   Q.    Okay.  In your deposition I asked you if there were prior

18   UCC searches, and my recollection is you said that you weren't

19   sure but you did think that there were other searches.

20   A.    Yes.

21   Q.    And in this case we've identified through testimony -- it

22   was either with Mr. Lucken or Mr. Crim, I think perhaps

23   Mr. Crim -- that there were at least three prior UCC searches in

24   2010.  And if that's the case that those UCC searches were done,

25   would those have identified Ford as a prior creditor?

1   A.   Yes, they would.

2   Q.   Are these -- these SBA loan documents, particularly the

3   loan authorization, are those documents that are rigid documents

4   that if it says A, B, C, D, by golly, you need to follow A, B,

5   C, and D?  That's what -- it means what it says.

6   A.   Yes.

7   Q.   Have you heard of the phrase boilerplate?

8   A.   Yes.

9   Q.   What is boilerplate?

10  A.   Boilerplate would be standard language that would be used

11  in a loan document.

12  Q.   And does sometimes standard language not always apply to a

13  particular case?

14  A.   Well, I guess I'm not sure what you're asking.  If -- if --

15  Q.   Let me help you out.  Let me help you out.

16  A.   Sure.  Sure.

17  Q.   Let's -- I want to put up Exhibit 11.  I want you to look

18  at -- just a moment.  I'll find what I'm looking for.  Yes.

19  Took me a moment.  Apologize.

20       Under page 2 of Exhibit 11 -- and oh, here, hang on.

21  Let's go to the first page so you know what you're looking at,

22  you're not just jumping into a document.  This is Exhibit 11.

23  We've looked at it a little bit yesterday.  Can you tell the

24  jury what this is?

25  A.   It's the SBA's authorization for a 7(a) guaranteed loan.

1    Q.   And let's go now to the -- let's go down to page 2 of that

2    under (e), contingencies.

3             MR. REINSCHMIDT:  Blow up the (e), contingencies.  And

4    would you -- Ms. Liston, would you highlight number 2(e)(2).

5    Q.   And that says under contingencies that the guarantee is

6    contingent upon, and then it lists six items.  And the second

7    item says having paid the full guarantee fee in the time and

8    manner required by this authorization and the SOP.  Do you see

9    that?

10   A.   Yes.

11   Q.   Typically with SBA loan guarantees, was there a fee

12   required?

13   A.   Yes.

14   Q.   And was that a percent?  Is that a flat fee or a percent of

15   the total magnitude of the loan?

16   A.   Yeah.  I think if I recall it was a flat fee.

17   Q.   A pretty significant fee?

18   A.   Yes.

19   Q.   And back in 2008 and 2009, there was a law drafted by

20   Congress I think called the American Recovery and Reinvestment

21   Act of 2009.  Do you know that law or have heard of that law?

22   A.   I've heard of it, yes.

23   Q.   What was the purpose of that law?

24   A.   Purpose was to encourage or to loosen lending, make more

25   lending available to those who wanted to borrow funds.

1  Q.   And explain how that worked.  In other words, if I'm a

2  bank, you come to me, I'm not so sure if I want to lend to you,

3  how does the -- how does the SBA and their loosening, how does

4  that relate to me making a decision to loan money to you?

5  A.   Yeah.  Really the underwriting process really didn't

6  change.  In other words, the government or the taxpayer didn't

7  want banks to be lending money to individuals or businesses that

8  weren't qualified.  What the SBA did is I believe they

9  eliminated their fee for a guaranteed loan, but they didn't

10  change any of the underwriting requirements or the due diligence

11  or the credit analysis.  But they did -- there was a period of

12  time where you didn't have to pay a fee to get an SBA loan.

13  Q.   So in terms of this loan, everything -- the decisions the

14  bank made about whether to loan money to Mr. Dirks and Dirks

15  Motors, the SBA reviewed all that and made its own independent

16  decision on whether to provide a loan guarantee for such a loan.

17  A.   Yes.

18  Q.   And in this case they did do that; correct?  They provided

19  this loan guarantee.

20  A.   Yes.

21  Q.   And that was a good segue for what you just said.  You said

22  you thought that the guarantee had been waived.  Now, here would

23  you call this (e)(2) boilerplate language that's standard

24  language in the authorization form?

25  A.   Well, I don't know that it's standard boilerplate language.

1  It would be a contingency in an SBA loan.

2  Q.   Well, boilerplate or not, it's in this one.

3  A.   Correct.

4  Q.   It says you will pay the fee; correct?

5  A.   Yes.

6  Q.   And you meaning the bank.

7  A.   Yes.

8  Q.   That can't be passed on to the borrower.

9  A.   Correct.

10  Q.   All right.

11         MR. REINSCHMIDT:  Let's look at the very first --

12  let's go back to the first page then.  And on the very first

13  page, if we just look at the -- let's see.  Go down to just

14  through sub (a), and that says -- and maybe you could highlight

15  that, Ms. Liston.

16  Q.   If we highlight that, there was a guarantee fee that was --

17  I think you said a pretty hefty flat fee of $53,187.50.  Do you

18  see that?

19  A.   Yes.

20  Q.   And under this, that was waived; correct?  In other words,

21  the bank did not have to pay a guarantee fee.

22  A.   Yes.

23  Q.   And that would contradict that other portion that said had

24  to pay a fee.

25  A.   Say that again.  I'm sorry?

1  Q.   And that would contradict what we had just looked at that

2  said the bank had to pay a fee, a guarantee fee.

3  A.   Yes.

4  Q.   Let's look at collateral.  We talked a little bit about --

5  I want to make sure I'm -- actually I want to make sure the jury

6  understands what you're saying about collateral.  Let's look

7  at -- yeah, let's look at Exhibit 145.  Oh.  But before we get

8  to 145, you talked for some time with Mr. Lawrence about that

9  there was an amount that the bank was owed prior to the SBA

10  loan, and then when the loan was actually finalized, it went

11  from about 194,000 to 329,000?

12  A.   Yes.

13  Q.   We talked about different aspects of this case about a year

14  ago I think; is that correct?

15  A.   When you did my deposition you mean?

16  Q.   Right.

17  A.   Yes.

18  Q.   I'm look -- it was just about a year ago, the 26th of

19  April, 2017, in Des Moines.  All right.  And on page 90 --

20  beginning of page 92, I asked you about the 329,000.  I said --

21  and we were looking at this specific document.

22       MR. REINSCHMIDT:  Maybe we could just switch from this

23  Exhibit 145 to -- it would be Exhibit 13.  And yeah, not that

24  one, Ms. Liston.  It would be the one -- might be the last page

25  I think.  Yes, we went to page 8 of 9 of Exhibit 13.  And just

1    highlight the middle part of that where it shows the 329,000.

2    Q.   And is this -- is this when the bank got paid on December

3    2, 2009, slightly over 329,000?

4    A.   I'm sorry?

5    Q.   Is this where the bank got paid at the commencement of the

6    SBA loan guarantee?  They got paid 329,000?

7    A.   I don't know.

8            MR. REINSCHMIDT:  Well, blow up the whole document.

9    Q.   I think that's that same document you were talking with

10   Mr. Lawrence about.  Shows payoff.  See that?

11   A.   I do see that it's a settlement sheet with the SBA and that

12   there's a payoff to Heritage Bank on December 2 of '09 of

13   $329,490.31.

14   Q.   And that's what you were talking about yesterday?

15   A.   Yes.

16   Q.   And you were concerned about that.

17   A.   Yes.

18   Q.   I asked you about that in your deposition.  I said -- I

19   asked you on page 92 of your deposition, question, In your

20   knowledge involving SBA loan guarantees, would an individual

21   from the SBA have reviewed this, given their title, and dated

22   it?  Answer, It appears, yes.

23           Do you stand by that testimony?

24   A.   Yes.

25   Q.   And particularly if we look at --

1          MR. REINSCHMIDT:  Just blow up the very bottom,

2   Ms. Liston, if you would.

3   Q.   Where it says SBA review by, title, and date, is that what

4   you were referencing?

5   A.   I'm sorry?  Reference --

6   Q.   Is that what you were referencing that the SBA -- someone

7   from the SBA would have had to review it, given their title, and

8   dated it?

9   A.   Yes.

10  Q.   And I also asked you in your deposition --

11          THE COURT:  Well, just a second.  You can't -- you

12  can -- what he said in the deposition is hearsay.  You can use

13  it to impeach him, but you can't use it as substantive evidence

14  which is what you just did and what you're about to do.

15          MR. REINSCHMIDT:  Okay.  I will not do that then, Your

16  Honor.

17          THE COURT:  Okay.  Thank you.

18  BY MR. REINSCHMIDT:

19  Q.   Sir, did you find any evidence in your review of all these

20  documents in this case that the SBA questioned the disbursement

21  of this $329,000?

22  A.   I didn't see anything where the SBA questioned that

23  distribution.

24  Q.   Thank you.  Now I think I want to just real quickly go back

25  to Exhibit 145.  We'll just -- let's just look at the first

1  page.  You've talked about that yesterday, but I just want to

2  familiarize yourself with it.  This is called a CAD management

3  info which I think was internal bank documents.

4         MR. REINSCHMIDT:  Maybe blow it up -- maybe the top

5  part a little bit if you could.

6  Q.  Do you remember talking about that yesterday?

7  A.  Yes.

8  Q.  Okay.  Let's go to the -- let's go to the second page of

9  that.  And if we go down to the bottom portion that's entitled

10  collateral, and this is listing all the collateral that the bank

11  is setting forth as to its -- to support the loan that they're

12  going to give Dirks.  Do you see that?

13  A.  Yes.

14  Q.  And there's three CDs listed on that page, and then if we

15  go to the next page, there's three cash value life insurance and

16  then a first lien on CRE.  Do you know what CRE is?

17  A.  Commercial real estate.

18  Q.  Now, there's been this conversation about what is personal

19  property.  The personal property on the prior page when it

20  listed CDs, were those CDs held by Dirks Motors, or were those

21  CDs held by Dick Dirks individually?

22  A.  I guess -- I guess I don't know.  If we go back to the

23  first page, does it -- does it identify who the owner is?

24  Q.  No, the very first page.

25  A.  No, that page was helpful.

1   Q.   Okay.  Sorry.

2   A.   No, that's all right.

3   Q.   Which page do you want to look at so we're not bouncing the

4   jury around here?

5   A.   The page with the CDs listed.

6   Q.   Okay.  We'll blow that up.

7   A.   So the collateral analysis is done on Dirks Motors, and in

8   those Heritage CDs I would assume the CDs were owned by Dirks

9   Motors.

10  Q.   If there's testimony that they were by Dirk -- owned by

11  Dick Dirks individually, would you have -- do you have other

12  knowledge to disagree with that or not?

13  A.   I don't have any other knowledge to disagree with that.

14  Q.   How about in terms of on the second page where it showed

15  the CRE, the commercial real estate?  We could go to that for a

16  moment on the next page.  Do you have an idea as to who owned

17  the commercial real estate?

18  A.   Based on the CAD that Heritage Bank prepared, it would

19  indicate Dirks Motors.

20  Q.   And if there's letters from the SBA saying, hey, that is

21  personal property of Dick Dirks, it needs to be transferred to

22  Dirks Motors, do you have knowledge of that or not?

23  A.   Well, it wouldn't be personal property.  It'd be his real

24  property, and I don't have any knowledge one way or the other if

25  it was to be transferred to Dirks Motors.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer-Aided Transcription
Case 5:16-cv-04005-MWB-KEM Document 168 Filed 05/07/18 Page 28 of 221

1  Q.   Now, when you were talking about numbers and kind of

2  worst-case scenarios, I presume that CDs are the same as cash;

3  correct?

4  A.   Yes.

5  Q.   And cash value of life by definition is cash.

6  A.   Yeah, it's close to cash.  You still have to -- you still

7  have -- you still have expenses to collect it, and it depends

8  on, you know, if the policy is up to date.  But it would be

9  close to cash, yes.

10 Q.   And when we -- and then similarly with commercial real

11 estate that isn't cash, that would have to be sold in order to

12 yield a value; right?

13 A.   Yes.

14 Q.   And they're knocking it down.  They're only giving it a 75

15 percent value.  Even on the 540,000 appraisal, they're still

16 knocking it down by another 25 percent; correct?

17 A.   Yes, that would be standard.

18 Q.   So I don't know if this was entirely clear.  If you're

19 taking the one million dollars collateral, almost 1.1 million

20 dollars collateral, from the 1.675 loan amount, that leaves that

21 $593,000 of potential monies owed that Dirks wouldn't be able to

22 pay; correct?

23 A.   Yes.

24 Q.   Of that, the SBA, if their loan guarantee worked, they

25 would pay 85 percent of that nearly $600,000; correct?

1   A.   Yes.

2   Q.   All right.  And that's the whole value to having an SBA

3   loan guarantee, that they pay the bulk of it.

4   A.   Well, that is true.  They do do that.  The value of the SBA

5   guarantee is that there are terms made more favorable to

6   borrowers such as longer amortizations and what have you.

7   Certainly there is -- the guarantee does come into play.

8   Q.   There's been testimony throughout this case by Mr. --

9   pri -- well, by Mr. Lucken of a phrase backup collateral.  Is

10  that a phrase that you use in any loan documents?

11  A.   Well, I'm not sure what you're asking.

12  Q.   Well, he's referred to his CD as being backup collateral.

13  A.   Yes.

14  Q.   Is that a phrase that you use in loan documents ever?

15  A.   What do you mean by use in loan documents?

16  Q.   Do you ever use that phrase anywhere -- will that appear in

17  a loan document about a particular piece of collateral, that

18  it's backup collateral?

19  A.   No.

20  Q.   What would you call something if it's not primary

21  collateral?

22  A.   Secondary.

23  Q.   Did you ever find anything in the documents, in

24  particularly the assignment of CD, the line of credit, that said

25  that that CD was secondary collateral?

1    A.    I did not.

2    Q.    It was -- was it clear to you from reading the line of

3    credit which is Exhibit 46 and looking at the assignment of CD

4    which is Exhibit 48 that this was a line of credit secured by

5    that CD?

6    A.    And I'm assuming we're talking about Lucken's line of

7    credit.

8    Q.    I am.

9    A.    Yeah.  So in looking at that, yes, it was secured by the CD

10   and so, therefore, would not be a typical floor plan financing

11   arrangement.

12   Q.    I didn't -- and we'll talk about whether it's typical or

13   atypical.  But just from looking at it, you understand that

14   that's a line of credit that's got a CD that's securing it.

15   A.    Yes.

16   Q.    I think earlier you testified that it was extraordinary in

17   terms of buying cars using that line of credit as opposed to a

18   floor plan.

19   A.    Yes.

20   Q.    There's been testimony in this case that Mr. Dirks was out

21   of trust with Ford and was searching for floor planning amongst

22   various banks and entities.  Do you know that to be the case?

23   A.    Yes.

24   Q.    If he was unable to obtain what you -- what you have

25   described as normal floor planning, is this an alternative to

1  that, in other words, an alternative that allows him to actually

2  buy vehicles?

3  A.   Yes.

4  Q.   Does he have to have a bank involved in order to buy

5  vehicle -- a bank or some financial entity in order to buy

6  vehicles?

7  A.   Does he have to have a bank?  He would not have to have a

8  bank involved to buy vehicles.

9  Q.   Well, can he just write a check to Ford or GM like a

10  personal check or --

11  A.   Sure.

12  Q.   He could?  Is that -- have you -- have you seen that done

13  with buying new vehicles?

14  A.   I have not.

15  Q.   You have not?

16  A.   I have not.

17  Q.   Oh.  And by the way, you mentioned about these OCC

18  enforcement actions.  During -- and I think those were during

19  2008, 2009 that those were entered into?

20  A.   Yes.

21  Q.   And in that time frame of 2008, 2009, there's been -- I

22  think it's been referred to as the great recession.  Was there a

23  recession in that time frame?

24  A.   Yes.

25  Q.   Were there hundreds if not thousands of banks that were

1  subject to OCC enforcement actions in that time frame?

2  A.   Yeah, there would be a number of banks subject to

3  enforcement actions.

4  Q.   Do you have any idea as a percentage of national banks in

5  America how many were subject to that?

6  A.   I do not.

7  Q.   But quite a few?

8  A.   Well, there'd be some.  As a percent of all the banks, I

9  think it would be a small percent, but there would be banks that

10 would be under enforcement actions.

11 Q.   And those enforcement actions that you talked about, I

12 think both of them call for a three-year plan?

13 A.   Yes.

14 Q.   If you recall.  And the terminations were well before that

15 three-year plan ended; correct?

16 A.   I don't recall but --

17 Q.   Well, I'm trying to save us looking at another exhibit.

18 But I think they ended like in the two-, two-and-a-half-year

19 range.

20 A.   I'd have to -- I'd have to -- if I looked at it, I could

21 confirm that.

22 Q.   Do you remember if it ended earlier than it was planned or

23 contemplated?

24 A.   I don't recall that.  I do remember they were terminated.

25 Q.   Okay.  And to your knowledge were there -- pursuant to what

1    happened in this case and the issues with Mr. Lucken, Mr. Dirks,

2    to your knowledge have there been any future OCC enforcement

3    actions?

4    A.    Yeah.  Those are typically confidential, so I certainly

5    haven't seen any additional enforcement actions.

6    Q.    Okay.  When did -- I wasn't totally clear on when you said

7    that these tied and tying events occurred, that the bank

8    supposedly said if you do this, then we'll give you that.  What

9    are you saying were the events, and when did those events occur?

10   A.    Sure.  The event would have been the offer of the floor

11   plan financing, and then that would be tied to the requirement

12   of Lucken's line of credit secured by Lucken's certificate of

13   deposit.

14   Q.    And when did that occur?

15   A.    Well, some time prior to Lucken signing his line of credit.

16   Q.    Well, can you give me a general time frame?

17   A.    I don't recall the exact date.  I could look at the

18   promissory note.

19   Q.    Promissory note was signed on January 19, 2012.

20   A.    So it would have occurred prior to that.

21   Q.    But prior as in that month or two months earlier?  When?

22   A.    Yeah.  Within -- within a couple months, whenever those

23   conversations occurred.  I think there was a meeting -- am I --

24   Q.    There's been testimony that the meeting between Dirks and

25   Crim and Lucken happened in early to mid November 2011.

1   A.   So that would be when the tying activity would have

2   occurred.

3   Q.   Okay.  Both the tied event and the tying event, if you

4   will.

5   A.   Tying event and tied event, yes.

6   Q.   Okay.  Fair enough.  Whenever a floor plan is -- a true

7   floor plan where they're taking an interest in the inventory and

8   the cars, whenever that's done, is there a dollar amount that's

9   attached to that, or is it a limitless floor plan since you know

10  you've got the inventory?

11  A.   Yeah.  There'd be a -- there'd be a dollar amount that the

12  bank could fund up to.

13  Q.   And I want you to look at an exhibit.  But before I do, do

14  you know if the conversations and agreements that Mr. Lucken had

15  with Mr. Dirks, if he put any of those in writing?

16  A.   I don't know.

17  Q.   Do you know whether or not there were conversations about

18  other floor plan financing opportunities like million-dollar

19  floor plan opportunities?

20  A.   Between --

21  Q.   Between Dirks and anybody but not -- not Lucken, not

22  Heritage.

23  A.   Yeah.  I do recall Dirks was trying to find other floor

24  plan options.

25  Q.   And according to what's been represented by Mr. Lucken to

1  this Court and this jury, a floor plan had been agreed to by

2  Heritage some time then in November 2011.  I mean, there's been

3  testimony about that.  Is that what you understand too, that at

4  that meeting?

5  A.    Yes.

6  Q.    And given that a floor plan had been agreed to, would it be

7  necessary for Mr. Dirks to seek other floor planning

8  opportunities after that?  I'm talking about shortly after as in

9  December of 2011 or January of 2012.

10  A.    So your question is?

11  Q.    If he had floor planning arranged with Heritage in

12  November, would there have been any need to look for other

13  financing opportunities just a month or two later?

14  A.    Yeah, I suppose the only need would be if he wasn't

15  satisfied with the arrangements that Heritage was providing.

16  Q.    Did you find anything in the documents and the hundreds if

17  not thousands of documents that were produced in this case that

18  suggests that there indeed was a floor plan provided by Heritage

19  in November of 2011?

20  A.    Okay.  I'm sorry.  Would you ask that again, please?

21  Q.    Any documents.  Not documents wherein Mr. Lucken is --

22  let's say he's mad, now he's upset and he's saying that.  I'm

23  talking about at the time in November 2011, December 2011,

24  January 2012.  Are there any documents to support that Heritage

25  created a floor plan?

A.   So I didn't see any floor plan loan documents between
Heritage and Dirks that would be floor plan financing.
Q.   By the way, have you ever done an OIC, an offer in
compromise?
A.   I've had individuals working for me who have.
Q.   And if Mr. Lucken had wanted to protect his interest in the
cars that were being purchased from his line of credit, could he
have done that?
A.   Sure.
Q.   How could he have done that?
A.   Well, what do you mean by protect his interest?
Q.   Well, is there something called a purchase money security
interest?
A.   Sure.
Q.   What is that?
A.   That would be that you would -- you would end up with a
first priority lien if the pro -- if the funds that were used to
purchase the, in this case, automobile, if he had filed a
purchase money security interest in that transaction, he'd have
a first security interest in that vehicle.
Q.   Even though the bank had this big SBA loan for -- at that
point in November 2011 I think it was down to about 1.6 million?
He still would have been ahead of the bank if he had filed a
purchase money security interest?
A.   On that specific transaction he would, and he'd be required

1   to provide that notice any time -- any time that he would be in

2   a transaction like that.  Had he not provided that notice, the

3   bank would be in first position.

4   Q.   So you're saying any time -- did he have to do it every

5   time a car was purchased?

6   A.   Yes.

7   Q.   And there weren't -- we could look at the -- we could look

8   at the Lucken line of credit.  I mean, there weren't thousands

9   of cars purchased.  There weren't even hundreds of cars, were

10  there, during that time frame of about a year?

11  A.   Correct.

12  Q.   Okay.  And is this just simply a matter of going to the --

13  filing something electronically with the Secretary of State?

14  A.   Yes.

15  Q.   With the Iowa Secretary of State?

16  A.   Yes.

17  Q.   A form sort of, I presume, like a one-page form much like

18  these UCC-1s?

19  A.   Yes.

20  Q.   And do you -- do you file those periodically on be -- when

21  you were a banker?

22  A.   Sure.

23  Q.   And these hypotheticals about what SBA would or would not

24  have done at the end of the day, the SBA did pay their loan

25  guarantee; correct?

1    A.    Yes.

2    Q.    And it -- I mean, Mr. Palmatier on behalf of Heritage

3    worked for about a couple years to get that done, but they did

4    pay; correct?

5    A.    The SBA did pay on their guarantee.

6            MR. REINSCHMIDT:  That's all I have, Your Honor.

7            THE COURT:  Thank you, Mr. Reinschmidt.

8            Any redirect?

9            MR. LAWRENCE:  Yes, Your Honor.

10           THE COURT:  Okay.  Thank you.

11           Why don't we give everybody a stretch break before you

12   redirect.

13           JUROR HANSEN:  Your Honor, excuse me.  Can I run and

14   get my coat?

15           THE COURT:  Sure.

16           JUROR HANSEN:  Thank you.

17           THE COURT:  Okay.  Please be seated.

18           You may proceed.

19           MR. LAWRENCE:  Thank you, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. LAWRENCE:

22   Q.    Mr. Tank, I'd like to go back to some questions

23   Mr. Reinschmidt was asking you about tying and when the tying

24   event in this case took place.  Now, you said the tying event

25   had to have taken place, you know, weeks or months before

1  January 19 of 2012 on cross-examination; correct?

2  A.   Yes.

3  Q.   Now, based on your knowledge from the courses you took on

4  anti-tying, I understand your testimony on direct that there

5  must be two things.  There must be a tying product and there

6  must be a tied product; correct?

7  A.   Correct.

8  Q.   And I also understood your testimony to be that the tying

9  product was the promise of floor plan financing, and the tied

10 product was the Lucken line of credit and the pledge of the CD

11 as backup collateral; correct?

12 A.   Yes.

13 Q.   Now, I want to focus on the tied product.  Could there have

14 been a tied product before that line of credit and that CD was

15 presented by the bank to Mr. Lucken?

16 A.   So the -- so the tied product actually occurred at the time

17 that Lucken signed the promissory note, purchased the CD, and

18 pledged the CD.

19 Q.   And if he signed that on January 19 of 2012, would that

20 have then been -- the date he signed the line of credit, signed

21 the pledge, would that have been the date the tying event took

22 place based on your knowledge in the banking industry?

23 A.   That would be the date of the tied event.

24 Q.   Based on your experience in the banking industry, is it

25 important for the written terms of an agreement to reflect the

1    actual circumstances of the deal that's being negotiated and

2    memorialized in that agreement?

3    A.    Yes.

4    Q.    Now, Mr. Reinschmidt talked to you about boilerplate

5    language.  Based on your experience in the banking industry,

6    would a prudent banker just go ahead and sign a boilerplate

7    agreement knowing that it -- the boilerplate language did not

8    fully accord with the actual circumstances of the deal, the

9    agreement that was being memorialized to writing?

10   A.    Would a banker do that?  Is that your question?

11   Q.    Would a prudent banker sign boilerplate language knowing

12   that that boilerplate language did not conform to the actual

13   circumstances of the deal being reduced to writing?

14   A.    Yeah.  They would not do that.

15   Q.    Now, Mr. Reinschmidt on cross asked you if you were aware

16   of any instance in which Heritage Bank promised to provide floor

17   plan financing to Dirks Motor in November of 2011, and I

18   understand that based on your recollection your testimony was

19   no, they did not; correct?

20   A.    Yes.

21         MR. LAWRENCE:  Can we pull up Exhibit 40?  And can we

22   highlight the top part of this up to the letterhead?

23   Q.    Now, I know there are a lot of documents in this case, but

24   is this letter from Heritage Bank to General Motors a document

25   that you would have reviewed in preparation for your testimony

1  here today?

2  A.   Yes.

3  Q.   And if you take a look at the subject line, this is a

4  commitment to pay General Motors for the sale of certain

5  vehicles; correct?

6  A.   Yes.

7        MR. LAWRENCE:  And can we go back and zoom in on the

8  first two paragraphs?

9  Q.   And can you just take a second to review that first

10 paragraph?

11 A.   Yes.  I've reviewed it.

12 Q.   Now, there has been testimony that this is a form letter

13 that General Motors provided, so I want you to assume that to be

14 true.  Based on your experience in the banking industry, would

15 this be a standard agreement between a bank and a car dealer to

16 provide floor plan financing for the purchase of vehicles from

17 that manufacturer?

18 A.   Yes, it would.

19 Q.   Okay.  Now, I'd like to go to the second page.  And then

20 I'd like to blow up both signature blocks.  And up above do you

21 see that this letter was signed by Mr. Crim for Heritage Bank?

22 A.   Yes, I do.

23 Q.   I want to focus on below.  Do you see this dealer

24 acknowledgment?

25 A.   Yes.

1  Q.   And do you see Dirks Motor and then Mr. Dirks' signature

2  below that?

3  A.   Yes, I do.

4  Q.   So based on your experience in the banking industry, would

5  you understand this to be a commitment from Heritage Bank to

6  General Motors to provide floor plan financing for Dirks Motor

7  that was acknowledged by Mr. Dirks on behalf of Dirks Motor?

8  A.   Yes.

9  Q.   Now, does this refresh your recollection as to whether

10  there is evidence of an agreement between Heritage Bank and

11  Dirks Motor to provide floor plan financing for the period of

12  time around November of 2011?

13  A.   Yes, it does.  What -- I guess what I was thinking about, I

14  didn't see any --

15  Q.   I'm sorry.  And what is your recollection now that you've

16  reviewed this document?

17  A.   That there was a floor plan arrangement between the bank,

18  Dirk Motors, and Ford Motor Credit.

19  Q.   I'm sorry.  G -- I'm sorry.  This is GM.  I apologize.

20  This would be General Motors.

21  A.   Yes, General Motors.

22  Q.   Okay.

23       MR. LAWRENCE:  Nothing further, Your Honor.

24       THE COURT:  Thank you, Mr. Lawrence.

25       Any additional questions?

```
 1          MR. REINSCHMIDT:  Yes, Your Honor.
 2                      RECROSS-EXAMINATION
 3    BY MR. REINSCHMIDT:
 4    Q.   Mr. Tank, do you know whether or not this exhibit that was
 5    shown, Exhibit 40, that you say that was floor plan financing by
 6    Heritage, do you know whether that was ever drawn upon by Dirks
 7    Motors?
 8    A.   What do you mean by drawn upon?
 9    Q.   Well, when was the first time from the meeting in November
10    2011 until Dirks actually purchased any cars from GM or Ford
11    after November 2011?  Do you know?
12    A.   I don't recall the dates.
13    Q.   On -- the Lucken line of credit shows that the first cars
14    purchased were November -- excuse me, January 24, 2012.
15    Would --
16    A.   So then January 24 of '12 would have been the first date.
17    Q.   So notwithstanding these documents, one with Ford and one
18    with GM, there were no cars purchased for 2 months until there
19    was a line of credit in place, correct, as far as you know?
20    A.   As far as I know, that's correct.
21    Q.   One last thing.  I'm going to restate this to you, and tell
22    me if I've misstated it.  You've said today that the tied --
23    that the arrangements, the tied and the tying, were an offer of
24    floor plan financing tied to Lucken's line of credit secured by
25    a CD.  Did I summarize that?
```

1   A.   Yes.

2   Q.   When I deposed you on April 26, 2017, you told me something

3   differently as to what the tied and the tying arrangement was,

4   did you not?

5   A.   What I -- what I did --

6   Q.   That just calls for a yes or no.

7   A.   So I'm sorry.  Ask the question again.

8   Q.   Did you tell me a different tied and tying arrangement on

9   April 26, 2017?

10  A.   I described the same tying and tied.  I unfortunately

11  reversed tied with tying in one situation during my deposition.

12  Q.   Well, in your deposition you said that the tying event was

13  the requirement of Lucken to pay off Ford and the tied event was

14  the floor plan line of credit.

15  A.   Correct.  That's where I misunderstood the question.  I got

16  confused.  It's actually the opposite of that.

17  Q.   But in today's testimony you're not talking about paying

18  off Ford at all as either the tied or the tying event.

19  A.   Sure.  So the floor plan line of credit would be the tying

20  event, and the tied event would be the line of credit.  To get

21  the line of credit with the CD, Lucken paid off Ford Motor

22  Credit.

23  Q.   And we spent a couple hours together on April 26, 2017, did

24  we not?

25  A.   Yes.

1   Q.   And in that I asked you a number of questions about tied

2   and tying events; correct?

3   A.   Yes.

4   Q.   And today you're saying a year later that you were confused

5   about what the particular events were?

6   A.   In that first question that you asked me during my

7   deposition, I was.

8   Q.   When you say my first question, we talked about it for some

9   time thereafter, did we not?

10  A.   Yeah.  There were other questions about tying and tied.

11  That's correct.

12  Q.   Did you ever say in the deposition that there was an offer

13  of floor plan financing tied to Lucken's line of credit secured

14  by a CD?

15  A.   I guess I don't recall specifically.

16          MR. REINSCHMIDT:  Thank you, Your Honor.

17          THE COURT:  Thank you, Mr. Reinschmidt.

18          Mr. Lawrence, anything further?

19          MR. LAWRENCE:  Nothing further, Your Honor.

20          THE COURT:  Okay.  Thank you.  We'll see if the jurors

21  have any questions for Mr. Tank.  Doesn't look like it.  Okay.

22  Thank you.

23          Mr. Tank, you may step down.

24          Everybody can take a stretch break.

25          And ready to call your next witness?

```
 1              MR. LAWRENCE:  Plaintiffs call Mr. Richard Dirks

 2   Senior.

 3              THE COURT:  Thank you.  Good morning.  Would you raise

 4   your right hand, please.

 5              RICHARD DIRKS, SR., PLAINTIFFS' WITNESS, SWORN

 6              THE COURT:  Thank you.  Please be seated in the

 7   witness box there.

 8              THE WITNESS:  Right here?

 9              THE COURT:  Over there.  Right.  You have to walk

10   around it.  And you can adjust the chair and the two microphones

11   so you can speak directly into the microphones.  So -- and can

12   we get you to scoot up a little bit so you can speak into the

13   microphones?  And when you're ready, would you tell us your

14   first and last name and spell your last name, please.

15              THE WITNESS:  Richard Dirks Senior, D-i-r-k-s.

16              THE COURT:  Thank you.

17              Mr. Lawrence?

18              MR. LAWRENCE:  Thank you, Your Honor.

19                          DIRECT EXAMINATION

20   BY MR. LAWRENCE:

21   Q.   Mr. Dirks, where do you presently live?

22   A.   Pardon?

23   Q.   Where do you presently live, Mr. Dirks?

24   A.   Akron, Iowa.

25   Q.   And how long have you lived there?
```

1    A.   Well, all my life.  I'm 89 years old, and with the

2    exception of 4 years in college and a hitch in the Navy, I've

3    lived there my entire life.

4    Q.   Can you tell us briefly about your family.

5    A.   Well, I'm born and raised in Akron.  I have four children

6    and my wife.  I attended Iowa State University.  I served in the

7    United States Navy in Korea.  And other than that, I spent my

8    entire life in Akron.

9    Q.   And are you retired right now, Mr. Dirks?

10   A.   Yes, sir.

11   Q.   And what was your occupation?

12   A.   I was a Chevrolet/Ford dealer in Akron, Iowa.

13   Q.   And was that dealership called Dirks Motor?

14   A.   Yes, sir.

15   Q.   And how long was Dirks Motor in your family?

16   A.   Well, since 1923.  And when I got out of the Navy in 1953,

17   I was there after that.

18   Q.   And when did you personally come to own and operate Dirks

19   Motor?

20   A.   When I was released from the Navy in 1953.

21   Q.   And is Dirks Motor still in operation today?

22   A.   No.

23   Q.   And what happened to Dirks Motor?

24   A.   Well, we were forced to close.  I believe it was in 1955 --

25   or tw -- yes.

```
 1   Q.   Okay.  Or I'm sorry.

 2   A.   19 -- I'm off on my date.

 3   Q.   Did you s --

 4   A.   2015 I believe it was.

 5   Q.   Did you sell Dirks Motor?

 6   A.   Yes.

 7   Q.   And who did you sell it to?

 8   A.   Sold to Total Motors.

 9   Q.   At the time you sold Dirks Motor, were you the only owner

10   of Dirks Motor?

11   A.   No.  I had two sons that were part owners of the business.

12   Q.   What were their names?

13   A.   David Dirks and Rick Dirks.

14   Q.   And how much of the business did they own?

15   A.   Pardon?

16   Q.   How much of the business did they own?

17   A.   Each had 25 percent, and I had 50 percent.

18   Q.   Okay.  And when did your sons buy their ownership interest

19   in Dirks Motor?

20   A.   Pardon?

21   Q.   When did your sons buy their ownership interest in Dirks

22   Motor?

23   A.   When they got out of college.  They came to work there, and

24   they purchased 25 percent apiece from me.

25   Q.   And after they acquired their interest in Dirks Motor, did
```

1  you still work at the dealership?

2  A.   After they -- pardon?

3  Q.   After they bought their shares of Dirks Motor, did you

4  still work at the dealership?

5  A.   Yes, sir, I did.

6  Q.   And what schedule or hours would you usually work?

7  A.   Oh, I was there between 7 and 8 in the morning till

8  probably 6 in the evening.  That was scheduled hours.  And

9  Saturdays.

10  Q.   How do you know Mr. Lucken?

11  A.   Pardon?

12  Q.   How do you know Mr. Lucken?

13  A.   Well, I've known him most of my life when he was -- I grew

14  up in Akron, and I knew his father, and I knew John.

15  Q.   Now, how did Mr. Lucken become involved with Dirks Motor?

16  A.   He helped us at a time when we needed floor planning.  He

17  offered his assistance to gain that floor planning.

18  Q.   Did he come to you to offer his assistance?

19  A.   No.  If I recall, I went to him.

20  Q.   And when you went to him, what did you tell him?

21  A.   That we were in need of floor planning, and he offered to

22  help us achieve that goal.

23  Q.   Okay.  Did you and Mr. Lucken ever meet with a banker at

24  Heritage Bank named Sterling Crim?

25  A.   Yes, we did several times.

1   Q.   And over the course of that meeting or meetings, to the

2   best of your memory, what did you discuss between you,

3   Mr. Lucken, and Mr. Crim?

4   A.   We discussed obtaining floor planning through Heritage

5   Bank.

6   Q.   And how do you know that the bank was going to be the one

7   providing the floor planning?

8   A.   Well, we were doing business with them on an SBA loan.

9   Q.   Did anyone at the bank tell you that they would provide

10  floor planning?

11  A.   Sterling Crum (sic) did.

12  Q.   At that meeting did you also discuss a debt you had to Ford

13  Motor Credit?

14  A.   Pardon?

15  Q.   At that meeting did you, Mr. Lucken, and Mr. Crim discuss a

16  debt you owed to Ford Motor Credit?

17  A.   To the best of my knowledge, we did.

18  Q.   And what was the money you owed to Ford Motor Credit?

19  A.   I can't say exactly, but it was several different things,

20  and it amounted to, I believe, $225,000 approximately.

21  Q.   And do you recall who was going to provide the money to pay

22  off Ford Credit?

23  A.   Well, I believe that's what Mr. Lucken was doing.

24  Q.   And then had that $225,000 not gone to Ford Credit, what

25  would have happened to Dirks Motor?

1   A.   Well, we were without floor planning.  And without floor

2   planning, we wouldn't have been able to operate.

3   Q.   And do you recall, did Mr. Lucken provide only $225,000 at

4   that point?

5   A.   If I remember correctly, he did not -- we did not receive

6   the money.  It went directly to Heritage.  But I believe he

7   offered at that time $250,000, and I believe Heritage forwarded

8   224,000 to Ford Motor Credit, and then they sent me a check for

9   slightly under $25,000 for operating funds.

10   Q.   And how did you spend that slightly right around $25,000?

11   A.   Well, it was supposed to be operating funds.  But if I

12   remember correctly, Mr. Crum applied the pressure to us we had

13   to pay them $27,000, and that money was not used for operating.

14   Q.   Did you have a franchise agreement with Ford Credit?

15   A.   We did.

16   Q.   And did that franchise agreement allow you to operate as a

17   Ford dealer in Akron, Iowa?

18   A.   It allowed us to operate as both a Ford dealer and a

19   Chevrolet dealer.

20          MR. LAWRENCE:  Can we pull up Exhibit 200?

21   Q.   And you can take a look at the monitor.  There's a monitor

22   down to your right, Mr. Dirks.

23   A.   Pardon?

24   Q.   There's a monitor right in front of you.

25   A.   Oh, okay.  I see it.

```
 1    Q.   And do you recognize this as the first page of your
 2    franchise agreement with Ford Motor Company?
 3    A.   Well, I guess that's what it is.  I guess I would recognize
 4    that.  I'd had it for over 25 years, that one, so . . .
 5    Q.   Now, under this agreement did you have responsibilities to
 6    Ford as a dealer?
 7    A.   Yes, you do.
 8    Q.   And do you recall all of those responsibilities?
 9    A.   Oh, there was pages of it I'm sure.
10    Q.   Do you think you might remember some of those
11    responsibilities if you reviewed the franchise agreement?
12    A.   Well, I'm sure I would.
13    Q.   I'm going to display page 11.  And I'd like to call out the
14    heading of 6, other dealer and company responsibilities.  Now,
15    just based on this heading for part 6, other dealer and company
16    responsibilities, is this where you would expect to find the
17    written responsibilities you had to Ford Motor Company?
18    A.   Well, I assume.  Like I say, I haven't looked at this for
19    years.  But there was -- both General Motors and Ford had
20    similar deals for responsibilities.
21    Q.   I'd like to go to subparagraph (d).  And do you see there
22    where it says capital?
23         MR. LAWRENCE:  Under paragraph (d), can we highlight
24    that, Rebecca?
25    A.   Yeah, I've got it here.
```

1    Q.    Do you see that, sir?

2    A.    Yes.

3    Q.    Now, does this refresh your memory or your recollection

4    that you had an obligation to at all times maintain and employ

5    in connection with your dealership operations separately from

6    any other business of Dirks Motor total investment, net working

7    capital, adequate lines of wholesale credit, and competitive

8    retail financing plans for vehicles in accordance with Ford's

9    guides?

10   A.    Yes.

11   Q.    Do you recall if Ford could terminate the franchise

12   agreement?

13   A.    Yes, they could terminate it.

14   Q.    Now, do you recall the specific reasons that Ford could

15   terminate the franchise agreement?

16   A.    Well, if you weren't -- if you weren't following the

17   details of their contract I would assume.

18        MR. LAWRENCE:  Okay.  Can we pull up -- go to page 17?

19   Can we go one more page?  I'm sorry.

20   Q.    All right.  At the top I'd like to call out this heading,

21   termination or nonrenewal of agreement.  Do you see that,

22   Mr. Dirks?

23   A.    Yes.

24   Q.    And I'd like to take a look --

25        MR. LAWRENCE:  Now go to page 19, so it should be the

1  next page.

2  Q.   And that is a continuation of this section.  And let's call

3  out this top section, 17(c).  And do you see there that this

4  agreement could be terminated by Ford Credit for nonperformance

5  by the dealer, Dirks Motor, of sales, service, facilities, or

6  other responsibilities?

7  A.   I've seen that, yes.

8  Q.   Okay.  And I'd like to take a look at paragraph (5) here.

9  This will be the second highlighted part.

10          MR. LAWRENCE:  If you could highlight paragraph (5).

11  Q.   Now, this says that if the dealer shall fail to fulfill any

12  of his responsibilities with respect to other responsibilities

13  under the provisions of subparagraph 6(a) through 6(h).  Do you

14  see that, Mr. Dirks?

15  A.   Of 17?

16  Q.   Under part (5), the very bottom highlighted part.

17  A.   Yes, I see it.

18  Q.   Now, what we just looked at about floor plan financing,

19  vehicle financing, that was under section 6(d); correct?

20  A.   Well, I don't see that.  Yes, I believe.

21  Q.   Okay.  And what this section (5) says is that if you did

22  not comply with that paragraph 6(d) Ford could terminate the

23  agreement; correct?

24  A.   Correct.

25  Q.   So does this refresh your recollection that Ford could

1  terminate the franchise agreement if you did not have vehicle

2  financing approved by Ford Motor Company?

3  A.   Correct.

4  Q.   Now, do you also recall if you had a separate franchise

5  agreement with General Motors?

6  A.   Yes, we did.

7  Q.   And do you recall if General Motors could terminate your

8  franchise agreement for not having floor plan financing?

9  A.   Well, I assume both were the same.  They're pretty similar.

10 Q.   And was GM going -- General Motors, was General Motors

11 going to terminate your franchise agreement in late 2011?

12 A.   Well, they had not threatened to, but if you didn't have

13 floor planning, you couldn't buy automobiles from them.

14 Q.   I'd like to go to document 143 and the last page.  And I'd

15 like to go down to the November 8 entry.  Now, up above this

16 talks about Manheim Kansas City began selling remaining vehicles

17 for a loss on sale of 27,000.  Do you see that?

18 A.   Yes.  I'm familiar with that.

19 Q.   Okay.  And since you're familiar with that, can you explain

20 why Manheim Kansas City was selling remaining vehicles?

21 A.   Well, Ford Motor Company took the units from our lot and

22 took them to the auction and sold them.

23 Q.   So after this date did Dirks Motor Company have any new

24 Ford vehicles on your lot?

25 A.   Not to my knowledge, not that were originally floor planned

```
 1   with Ford.

 2           MR. LAWRENCE:  Thank you, Mr. Dirks.  I have nothing

 3   further.

 4           THE COURT:  Thank you, Mr. Lawrence.

 5           Any cross-examination?

 6           MR. REINSCHMIDT:  Thank you, Your Honor.

 7           THE COURT:  Mr. Reinschmidt, approximately how long

 8   will your cross be, do you think?

 9           MR. REINSCHMIDT:  Probably no longer than his direct

10   but probably presumably less I think.

11           THE COURT:  Okay.

12           MR. REINSCHMIDT:  Thirty minutes maybe.

13           THE COURT:  Okay.  Well, why don't we go ahead and

14   take our mid-morning recess.  We'll be in recess until 10:20.

15   Remember my cautionary instructions about keeping an open mind

16   and not discussing this case among yourselves.  We'll see you

17   back here at 10:20.  Thank you.

18               (The jury exited the courtroom.)

19           THE COURT:  Mr. Dirks, you can step down.

20           Please be seated, everybody.

21           You can step down, sir.

22           THE WITNESS:  Okay.  Thank you.

23           THE COURT:  Anything we need to take up?

24           MR. THOMPSON:  Yes, Your Honor.  We anticipate that

25   Mr. Dirks will be done before 11:00, and then our last live
```

1    witness is Dave Dirks.  We expect him to be shorter than

2    Mr. Dirks timewise which would put us then at the point of just

3    reading in our designated deposition points, and then the final

4    thing would be the stipulation for punitive damages on the

5    wealth, and I want to at least raise that to the Court on that

6    issue, the punitive damage, how the Court wants to handle that

7    when we get to that point.  In other words -- in other words,

8    after we complete the two Dirkses and then read the deposition

9    parts, do you want me to ask the Court if I could read the

10   stipulation and get permission?

11                THE COURT:  Sure.

12                MR. THOMPSON:  Okay.

13                THE COURT:  Okay.  Yeah.

14                MR. THOMPSON:  I just wanted to make sure that was --

15                THE COURT:  Okay.  No, that's fine.  Thanks for

16   asking.

17                MR. THOMPSON:  Yep.

18                THE COURT:  Oh.  Would you mind instructing your

19   witnesses a little bit about the microphones because I've

20   actually never had a trial where it's been such a problem.  But

21   they keep brushing into the microphones, and it's kind of

22   distracting.  So I'd appreciate it.

23                Okay.  We'll see you back here at 10:20.  Thank you.

24                (Recess at 10:02 a.m.)

25                THE COURT:  Ready for the jury?  Thanks.  Why don't we

```
1    get the witness back.
2              (The jury entered the courtroom.)
3              THE COURT:  Thank you.  Please be seated.
4              And I wanted to thank the juror that baked the
5    cookies.  They look a lot better than my lunch that I brought,
6    so I'm going to have the cookies.  But you kind of stole my
7    thunder because I always bake cookies for the jury in a trial
8    that's four days or more.  My spouse is a former food editor for
9    Better Homes and Gardens Magazine.  Every once in a while she'll
10   help me out and cook them.  But she's out of town, so it's our
11   41st wedding anniversary today, but she's visiting her family in
12   DC.  So I will be making the cookies by myself and follow the
13   recipe carefully.  So thank you very much.
14             And, Mr. Reinschmidt, you may proceed.
15             MR. REINSCHMIDT:  Thank you, Your Honor.
16                          CROSS-EXAMINATION
17   BY MR. REINSCHMIDT:
18   Q.   Mr. Dirks, could you -- now that you're seated, could you
19   now pull the microphones in towards you a bit?
20   A.   Is that better?
21   Q.   Pretty darn good, yes.  And pull both of them in, why don't
22   you, if you can.
23   A.   Pardon?
24   Q.   There's two mikes.  Yes.  There you go.  All right.  Let's
25   see how that goes.
```

1    A.   Is that better?

2    Q.   Yes, it's great.  Thank you.

3         THE COURT:  Thank you.

4    Q.   Mr. Dirks, we've talked before about a year or so ago.  Do

5    you remember that?

6    A.   Not really.

7    Q.   Okay.  Fair enough.  We talked -- you talked with

8    Mr. Lawrence about that you've had a dealer -- had a dealership

9    for many years until 2015?

10   A.   That's correct.

11   Q.   Okay.  And pursuant to that dealership, you had something

12   called floor plan financing; is that correct?

13   A.   Correct.

14   Q.   And that's where -- I think you had that with Ford Motor

15   Credit?

16   A.   I had it with Ford Motor Credit.

17   Q.   And so they would finance a particular vehicle, and then

18   your job was when you sold that vehicle to a customer, then you

19   had to pay Ford Motor Credit back.

20   A.   Correct.

21   Q.   Did you find yourself sometime by spring of 2011 out of

22   trust?

23   A.   Well, out of trust is when you don't pay for the car

24   immediately upon delivery, and we were out of trust.

25   Q.   Is that a -- can that develop into a pretty serious

1  situation?

2  A.   Well, depending on the amount and how far out of trust you

3  were, how long.

4  Q.   Did it develop ultimately by summer -- spring and summer of

5  2011 into a pretty serious situation for your dealership?

6  A.   Oh, as I recall, business was tighter at that time, and it

7  was slower getting the cars paid off.

8  Q.   Well, did it reach a point where Ford Motor Credit said

9  this is so serious we're going to take your inventory?

10 A.   Pardon?

11 Q.   Did it reach a point where Ford Motor Credit felt it was so

12 serious they were going to take your --

13 A.   As I recall, I think so.

14 Q.   Okay.  Let's go back to after you first fell out of trust

15 in spring of 2011.  Did you seek other floor plan opportunities?

16 A.   If I recall, we did.

17 Q.   And we've got documents in this case, exhibits, where you

18 went to a host of banks in Iowa, at least one or two in Sioux

19 Falls, and at least I think one or two in Minneapolis.  Does

20 that sound right?

21 A.   I don't recall ever going to anything in Sioux Falls.  I

22 did go to one in Minneapolis, but I don't recall anything in

23 Sioux Falls.  And the only banks in Iowa that I know of weren't

24 in that -- as far as local banks weren't in that business of

25 floor planning.

1  Q.   Well, we'll -- we can look at that in a minute.  There's

2  various memos, and I think you wrote a letter to Ford Motor

3  Credit where you said here's all the -- here's all the banks I'm

4  trying to look at to get floor plan financing.  Do you remember

5  writing letters like that?

6  A.   I don't recall.  I remember going to a bank in Minneapolis.

7  Q.   Well, let's -- let's just -- let's take a look here for a

8  minute.  But before we look at those other banks that you've

9  looked at, did you -- actually, sir, I will have you just look

10  at Exhibit 1012.  That will come up on your monitor.  And is

11  this a letter that you wrote to -- that you wrote to a

12  Mr. Ganard?  Do you remember who he is?

13  A.   Not really.  What bank was he associated with?

14  Q.   I think that he was associated with Ford Motor Credit, and

15  we can backtrack and find that, but . . .

16  A.   That could be.  I don't -- I don't recall that name.

17  Q.   All right.  And I'm just going to underline.  You say -- or

18  I'll actually -- you say in this area here, "I've talked to

19  several different banks including Chase, Wells Fargo, and U.S.

20  Bank.  They were hesitant about taking floor plan when Heritage

21  had my SBA loan."  Do you see that right here?

22  A.   Let me read that.  Just a second.

23  Q.   Yeah, go ahead and do that.

24  A.   I believe if I'm not mistaken Chase was the one in

25  Minneapolis, and Wells Fargo and U.S. were in Sioux City.

1  Q.    And then -- so you're telling -- you're telling -- why are

2  you sending this fax or a fax or a letter to Mr. Ganard at Ford

3  Motor Credit?  Why are you telling him that?

4  A.    I don't recall.  When was this?  Seven years ago?

5  Q.    We'll go up a little bit.  It's on --

6  A.    August 2011.

7  Q.    Yeah.

8  A.    I don't recall a Mr. Ganard, but I evidently was looking

9  for floor planning.  And according to this note here, they were

10 hesitant because I had an SBA loan with Heritage.

11 Q.    And then I see also you say you've contact -- what I

12 underlined was you've contacted GM Financial in Texas.  Do you

13 see that?

14 A.    Well, GMAC I suppose.

15 Q.    So -- then I see one other.  You also say you were talking

16 to First American Bank.

17 A.    That's in Sioux City if I'm not mistaken.

18 Q.    So fair to say you'd gone to -- just in this letter alone

19 you're talking about, look, I'm making some very serious efforts

20 to try to find floor planning?

21 A.    Well, I evidently was.

22 Q.    Did you ever talk to Mr. Crim at Heritage Bank about doing

23 floor planning in addition to the SBA loan?

24 A.    Well, I did.  Mr. Lucken and I both were engaged in

25 conversation with him about floor planning.  I knew that he had

1  given floor planning to a dealer in LeMars, and I did -- I

2  believe if I recall correctly spoke to Mr. Crim.

3  Q.   And so are you talking about this November meeting that you

4  talked with Mr. Lawrence about earlier?

5  A.   I don't recall if it was a November meeting or not, but I

6  did talk to him about floor planning, yes.

7  Q.   And what was his answer to you?

8  A.   Well, when Mr. Lucken and I talked to him, he was

9  favorable, but I had to meet certain conditions.

10  Q.   Let's go back to earlier than that.  Let's go back to July

11  of 2011.  And I'm going to pull up Exhibit 138 for you, sir.

12  And we've just blanked out so we could blow it up.  You can't

13  see the letterhead, but the letterhead is from Heritage Bank.

14  And that's a -- just take the time to read that if you can, sir,

15  to yourself.  And why don't I highlight the very first paragraph

16  of that.

17  A.   I just read that, yes.

18  Q.   Okay.  Why don't we just stop there.  On that first

19  paragraph, what is he telling you in that paragraph?

20  A.   You mean about thank you for your continuing interest?

21  Q.   No.  What is he telling you about what I can't do for you?

22  What is he --

23  A.   Oh, the one outlined in yellow?

24  Q.   Yes.

25  A.   Well, that was in July.

1 Q.   That's what I'm asking you.

2 A.   And if I remember correctly, he might have said that at the

3 time, but he told us in November that -- what I had to do to get

4 that additional floor planning.

5 Q.   Well, I just want to talk about July, and then we'll talk

6 about November.  So in July he said no, we can't do any more --

7 we can't do any more loans to you; is that correct?

8 A.   Well, it says that.  I don't recall those exact words, no.

9 Q.   Well, did --

10 A.   I didn't get floor planning from them, so evidently they

11 didn't accept it.

12 Q.   And then after he rejected you in July of 2011, the letter

13 we had just looked at which was -- the exhibit we just looked

14 at, and that exhibit, that was on August 3, 2011, I believe.  So

15 after this July 14 letter, you're out looking for more floor

16 plan financing; correct?

17 A.   Well, I was looking for floor planning, period.

18 Q.   Right.  Okay.  So then by late September of 2011 -- and

19 maybe, you know, whether you remember the exact month, let's put

20 it this way.  Did Ford finally come onsite and take your cars?

21 A.   I don't recall if it was in September of '11 or not.  But

22 they did take some cars from us and took them to the auction.

23 The exact date I can't recall.

24 Q.   By the time you met with Mr. Lucken, were there any cars

25 left on your lot?

1    A.    I don't recall.

2    Q.    And did you -- I think you said that you contacted

3    Mr. Lucken or initiated contact.  And when you did, was -- did

4    you have an initial -- a meeting with just him, or was the first

5    meeting with you, Mr. Crim, and Mr. Lucken?

6    A.    Well, I assume it was with Mr. Lucken personally, and then

7    the two of us met with Mr. Crim.  I -- like I say, this is seven

8    years ago.  I can't tell you the exact dates and the exact

9    conditions, but I assume that's what it was.

10   Q.    How much did you -- how much were you seeking for a floor

11   plan line of credit?

12   A.    Well, our floor plan normally when we had it with Ford

13   Motor Credit would be well over a million dollars.

14   Q.    So you felt --

15   A.    The value of each of the units, of the new units that you

16   floor planned, has gone up considerably since the beginning when

17   I was in business.  So if you wanted to have 30 or 40 new units

18   on hand and if you did any floor planning of used, you would

19   probably run between a million and two million dollars.

20   Q.    So you had this meeting with Mr. Crim and Mr. Lucken.  And

21   what was the outcome of that meeting with those two men?

22   A.    Well, as I recall, he spoke favorably of it, but there were

23   certain conditions we had to meet.  And I believe -- now, this

24   is strictly from recollection seven years ago, but I believe

25   when he went along with it and that he would probably get the

1   floor planning okayed but he -- there were certain conditions,
2   and I found out later one of those, that Mr. Lucken had to
3   guarantee the floor planning for a certain amount that he gave
4   separate.  Now, I never did see any of the money that Heritage
5   paid that Mr. Lucken gave them.  But I'm familiar with what I've
6   been told.
7   Q.   Well, I want to go back to what did you understand the
8   outcome of that meeting was?  What was -- who was going to do a
9   floor plan if at all and for how much?
10  A.   Well, Heritage said they would do a floor plan.  I don't
11  know if there was any limit on it.  Your floor planning would go
12  up and down.
13  Q.   So did -- the floor plan you have with Ford, did that have
14  a limit on it?
15  A.   Not to my knowledge.
16  Q.   So just you could potentially buy up to ten million dollars
17  in cars?
18  A.   Well, I assume that if you went to ten million dollars then
19  there'd be a limit.  But we were never limited on the number of
20  new cars we could floor plan with either Ford or General Motors.
21  Many times they were pressing you to buy more cars and they
22  automatically okayed more floor planning.
23  Q.   So when you left that meeting -- and there's been a fair
24  bit of testimony that the meeting happened some time by early to
25  mid November of 2011 between you and Mr. Crim and Mr. Lucken.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Computerized Realtime Transcription*
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 67 of 221

1  When you left that meeting, you're telling the jury that you

2  thought you had about a million-dollar floor plan?

3  A.   I don't recall any particular dollar amount.  We might

4  have, but I don't recall.  I believe floor planning was the

5  discussion.

6  Q.   And so did you have a firm commitment from anybody,

7  Mr. Lucken or Sterling Crim on behalf of Heritage, to floor plan

8  you at that point?

9  A.   I believe after we'd spoke to Mr. Crim and the conditions

10 were to be met that we would have floor planning.

11 Q.   There wouldn't have been -- would there have been any need

12 after that early to mid November 2011 meeting for you then in

13 the next month or two months for you to continue in the search

14 for floor planning like we had seen in July and in August of

15 2011?

16 A.   I don't recall.  I would assume that if they okayed the

17 floor planning that I wouldn't be looking for different floor

18 planning.

19 Q.   Sure.  That makes sense.  Why don't we look at -- I think

20 it's Exhibit -- it's Exhibit 1035, if we could look at that.

21 And 1035, have you ever seen this type of document before?

22 A.   I don't recall seeing it before.  Let me look.

23 Q.   All right.  We've had reference in this case to that these

24 were called UCC-1s.  Does that ring a bell?

25 A.   Not really, but I -- is this -- let me read this a little

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 68 of 221
Computerized Court Transcription

1    farther.

2              MR. REINSCHMIDT:  Why don't you blow up --

3    A.   She did already.

4    Q.   Ms. Liston's going to blow that up for you a little bit.

5    All right.  So at the very top it says -- I'm going to circle it

6    for you.  It says Diligenz.  And there the secured -- that's

7    where the acknowledgment's to be sent to, and the secured party

8    is Dealer Services Corporation.  Who's that.

9    A.   I'm not familiar with that -- did you say Diligenz?

10   Q.   Yes.

11   A.   I don't recall them on that name.

12   Q.   And this was filed on December 19, 2011?

13   A.   Yeah.

14             MR. REINSCHMIDT:  And, Ms. Liston, if you would

15   highlight that portion that begins with "all debtors."

16   Q.   Do you understand that pursuant to this document Dirks

17   Motors was giving Diligenz or Dealer Services Corporation an

18   interest in vehicles, parts, and inventory?

19   A.   I'm not familiar with that Diligenz at all.  Is my

20   signature on that?

21   Q.   We only have the one-page document, but it's by Dirks

22   Motors to Diligenz, sir.

23   A.   I'm not familiar with any Diligenz at all.

24   Q.   There would not have been a need for you to give a UCC-1 in

25   December of 2011 to anyone if you had a floor plan with

1   Heritage?

2   A.   Not to my knowledge.  I don't remember this statement even.

3   Q.   Did you talk --

4   A.   Let me read this further.  I don't -- Dealer Service

5   Organization.  Now, what is that?  Is that this Diligenz?

6   Q.   The way this works, sir, is I ask the questions, and you

7   have to answer them.

8   A.   I'm not familiar with Diligenz.

9   Q.   Did you thereafter -- after this document did you seek

10  financing from anyone else in December 2011 or January 2012?

11  A.   I don't recall ever -- if we had floor planning okayed with

12  them, I don't recall ever going to anybody else.

13  Q.   Let's --

14  A.   Was this located in the state of Washington?

15  Q.   I don't know.  But they're the ones who got granted the

16  security interest, sir.  Let's look at another one.  Did you

17  seek -- you had talked in that August 2011 letter -- sir?

18  A.   Pardon?

19  Q.   You had talked in that August 2011 letter to Mr. Ganard

20  that we looked -- the very first document.

21  A.   Oh, from Ford Motor Credit?

22  Q.   Yes.

23  A.   I don't remember that name even.  I'm sure he might have

24  worked there, but I don't recall.

25  Q.   Any rate, when you wrote that letter, you said you were

1    talking to GM Financial in Texas in that letter.  We just talked

2    about that a few minutes ago.

3    A.    Well, I don't recall telling anybody I talked to GMAC after

4    I was with Ford Motor Credit.  I possibly could have.

5    Q.    Did you -- you've already testified at some length that you

6    had no further need to look for floor planning after the meeting

7    with Mr. Crim and Mr. Lucken; correct?

8    A.    Well, I would assume if I had it okayed I didn't have a

9    need for any other floor planning.

10   Q.    Did you talk to GM Financial in either December of 2011 or

11   January 2012 about floor plan financing?

12   A.    Not to my knowledge, but I don't know.

13   Q.    Well, let's just look at Exhibit 206.  This is a note to

14   file that Mr. Crim testified to about a vis -- and, by the way,

15   I'm going to just -- just for right now, I'm going to change

16   this.  That should be -- boy, it's hard to write with my finger,

17   but that should be 2012; okay?  There's been testimony it was

18   January 27, 2012.  And I want --

19          MR. REINSCHMIDT:  Ms. Liston, if you'd just highlight

20   that first paragraph.

21   A.    I can remember talking to Mr. Crim -- and I assume the

22   gentleman with him was Hegarty -- at our dealership.

23   Q.    Right.

24   A.    But I don't recall the conversation.  It could be that I

25   was talking.  I had several people interested in buying the

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Shelly Semmler, RMR, CRR - Federal Official Court Reporter
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 71 of 221

1   business.

2   Q.   Well, I want to ask you specifically about -- and actually

3   what I wanted to do is go down to the next paragraph, too, if

4   you would.  There.  He's talking about a floor plan with GM

5   Financial or just says GM.  Do you recall that conversation?

6   A.   No, I don't recall that at all because if I had floor

7   planning with them, I wouldn't -- I wouldn't be looking for

8   other floor planning.

9   Q.   So since you don't recall, you can't agree or disagree with

10  that.  If that's what's stated, you have to defer to what was

11  written down?

12  A.   Well, I kind of disagree with telling anybody that I was

13  contacting GM because GM had had a lot of problems.  They'd gone

14  through bankruptcy and cancelled a lot of dealers.  And GMAC was

15  very restrictive on their floor planning.  So I don't -- to my

16  knowledge I don't recall that conversation.  But it seems to me

17  I wouldn't be talking to them about going to GM for floor

18  planning.

19  Q.   All right.  Well, let's look at another document.  Let's

20  look at Exhibit 141.  And this is -- these are internal e-mails

21  that Ford was sharing with -- like one individual at Ford would

22  e-mail another individual at Ford.  And I want to just focus on

23  that very first paragraph where this is something you've

24  apparently told them, that Heritage has your floor planning but

25  it's all meant to be temporary.  You intend to go with the new

1  GM Financial, previously AmeriCredit, in first quarter 2012.  Do

2  you see that?

3  A.   Yes, and I question that.  I don't believe we were ever

4  going back to GM for floor planning.

5  Q.   This e-mail, this internal e-mail, involving parties that

6  are not party to this lawsuit, that would have been based upon a

7  conversation with you?

8       MR. LAWRENCE:  Objection, Your Honor.  Foundation.

9       THE COURT:  Overruled.  You can answer if you know.

10 A.   That last part, that last paragraph, we were forced to be

11 getting cars through other dealers.

12 Q.   But I'm just focusing on GM Financial.  Were you talk --

13 had you talked to Ms. Hammitt -- or maybe you don't remember the

14 name.  Had you talked to someone at Ford Motor Credit about what

15 you were doing?

16 A.   I don't recall talking to anyone.  I know that if I had

17 floor planning already I would not see any reason for talking to

18 anybody else, especially to Ford or GM.

19 Q.   Let's look at Exhibit 140.  And that's another e-mail

20 involving this Ms. Hammitt from Ford.  And a couple of things

21 there I wanted to point out to you.

22 A.   This Miss Hammitt, is she with Ford Motor?

23 Q.   She's with Ford Motor Credit, yes, sir.  And I want to

24 focus on the last paragraph.  Apparently you had talked to her

25 and said what if -- and this is on December -- excuse me, this

1   is on November 18, 2011.  And you had said what if I can come up

2   with 750,000.  Do you recall that conversation?

3   A.    No, not right offhand.  Let me read that paragraph.

4   Q.    Sure.  Do you want that underlined, or was that an

5   accident, sir?

6   A.    Oh, that was an accident.

7   Q.    Okay.  Let me undo it.

8   A.    My glasses.

9   Q.    Have you read that?

10  A.    I'm finishing it.

11  Q.    I have a couple --

12  A.    I might have talked to Ford Motor Credit about working with

13  Heritage to get us floor plan.  Is that what it said?

14  Q.    Well, I don't know.  I'm asking you, sir.

15  A.    Well, that's the only thing I would have talked to them

16  about.

17  Q.    Now let's look at this date.  That's November 18 which

18  there's testimony in this case that that would be after the

19  meeting with Mr. Crim and Mr. Lucken.  And you've told us

20  already that when you left that meeting you knew you had floor

21  plan financing with Heritage.  In this conversation on November

22  18 with Miss Hammitt, you're saying that you'd mentioned in an

23  earlier call that you're in negotiations with Heritage Bank.  So

24  as of November 18 apparently you didn't have anything in place

25  with Heritage Bank.

```
 1          MR. LAWRENCE:  Objection, Your Honor.
 2  A.   I don't --
 3          MR. LAWRENCE:  Foundation on the grounds that he has
 4  not yet established the witness's recollection of the
 5  conversation but is yet setting it forth as if he has in his
 6  question.
 7          THE COURT:  Sustained.  Why don't you rephrase the
 8  question.
 9          MR. REINSCHMIDT:  Certainly, Your Honor.
10  BY MR. REINSCHMIDT:
11  Q.   Did you memorialize any conversations that you had with
12  Ford Motor Credit?
13  A.   I had a lot of conversations with Ford Motor Credit.  And
14  if we were having a Ford -- problem with Ford Motor Credit, I
15  was probably telling him that we were working on getting it
16  taken care of.  And if I had it taken care of when we're in
17  Mr. Crim's office, I'm sure I didn't negotiate with them about
18  going back to Ford.
19  Q.   Did you -- my question was did you -- when you would have
20  conversations, would you document or write down what you had
21  said to someone at Ford?
22  A.   I doubt that.  I had that many conversations, and I didn't
23  document what was said in every one.
24  Q.   So if Ford -- throughout this case we've seen many memos
25  from Ford where they do memorialize, they document their
```

1  conversations.  Would you defer to the recollection of these

2  Ford individuals when they're documenting things regarding Dirks

3  Motors?

4  A.    No, I wouldn't agree with the fact that I offered something

5  about $750,000 with Ford.  I'm sure I didn't tell them anything

6  like that.  If I told them anything, I told them that we had

7  arranged floor planning.

8  Q.    Doesn't say anything like that in this memo.

9  A.    Not to my knowledge.

10  Q.    Did you -- did you ultimately -- did you get statements

11  from Heritage Bank on the line of credit that Mr. Lucken had

12  with Heritage?

13  A.    I don't recall.  I'm sure we had statements on the cars

14  that we were floor planning.  I don't ever recall getting

15  anything saying it was from a line of credit for John Lucken.  I

16  thought my line of floor planning was through Heritage Bank, and

17  I thought that the collateral of those -- that floor planning

18  would be like things that I'd known over 60 years.  Floor

19  planning was when you bought cars from the factory, you floor

20  planned that car.  And when that one sold, you -- it was paid

21  off.  I don't recall ever saying anything or knowing anything

22  about having a line of credit with John Lucken.  I thought my

23  line of credit was with Heritage and it was regular floor

24  planning.

25  Q.    Well, let's talk about that.  Can you -- I don't think

1   anyone yet has really explained to the jury how the mechanics of

2   floor planning actually work.  In other words, if it is a

3   normal -- what you would consider a regular floor plan like you

4   had with Ford Motor Credit, when you would want to purchase a

5   car from Ford Motor Company different than Ford Motor Credit,

6   what would happen?

7   A.   They would -- Ford Motor Company would bill Ford Motor

8   Credit, and then Ford Motor Credit, it's a separate corporation

9   altogether.  They would hold a note on the cars.  When those

10  cars came into the dealership and they were floor planned, you

11  had a contract with them that when that car was sold you would

12  pay the car off.  At different times that was changed for a

13  brief time because a lot of the banks we were doing business

14  with, we would sell a car to a party and take a contract, and

15  maybe it was ten days or two weeks before they were paying off

16  on that contract.  So Ford Motor Credit and GMAC tend to relax

17  their requirements that they would give you so many days to pay

18  for that car till it came on.

19  Q.   Let me stop you there for a minute.  What I wanted to ask

20  you about, I think to this point the jury's understood the

21  generalities of how it works with floor planning.  But I want to

22  understand specifically.  Like with ownership documents, did

23  Ford Motor Credit or Ford retain ownership documents to the

24  vehicles?  How did that work?

25  A.   Well, over the years it's my understanding with a lot of

1    dealers they would hold the MSO, the title or the manufacturer's

2    statement of origin.  But in our case over the years we had

3    possession of those.  We had those in the office.  When we sold

4    a car, we'd type it up, send it to the county treasurer.  The

5    buyer would get a title, or it would go to the finance company.

6    Q.   Would Ford Motor Credit typically or would they ever come

7    out and count cars or check cars?

8    A.   Oh, all the time.

9    Q.   So that's something that you would expect with floor

10   planning.  When you say all the time, do you mean once a week,

11   once a month?

12   A.   You never knew.  It was -- if it was going to be an audit,

13   audits aren't prewarned.  They would just come in the door, and

14   they'd count the cars you had.  They'd count the sales and the

15   paperwork on it.

16   Q.   After you thought you had this -- according to your

17   testimony, you walked out of the meeting in November 2011

18   thinking you had a floor plan with Heritage, did Heritage ever

19   come to your business and count cars?

20   A.   It was to my knowledge -- when I saw this about Sterling

21   Crim and another party coming to our dealership, I might be

22   mistaken on this, but I thought they came to count cars.

23   Q.   That would have been two months after the agreement?

24   A.   I don't recall the dates, but, I mean, that's --

25   Q.   Well, hang on, sir.  I'm going to help you out.  November

1  2011, early to mid November 2011 is when the meetings occurred.

2  A.   Yeah.

3  Q.   They came out on January 27, 2012, so about 2 months later.

4  So you never had any site visits that would have involved

5  counting cars or anything by Heritage from the time of that

6  meeting until January 27, 2012?

7  A.   If that was when Crim came to our dealership, that would

8  have been the only time I could recall.

9  Q.   And in that trip to the dealership, my recollection is he

10  said there was virtually no inventory, in other words, no cars.

11  A.   Well, that could be.  I don't know what we had.

12  Q.   There were no cars to count.

13  A.   I don't know what we had.

14  Q.   There what?

15  A.   I don't recall seven years ago what we had sitting on the

16  lot.

17  Q.   You said that you didn't realize -- you thought you had a

18  floor plan and you weren't pulling money from a Lucken loan.

19  Let's look at Exhibit 117.  This is one -- actually I want to

20  show the whole thing so you can show -- show the top part first.

21  And this is Heritage Bank sending something, and I'm not trying

22  to keep you in the dark.  We've gotta go down below to see it.

23  But they're sending something to John and Mary Lucken.  Do you

24  see that on the lower left of what's blown up?  It shows to John

25  and Mary.

1    A.    Uh-huh.

2    Q.    Is that a yes?

3    A.    I see this, yes.

4    Q.    Okay.  You see right here?

5    A.    Yes, I see that.

6    Q.    Okay.  Then I want -- now I want to go down to the body of

7    the document.  And the body of the document shows -- it shows a

8    balance, an interest rate, the interest that's owed.  Well,

9    actually the interest owed is down here.  And it shows that this

10   is on July 19, 2012, and shows a credit limit.  That's to John

11   Lucken.  John Lucken has testified in this case that he gave

12   those statements many times unopened to either you or Dave or

13   Rick Dirks.  Do you recollect that?

14   A.    No, I don't recollect that.  But I notice this was to him.

15   It wasn't directed to us.

16   Q.    Do you recall whether or not Dirks Motors paid -- for

17   example, I've circled -- the one I've circled here, I've now

18   double circled it where it says $740.89.  Do you see where I put

19   the two circles?

20   A.    Uh-huh.

21   Q.    That's a yes?

22   A.    I recall -- yes, I see that.

23   Q.    And then if we go up above where it shows a check number --

24   well, actually yeah.  Do you know if that is a check from Dirks

25   Motors?

Contact Shelly Semmler at (712) 233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Transcription
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 80 of 221

```
1    A.   I don't know.  But we paid interest at different times.
2    Q.   You paid --
3    A.   I don't know.
4    Q.   You paid interest on what?
5    A.   Well, whatever we had a bill on from them.  I didn't -- I
6    don't handle these things in the office.  And that could be our
7    check number.
8    Q.   If you or one of your -- when you say you don't handle
9    these, who did handle it at your business?
10   A.   Well, our office manager for one.  I didn't pay the bills
11   there, but I would assume that we paid some interest to Heritage
12   if they had the floor planning.
13   Q.   Did you know that you were paying interest on this when it
14   was handed to you?  Did you look at the document?
15   A.   I don't recall looking at the documents.
16   Q.   Would someone -- whenever bills are paid at your office,
17   does someone have the responsibility at Dirks Motors to look at
18   the document and ascertain what they're paying?
19   A.   Normally when checks are written, one of my sons would look
20   at those.  But --
21   Q.   Which son typically would that be?
22   A.   Pardon?
23   Q.   Which son would that typically be?
24   A.   It'd be either Rick or Dave.  They paid the bills or the
25   ch -- actually they were paid out of the office by Mary Caskey.
```

1  But in paying the bills, they were normally looked at and

2  confirmed to pay by one of the sons.

3  Q.  Do you believe that the only amount of money that you were

4  ever allowed to draw upon was $250,000?

5  A.  No.  If we were told $250,000, that wouldn't begin to be a

6  floor plan for us.  That would only be a few units.

7  Q.  That'd be kind of just maybe a bridge to get to a bigger

8  floor plan?

9  A.  No, I wasn't looking at any bridge.  We have to order cars

10  from GM and from Ford.  And when we order cars, they expect to

11  be paid for at that time.  And if I ordered -- I think at a

12  later date there was -- a problem came up that this got to 500

13  and some thousand.  And that's when Stewart -- Sterling Crim got

14  all excited, called me up and said I had to get rid of them.  We

15  wouldn't have ordered these cars if we thought we had a $250,000

16  limit.

17  Q.  And that happened --

18  A.  And floor planning 250,000 wouldn't even keep you in

19  business.

20  Q.  We've looked at that document, and that showed that that

21  was in March and April of 2012, that then it reduced back down

22  to under 250,000.  At that point did you understand that you had

23  a cap of 250,000?

24  A.  At that point we were very upset because I had to get rid

25  of $300,000 worth of cars at a loss in many cases, and that was

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
EMparticular Reporting by Computer-Aided Transcription
Case 5:16-cv-04005-MWB-KEM Document 168 Filed 05/07/18 Page 82 of 221

1  the first time when we realized that we were being limited like

2  that.

3  Q.   And once you were limited like that, then from there on

4  through the balance of the time that you joined that line of

5  credit, did you make every effort to limit yourself to no

6  more -- you gotta wait till I'm finished, sir.  I can see you're

7  about to speak.  Did you try to limit yourself to no more than

8  $250,000 on the credit line?

9  A.   I don't recall, but it's during this time some time we had

10 to take a check down to Sterling I believe before we could ever

11 get the car taken care of.

12 Q.   Because you had to get it below 250.

13 A.   Well, not below that.  I don't remember the details, but

14 that was the first time that we realized that they -- we didn't

15 have this floor planning as such.

16 Q.   Did you ever -- and did you ever talk to Sterling or --

17 well, strike that.

18        Did you ever talk to Mr. Lucken about that?

19 A.   I don't recall talking to John, but I talked to Sterling so

20 many times I can't remember, normally taking somebody with me

21 because I had so many different answers from Sterling.

22 Q.   First I want to talk to you about John Lucken.  Did you

23 ever tell John Lucken, hold the phone, John; I apparently only

24 have $250,000 available?

25 A.   I don't recall that.  I might have.  I don't know if I did

1  or not.

2  Q.   Did you ask Sterling -- in these many conversations you say

3  you had thereafter with Sterling, did you ask him to increase

4  this line of credit?

5  A.   Well, I know there was discussions that I thought we had

6  floor planning and we didn't have.

7  Q.   I asked you after this happened.

8  A.   I don't recall.

9  Q.   All right.  Let's look at Exhibit 1027.

10        MR. REINSCHMIDT:  And go to the second page of this

11  document.

12  Q.   This is a letter that Mr. Lucken drafted to you on January

13  15, 2013.  And in there he's talking about that he loaned you

14  half a million dollars in that very first paragraph.

15        MR. REINSCHMIDT:  If you'd highlight that, Ms. Liston,

16  the very first paragraph.

17  A.   Uh-huh.

18  Q.   Does that fairly describe what was done in November 2011?

19  A.   Well, at that time he agreed to, we never saw this money.

20  John gave this money to -- the first $250,000, he gave the money

21  directly to Heritage Bank.

22  Q.   By the way, I want to stop you there.  When you say we

23  never saw the money, you had a big debt owed Ford Motor Credit,

24  so you may not have seen the money or held it very long, but it

25  went to pay off your debt; correct?

1  A.    I never held it at all.  John paid it to Heritage.

2  Heritage paid the money to Ford Motor Credit.

3  Q.    Hang on.

4  A.    And gave the balance of 25,000 to me.  That's the only time

5  I saw that.  I knew it was there.  I knew John paid it, and I

6  knew I owed it.  But I never had my hands on the money.

7  Q.    So you no longer had a debt once John Lucken paid that for

8  you with Ford Motor Credit.

9  A.    No.

10 Q.    Did you ever -- did you discuss with John Lucken in

11 November 2011 about signing documents with him?

12 A.    I'm sure I must have, but I don't recall.

13 Q.    In the second paragraph, he says -- if you look at your

14 screen again, sir, in the second screen, in the second

15 highlight, that is, it says, "I was to receive security for the

16 $500,000 loans by becoming a second secured party on two

17 different insurance policies, life insurance policies."  Did

18 that ever happen?  Did he ever become a second secured party?

19 A.    I believe he d -- well, I don't know the details, so I

20 can't say that.  I can say that those insurance policies that

21 are being spoken about here were brought up by Sterling some

22 time after we had the negotiations for the SBA loan.  These

23 insurance policies, one of those was a -- belonged to my

24 children.  They were in a trust for my children.  And I was told

25 I had to have this at a much later date when this application

1   for SBA loans.  So they had the first security interest.

2   Q.   Did you ever --

3   A.   The second $250,000 was owned by my wife, for my wife.  The

4   same deal, that came up -- I believe all these policies were

5   assigned to Heritage.  It was done later on in the summer or

6   fall of 2009.  I wasn't told when I applied for this loan that

7   they had to be taken in as security.  That came along

8   afterwards.

9   Q.   Let me -- let me -- sir, sir --

10  A.   I'm sure John wanted security, and he got a second

11  interest.

12  Q.   You have to stop a bit so I can insert a question.

13  A.   Okay.

14  Q.   Okay?  Did you -- when you say about you didn't realize

15  that originally, did you ultimately agree to the SBA loan with

16  certain things assigned including life insurance?

17  A.   Not originally.

18  Q.   But did you --

19  A.   Before it was okayed, yes.

20  Q.   Okay.  And since we're talking about -- so you've said John

21  Lucken did not become a secured party in the life insurance.

22  Did you ultimately when you -- you did settle ultimately with

23  John Lucken; is that correct?

24  A.   Did I ultimately settle?

25  Q.   Did you ultimately sign a settlement agreement with John

1  Lucken?

2  A.   I believe, yes.

3  Q.   And in that settlement agreement, did you assign over two

4  life insurance policies to him?

5  A.   One insurance policy on my life was taken by Heritage,

6  cashed in, and took the cash value on it.  The other two

7  policies belonged to my children, and I believe they were

8  assigned when this was going -- at the end that if anything

9  happened to me John was on there.

10  Q.   So did you sign a settlement agreement with John Lucken and

11  his wife, Mary Lucken, and the trust where -- hang on; let me

12  finish my question -- wherein they got a couple of insurance

13  policies, life insurance policies?

14  A.   What do you mean a settlement?  I don't understand what you

15  mean.

16  Q.   Well, let's just go to -- actually we're going to finish on

17  this document, and then I'll go to the settlement.  Let's finish

18  on this document.  Let's go to the -- let's go to the next

19  paragraph.  And on that, Mr. Lucken says -- says that he was to

20  become a second secured party on the real estate that you

21  estimated appraised at $850,000.  That is just the real estate.

22  Is that what you estimated it was worth?

23  A.   Pardon?

24  Q.   You estimated your real estate was worth $850,000?

25  A.   I didn't.  The SBA had an appraiser come in, and that's

1    what they valued it at.

2    Q.   We have an appraisal from the SBA -- or for that SBA loan

3    that said 540,000.

4    A.   Well, I don't know.  Originally if I'm not mistaken

5    Sterling loan (sic) had that loan appraised, and originally it

6    was at $850,000.

7    Q.   We can look at it.  And I don't want to argue with you

8    about it.

9    A.   Well, I don't --

10   Q.   I think you are mistaken.  We can look at that.  Did you --

11   do you agree that it was ultimately 540 or not?

12   A.   I don't know.  The only figure I'm familiar with is that

13   850.

14   Q.   And you just gave that -- you gave that to John.  That's

15   what you thought it was worth?

16   A.   Pardon?

17   Q.   You gave that number to Mr. Lucken saying this is what I

18   think it's worth.

19   A.   I never said it was worth that much.  I don't think I told

20   John it was worth 850,000.

21   Q.   Well, he says --

22   A.   I'm saying that they came in -- that was the appraisal that

23   Sterling Crim got originally was $850,000.  I thought that was

24   very high.

25   Q.   Did you ever -- did John Lucken ever ask you to sign a

1    promissory note?

2    A.   Yes, I'm sure he did.

3    Q.   Did you ever sign one?

4    A.   I assume I did.  I don't recall.

5    Q.   In the next paragraph, to help your recollection, it says,

6    "Promissory notes to bear 4 percent annual percentage interest

7    have yet to be formalized, and updated life insurance values and

8    real estate appraisals have not been furnished to me."  Do you

9    agree then after you read this that you did not sign a

10   promissory note with Mr. Lucken?

11   A.   I said I don't recall if I'm not mistaken.

12   Q.   And then let's go down to the next paragraph.  He says that

13   his loan -- his $500,000 was for one year and arrangements were

14   being negotiated with other financing opportunities to get floor

15   plans of approximately a million dollars.  Does he mention

16   anything in that paragraph about the other financing

17   opportunities were at Heritage?

18   A.   I don't remember ever -- is this something I was supposed

19   to have told John?

20   Q.   That is his letter to you, yes.

21        MR. LAWRENCE:  Your Honor, I'm going to object to the

22   form of the question --

23   A.   I don't recall that letter at all.

24        THE COURT:  Excuse me.  Yes, Mr. Lawrence.

25        MR. LAWRENCE:  -- in that he's trying to substitute

1  what Mr. Lucken wrote here for things that Mr. Dirks said

2  without first having established that foundation.

3      THE COURT:  Overruled.

4  BY MR. REINSCHMIDT:

5  Q.  Were you looking for floor plans of approximately a million

6  dollars after this meeting in November 2011?

7  A.  I don't believe so.  I'm not -- I don't recall ever trying

8  to get floor planning.

9  Q.  You wouldn't have needed to.

10 A.  No, not that I know of.  One million dollars?  I don't

11 recall.

12 Q.  In the settlement that you did with Mr. Lucken -- we talked

13 about it yesterday -- there was one policy for 250,000, another

14 for 300,000.  Do you remember those policies?

15 A.  The one was a joint policy for 300,000 with MetLife on both

16 my wife and I.  In other words, we both had to die before that

17 was good.  The other was a policy of 250,000 on my life, and I'm

18 not sure if the owner of that was my wife or my children's trust

19 because I had two of them.  And one of them Heritage Bank took

20 and cashed it for cash value on the settlement I made with them.

21 Now what was the question again?

22 Q.  The one that you -- then the one that you gave to

23 Mr. Lucken for 250,000, was that paid up?

24 A.  Yes, but it was -- there was a loan against that if I'm not

25 mistaken.

1   Q.   Do you recall how much the loan was?

2   A.   Yeah, about -- I think it was 50 or $75,000.

3   Q.   Against 250,000?

4   A.   Yeah.

5   Q.   Okay.  And then on the --

6   A.   That was the death benefit, not the cash value.

7   Q.   Right.  I understand.  So that's on the 250.  On the

8   $300,000 one, was that -- was that just on your life?  Excuse

9   me.  I'm confusing myself.  The 250, was that second to die or

10  just you?

11  A.   That was for just myself.

12  Q.   All right.  Then on the other policy, the 300,000, that was

13  second to die?

14  A.   Yes.  My wife and I were on that.

15  Q.   All right.  Was that a paid-up policy?

16  A.   No.

17  Q.   Did it have enough money to pay premiums for a period of

18  time?

19  A.   For a few years, yes.

20  Q.   And then Mr. Lucken's testified that he thought it was in

21  the range of four or five thousand dollars per year starting

22  this year.  Does that sound accurate?

23  A.   The premium sounds correct.  I don't know how many years.

24  It could be this year.

25  Q.   Was there any loan against that policy?

```
 1   A.   No, no loan.

 2        MR. REINSCHMIDT:  That's all I have, Your Honor.

 3        THE COURT:  Thank you.

 4        Any redirect, Mr. Lawrence?

 5        MR. LAWRENCE:  No, Your Honor.

 6        THE COURT:  Okay.  Any questions from the jury for

 7   Mr. Dirks?  Doesn't look like it.  Thank you.  You may be

 8   excused.

 9        And everybody can take a stretch break.

10        And Mr. Thompson can call your next -- and I believe

11   it's your last -- witness; isn't that correct?

12        MR. THOMPSON:  That's correct, Your Honor.

13        THE COURT:  Thank you.  Mr. Dirks, if you'd just come

14   forward, I'll swear you in.  Good morning.  Would you raise your

15   right hand, please.

16        DAVID DIRKS, PLAINTIFFS' WITNESS, SWORN

17        THE COURT:  Thank you.  Please be seated in the

18   witness box.  You can adjust the chair and the microphones so

19   you can speak directly into the microphones.  And when you're

20   settled in, would you tell us your first and last name and spell

21   your last name, please.

22        THE WITNESS:  David Dirks, D-i-r-k-s.

23        THE COURT:  Thank you.

24        Mr. Lawrence?

25                        DIRECT EXAMINATION
```

1    BY MR. LAWRENCE:

2    Q.   Good morning, Mr. Dirks.  From 2009 until Dirks Motor was

3    sold, were you an owner of Dirks Motor?

4    A.   Yes, I was.

5    Q.   And what percentage of an ownership interest did you have?

6    A.   25 percent.

7    Q.   And what was the financial state of Dirks Motor in about

8    April of 2011?

9    A.   Not very good.

10   Q.   And specifically do you recall if anything was going on

11   with Ford Motor Credit and Dirks Motors' floor plan financing?

12   A.   Yes, they had kind of dropped us or wanting to drop us

13   because we were behind in some payments.

14   Q.   And what was your role at Dirks Motor?

15   A.   I was the sales manager.

16   Q.   Now, did you need cars on the lot to be an effective

17   salesman?

18   A.   Yes.  It's hard to sell them when you don't have them to

19   show.

20   Q.   And prior to April of 2011, how did Dirks Motor acquire its

21   inventory?

22   A.   I mean, we were able to get some.  We had another sub prime

23   source but not very many.

24   Q.   I'm going back in time before April of 2011, and let's just

25   focus on your new car inventory.

```
1   A.   Oh, okay.  We would -- we had Ford Motor and then GMAC is

2   how we got our new cars.

3   Q.   Was Dirks Motor out of trust with Ford Credit in 2011?

4   A.   Yes.

5   Q.   Very briefly, what does it mean to be out of trust?

6   A.   You sold cars without paying for them.

7   Q.   And what actions did Ford Credit take over the course of

8   2011 as a consequence of Dirks Motor being out of trust with

9   Ford Credit?

10  A.   They sat -- they brought somebody in, and every time we

11  sold what we did have, we had to pay it on the spot.

12  Q.   Did they do anything else?

13  A.   They took some of our cars.

14  Q.   And do you know what they did with your cars after they

15  took them?

16  A.   They took them to the auction.

17  Q.   And do you recall about when that was?

18  A.   I don't know of the exact time to be honest.  I suppose it

19  was in the fall or late summer, but I can't be sure.

20       MR. LAWRENCE:  Can we pull up Joint Exhibit 25

21  briefly?

22  Q.   There will be a monitor.

23  A.   Oh.

24  Q.   I'll tell you this is a September 19, 2011, letter that

25  Ford Credit sent to Heritage Bank, and you see there the
```

1  subject, notice of private sale, Dirks Motor Company?

2  A.   Yes.

3  Q.   Does this refresh your recollection as to the time that

4  Ford Motor Credit would have been taking your vehicles to sell

5  at auction?

6  A.   Yes, it does.

7  Q.   And so based on your refreshed recollection, what time do

8  you believe your vehicles were taken by Ford Credit for sale at

9  auction?

10  A.   It would have been about this time, September.

11  Q.   So after this did Dirks Motor have any new car inventory on

12  its lot?

13  A.   No.

14  Q.   I'd like to pull up Exhibit 2.

15       MR. LAWRENCE:  And can we highlight right around

16  February 14.

17  Q.   I'll tell you this is a balance statement or a statement on

18  what we've called the Lucken line of credit.  But I want you to

19  focus in on February 14 of 2012.  There's a reference there -- I

20  believe that's a VIN number, and, you know, Chev would be

21  Chevrolet.  Would this be the sort of entry you would expect for

22  the purchase of a vehicle from Chevrolet as the manufacturer?

23  A.   Yes.

24  Q.   And to the best of your knowledge, between that September

25  2011 time frame and buying this car, did Dirks Motors buy any

1  new car inventory in that time?

2  A.   Not that I'm aware of or that I can remember, but I don't

3  believe so.

4  Q.   So as a salesman, what did you think when you were able to

5  buy new car inventory again?

6  A.   I thought we're back in business.

7  Q.   And would part of being back in business be having floor

8  plan financing?

9  A.   Yes.

10 Q.   Now, did you really have floor plan financing at this time?

11      MR. REINSCHMIDT:  Objection, Your Honor.  Lack of

12 foundation.

13      THE COURT:  Overruled.

14 A.   No.

15 Q.   And why is it that you believe you did not really -- you

16 now believe you did not really have floor plan financing at this

17 time?

18 A.   Well, I thought we could order all the cars we wanted, and

19 we weren't able to.

20 Q.   Okay.  I'd like to back out of this, and let's go a little

21 broader.  Let's go from February 14 to the end of this page.

22 From February 14 to March 20, there are quite a few vehicles

23 there; correct?

24 A.   Yes.

25 Q.   And looking over at the right-hand column, there's a entry

```
1   of $476,600; correct?
2   A.    Yes.
3   Q.    Did the bank ever contact you or Dirks Motor about these
4   cars that you had bought?
5   A.    Yes.
6   Q.    And what did the bank tell you or --
7   A.    That we were over our limit.
8   Q.    Were you aware that you had a limit before that call?
9   A.    No.
10  Q.    And what did you do in response to the bank telling you you
11  were over that limit?
12  A.    We had to dispose of the cars.
13  Q.    Did you still make money on the cars when you disposed of
14  them?
15  A.    No.
16  Q.    Had you sold those cars in the regular course of business,
17  how much do you think you -- do you think you could have made
18  money on those cars?
19  A.    It's hard to say, but, I mean, the goal is to make money.
20  I mean, they were -- I remember some pickups, and they're good
21  property so . . .
22  Q.    Now, what eventually happened to Dirks Motor?
23  A.    We went out of business.  Or we sold out I should say.
24        MR. LAWRENCE:  Can we pull up Plaintiffs' Exhibit 235?
25  Q.    Do you recall who Dirks Motor sold its business to?
```

1  A.   Yes.

2  Q.   And who was that?

3  A.   Total Motors.

4  Q.   And I'd like you to take a look at this document called the

5  seller's closing statement.  Does this reflect some of the terms

6  of Dirks Motors' sale to Total Motors?

7  A.   Yes.

8  Q.   And specifically does this reflect how different -- the

9  total sale amount and then how that sale was allocated to

10  different parties or different purposes for the purpose of the

11  sale?

12  A.   Yes.

13          MR. LAWRENCE:  Nothing further, Your Honor.

14          THE COURT:  Thank you, Mr. Lawrence.

15          Mr. Reinschmidt?

16          MR. REINSCHMIDT:  Yes, Your Honor.  I'll be brief.

17                    CROSS-EXAMINATION

18  BY MR. REINSCHMIDT:

19  Q.   Mr. -- Mr. Dirks, when Ford Motor Credit -- when you got

20  that letter on September 19, 2011, and they said we're going to

21  take your cars and sell them at auction, did Heritage Bank in

22  any way try to restrict or impede Ford Motor Credit from doing

23  that?

24  A.   Not that I recall.

25  Q.   And you talked a little bit about what -- or in this case

1  it's been talked about what out of trust was.  I think you

2  briefly alluded to it.  That means that basically you didn't pay

3  back -- pay back Ford Motor Credit for cars you'd purchased;

4  correct?

5  A.   Correct.

6  Q.   Just used it for other purposes in your business.

7  A.   Right.

8  Q.   And so Ford ended up being owed a substantial amount of

9  money, about 224, 225,000.

10  A.   That's correct.

11  Q.   And when you were drawing upon John Lucken's line of

12  credit, ultimately if you had taken the cars and paid down the

13  line of credit every time you sold a car to a customer, there

14  wouldn't have been any money owed on that $250,000.

15  A.   That's probably correct, but we do wait for rebates and

16  stuff like that, so there's always timelines -- you know, time

17  lapse and trade-ins and that kind of thing.

18  Q.   Well, basically what had happened between Dirks Motors and

19  Ford Motor Credit, the same thing happened with Dirks and John

20  Lucken.

21  A.   I guess I'm not sure.  I mean, you could say that I guess

22  but . . .

23  Q.   Well, at the end of the day, he was owed $250,000 that

24  Dirks Motors had agreed to pay him --

25  A.   Yes.

1   Q.   -- on just that portion let alone the first portion he'd

2   paid, the other 250; correct?

3   A.   Yes.

4            MR. REINSCHMIDT:  That's all, Your Honor.

5            THE COURT:  Thank you, Mr. Reinschmidt.

6            Mr. Lawrence, any redirect?

7            MR. LAWRENCE:  No, Your Honor.

8            THE COURT:  Okay.  We'll see if any of the jurors have

9   any questions for Mr. Dirks.  Doesn't look like it.

10           So, Mr. Dirks, you're excused.  Thank you.

11           THE WITNESS:  Thank you.

12           THE COURT:  And, Mr. Thompson, I believe that

13  concludes your witnesses but you have a stipulation to read?

14           MR. THOMPSON:  We do, and then we'll have some

15  designated deposition parts also.

16           THE COURT:  Okay.  That's fine.  Thank you.

17           MR. THOMPSON:  For the stipulation, Your Honor, the

18  parties have stipulated to the following:  The most current

19  financial information for Heritage Bank National Association as

20  of December 31, 2017, indicates that its total assets are

21  $412,119,000.  The equity capital is $39,250,000.  And the

22  annual net income was $2,664,000.

23           THE COURT:  Thank you, Mr. Thompson.  And do you have

24  some depositions you're going to read now?

25           MR. THOMPSON:  I do.  We have three, and the first of

```
 1   those will be Jennifer Whipple, and I'd ask for Rebecca Schmidt

 2   from our office to read that.

 3         THE COURT:  Okay.  And, jurors, remember in the

 4   instructions I told you a deposition's just simply a statement

 5   made almost always prior to trial, and then sometimes they

 6   either read or show a video of the deposition.

 7         So you may proceed.  Thank you.

 8         And you're to treat a deposition as if the testimony

 9   is done here in court.

10         (Deposition designations of Jennifer Whipple were read

11   in open court.)

12         MR. THOMPSON:  That's the conclusion of that portion

13   of the deposition, Your Honor.

14         THE COURT:  Thank you.  Does the defense have a

15   portion they're going to read or . . .

16         MR. THOMPSON:  We've read the entire portion of the

17   deposition from each party.

18         THE COURT:  Okay.  Great.  That made it easier.  Thank

19   you.

20         MR. REINSCHMIDT:  And actually, Your Honor -- sorry.

21   Actually we have -- we're going to do that on the other two as

22   well.

23         THE COURT:  Okay.  Great.  Thank you.

24         MR. THOMPSON:  The next deposition portion that we're

25   reading is from Dave Hegarty.  And Mr. Lawrence will read for
```

```
1   him.

2            (Deposition designations of Dave Hegarty were read in

3   open court.)

4            MR. THOMPSON:  That's the conclusion of the portion

5   from Mr. Hegarty.

6            We're now going to read a portion of the deposition of

7   Richard Lee Palmatier with Mr. Lawrence reading.

8            THE COURT:  Thank you.

9            (Deposition designations of Richard Palmatier were

10  read in open court.)

11           MR. THOMPSON:  That concludes the reading of the

12  deposition, Your Honor.

13           THE COURT:  Thank you.  Does the plaintiff have any

14  additional evidence?

15           MR. THOMPSON:  We do not, Your Honor.  We rest.

16           THE COURT:  Okay.  Members of the jury, it is five

17  minutes to noon.  We'll be in recess until 1:15.  Please

18  remember keep an open mind till you've heard all of the

19  evidence.  And don't discuss this case among yourselves until

20  it's time to deliberate.  Thank you.

21           (The jury exited the courtroom.)

22           THE COURT:  Please be seated.

23           Would you like to make your Rule 50 motion at this

24  time?

25           MR. REINSCHMIDT:  Yes, we would.
```

1      MR. CROSS:  Yes, Your Honor.  Do you want me up there

2  or . . .

3      THE COURT:  Remember what I said?  You can crawl under

4  the table if you want to.

5      MR. CROSS:  I only do that when my wife yells at me.

6      Thank you, Your Honor.  Just to clarify, at the

7  pretrial conference I could not remember whether plaintiff said

8  they wanted to present additional evidence for unjust enrichment

9  or contract rescission outside the presence of the jury, so when

10  they say they're --

11     THE COURT:  Well, we're only dealing with the two

12  claims that are being submitted to the jury so . . .

13     MR. CROSS:  Okay.  That's what we're g -- just that?

14  Sounds good.  Thanks, Judge.

15     THE COURT:  Okay.  Thank you.

16     MR. CROSS:  All right.  So the defendants move under

17  Rule 50 claiming that no reasonable jury would have sufficient

18  evidentiary evidence to find for fraud by clear and convincing

19  and satisfactory evidence.

20     Similarly, they would say no reasonable jury would

21  have sufficient evidentiary basis to find unlawful tying

22  arrangement, and they would reassert their statute of

23  limitations has run on the unlawful tying.  I'll address these

24  in turn.

25     One of the things I point out to the Court is for the

Rule 50 motion as a standard of review which I'm sure the Court

is fully aware of, there's a U.S. Supreme Court case that says

as part of ruling on a motion -- and they refer to as directed

verdict -- it's necessary -- it necessarily implicates the

substantive evidentiary standard of proof, and so that's why I

talk about clear and convincing.

As you know from the jury instructions and our going

back and forth, the elements of fraud are eight elements, and

they consist of representation, falsity, material

representation, knew it was false, intent to deceive,

justifiable reliance, causation, and damages.  I'm going to

focus on some of these, most of them, but not the falsity.  We

deny that a statement was even made let alone made it knowing it

was false.

The first one with regard to the representation, as

the Court is aware, Mr. Lucken and the Luckens have to prove

that these representations by the bank were made prior to his

investing any money.  We do not believe a reasonable jury could

find that based on the sequence of events.  The first

$250,000 -- well, let me back up.

The meeting with Mr. Dirks, Mr. Lucken, and Mr. Crim

occurred on November 8, 2011, I believe is what Mr. Lucken has

established by a calendar and his credit card going to Colorado.

November 16, Exhibit 139 establishes that Mr. Dirks reported to

Ford there's been no deal or he doesn't mention a deal, no

1 payment plan.  But Ford says we're going to come down on you,

2 forbear on you, and take your collateral.

3          November 17 is when Mr. Lucken returns, and he pays

4 off Ford.  He does not put up money for a CD on that date.  The

5 following day, on November 18, Crim asks for financials for

6 underwriting a loan.  November 19, 2011, Mr. Lucken gives

7 financials.  November 21, 2011, Crim asks to get together to

8 further discuss those financials as well as the difference in

9 interest rates as Mr. Crim testified.

10          Lucken does not refute that that discussion took

11 place.  It was not in his testimony.  And November 23 is when

12 the CD was finally paid.

13          I would submit to the Court that no reasonable juror

14 could find that these conditions were made on November 8, 2011,

15 to pay off Ford, put up a CD with those sequence of events that

16 are undisputed.  I believe the only explanation Mr. Lucken gave

17 was that, well, that's just a part of Crim's intent to deceive

18 me.  He never provided an actual explanation of what that means.

19 If the original meeting required those two conditions, a

20 reasonable jury or any reasonable person should find that he

21 would have paid $500,000 on November 17, he would have paid off

22 Ford, and he would have purchased the CD right at that point.

23 There would have been no need for further discussions or

24 anything in that regard.

25          The other reason we would move that no representation

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*EMuptsemiptompinte technoppy seanbteanige*
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 105 of 221

can be found is that similar to our motion for summary judgment
Mr. Lucken's testimony is replete, so replete, with
inconsistencies that no reasonable juror could believe him.  And
what I mean by that is he on January 13 in his own recitation of
facts indicates that he was nego -- that he knew Dirks was
negotiating with other floor plan financing people in trying to
find million-dollar plans and that he knew he was just
temporary.

And in addition to that, he has two different stories
depending on what helps him at the time.  His first story is the
bank duped me; I did not know I signed a letter of credit; I did
not read it.  Or his other inconsistency is I didn't understand
it which means he read it but he didn't understand it.  But he
didn't find out about this line of credit till January 2013 when
the bank called and said, "Are you going to renew your line of
credit or pay it off?"  And I believe his testimony was, "I was
angry.  I didn't know about it."

Story number 2 is when he wants to talk about the bank
misapplying or misusing his funds from the line of credit.
Within 14 days -- or excuse me, within approximately 10 days of
signing the letter of authorization saying Mr. Dirks can use his
line of credit, he on February 2 got a phone call from Mr. Crim
asking for permission to use his line of credit to pay SBA loan
payments, and I believe Mr. Lucken's testimony was, "I argued
with him.  I was unhappy about it."  And the reason he says that

 1   is because that would reduce the amount of his line of credit

 2   for floor planning.  And I believe his testimony in that regard

 3   was that he knew it would reduce his line.

 4        In addition to the two inconsistent stories, he admits

 5   to receiving --

 6        THE COURT:  Mr. Cross, how long do you think this is

 7   going to take?  This is -- had I known this was coming, I would

 8   have set time limits on the Rule 50 motion.

 9        MR. CROSS:  All right.

10        THE COURT:  But here's what I want to do.  You're

11   being very thorough, and I appreciate that.  It's the most

12   thorough Rule 50 motion I've seen.  But here's what I want to

13   do.  I need to give my court reporter a break let alone

14   everybody else.  So I can't recall ever granting a Rule 50

15   motion, but what I do -- I think the Supreme Court called it the

16   Uhlenhopp rule where you let the case go and then you deal with

17   it post-trial so you hopefully can avoid a retrial.

18        And I think there may be considerable merit to your

19   argument based on what I've heard so far, but I'm going to --

20   I'm going to let you make it after we send the jury home at the

21   end of the day today.  You can make as long of a record as you

22   want.  I don't mean to cut you off.  But that -- my court

23   reporter will have had a break or several by then.  And then

24   we'll take up the Rule 50 motion.

25        But I can guarantee you I'm going to take it under

1  advisement, have the defense put on their case.  From a trial

2  management point of view, it's always just made a lot of sense

3  to me.  We'll give obviously Mr. Thompson an opportunity to

4  resist it and all.  But it's really -- you know, the jury may

5  get you off the hook by finding for the defense.  If they don't,

6  then we'll have a real serious post-trial argument, or I'll just

7  go ahead and rule on the Rule 50 motion because I've reserved

8  it.  Is that okay?

9          MR. CROSS:  That is fine, Judge.  One other thing --

10          THE COURT:  Yes.

11          MR. CROSS:  -- you brought to my attention.  I did

12  prepare a brief, and I'd be more than happy to file one for you

13  as well.

14          THE COURT:  Oh, that'd be great.  Yeah, I'd appreciate

15  that.  Thank you.

16          Is it okay to proceed this way, Mr. Thompson?

17          MR. THOMPSON:  Yes.

18          THE COURT:  Okay.  Thank you.  We'll see you back here

19  at 1:15.  Thank you.

20          (Lunch recess at 12:05 p.m.)

21          THE COURT:  Ready to have the jury brought in?

22          MR. REINSCHMIDT:  Yes, Your Honor.

23          THE COURT:  Okay.  Thank you.  And is your first

24  witness in the courtroom?

25          MR. REINSCHMIDT:  Right here:  Mr. Mathiasen.

```
 1                THE COURT:  Okay.  Great.  Thank you.

 2                (The jury entered the courtroom.)

 3                THE COURT:  Good afternoon.  Please be seated.

 4                THE JURY:  Happy anniversary.

 5                THE COURT:  Oh, thank you.  Thank you.  Sorry.  Yeah,

 6     I was just texting my spouse, so thank you very much.

 7                Ready to proceed with your next witness?

 8                MR. REINSCHMIDT:  Yes, Your Honor.

 9                THE COURT:  Shelly, do you need a little break to fix

10     the tech problem?

11                THE REPORTER:  Maybe 30 seconds.

12                THE COURT:  Okay.  Let's proceed.  Thank you.

13                MR. REINSCHMIDT:  Sure.  I'd like to call

14     Mr. Mathiasen.

15                THE COURT:  Thank you.  Good afternoon.  Would you

16     raise your right hand, please.

17                 ROBERT MATHIASEN, DEFENDANTS' WITNESS, SWORN

18                THE COURT:  Thank you.  Please be seated.  And would

19     you tell us your first and last name, please, and spell your

20     last name.

21                THE WITNESS:  Robert Mathiasen, M-a-t-h-i-a-s-e-n.

22                THE COURT:  Thank you.

23                Let me just explain one thing to the jury.  I'm not

24     sure I totally explained it.  I told you that most of the

25     witnesses aren't allowed to be in the courtroom when others are
```

1   testifying.  But there are exceptions for that.  So the

2   exception would be Mr. Lucken who's the plaintiff and one of the

3   parties, and then the corporate entities have a right to have a

4   corporate representative with them at counsel table.  So that's

5   what's happening here.  Thank you.

6           Mr. Reinschmidt, you may proceed.

7           MR. REINSCHMIDT:  Thank you, Your Honor.

8                    DIRECT EXAMINATION

9   BY MR. REINSCHMIDT:

10  Q.   Mr. Mathiasen, how old are you?

11  A.   Forty-seven.

12  Q.   And where do you reside?

13  A.   I live in Willmar, Minnesota.

14  Q.   And what do you do in Willmar, Minnesota?  What is your job

15  there?

16  A.   I work for Heritage Bank, chief banking officer, chief

17  credit officer.

18  Q.   By the way, there was a -- statements in this case about --

19  that Heritage is a national bank.  What does that mean to say

20  that a particular bank is a national bank?

21  A.   Banks have the option of being state chartered or federally

22  chartered.  If you're state chartered, you're regulated by

23  different entities.  If you're federally chartered, you're

24  regulated by the Office of the Comptroller of Currency, the OCC

25  that we've talked about a few times.

1    Q.   And why do banks choose to be chartered by either state or

2    federally?

3    A.   It goes back and forth.  Some banks have actually switched

4    their charter for various reasons over the years based on they

5    think that one regulator's being unfair to them, and they'll

6    switch to another, and they go back and forth.  But one of the

7    advantages of being federally chartered is because we have our

8    locations in multiple states.  That makes it -- otherwise we'd

9    have to have separate charters for each state.

10   Q.   And that being said about the several states, do you do

11   business nationally?

12   A.   No, we do not.

13   Q.   Where does Heritage Bank do business?

14   A.   Primarily southwest Minnesota, northwest Iowa, and most

15   recently we opened up a location in Sioux Falls.

16   Q.   Sioux Falls, South Dakota?

17   A.   South Dakota, yes.

18   Q.   And do you have any intentions to expand beyond those three

19   states at least at the moment?

20   A.   Not at the moment.

21   Q.   And you are the -- what is your title at Heritage?

22   A.   I wear a couple different hats.  Chief banking officer and

23   chief credit officer.

24   Q.   So often now there's different titles than there used to

25   be.  Like you used to say someone's a president of a business.

1  Is that the equivalent or not?

2  A.   Can I just explain the two various roles?

3  Q.   Yes.

4  A.   Okay.  As a chief credit officer, I have responsibility for

5  the credit policy, work flows involved with credit, and then

6  heading up the credit committee.

7           As the chief banking officer, I have

8  responsibilities -- the market presidents report in to me, and I

9  have responsibilities to make sure they have the tools they need

10  to be successful, you know, marketing and the right people,

11  et cetera.

12  Q.   When you say a market president, does each location have a

13  president?

14  A.   No.  We have a Minnesota and rural Iowa market president,

15  and we have a Sioux Falls/Sioux City market president.  Those

16  are two people.

17  Q.   Okay.  Where are your locations in Minnesota?

18  A.   Primarily right in the Willmar area.  Willmar being a town

19  of about 20,000 people is our main location, and then to the

20  north of that about six miles is Spicer.  To the west of that

21  six miles is Pennock, and then about ten miles southwest is

22  Raymond.

23  Q.   And then you've mentioned Sioux Falls?

24  A.   Correct.

25  Q.   And then how about in Iowa?

1  A.   In Iowa we have the two locations in Sioux City, downtown

2  here and then down in the Morningside area.  And across rural

3  Iowa from west to east we are in Anthon, Cushing, Holstein,

4  Aurelia, Alta, and Lytton, mostly towns -- some of them under a

5  thousand people, well under a thousand people.

6  Q.   And I referred in my opening statement to describe Heritage

7  as a community bank.  Is that a fair description?

8  A.   Yes.

9  Q.   What is that, and what does that mean?

10 A.   We -- our focus is building relationships with our

11 customers.  We want to be a trusted advisor, be part of their

12 team and know their business so that sometimes we anticipate

13 opportunities before they know that they're coming where we can

14 help out and lend a hand.  We want to work intimately with our

15 customers and use as much local decision making as possible.

16 Q.   All right.  Let's just jump into what happened here.

17 Starting with Mr. Crim, Mr. Crim testified that he was let go by

18 the bank in October of 2012.  And I believe his testimony was

19 that he wasn't -- he was told he could call HR to find out why,

20 he didn't bother, he just got another job.

21       MR. THOMPSON:  Your Honor, I object to leading.

22       THE COURT:  It's foundational.  Overruled.

23 BY MR. REINSCHMIDT:

24 Q.   So with that being said, do you know or were you involved

25 in his termination?

1    A.   I was involved.  I supported the ultimate decision.

2    Sterling was let go for a couple reasons.  One is with the

3    merger of our Iowa charters and Minnesota charters, we

4    implemented a different philosophy on the commercial banking in

5    our communities which involved this team of three.  The team of

6    three was designed to play to the strengths of various

7    personality styles so that we had a credit manager which you've

8    already heard is David Hegarty at that time who was more -- kind

9    of more introverted, more into the numbers and more the credit

10   person, taking care of the portfolio with Sterling designed to

11   be more of the outbound person building relationships with our

12   customers, prospects, centers of influence, and then teaming

13   that person with a business associate who Jen Whipple was at the

14   time.  That name has come up as well.

15         Sterling struggled in that model.  Previously when he

16   first started working for Heritage Bank, Iowa, he did all of

17   those roles and had some help, but he didn't find success in

18   this new model.

19         We also asked Sterling to broaden his customer base,

20   who he would call on.  We wanted more manufacturing and more of

21   some of the other entities that are thriving in this community,

22   and he just struggled to find success in that model.

23   Q.   Did you terminate him for any reason related to the events

24   that have been discussed in this lawsuit?

25   A.   No.

1    Q.   You heard Mr. Tank talk about the Office of the Comptroller

2    of the Currency, the OCC.  And in that he discussed that there

3    were an enforcement action in Minnesota and also one in Iowa.

4    Tell us just briefly, tell the jury just briefly, about that as

5    to -- and we can look at the exhibits, but we're trying to save

6    time.  So do you remember about when that was?

7    A.   I do because it was happening just as I was hired with

8    Heritage Bank.  I was hired -- it will be ten years here in May

9    that I've been with the bank, so that would put us at 2008 I was

10   brought on, and the enforcement action was in process if not

11   formalized shortly thereafter.  It had to do with the economics

12   of the time and what we had identified as loans that in the

13   industry they call them as classified loans.  They're loans that

14   show that there's a well-defined weakness in the credit.  Once a

15   loan has a well-defined weakness, we give that a certain risk

16   rating.  And as a whole, we had too many of those loans as a

17   percentage of our total loans that were in that state.

18   Q.   Both in Iowa and in Minnesota?

19   A.   Correct.

20   Q.   And that's kind of the -- that phrase, well-defined

21   weakness, what does that mean?

22   A.   Generally it comes down to the cash flow of the business

23   and are they able to service their debt, whether it's our debt

24   or debt of accumulation of different lenders.  And if the

25   business is struggling to show that cash flow even though it

1    might be tapping into their reserves or the guarantor injecting

2    money into the business, it still has a well-defined weakness if

3    the core business can't pay its debt.

4    Q.    And with your background in banking, are you aware whether

5    other banks were subjected to these enforcement actions in 2008

6    and 2009?

7    A.    There were several.  I'm on the Minnesota Banker

8    Association's government relations council, and we have reports

9    that would come in from time to time.  And at one time in

10   Minnesota a third of all banks were on an enforcement action.

11   Q.    And is there a limit that's given within those enforcement

12   actions?  I mean, do they terminate by their own terms at a

13   certain point or not?

14   A.    Generally an enforcement action, it's similar to what we

15   might do with our customers, is that they set out the criteria

16   that they want to see the bank achieve over a time period.  It

17   normally involves getting those classified levels down to a

18   level that's more acceptable.  It might mean getting your

19   capital levels up or getting your liquidity levels to a certain

20   point.  But it's an agreed-upon expectation that they have for

21   the bank.  And when we achieve that, they would recognize it and

22   terminate that enforcement action.

23   Q.    And in this case -- and I think it's -- we haven't put them

24   up, but it's Exhibit 24 for Minnesota and Exhibit 131 for

25   Holstein.  Those were -- those OCC enforcement actions were

1    terminated; is that correct?

2    A.    Correct.

3    Q.    And I think -- well, actually I just want to put the dates

4    up just so we can see the dates.

5          MR. REINSCHMIDT:  If we put up Exhibit 24, Ms. Liston.

6    Q.    And I'm looking at -- this is the -- this is -- it says

7    Heritage Bank, Spicer, Minnesota, at the very top; is that

8    correct?

9    A.    Yes.

10   Q.    And then I'm just going to --

11         MR. REINSCHMIDT:  Maybe you could highlight the

12   narrative and then the date down below if you would.  Thank you.

13   Q.    And this is where it says in bold letters or caps and -- at

14   least caps "terminated" in the next to last paragraph; correct?

15   A.    Correct.

16   Q.    And then that's signed by Mr. Sutcliffe from Sioux Falls,

17   comptroller, on June 14, 2011?

18   A.    Correct.

19   Q.    And then that's the Minnesota one.  Then if we put up 131,

20   is that the -- is that the Iowa one?

21   A.    Yes, it is.

22   Q.    And why does it -- why does it say Holstein as opposed

23   to -- I don't know.  There's, you said, eight locations.

24   A.    Holst -- you have to identify a location that's going to

25   hold the charter.  Holstein was where we held our charter.

1    Q.   Okay.  And then if we go -- if we go down on that document

2    to the narrative and the date -- this one's actually physically

3    signed, not just a slash, s, slash -- is this the same person,

4    Mr. Sutcliffe?

5    A.   It is, yes.  We still work with Mr. Sutcliffe.

6    Q.   And on this one for Iowa he signed it on July 25, 2011?

7    A.   Yes.

8    Q.   And other than -- since that time have you had any other

9    enforcement actions or threatened enforcement actions with the

10   OCC?

11   A.   This reached the level of what they call a formal

12   agreement.  It's not uncommon at all that regulators will issue

13   memorandums of understanding, MOUs.  And we have had MOUs which

14   heightens an expectation around a certain segment but doesn't

15   elevate to a level that they're overly concerned about the

16   overall bank.

17           But, for example, IT security is something that right

18   now as an industry there's more MOUs out on data security and

19   information technology security.  That seems to be a common

20   theme that the regulators are focused on.  So there have been

21   MOUs since this time.

22   Q.   Mr. Tank talked about whether or not there would be

23   concerns to have in this case this loan with -- this SBA loan

24   guarantee with Mr. Dirks become troublesome and whether or not

25   that'd be an issue with the OCC.  Let's talk about that for a

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Appeal Proceedings recorded by mechanical stenography*
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 118 of 221

1 minute.  Do you recall whether or not you ever had worries at
2 any time from the termination in July 2011 of the Iowa
3 enforcement to the -- through the term of this loan guarantee
4 and when it was finally resolved?  Did you ever have a concern
5 about the OCC coming back?
6 A.   No, no.  And it would be odd for the OCC to get too
7 specific about any one credit.  They look at the bank as a
8 whole.  They will, when they come in, examine individual credits
9 to see if they agree with us on our risk rating, so they'll look
10 at individual credits.  But their focus is more on the bank as a
11 whole.
12 Q.   Have you been -- prior to -- prior to that loan that was
13 done in 2009 by Heritage with the loan guarantee from the SBA,
14 had you been involved in SBA loan guarantees before?
15 A.   Yes.
16 Q.   And some t -- I mean, how involved?  Just in oversight or
17 actually doing the paperwork or . . .
18 A.   I did not produce documents actually at any point in my
19 career.  I've always had someone or a team that would help with
20 that.  Early in my career I was a banker, and I originated SBA
21 loans and worked with either my support team or our SBA
22 department that we had to take care of those details.
23 Q.   All right.  And did you -- did you -- as this loan
24 developed in Sioux City, do you recall any -- I mean, did you
25 have specific involvement in it?

1   A.   I did not.

2   Q.   Okay.  When -- the first time I want to talk about is July

3   2011, but rather than that, maybe I should ask you, when did you

4   first become aware of any kind of issues with this Dirks --

5   Dirks loan guarantee?

6   A.   My -- my role with our Iowa team started -- all these dates

7   I struggle with.  I believe it was in early 2011 is when I first

8   started maybe coming down to Iowa and getting to know the team

9   and getting to know a little bit about the portfolio.  I don't

10  recall this loan becoming something that I was involved with

11  until the credit committee when we were notified of the Ford

12  Motor floor plan loan being out of trust.

13  Q.   And I'm going to show you what's been marked as Exhibit

14  138.

15            MR. REINSCHMIDT:  Blow that up a little bit.

16  Q.   It's on Heritage Bank letterhead.  And this is the letter

17  that we talked about written by Mr. Crim to Mr. Dirks.  Do you

18  recall testimony about that?

19  A.   I do.

20  Q.   And in that he talks about loan limits, that we've reached

21  our loan limits.  Can you explain that to the jury and what he

22  meant there?

23  A.   When we do a government guaranteed loan, there is a limit

24  to how much the SBA will allow you to have to one borrower, and

25  we had reached that with this loan.

```
 1   Q.   And specifically in here apparently Mr. Dirks has been
 2   asking for a dealer floor plan.  Do you see that?
 3   A.   Yes.
 4   Q.   And at this point in July of 2011, did you do floor plans
 5   at any of your banks in Iowa or Minnesota?
 6   A.   It's my understanding through the testimony that we did
 7   with that Total Sales.  I was not involved with that credit, nor
 8   have I been involved with it.
 9   Q.   Other than Total Sales, are you aware in 2011 of --
10   A.   No.
11   Q.   -- any other floor plans?
12   A.   No.  And as it was -- somewhere along the -- earlier
13   someone mentioned that it's not something community banks
14   typically do.  They're higher risk.  They're labor intensive.
15   They're time intensive.  And in order to get paid for them, you
16   need to charge a fairly high rate, and because of that a lot of
17   times dealerships will just go to some national floor planner.
18   Q.   Like Ford Motor Credit or GM Financial?
19   A.   Correct.
20   Q.   When you say a high rate, like what would you typically
21   charge?  If you -- if you were doing a floor plan, what would
22   you anticipate you'd need to charge to make it profitable for
23   the bank?
24   A.   Well, recognizing that rates are lower today than they were
25   back then, today you would need to charge probably 12 to 15
```

```
1   percent just to cover your cost.  They're that intensive.
2   Q.   Well, let's talk about back then in 2011.  What do you
3   think you would have had to have charged in 2011?
4   A.   15 percent, 20 percent.  I don't know.
5   Q.   And as you understand it, is that well in excess of what a
6   national floor planner would offer?
7   A.   Yes.  Even the national floor planners will in today's
8   environment be closer to that 10 percent range or over 10
9   percent.
10  Q.   And you also mentioned that it was both administratively
11  intensive and labor intensive.  Can you explain that?
12  A.   There's a lot of paperwork going back and forth between
13  titles and inspections.  A well-organized floor plan would
14  require the dealership to actually call the bank beforehand so
15  the bank can do some releases.
16  Q.   You mean for a particular car you mean?
17  A.   For a particular car, yes.
18  Q.   And how often would you anticipate that someone from the
19  bank would have to go do an inspection?
20  A.   The expectation is minimum a month, monthly.
21  Q.   And is that a matter of literally counting cars?
22  A.   Counting cars and verifying the VIN numbers of the car to
23  see -- make sure that matches up with what we have on our
24  records as the inventory.
25  Q.   So given what -- given the very small amount of floor plans
```

1   that you were doing in your bank in 2011, were you surprised in

2   July 14, 2011, when Mr. Crim said no, we can't do a floor plan

3   for you?

4   A.   Not at all.

5   Q.   Would the loan limits have changed if Mr. Dirks had paid

6   off another loan?  Let me restate that better.

7           If he had paid off Ford Motor Credit, for example,

8   does that change the loan limits for you to do floor planning or

9   any other loan for him?

10  A.   No, it's not a global debt sort of calculation.  It's the

11  amount of debt we have with that borrower.

12  Q.   Okay.  And now I want to shift to Exhibit 27.  And this

13  is -- this has been testified to by several witnesses.  Is this

14  a meeting that was held on September 29, 2011?

15  A.   Yes.

16  Q.   So when it says September 29, is that when somebody then

17  actually dictates it and it's typed or . . .

18  A.   The CAD as you've seen previously is presented by the team

19  to the credit committee.

20  Q.   Remind me and remind us what the CAD stands for.

21  A.   It's the credit action display.

22  Q.   And what is -- that sounds like a pretty active thing,

23  credit action display.  What does that do, or what's it for?

24  A.   The goal of a well-written CAD is that the reader of that,

25  the reviewer of that, can come to the same conclusion that the

1  team did in their lending decision and in a risk rating.  So
2  whether that reviewer is the credit committee, a supervisor, a
3  regulator, a third party coming in to review the portfolio, they
4  can all see the thought process and draw the same conclusion
5  that the team did in their credit review.
6  Q.   And so I'm going to underline Dave Hegarty, Sterling, and
7  Bob M.  Is Sterling Sterling Crim?
8  A.   Yes.
9  Q.   And is -- Bob M., is that you?
10 A.   That is me.
11 Q.   And is this something where this meeting is held solely for
12 the purposes of Dirks Motors, or did it cover a number of loans?
13 A.   No.  This would be -- we have three days a week where we
14 have a credit committee on the calendar.  And if there's credits
15 to review, we'll have the meeting.  Otherwise we would not.  So
16 on whatever this September 29 date is would have been one of the
17 meeting dates that we had as a standing meeting.
18 Q.   And there's been talk about these three bullet points that
19 I've just highlighted.  Do you have an independent recollection
20 about the first one, the lack of financials?
21 A.   I don't have a recoll -- reco -- I don't recall a
22 conversation necessarily about that, but it's definitely a
23 concern.
24 Q.   Can you explain -- can you explain to the jury why lack of
25 financials is a concern?

1  A.    Well, a well -- a good credit has continual monitoring.  I

2  stress to my team that at any point in time I should be able to

3  ask the team how that business is doing, and they should be able

4  to have information to answer that question.  If we're not

5  getting financial information till 18 months after it's been

6  completed, we really don't have our arms around the realtime

7  situation that that business is in.

8  Q.    Is there a punch list that the bank uses to define and

9  analyze a loan?

10 A.    There's an art and a science to lending.  The science part

11 is a lot of the ratios and the numbers.  And then there's the

12 art which is what is the story, what is really happening with

13 this credit, and that's the goal of a good credit manager is to

14 be able to blend those two into that CAD.

15 Q.    Do lack of financials relate to someone's character?

16 A.    Potentially, yeah.  Potentially, yes.

17 Q.    Is that a factor that you consider?

18 A.    Absolutely.  There's -- they often talk about the five Cs

19 of credit, and I won't bore you with a credit class here, but

20 the first one is character, and that's most important.  If you

21 don't have confidence that the person you're dealing with is

22 trustworthy, I don't care how good the numbers look; I don't

23 want to be doing business with them.

24 Q.    And then secondly on this, on the bullet points, payment

25 history of the loan, apparently according to that bullet point

1    that it started to show a little bit late?

2    A.    Yes.

3    Q.    Is that significant that it says loan is currently over 20

4    days past due?

5    A.    Generally 20 days past due would not be a concern if it

6    wasn't on top of the other items on this list.

7    Q.    And then the last one is that borrower -- and just I'm sure

8    we're all on the same page by this point, but that is Dick Dirks

9    I presume?

10   A.    Yes.

11   Q.    Okay.  And it says that he brought in a default letter that

12   he received.  Were you concerned about that?

13   A.    Very much.  That is -- I mentioned before the character

14   issue.  Being out of trust is a serious, serious thing in

15   financing.  A lender makes a loan in good faith.  And the

16   borrower's expected to follow the expectations and that is when

17   you sell a vehicle you pay back the loan.  And to be out of

18   trust is a huge character issue.

19   Q.    Did -- and then the next thing is -- well, let me ask you

20   about that.  The default letter, if Ford -- and that's a default

21   letter -- I think there was a -- we could look at it, but it was

22   September 19 I think.  Does that sound right, a default letter

23   from Ford to both Heritage and to Dirks?

24   A.    Sure.

25   Q.    Okay.  And is that the default letter we're talking about

1  where they were going to pull cars?

2  A.    Yes.

3  Q.    If they had pulled his cars, what did that do to his

4  business?

5  A.    Well, he had a service department.  He could have

6  maintained service, but I think that would not be a viable

7  business model to pay the amount of debt that he had.

8  Q.    And then I'm going to go down to this portion.  I've

9  circled the portion that says APP, period, 259M.  What does that

10 mean?

11 A.    Approximately 259,000.

12 Q.    Well, what does that mean in the context of this case and

13 this loan?

14 A.    The charge-off rules are dictated by GAAP which is the

15 generally accepted accounting principles, G-A-A-P, and GAAP

16 dictates that when you identify a well-defined weakness in a

17 credit that you do an analysis, and the analysis came back

18 showing that the appropriate accounting -- now, a charge-off is

19 strictly an internal -- the customer never knows that a note's

20 been charged off.  It's just an internal accounting.  And the

21 GAAP rules dictated that we would take that charge-off at that

22 time.

23 Q.    And if we went to -- I think there were exhibits that

24 showed by summer of 2011, summer, fall of 2011, there was about

25 1.6 million left on the loan --

1   A.   Yes.

2   Q.   So how does -- the 259,000, how was that calculated just

3   roughly against that 1.6 million?

4   A.   The 259 would be the amount that the SBA guarantee does not

5   cover. For banking purposes, when an SBA loan or a farmer FSA

6   loan is in place, it does not require the same levels of capital

7   to be held by the bank. So we basically charged off the portion

8   that is not -- was not covered by the SBA guarantee which would

9   be GAAP.

10   Q.   And does that mean the portion not covered by the SBA

11   guarantee, do you first -- do you take the loan and then first

12   subtract collateral from it?

13   A.   No, no. It's assuming that you would not collect one penny

14   on that loan. And this was the most conservative -- to charge

15   off the full amount of the unguaranteed portion was the most

16   conservative that we could be.

17   Q.   So if I understand what you're saying, it would be we don't

18   collect a penny on the 1.6 million owed us, and we know from

19   further down that you said 85 percent guarantee?

20   A.   Uh-huh, yes.

21   Q.   Is that correct?

22   A.   Yes.

23   Q.   So this would be the bank picking up 15 percent of the 1.6

24   million?

25   A.   That's what the math should be, yes.

1   Q.   And you've seen -- the exhibits you've seen showing the

2   collateral, what did the collateral consist of?

3   A.   We had the CDs, the cash value of life insurance, and the

4   real estate.

5   Q.   And for the cash value life insurance and the CDs, is that

6   the same as cash?

7   A.   For the most part, yes.  I think, yeah.

8   Q.   And so this is calculating that you're not subtracting that

9   before you're getting to the unguaranteed.

10  A.   No.

11  Q.   And similarly with the real estate, I mean, obviously we

12  don't know quite what the real estate would bring.

13  A.   Right.

14  Q.   All right.  Did you -- did you know that -- at this time

15  that he was getting -- well, strike that.

16       I presume given that third bullet point that you knew

17  that Ford Motor Credit was floor planning Mr. Dirks; is that

18  correct?

19  A.   Yes.

20  Q.   Had you known before September 29, 2011, that Dirks Motors

21  was being floor planned by Ford Motor Credit?

22  A.   Sterling certainly would have been.

23  Q.   Do you -- given your knowledge of floor planning, did you

24  expect that Ford Motor Credit would be in a superior or inferior

25  position to Heritage Bank on cars and parts?

1   A.   Superior.

2   Q.   And why would you expect them to be superior to you?

3   A.   As has been previously testified, no floor planner would

4   allow someone in front of them on the vehicles.

5   Q.   All right.  And pursuant -- did you ever send -- we've

6   looked -- there's been a number of e-mails produced in this case

7   relative to your bank.  Have there been any e-mails or any

8   correspondence whatsoever that suggested you or anyone else at

9   the bank was concerned about the superior Ford lien?

10  A.   No.

11  Q.   Were you concerned about the superior Ford lien?

12  A.   No.

13  Q.   Did you feel like you had violated in any respect the

14  authorization which is Exhibit 11 of the SBA loan guarantee?

15  A.   No.  It was never relied on at the time of approval, so no.

16  Q.   At the time of approval, was any -- were any cars or parts

17  listed as collateral for the SBA loan guarantee?

18  A.   They were not.

19  Q.   Subsequent to this on September 29, 2011, did -- did

20  Mr. Crim do a UCC search?

21  A.   I believe earlier we learned that he had.  I don't have

22  personal knowledge of that UCC search.

23  Q.   Would that be a normal -- normal protocol or not to do a

24  UCC search after this meeting?

25  A.   Yes.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*M. Jean Mullenbach, United States Court Reporter*
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 130 of 221

1   Q.   And we've heard testimony about that, that it showed that

2   Ford had a superior lien.  Did that surprise you?

3   A.   No.

4   Q.   You heard testimony that there were prior lien searches in

5   2010.  Did that surprise you that there were prior UCC lien

6   searches?

7   A.   No.

8   Q.   Why did that not surprise you?

9   A.   We pull UCC searches to verify our position at the time of

10   underwriting.  And we pull UCC searches post closing to see if

11   there's other debt that's showing up with our borrower.  We want

12   to -- we want to make sure we understand the situation we're in.

13   Q.   At this point on September 29, 2011, have you decided to

14   exit the loan?

15   A.   I would say yes.  That character issue was huge with me.  I

16   said that earlier that I don't want to be working with someone

17   that I can't trust, and in my mind this was an exit.  I don't

18   know if you would find language that uses that term in any of

19   the documentation, but yes, I would say we were exiting his

20   credit.

21   Q.   And was there anything untrustworthy at this point that you

22   felt about Mr. Dirks?

23   A.   Clearly.  I know -- without even having met Mr. Dirks at

24   this point, just that bullet point alone would mean I no longer

25   can trust this borrower.

1   Q.   You're talking about the bullet point I've just put an X

2   by?

3   A.   Yes.

4   Q.   That is that Ford is saying we're taking cars?

5   A.   Yes.

6   Q.   And you heard this phrase used out of trust.  Are you

7   familiar with that phrase?

8   A.   Yes.

9   Q.   And how does that -- how do you deem that event to be an

10  event causing someone to become untrustworthy in your eyes?

11  A.   You can't be in the car business and not understand how the

12  floor plan line works.  And if you're out of trust, you are

13  basically taking and selling an asset that in this case Ford

14  Motor Credit technically had -- that was their vehicle that you

15  are selling and taking the proceeds and using it for some other

16  purpose.

17  Q.   Did you ultimately -- I'm going to show you Exhibit 31.

18  And on Exhibit 31 --

19            MR. REINSCHMIDT:  Blow that up a little bit.  Before

20  you do, Ms. Liston, go up to the top for the date.

21  Q.   And what's the date on that, sir?

22  A.   November 3, 2011.

23            MR. REINSCHMIDT:  Now let's go down to the body of the

24  letter.

25  Q.   And that's s --

```
 1              MR. REINSCHMIDT:  Before you -- go back just for a
 2    moment.
 3    Q.   And who is that signed by?  Or it's not signed, but his
 4    name is typed.
 5    A.   Sterling Crim.
 6    Q.   Okay.  Now let's go to the body of the letter.  And what --
 7    just what's the gist?  What is this letter doing?
 8    A.   Law dictates that we send out a letter of default.  It's a
 9    requirement as part of the ongoing efforts of a collection is to
10    put a written notice to the customer.
11    Q.   Were you involved in -- so to go back, I used the phrase
12    exiting the loan.  Is that different than foreclosure?
13    A.   Yes, it would be.  When we're looking to exit a loan, the
14    preference would be to have the borrower find refinancing
15    somewhere else.  We move on.  They move on.  If they cannot find
16    that financing somewhere else, then we have to look at our other
17    options which may include foreclosure.
18    Q.   You heard about the -- or hear about, we are physically
19    here about a lawsuit in which Mr. Lucken said that he was told
20    Heritage would floor plan.  When did you first learn about
21    Mr. Lucken?
22    A.   I would say that at a -- I don't know if it's a credit
23    committee, but when Sterling made us aware that there was a
24    local investor, we were in the process of going through this
25    exit, and Sterling brought it to my attention that there was a
```

1   local investor that he was working with.

2   Q.    When you heard about the -- and did you know the name at

3   that point?

4   A.    I probably didn't.

5   Q.    Were you pleased with that information that there might be

6   a local investor involved or interested?

7   A.    As a bank you're always hoping for a win-win.  You never

8   come out in a foreclosure ahead.  So if this was going to be a

9   person who could help Dick Dirks over the hump and maybe be a

10  ongoing resource for him, I think -- we were still -- we're

11  still exiting the credit because of the lack of trust at this

12  point.  But this might make him refinanceable for someone else.

13  Q.    And you heard the testimony.  You heard Mr. Crim's

14  testimony on the one hand, and you heard Mr. Lucken's testimony

15  and Mr. Dirks' testimony on the other hand; correct?

16  A.    Yes.

17  Q.    You were not present for that meeting, correct, with

18  Mr. Crim?

19  A.    No, I was not.

20  Q.    When you saw -- I want you to look at Exhibit 46 first.

21  We'll just take the top half and blow it up perhaps.  And this

22  is the -- this is the note that Mr. Lucken signed in January --

23  on January 19, 2012.  Is this a standard promissory note?

24  A.    Yes, it is.

25  Q.    And when I say standard, it's -- I presume it's computer

1  generated?

2  A.  It is.

3  Q.  And that being said, then there's items, though, that then

4  have to be filled in such as like here you have to fill in how

5  much is being borrowed; correct?

6  A.  Correct.

7  Q.  All right.  And what does it mean when it says multiple

8  advance?

9  A.  That it is a line of credit that would involve advances,

10 paydowns, advances, paydowns over the life of that loan.

11 Q.  Can it be -- so does it mean that you have to just make one

12 advance from it, or can it ebb and flow up and down?

13 A.  It can ebb and flow up and down.

14 Q.  How about the interest rate that I've just circled, the 3.7

15 percent?

16 A.  That was done because of our collateral in this case which

17 was the CD, very low risk so we can offer a better rate.

18 Q.  So are you saying -- like what other -- what would be --

19 having looked at the Lucken balance sheets a bit, what other

20 collateral could you have taken besides a CD?

21 A.  In other situations, borrowers have pledged stocks,

22 investment portfolio, real estate.

23 Q.  Let's just take -- just use stocks as an example, and we'll

24 just use that only one as an example.  Why couldn't you charge

25 the same rate of interest on this note if it was secured by

1   stocks?

2   A.   Well, there's more risk with a stock.  The CD is as close

3   to cash as you can get.  A stock can lose value.  So we would

4   either require more stock than the amount of the note in case

5   that happened.  Or, you know, there is a little bit more risk

6   and monitoring involved, so that rate would be higher.

7   Q.   How do you calculate this interest rate relative to having

8   a CD as security?

9   A.   At that time I think we had a policy of some sort of a 250

10   or 200 basis points over the CD.  I don't recall.  But there was

11   some rule of thumb that was followed.

12   Q.   Are basis points your nomenclature for interest?

13   A.   Yes.

14   Q.   So 2 percent higher.

15   A.   2 percent, 2 1/2 percent higher than the CD.

16   Q.   If it had been stocks, for example, what percentage rate do

17   you think it would have been at that time in January of 2012?

18   A.   It still would have been a good collateral, so probably in

19   that 5 to 7 range.

20   Q.   And then I'm just going to look at the bottom half of the

21   note.  We've talked about this note at length, but I don't think

22   anyone's asked what does that mean when it says 1 -- the

23   handwriting there that I'm circling says, "1-20-12 boarded," and

24   then there's initials who I can't read the initials.  Maybe you

25   can.

1    A.   I'm guessing Jen Whipple, JW.  Boarded is when you take the
2    physical note that's been signed and you get it put on to our
3    system for ongoing monitoring.
4    Q.   You heard testimony yesterday about the Exhibits 40 and 41
5    which were the GM and Ford commitment letters.  That had -- that
6    had this -- if we go back up to the top, I think in the upper
7    right of the top we're going to see this number 0881.  Do you
8    see that?
9    A.   Yes.
10   Q.   When Mr. Crim put 0881 on those documents, how did he have
11   that num -- how would he have had that number --
12            MR. THOMPSON:  Objection.  Calls --
13   Q.   -- in your system if you know?
14            MR. THOMPSON:  Objection.  Calls for speculation and
15   leading.
16            THE COURT:  Overruled.  You may answer.
17   A.   When a note is -- when the note is to be drawn, we had a
18   system for assigning that note number.  So it's possible -- I
19   wasn't there, so -- but it's possible Jen Whipple pulled the
20   next note number available and knew that that was going to be
21   the note number that was used at the time the note would be
22   drafted.
23   Q.   And you heard the testimony yesterday that no monies
24   were -- no monies were used for cars from November 2011 until
25   January 24, 2012?

1    A.    There was no note, right, no.

2              MR. REINSCHMIDT:  And let's go down to the bottom

3    again of this note, Ms. Liston.

4    Q.    And on the bottom of the note it shows for security, and

5    I'm putting that -- circling that in red.  It says that a CD is

6    assigned to it; correct?

7    A.    Correct.

8    Q.    And we've talked about that's the $250,000 CD?

9    A.    Yes.

10   Q.    Okay.  Did Mr. Lucken receive interest statements after he

11   signed this line of credit?

12   A.    I would assume so.  I can't speak to that for certain.

13   Q.    Well, we'll just look at 117 quickly.  We've talked about

14   that.  I'll put it up.  We'll take it down quickly.  That's just

15   one of the interest statements.  There's several others in 117,

16   but that's an interest statement from 7 -- well, this says when

17   payment's due, 7-19-12.  And that would show -- well, you tell

18   me what would that show on that?  What would that tell a

19   borrower?

20   A.    That's the amount of interest that's due.

21             MR. THOMPSON:  Objection, Your Honor.  Excuse me, Your

22   Honor.  Objection, Your Honor.  Lack of foundation for this

23   witness to testify.  I think he said he didn't read it, he'd

24   have to assume what it is.

25             THE COURT:  Sustained.

1    BY MR. REINSCHMIDT:

2    Q.    Do you regularly in your bank produce statements like this

3    to customers?

4    A.    Yes.

5    Q.    On this particular Exhibit 117 when it says principal

6    balance, what does that show?

7    A.    That's the amount that has been drawn on that line.

8    Q.    Is there a way of looking at this that you can tell whether

9    or not this is a loan or a line of credit?  I mean, anything

10   unique about this?

11   A.    The fact that there's a credit limit tells me that there's

12   still availability which would indicate more than likely a line

13   of credit.

14   Q.    And I'm going to circle here on the right where it says

15   250,000.

16   A.    Yes.

17   Q.    Okay.  Did the presence of Mr. Lucken -- once you knew

18   about Mr. Lucken's involvement, was that helpful or unhelpful to

19   what your plan was to exit this loan?

20   A.    In many ways it was unhelpful because if payments are

21   brought current, we're now with a borrower that we no longer

22   want to do business with because we no longer can trust them.

23   Our ability and what we can use to call that note in default are

24   limited.  So by bringing the note current, we're kind of needing

25   to continue on with the loan as long as the payments are made as

1    we agreed to contractually.  So that would be a concern.

2             I was optimistic that it could be helpful, though, as

3    I said earlier, that this investor who turns out to be

4    Mr. Lucken would be able to help him over the hump and maybe be

5    an ongoing advisor for him.

6    Q.   Did it -- did it -- once -- once Ford Motor Credit was

7    paid, did you move to first lien on cars or not?

8    A.   I don't -- I don't know.

9    Q.   Let me help you out.  Let's look at Exhibit 1037.  And you

10   see in the upper right.  What is that document?

11   A.   This is a UCC-1 filing statement.

12   Q.   And I'm circling the date.  What is the date that it was

13   filed?

14   A.   December 7, 2011.

15   Q.   And so this is after the meeting, and this is after the

16   payment to Ford Motor Credit; correct?

17   A.   Correct.

18   Q.   And I've circled what kind of a UCC financing statement is

19   it?

20   A.   This is an amendment to the initial statement, original

21   statement.

22   Q.   And then down below what I've put red lines on either

23   side -- well, actually I'll put a box around it.

24             MR. REINSCHMIDT:  Maybe just blow that up if you

25   could.

1   Q.   Okay.  And so what does this amendment purport to do on

2   behalf of Ford Motor, Ford Motor Credit?

3   A.   It's continuing on.

4   Q.   Did that concern you?

5   A.   No.

6   Q.   Was the bank aware that this was continuing on?

7   A.   I can't say for certain.  I wasn't involved with it, but

8   Sterling might have known.

9   Q.   And then I'm going to show you what's been marked as

10  Exhibit 1038.  And 1038 is what?  Or excuse me.  That is an

11  amendment also?

12  A.   Yes.

13  Q.   And actually it says amendment at the top, but I've just

14  circled the box that has been Xed that says termination; is that

15  correct?

16  A.   Yes.

17  Q.   And so on September 30, 2013, what happened with Ford Motor

18  Credit Company and UCCs on 9-30 of 2013?

19  A.   That is when they terminated their position on the assets.

20  Q.   And were -- was Heritage Bank well into the loan guarantee

21  application at that point?

22  A.   I believe so.

23  Q.   What was -- we heard Dick Palmatier's testimony this

24  morning in the form of reading portions of a deposition.  Why

25  was he hired?

1  A.   Dick brought a wealth of knowledge to our team, and I was

2  creating -- I had created a new group to work on troubled

3  credits across our footprint.  We had several in Minnesota as

4  well as our -- well, across the footprint, and he was going to

5  help me lead that effort.

6  Q.   Was he hired specifically to deal with this loan?

7  A.   No, no.

8  Q.   Was he hired to deal with problem loans in Sioux City?

9  A.   No, no.

10  Q.   What area was he hired to deal with any problem loans?

11  A.   Across our 13-location or at that time 12-location

12  footprint.

13  Q.   Did you have that many problems with loans that you had to

14  hire an individual just for -- a dedicated person just to handle

15  problem loans?

16  A.   No.  It's not -- they have multiple duties.  At the time

17  the position was created there were like 20 different tasks.

18  One of them was helping with those troubled credits, but there's

19  many other things that that position was created to also do.

20  Q.   Are there any bank documents whatsoever in this case that

21  support that Heritage Bank did a floor plan for Dirks Motors?

22  A.   No.

23  Q.   I just want you to look at one final thing, and that is

24  Exhibit 94.  And this is an e-mail from Dick to you in August of

25  2014, and he's talking about we're wrapping this up; correct?

1   A.   Yes.

2   Q.   And I really want to talk about another page, but just

3   since we're already -- it's up there and we're maybe reading it,

4   is there anything significant about this page?

5   A.   I'm not sure what you're looking for.  No.

6   Q.   Okay.  Let's just go to the third page of Exhibit 94.  And

7   does this -- does this help describe how much you ultimately got

8   paid if you know?

9   A.   It appears that way, yes.  This is the final book entry.

10  Q.   Okay.  And I think originally in that Exhibit 27 it shows

11  you were charging off 259,000.  Here it says charged off

12  principal approximately $253,810.15.  Do you know why there's a

13  difference?

14  A.   The 259 said approximately, so maybe that's why.  I don't

15  know.

16  Q.   Now let's go down to the bottom.  And I just want to --

17  let's see.  Let's make sure we always have to read from the --

18  we have to read from the bottom up, correct, of these e-mails to

19  get the e-mail thread?

20  A.   Yes.

21  Q.   Okay.  So we start with Dick to you.  Then you respond

22  saying this is huge in response to what he's written.  Can you

23  explain what he's written?  First of all, is -- that first line

24  with the 447,000, is that the check you got from the SBA for

25  the -- for their guarantee?

1  A.   Yes.

2  Q.   And what is it -- if you know, what does it mean when it

3  mentions the 186,000 and the 260,000?

4  A.   Book balance is the amount that has not been charged off,

5  and we would have had a book balance at that time because of the

6  SBA guarantee still, so what this is saying is that we recovered

7  enough to pay off the rest of that book balance, and then the

8  rest of the proceeds went to our ALLL, allowance for loan and

9  lease loss.  It's a category that banks use in anticipation of

10 potential charge-offs down the road.  When we recover money, it

11 goes back into that account and adds to that for future losses.

12 Q.   Is that like -- I mean, is that something you're regulated

13 and required to do, or is that something --

14 A.   Yes.

15 Q.   By the OCC?

16 A.   Yes.

17 Q.   And at the very end he says --

18       MR. REINSCHMIDT:  Maybe we can just blow that whole --

19 that whole statement up.

20 Q.   At the very end as he's talking about all that, then he

21 says, "With this kind of luck, I should go to the Hard Rock,

22 great for the team."  What kind of luck is had by those prior

23 numbers?

24 A.   This was a time period that the banking industry had

25 concern because the SBA and other government guarantee entities

1    were finding odd reasons and various reasons to not stand behind

2    their claim.  We had one at the bank prior to this that they did

3    not stand behind the claim.  And there was numerous reports when

4    I'd go to my Minnesota banker meetings or read articles about

5    the industry that the SBA was finding I's not dotted, T's not

6    crossed, it felt like almost anything to not stand behind that

7    guarantee.  And the fact that we were able to collect on this

8    one was -- was a relief.

9    Q.   Were you concerned that because inventory, that is, cars

10   and parts, hadn't been listed that that was going to be

11   something that the SBA loan -- SBA would pick apart and deny?

12   A.   No.

13   Q.   As you sit here and look at this jury today, do you think

14   that Heritage did anything that would require them or obligate

15   them to pay Mr. Lucken back the money that he loaned to Dick

16   Dirks?

17          MR. THOMPSON:  Objection.  That calls for a legal

18   conclusion, Your Honor.

19          THE COURT:  Overruled.  You may answer.

20   A.   I do not.

21          MR. REINSCHMIDT:  That's all I have, Your Honor.

22          THE COURT:  Thank you, Mr. Reinschmidt.

23          Why doesn't everybody take a stretch break, and then

24   we'll see if there's cross-examination.

25          Thank you.  Please be seated.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer aided transcription
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 145 of 221

```
1              Mr. Thompson, whenever you're ready.

2              MR. THOMPSON:  Yes, Your Honor.

3                        CROSS-EXAMINATION

4   BY MR. THOMPSON:

5   Q.   Mr. Mathiasen, I understand you're 47 years old?

6   A.   Correct.

7   Q.   Live in Willmar, Minnesota?

8   A.   Yes.

9   Q.   You saw Dick Dirks testify this morning?

10  A.   (Witness nodded head.)

11  Q.   Did you?

12  A.   Yes.

13  Q.   He's 89 years old.  He's lived all of his life in Iowa,

14  Akron, Iowa.  Are you suggesting in this courtroom that Dick

15  Dirks is not a man of character?

16  A.   He's --

17  Q.   Yes or no.  Why are you having trouble answering that?

18  A.   Because I don't want to -- I don't know him personally.

19  All I know is as a lender when someone is out of trust I can no

20  longer in good conscience trust that person.

21  Q.   So what you're going to tell this jury is Dick Dirks,

22  89-year-old Akron, Iowa, born and raised all of his life, is he

23  a man of character or is he not a man of character,

24  Mr. Mathiasen?

25  A.   From a lender's viewpoint, he is not.
```

1  Q.   Let's go to Exhibit 96, please.  Mr. Reinschmidt brought up

2  the termination agreements with the OCC.  This is the actual

3  agreement with the OCC.  You're familiar with that?

4  A.   Yes.

5  Q.   Was your bank out of trust with the OCC when this agreement

6  was entered into?

7  A.   No.

8  Q.   Did you guys lack character to have this type of an

9  agreement entered into with the federal government?

10  A.   No.

11  Q.   Let's go to Exhibit 95.  This is the other agreement with

12  the OCC.  Was your bank out of character (sic) with the

13  government?

14  A.   No.

15  Q.   Does that show you lack character with the government

16  because --

17  A.   They -- they agreed with us.

18  Q.   Does that show you lack character with the government

19  because you're under regulation?

20  A.   No.

21  Q.   You had those agreements because you had unsafe and unsound

22  loans, didn't you?

23  A.   No.

24  Q.   OCC doesn't just enter into these agreements willy-nilly

25  with banks, do they?

1   A.   They do not.

2   Q.   There's gotta be a problem, doesn't there?

3   A.   Yes.

4   Q.   Now, there was a little discussion about these UCC

5   searches.  The only one that actually shows a Secretary of State

6   search was from 2011; correct?

7   A.   Can I -- say that again.

8   Q.   The only UCC search that this jury has seen, an actual

9   search that went to the Iowa Secretary of State, was from

10  October 2011 after your committee meeting.

11  A.   If that's -- if that's the fact, yes.  I don't remember if

12  we've seen others or not.

13  Q.   The only evidence your bank has put forward of any OCC --

14  or any UCC searches before the committee meeting on September of

15  2011 are just three checklists; right?

16  A.   That the jury has seen?

17  Q.   Yeah.

18  A.   Yes.

19  Q.   And those checklists were all in 2010; right?

20  A.   I recall, yes.

21  Q.   We didn't see any Secretary of State search from 2009 when

22  the SBA loan was being obtained, was there?

23  A.   Not one that's been shown.

24  Q.   And we don't even have a checklist from 2009 showing that

25  your bank checked the Secretary of State for liens before the

1  SBA loan, do we?

2  A.   Not one that's been shown.

3  Q.   Well, if you had one, you should have produced it; right?

4  A.   You asked me if one had been shown.  I don't know.

5  Q.   Well, you suggested I think by shown that there's one there

6  that just hasn't been shown.

7  A.   I don't know.

8  Q.   I think you also called Mr. Lucken an investor.  Did he

9  ever take an equity position in Dirks Motors?

10 A.   That's how he was presented to the credit committee.

11 Q.   And who presented him as an investor?

12 A.   It would have been Sterling Crim and David Hegarty who

13 presented.

14 Q.   From anything that you've seen about this transaction where

15 Mr. Lucken provides 250,000 to pay off Ford, the balance to Dick

16 Dirks, he buys the 250,000 CD, putting any of that money in,

17 does that make him an investor?

18 A.   I don't know what the arrangements that Mr. Dirks and

19 Mr. Lucken had.  If it was an equity position or a loan, that's

20 not to the bank's privy.

21 Q.   Well, I appreciate that.  But your bank, apparently

22 somebody at your bank, Crim, said he was going to be an

23 investor.  And what I'm asking you if you'd listen to my

24 question is with the 250,000 wired to pay Ford and then the

25 remainder to Dirks and buying a 250,000 CD, with that

1   information, can you in any way say that Mr. Lucken was going to

2   be an investor in Dirks Motor Company?

3   A.   I believe I just answered.  I have no way of knowing what

4   the arrangement was between Mr. Lucken and Mr. Dirks.

5   Q.   Let me ask you this.  If I'm a bank customer and I buy a

6   CD, does that make me an equity owner in any business by buying

7   a CD?

8   A.   It does not.

9   Q.   If I wire money to Ford, does that make me an equity

10  investor in any business just by the wire?

11  A.   It's apples and oranges.  How the money -- how the -- the

12  arrangement that Mr. Lucken and Mr. Dirks have between them has

13  nothing to do with the actual transfer of money to Ford Motor

14  Credit.

15  Q.   Well, you've been through this whole trial.  Have you seen

16  any evidence that Mr. Lucken ever wanted to become an equity

17  owner?

18  A.   The evidence would say no.

19  Q.   Yeah.  In fact, Dick Dirks, the guy that was sitting here,

20  said the owners were himself at 50 percent and his 2 boys, 25

21  percent each.  You heard that, didn't you, this morning?

22  A.   Yes.

23  Q.   Yeah, yeah.  Now, that doesn't indicate that John Lucken

24  ever became an owner, does it?

25  A.   I don't know if he was a debtor or an owner.  I have not

1  seen the paperwork that was signed between Mr. Lucken and

2  Mr. Dirks.

3  Q.   You were asked about this Lucken line of credit and the

4  number that was put on it, this 100881.  Do you remember that?

5  A.   Yes.

6  Q.   And there was that Exhibit 40, the Heritage Bank commitment

7  to pay GM.  You remember that.

8  A.   Yes.

9  Q.   And that had that account number on it, didn't it?

10  A.   It did.

11  Q.   Let's pull up Exhibit 40.  And this was -- this was

12  actually sent to GM, wasn't it?

13  A.   It appears that way.  I wasn't involved.

14  Q.   And I believe the date on this is November 25 -- does that

15  sound correct to you -- 2011?

16  A.   I wasn't involved.

17  Q.   Okay.  Well, let's look at it.

18       MR. THOMPSON:  Second page, please.  Middle of --

19  A.   November 25, 2011.

20  Q.   Now, have you seen any evidence that John Lucken had signed

21  any applications to create that account before November 25,

22  2011?

23  A.   No.

24  Q.   And if I understood your testimony earlier today, you

25  thought that the way that number 100881 shows up on Exhibit 40

1    is because Jen Whipple may -- you don't know -- may have just

2    picked the next promissory note number in the lot?  Is that --

3    A.    We use an eight-digit loan number, and it goes off of the

4    year, and then the other four digits are sequential.  So if the

5    note was to be coming, she would know what note number to use.

6    Q.    But that's just from the next -- next one in the chute, so

7    to speak; right?

8    A.    I can't speak specifically to how we -- I know how they

9    work.  I don't know exactly if that's a system-generated thing

10   or something that we keep separate.  I don't know.

11   Q.    Well, let me ask you this.  Suppose you sent this

12   commitment to GM to pay 250,000 a week for vehicle purchases, GM

13   receives this, and they're expecting this to be your word;

14   right?  I mean, if Heritage sends this, it's its word; right?

15   Talking about character.

16   A.    Yes.

17   Q.    We're talking about character; right?

18   A.    Yes.

19   Q.    You're going to stand behind that, aren't you?

20   A.    Yes.

21   Q.    Yep.  Okay.  Now, let's say January of 2012 Mr. Lucken

22   comes in and your bank presents him the line of credit and

23   presents him the line of credit with 100881 on the document just

24   like we've seen.  And suppose he says, you know what?  Not

25   signing it, this isn't the deal, so I'm not going to sign it;

1    okay?  You'd be in a lot of trouble, wouldn't you, with GM for

2    sending them a commitment to pay them on an account that never

3    even existed; right?

4    A.    I believe something like this would be rescinded, and

5    there's no account to be drawn on, so there was no risk of that

6    happening.

7    Q.    Well, rescinded.  I mean, you guys have signed it, and so

8    has Dirks, and you've sent it to GM.  They aren't going to be

9    happy, are they, if they find that out?

10   A.    Probably not.  They want to sell vehicles.

11   Q.    And there was also testimony I'm pretty sure that the deal

12   was if there wasn't a commitment to pay GM by November 28, 3

13   days after this letter was sent by your bank, GM's going to pull

14   that franchise.  Do you remember that?

15   A.    Yes.

16   Q.    They probably wouldn't be very happy if they found out in

17   January of '12 that they couldn't pull their franchise because

18   they thought your bank gave the commitment and they were later

19   told that didn't come about.  That'd be a problem, wouldn't it,

20   for your bank?

21   A.    You'd have to define problem, but I can see where you're

22   going with that, yes.

23   Q.    And it also helped your bank to keep that franchise with GM

24   with Dirks Motors, whether you liquidated or not; right?

25   A.    This would not have been a letter generated by Sterling out

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*United States District Court, Northern District of Iowa*
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 153 of 221

1  of communications he had had with GM or Ford. This would have

2  been something at the request of Dick Dirks. This isn't a

3  standard letter that we would produce.

4  Q.  Oh, I understand that. But what I'm saying is it

5  benefitted your bank at the time that letter was sent on

6  November 25 with a deadline 3 days later that GM was going to

7  pull the franchise --

8  A.  I respectfully disagree. We were in an exit position. We

9  were looking to begin liquidation. This was done to accommodate

10  Dick Dirks so that his business could stay in business while he

11  and Mr. Lucken worked on their plan and hopefully could get

12  refinancing. To us to not send this letter would have shut down

13  the business when there was a viable plan in the works. It

14  would not have been fair for us to allow that to happen.

15  Q.  But when this business was sold to Total Motors -- and you

16  were aware of that; right?

17  A.  Yes.

18  Q.  You knew that one of the big things that Total Motors found

19  attractive to pay 575,000 for this business is because it wanted

20  the GM dealership because it had lost that dealership in LeMars,

21  and it wanted to have in Plymouth County the GM dealership.

22  That was a benefit not only for Total to buy it at that price

23  but for your bank to receive the closing proceeds; right?

24  A.  If we can agree that there's mutual benefit to maintaining,

25  yes.

1   Q.    Yeah.  I mean --

2   A.    The bank benefitted.  Mr. Dirks benefitted.  And I would

3   assume Mr. Lucken would have benefitted because he had already

4   put in money.

5   Q.    My question to you that started this was just simply did

6   your bank benefit from keeping that GM franchise.

7   A.    In the end we did because it was part of the sale, but that

8   wasn't at the time -- if we were looking to liquidate, we would

9   have just moved forward.

10          MR. THOMPSON:  Let's look at Exhibit 1037.  If you

11  could, yeah, blow up the top, please.

12  Q.    I believe you gave some testimony earlier today about this

13  UCC-1 filed by Ford on December 7, 2011; is that correct?

14  A.    Yes.

15  Q.    And you didn't become aware of this until probably a couple

16  months ago; right?

17  A.    Aware that their position continued?

18  Q.    Aware that this document even existed.

19  A.    No, I wouldn't get this involved with a credit.

20  Q.    So when you were involved in 2012, you didn't even know

21  this had been filed; right?

22  A.    No.

23  Q.    2013 you didn't know this had been filed.

24  A.    Me personally?

25  Q.    Yep.

1  A.   No.  I wasn't working this involved with the credit.

2  Q.   2014, you didn't know this existed, did you?

3  A.   No.

4  Q.   And did this document originate from your loan file or from

5  some other source?

6  A.   This isn't our -- this is Ford Motor Credit.

7  Q.   I understand, but this was never in the bank files;

8  correct?

9  A.   I can't say for certain, but no, probably not.

10  Q.   Mr. Crim reported to you; is that correct?

11  A.   He testified to that.  I don't recall him ever being my

12  direct report.  He reported into Randy Wilkinson who was the

13  market president and then Scott Sehnert.  Scott Sehnert did

14  report into me, so maybe Sterling meant through Scott Sehnert he

15  reported to me.

16  Q.   We've talked about Exhibit 40.  That's the commitment to

17  pay GM from November 25, 2011.  Do you remember that?

18  A.   Yes.

19  Q.   When did you first become aware of that actual document,

20  actually read it?

21  A.   That's just not a level -- we don't -- I wouldn't be that

22  involved with a credit.  We don't micromanage.  Sterling didn't

23  need permission.  He was an officer of the bank.  He didn't need

24  someone else to sign off on any letter that he would send.  So I

25  would not have been aware of that letter.

1  Q.   My question -- I'm going to ask it again.  When did you

2  first become aware of Exhibit 40?

3  A.   As part of the trial or as part of the case.

4        MR. THOMPSON:  Let's go to Exhibit 57.  And actually,

5  Rebecca, if we could start with the bottom part.  Thank you.

6  Q.   This is an e-mail from Sterling Crim to yourself April 24,

7  2012.  Do you see that?

8  A.   Yes.

9  Q.   And just as a point of reference, you know, this is after

10 the commitment to GM.  This is after the line of credit and the

11 assignment of the CD.  And I believe this is at a point when

12 draws had started on the Lucken line of credit.  Is that all

13 consistent with what you believe?

14 A.   That time frame, yes.

15 Q.   And if you'd look in the middle of that first paragraph, I

16 want to focus on the sentence that says Dick has managed to

17 raise approximately 48,000 to be used for payments.  Do you see

18 that?

19 A.   I do.

20 Q.   Did you know when you got that e-mail where he had raised

21 the 48,000 from?

22 A.   No.

23 Q.   Now, I think your testimony was that because Mr. Dirks was

24 out of trust that you were exiting the credit.  Is that what you

25 said?

1   A.   Yes.

2   Q.   Now, when -- this is well after you knew Mr. Dirks was out

3   of trust, well after this September 2011 board meeting.  We're

4   more than 6 months down the road, and you get a chance to get

5   48,000 into the bank.  Why didn't you say, we're exiting, this

6   is a bad guy, doesn't have good character, don't take the money,

7   let's just liquidate?  Why didn't you do that?

8   A.   We're not going to force a default by denying a payment.

9   We're obligated to take a payment, especially with an SBA note.

10  We're very limited on when we can call a note, the SBA note, in

11  default.

12  Q.   Let's go to the top part of this e-mail.  And this is your

13  response to Mr. Crim; correct?

14  A.   Yes.

15  Q.   You say, "I'm fine calling off the liquidation if the loan

16  is brought current"; right?

17  A.   That's what I say.

18  Q.   You didn't say, hey, this Dick Dirks, he's a bad guy, he's

19  out of trust with Ford seven months ago, we're done with this

20  guy.  That isn't what you said, did you?

21  A.   I don't recall the situation, but like I said, with an SBA

22  note, you can't even take action until there's a certain number

23  of days past due, so I don't know what this 48,000 we're

24  referring to represented at the time, if that was one payment,

25  two -- we know it was more than one payment.  I just don't know

1    what that represented for how many days past due he was.

2    Q.   Not only were you willing to take his money, 48,000, not

3    only were you willing to call off the liquidation if the loan's

4    current, you would even support a 90-day extension; right?

5    A.   Per the SBA rules if all payments had been made, we would

6    not be able to just call that off.

7    Q.   And this is with a guy you think's a bad actor.

8    A.   We're very limited when payments are made.

9    Q.   Mr. Reinschmidt showed you one of the bank statements that

10   went on the line of credit, 100881, and I remember he pointed

11   out the credit limit was on there of 250,000, and you said based

12   upon that I can deduce that this is a line of credit.  Is that

13   generally correct?

14   A.   Yes.

15   Q.   That credit limit wasn't a very firm credit limit, was it,

16   Mr. Mathiasen?

17   A.   It was except for the mistake that was made in the

18   boarding.

19   Q.   And it was a big one.  It went over 250,000 by more than

20   double.  It went over to 515,000, 200 -- more than a quarter of

21   a million over your limit; right?

22   A.   Yes.

23   Q.   That's not good for the bank, is it?

24   A.   It was a concern.

25   Q.   And should Mr. Lucken have been made aware that that had

1   happened?

2   A.   He would have only been obligated for the 250 that he

3   signed for.  What happened was at the time of boarding a field

4   was failed to be entered or was entered incorrectly.  As

5   requests came in, they were processed assuming that the line had

6   availability or wouldn't have been allowed to process.  The fact

7   that it hadn't been boarded correctly allowed that number to

8   climb above the 250.

9   Q.   Appreciate that, but my question was a little different.

10  Should Mr. Lucken have been notified that his line of credit

11  went over 250,000?  And I think that's a yes or a no.

12  A.   I don't know if he was or wasn't.

13  Q.   Should he have been notified?  Yes or no.

14  A.   At that point it's really a internal bank issue.  It didn't

15  affect Mr. Lucken.  He was only obligated for the 250,000, so

16  that'd be a judgment call.  I can say it probably would have

17  been proper.  I don't know if I would go as far as saying it was

18  required.

19  Q.   If the line of credit doubled, that could have doubled the

20  amount of interest he had to pay on that amount, couldn't it?

21  A.   If it hadn't been corrected and caught, it probably would

22  have impacted the statements, yes.

23  Q.   And not only did that happen once on this line of credit

24  that it went over, it happened again, didn't it, in December?

25  A.   Well, no.  Sterling was correct on that, that it was a

```
 1  timing issue, that checks had been presented.  Therefore, that's
 2  common practice.  If we know that we have checks, we would allow
 3  an advance.  If checks come in after 3:00, they go to next day.
 4  Q.  All right.
 5           MR. THOMPSON:  Let's go to Exhibit 94, page 3, bottom
 6  of the page, please.
 7  Q.  I think we heard testimony from Mr. Palmatier through
 8  deposition that the bank got all of its principal back, every
 9  penny of principal, and even got interest on the SBA loan;
10  right?
11  A.  Yes.
12  Q.  And he says, "With this kind of luck, I should go to Hard
13  Rock, great for the team"; right?
14  A.  Correct.
15  Q.  Was that great for Mr. Lucken?
16  A.  Mr. Lucken wasn't part of our collection efforts on our SBA
17  loan to Mr. Dirks.
18  Q.  And after Mr. Lucken put in $500,000 of his money, the bank
19  didn't put in one more penny, did it, to Dirks Motors?
20  A.  No.
21           MR. THOMPSON:  Thank you.
22           THE COURT:  Why doesn't everybody take a stretch
23  break.
24           Thank you.  Please be seated.
25           Mr. Reinschmidt, any redirect?
```

1          MR. REINSCHMIDT:  Yes, Your Honor.

2          THE COURT:  Thank you.

3                    REDIRECT EXAMINATION

4     BY MR. REINSCHMIDT:

5     Q.   Mr. Mathiasen, you were asked about Exhibit 40 which is the

6     GM commitment and 41 that was alluded to that was the Ford

7     commitment signed in November 2011 by Heritage.  Did you hear

8     Mr. Dirks' testimony this morning that no cars were purchased in

9     November and December 2011 and not until January of 2012?

10    A.   Yes.

11    Q.   They were not purchased until the line of credit was in

12    place; is that correct?

13    A.   Correct.

14    Q.   And if the business -- Mr. Thompson talked about the

15    benefit -- the arguable benefit to the bank by keeping the

16    business alive and the franchise alive in that November time

17    frame.  If the business had shut down at that point, would

18    Mr. Lucken have lost the first 250,000 that he paid off Ford

19    Motor Credit?

20    A.   I'm not aware of the arrangement that Mr. Dirks and

21    Mr. Lucken had.  I would assume that without a viable way of

22    running a business Dick Dirks would have had a hard time paying

23    back Mr. Lucken, yes.

24    Q.   So there was a benefit to the investment that Mr. Lucken

25    made, the loan that he made.  There was a value to him to have a

1   viable business?

2   A.   I would think he would agree with that too, yes.

3   Q.   And at the very end when Mr. Thompson talked about Dick

4   Palmatier's comment about great job, you know, we collected all

5   this, and you were asked did Mr. Lucken benefit, there was an

6   offer in compromise done in this case; is that correct?

7   A.   Correct.

8   Q.   And pursuant to that offer in compromise -- let me step

9   back.

10          If that offer in compromise had not been done, would

11  Mr. Dirks have retained those two policies of 250,000 and

12  300,000?

13  A.   Heritage and the SBA would have maintained those life

14  policies and to this day would still be owning those.

15  Q.   And given that those policies ultimately made their way

16  first to Mr. Dirks and then to Mr. Lucken, Mr. Lucken did

17  benefit how the SBA loan guarantee worked out.

18  A.   Yes.

19          MR. REINSCHMIDT:  That's all I have.

20          THE COURT:  Thank you, Mr. Reinschmidt.

21          Mr. Thompson, anything else?

22          MR. THOMPSON:  Nothing further, Your Honor.

23          THE COURT:  Okay.  Any questions for Mr. Mathiasen

24  from the jurors?  Okay.  Why don't you pass it, and I'll take a

25  look at it.  Then we'll let the lawyers look at it, and

1  hopefully we'll be able to ask it.

2          Thank you, Denise.

3          Counsel?

4          (At sidebar off the record.)

5          THE COURT:  No objection from counsel, so I'm going to

6  ask you this question.  Why would a representative of your bank

7  accept any monies from anyone on behalf of a business that is

8  failing?

9          THE WITNESS:  We were in the process of liquidating

10  and exiting Dirks Motors.  The ability to do that was based on

11  his not having the vehicles and the past-due payments,

12  et cetera, that you saw on the one exhibit.  By Mr. Lucken's

13  becoming involved, he all of a sudden had viable floor plan and

14  had notes brought current.  It wouldn't be appropriate for us,

15  SBA loan or not, to continue with exiting that credit at that

16  time or forcing that business to close.  The arrangement made

17  outside of the bank between Mr. Lucken and Mr. Dirks in many

18  ways is between them and not -- that's not our concern.

19          THE COURT:  Mr. Reinschmidt, any follow-up questions?

20          MR. REINSCHMIDT:  Yes, Your Honor.

21                    FURTHER REDIRECT EXAMINATION

22  BY MR. REINSCHMIDT:

23  Q.   Do you have a duty to your customer, in this case Dirks

24  Motor Company, to act in good faith and deal with him fairly?

25  A.   Absolutely.

```
 1              MR. REINSCHMIDT:  Thank you.
 2              THE COURT:  Mr. Thompson?
 3                        RECROSS-EXAMINATION
 4   BY MR. THOMPSON:
 5   Q.   I believe as part of your answer that you just gave you
 6   said Lucken had a viable floor plan financing or Dirks had a
 7   viable floor plan financing with Lucken?
 8   A.   A way of obtaining vehicles.  If I said floor plan, I don't
 9   know what I said, but he was going to be able to get vehicles
10   again.
11              MR. THOMPSON:  Could we have his answer read back,
12   please?
13              THE COURT:  Yeah, we'll see if Shelly's taking
14   anything down during the trial.  It's always a good test.  She
15   moves her fingers, but does she take anything down?
16              (The requested portion of the record was read.)
17   BY MR. THOMPSON:
18   Q.   So this viable floor plan, that's what you're saying the
19   line of credit was?
20   A.   The 250,000 against the CD, yes.
21   Q.   I thought we've had testimony from you and others that a
22   floor plan is labor intensive even for a bank?
23   A.   Yes.
24   Q.   And part of a floor plan financing is you get a secured
25   interest in the vehicles?
```

1  A.   That's typical, yes.

2  Q.   John Lucken in the letter of credit didn't get any security

3  interest in the vehicles, did he?  It's a yes or no.

4  A.   That would be up to -- I don't -- it appears he did not

5  file a UCC, correct.

6  Q.   And do you believe John Lucken expected that he was

7  undertaking a labor-intensive effort to monitor the collateral

8  as a floor plan financier when he signed that line of credit?

9  A.   I'm sorry.  I don't mean to dodge you, but I don't know the

10  arrangement made between Mr. Lucken and Mr. Dirks.  That is

11  not . . .

12  Q.   Well, then how can you say that Dirks Motors had a viable

13  floor plan financing if you can't say the line of credit was?

14  A.   Bad choice of words.  I meant there was a viable way of

15  obtaining vehicles again to continue in business.

16          MR. THOMPSON:  Nothing further.

17          THE COURT:  Thank you, Mr. Thompson.

18          Mr. Reinschmidt, anything?

19          MR. REINSCHMIDT:  No.

20          THE COURT:  Okay.  You're excused.  Thank you.

21          Why don't we take our afternoon recess.  It is a

22  quarter to 3, and we'll be in recess for 20 minutes until 5

23  after 3.  Thank you.

24          (The jury exited the courtroom.)

25          THE COURT:  Anything we need to take up?

```
 1            MR. REINSCHMIDT:  No, Your Honor.
 2            THE COURT:  Okay.  Can you have your next witness in
 3    here ready to roll?  Thank you.
 4            (Recess at 2:47 p.m.)
 5            THE COURT:  Who's your next witness going to be?
 6            MR. REINSCHMIDT:  Mr. Welte.
 7            THE COURT:  Okay.  I'm confused.  You're still calling
 8    Palmatier?
 9            MR. REINSCHMIDT:  I am not.
10            THE COURT:  Oh, you're not.  Okay.
11            MR. REINSCHMIDT:  You can strike him, Your Honor.
12            THE COURT:  So we should finish a little early
13    tomorrow I think.
14            MR. REINSCHMIDT:  I think we'll finish in the morning,
15    early -- I mean mid morning at the latest.
16            THE COURT:  Well, why don't you sit down for a minute.
17    I want to talk to you about that.  So if we finish tomorrow mid
18    morning and I give you maybe after we finish a 30-minute or so
19    break, will you be ready to roll with closing arguments?
20            MR. THOMPSON:  Yes, Your Honor.
21            THE COURT:  Or you want to come back Friday morning
22    for closing arguments?
23            MR. REINSCHMIDT:  No, let's do it --
24            THE COURT:  Is 30 minutes enough of a break?
25            MR. THOMPSON:  Yes, Your Honor, for me.
```

1          THE COURT:  You want more?  I'd give you more if you

2     want it.

3          MR. THOMPSON:  No.

4          THE COURT:  Okay.  Sounds good.  Do you want more than

5     30 minutes for your closings?  Do you want 45 each?

6          MR. REINSCHMIDT:  I don't.

7          MR. THOMPSON:  I'm fine with 30.  We agreed on it.

8          THE COURT:  Okay.  But if you want a little -- you

9     both went a couple minutes over on your openings, but I could

10    tell you were wrapping up, so I didn't do anything.  Same thing

11    will apply.  It's going to be fine if you go over a little bit.

12    It's really hard to measure the time.

13         MR. THOMPSON:  I now know where the clocks are.  I

14    wasn't oriented so I can . . .

15         THE COURT:  Okay.  Thank you.  Ready to have the jury

16    brought in?

17         MR. REINSCHMIDT:  Yes.

18         THE COURT:  Thanks.

19         (The jury entered the courtroom.)

20         THE COURT:  Thank you.  Please be seated.

21         Members of the jury, I have some disappointing news

22    for you.  We're probably going to finish the case tomorrow, and

23    I know how disappointed you will be that the evidence isn't

24    going to go into Friday morning, but contain your

25    disappointment.  And we're pretty sure -- you know, things can

1    happen.  But we're pretty sure it's -- we're going to wrap up

2    kind of late in the morning.  We'll take a break because I

3    always like to give the lawyers some time, and then we'll have

4    closing arguments.  So the plan is we will have lunch brought in

5    for you tomorrow so you can have lunch while you're

6    deliberating.  So just wanted to give you an update on that.

7              Ready to call your next witness?

8              MR. REINSCHMIDT:  I am, Your Honor.

9              THE COURT:  Thank you.

10             MR. REINSCHMIDT:  Mr. Welte.

11             THE COURT:  Good afternoon, Mr. Welte.  Would you

12   raise your right hand, please.

13                KEVIN WELTE, DEFENDANTS' WITNESS, SWORN

14             THE COURT:  Thank you.  Please be seated in the

15   witness box.  And you can adjust the chair and the two

16   microphones so you can speak directly into the microphones.  And

17   when you're settled in, would you please tell us your first and

18   last name and spell your last name for us.

19             THE WITNESS:  My name is Kevin Welte.  That's spelled

20   W-e-l-t-e.

21             THE COURT:  Thank you.

22             Mr. Reinschmidt?

23             MR. REINSCHMIDT:  Thank you, Your Honor.

24                          DIRECT EXAMINATION

25   BY MR. REINSCHMIDT:

```
1   Q.    Mr. Welte, how old are you?

2   A.    I'm 60 years old.

3   Q.    And what do you do for a living?

4   A.    I'm a consultant for Timm Funk Associates.

5   Q.    And what does Timm Funk and Associates consult on?

6   A.    Primarily we're acting CFOs of some companies.  We help

7   with accounting processes, inventory control, a lot of

8   accounting issues, forecasting.  We do business income claims

9   for insurance companies.  We work with various businesses around

10  town here and help them with their accounting needs.

11  Q.    Let's quickly talk about your background.  I'll probably

12  only talk about your recent background prior to Funk and

13  Associates.  Let's look at Exhibit 1032.  That is your résumé;

14  is that correct?

15  A.    That's correct.  That's correct.

16  Q.    And we'll -- why don't we just go down --

17        MR. REINSCHMIDT:  I don't know if you can blow that up

18  a bit larger without dividing the page.  Yes.  There we go.

19  Q.    Just in terms of time frame, so I see you've been with

20  Mr. Funk about three years?

21  A.    Yes.

22  Q.    So three years of consulting on the things that you just

23  talked about; is that correct?

24  A.    Yes.

25  Q.    And then prior to that you'd been -- you'd been with
```

1  Condon, and is my math right about 18 years or so?

2  A.    Actually it was about 20.

3  Q.    Okay.  From 1993 to March 2015?  Good gosh, my math is bad.

4  It's 22 years.

5  A.    Twenty-two years, yes.

6  Q.    You're not much better.

7  A.    I was trusting you.

8  Q.    So 22 years with Condon Companies.  And apparently there

9  was kind of a litany of different Condon companies; correct?

10  A.    Yes.

11  Q.    All right.  And you were you ultimately -- I mean, as you

12  kind of moved up, you ultimately became -- at the very bottom I

13  see you were the chief financial officer?

14  A.    That's correct.

15  Q.    And what did you do when you were at Condon Companies?

16  A.    I was responsible for all of the accounting functions and

17  financial needs of the company.

18  Q.    And of those various Condon companies, what was the primary

19  Condon company if you will?

20  A.    The primary one was the -- Condon Auto Sales and Service

21  was the primary company.

22  Q.    And what did they do?

23  A.    It was a franchised Honda, Buick, and at one time Isuzu

24  dealership.

25  Q.    In Sioux City?

```
 1   A.    Here in Sioux City, yes.
 2   Q.    And you have an accounting degree if we went to the next
 3   page.  We'll save the jury a look at the second page of your
 4   résumé, but if we did, where would it show you went to college?
 5   A.    Briar Cliff University.
 6   Q.    That's here in Sioux City?
 7   A.    In Sioux City.
 8   Q.    And when did you graduate from there?
 9   A.    1984.
10   Q.    Okay.  With what degree?
11   A.    A bachelor of arts in accounting.
12   Q.    And what were you hired to do here?
13   A.    I was hired to give my opinion on the due diligence that
14   would be done if you were going to loan funds to a car
15   dealership.
16   Q.    And in this -- did you specifically look at Mr. Lucken, or
17   did you look at Heritage?  What are you talking about that you
18   looked at?
19   A.    What was the question?
20   Q.    In terms of the loan, were you looking at Heritage, or were
21   you looking at --
22   A.    I was looking at Mr. Lucken's loan.
23   Q.    Okay.
24   A.    What if I was in that position advising that, how I would
25   look at that Dirks Motor Companies to see about loaning them the
```

1 500,000.

2 Q.   And I'm just going to put up the first page of Exhibit 106

3 which is a number of -- and we can blow that up a little bit.

4 We talked about that when I had Mr. Lucken on the witness stand.

5 And that was just one of a number of balance sheets of

6 Mr. Lucken's various entities.  Have you seen that?

7 A.   Yes, I have.

8 Q.   What specifically have you reviewed in this case in order

9 to deliver the opinions you're going to deliver today?

10 A.   Well, what I specifically looked at, I looked at the -- I

11 briefly looked at Mr. Lucken's financial statements and saw that

12 he had -- you know, it's an -- impressive businesses that he's

13 had.  He's been very successful according to these financial

14 statements, and I looked at that just to see what kind of net

15 worth he had and the ability to loan that type of money.  And

16 then I then moved on to analyzing Dirks Motor Company and to see

17 what their -- what their financial position was.

18 Q.   What did -- when we looked at just that first page of 106,

19 his first balance sheet, what does that show to you other than

20 he's got, you said, a significant net worth?  But beyond that,

21 what if -- what relevance does that have to you?

22 A.   Well, also he -- it was the fact that he had that kind

23 of -- was that organized with his businesses.  That was -- what

24 I do a lot -- what I do is go to businesses and get them that

25 organized.  And it appeared from his statements that he has some

1  sophisticated accounting procedures set in place where he's

2  producing those statements so he can manage his businesses that

3  he has.

4  Q.   What else did you look at besides Mr. Lucken's financial

5  statements?

6  A.   I looked at Dirk Motor Company's income tax returns.

7  Q.   Do you recall for what years?

8  A.   They were from 2007 to 2010.

9  Q.   And what did you -- what did you deduce from looking at the

10 2008 through 2010 Dirks Motors' tax returns?

11 A.   Well, he had -- Dirks Motor showed consistent losses over

12 that 4-year period that accumulated to 1.1 million in losses

13 during that time frame.

14 Q.   And did you reach any conclusion from reviewing those tax

15 returns other than what you've just said?

16 A.   Well, I looked a little further.  I kind of looked at the

17 retained -- the balance sheet that was on the income tax return,

18 looked at the net worth of the company, and that -- that was --

19 up until 2010, it was showing a 1.4 million net -- negative net

20 worth, so technically on the books of the bank the company was

21 bankrupt.

22 Q.   And based upon that did you -- are there advice or --

23 strike that.

24         What would you have advised Mr. Lucken to do given

25 that there's been testimony about his loan of $500,000 to

1  Mr. Dirks?  What would you have advised him to do to help make
2  him -- help him make that decision?
3  A.    Well, I would have focused in on the ability of Dirks Motor
4  Companies to be able to repay the $500,000 that he was going to
5  loan them because that's pretty much -- when you're looking at
6  lending to someone, you want to make sure that they have the
7  ability to repay you.  And judging from those income tax returns
8  that were there, he was not -- it was -- he had over $600,000 in
9  negative cash flow meaning he wasn't meeting his obligations.
10 He showed consistent losses.  I didn't see a way that Mr. Lucken
11 could possibly expect him to pay this off based on those
12 documents.
13 Q.    Did you see any due diligence on Mr. Lucken's part prior to
14 the first payment to Ford Motor Credit of 250,000?  Well, it was
15 about 224,000, and then another 26 or so went to Dirks, but it
16 totaled 250,000.  Did you see any due diligence of Mr. Lucken
17 prior to those -- that use of his 250,000?
18 A.    No, I didn't see any evidence of any.
19 Q.    Did you see any due diligence exercised by Mr. Lucken prior
20 to his loan from Heritage Bank that resulted in a promissory
21 note of 250,000?
22 A.    No, I didn't see anything.
23 Q.    Did Mr. Lucken formalize his loan to Mr. Dirks with any
24 documents?
25 A.    No, not any doc -- I did not see any documents that spelled

1    out the terms and conditions of the loans.

2    Q.    And is that something you would normally advise or not?

3    A.    Yes.  I would -- it should be reduced to writing, would

4    be -- is a typical process to do that so everyone knows the

5    terms and conditions, when the payment's going to be happening,

6    if there's going to be payments, just what's the interest rate,

7    all those things.

8    Q.    And in this case there's been -- we've shown several times

9    in Exhibit 117 which shows that Mr. Lucken received statements

10   from the bank on a monthly basis on this line of credit.  What

11   would that have shown you once you -- once Mr. Lucken did take

12   the line of credit out?

13   A.    That was showing the loan balance that was set up at

14   Heritage Bank.  It was showing that.  It was showing the

15   payments to date.  It was showing the -- that -- if it was

16   current or not, how much interest was being paid, and really the

17   key thing is the balance.  That way you'd know if the balance is

18   fluctuating up and down, if there's being payments made down on

19   the line of -- on the loan, or it has all the financial

20   information that would help you monitor what's happening between

21   the bank and if -- and Dirks.

22   Q.    How long did it take you -- once you looked at these tax

23   returns and Mr. Lucken's financial statements, how long did it

24   take you to get a grasp upon this matter and decide whether or

25   not -- or be able to advise Mr. Lucken on whether or not he

```
 1  should have undertaken this loan?
 2  A.    It was pretty apparent right away, I mean, once I had the
 3  statements from the tax returns pulled together, did a quick
 4  little spreadsheet just to see where the -- you know, where the
 5  values were in the company.  I looked at the balance sheet first
 6  which is just to see what kind of worth the business had and
 7  then moved on to the income statement.  And I would say probably
 8  within half hour, 45 minutes I thought this is not going to be a
 9  good thing if I was advising someone based -- to have an
10  unsecured loan of any type to them.
11  Q.    So once you got done, can you state with a reasonable
12  degree of certainty what your conclusions are regarding
13  Mr. Lucken's actions in this case relative to loaning the money
14  to Dirks?
15  A.    Yes.
16  Q.    Can you state that?
17  A.    Oh.  Yeah.  That I would advise against it.  I think it'd
18  be highly unlikely that the company would have the ability to
19  pay the money back.
20            MR. REINSCHMIDT:  That's all I have, Your Honor.
21            THE COURT:  Thank you, Mr. Reinschmidt.
22            Mr. Thompson?
23            MR. THOMPSON:  Yes, Your Honor.
24                        CROSS-EXAMINATION
25  BY MR. THOMPSON:
```

```
1   Q.   Good afternoon, Mr. Welte.
2   A.   Hi.
3   Q.   I see you have a manila folder.  Do you have your report
4   that you prepared?
5   A.   Yes, I do.
6   Q.   That's not an exhibit, but I might have you refer to that,
7   so if you can get that ready.
8   A.   Okay.
9   Q.   Do you know John Lucken at all?
10  A.   Just from attending some depositions.  No, I don't
11  personally know him, no.
12  Q.   And Dick Dirks, do you know him at all?
13  A.   I knew of him just from the car business.
14  Q.   I was going to ask you that too.  Had you ever bought -- if
15  you're at Condon Auto, I'm assuming not, but had you ever bought
16  at Dirks Motors?
17  A.   No, I did not.
18  Q.   I've looked at your report, and it's -- as I would say,
19  it's in three sections.  You have observations that kind of set
20  out the facts as you understood them, the analysis that you
21  talked about today, and then your opinions.  Is that generally
22  the structure?
23  A.   Sure.  Yes.
24  Q.   And I'm going to focus on your observations in your report.
25  A.   Okay.
```

1  Q.   First of all, did you put these observations, these facts,

2  this timeline together yourself, or did someone help you with

3  that?

4  A.   I did this myself.

5  Q.   And did you do this by looking at documents?

6  A.   Yes.

7  Q.   Depositions?

8  A.   Yes.  I'd updated it after I had gone back and found out

9  some additional information after depositions, yeah.

10  Q.   Sure.  One of your -- your first date for a bullet point

11  that you have is November 17, 2011, as you say when the Lucken

12  trust loaned 250,000 to Dirks Motor; correct?

13  A.   Correct, uh-huh.

14  Q.   And you call it a loan; correct?

15  A.   Yes.

16  Q.   It was not an equity investment of capital that he

17  provided; right?

18  A.   No.

19  Q.   And you understood that.

20  A.   Yes.

21  Q.   What I would like to know is, for example, I think there's

22  been testimony that Dick Dirks and John Lucken met on or about

23  November 3 of 2011 and discussed floor plan financing.  That's

24  not in your report, is it?

25  A.   No.

1   Q.   And Mr. Lucken took notes at that meeting and was also

2   provided financial information by Mr. Dirks at that meeting.

3   Were you aware of that?

4   A.   I have seen -- I've seen as -- exhibits are part of the

5   discovery.

6   Q.   And on that Exhibit 30 that has kind of the balance sheet

7   information or at least the assets of Dirks Motors, do you

8   recall that?

9   A.   Not Number 30.  I'd have to look at that.

10          MR. THOMPSON:  Let's put Exhibit 30 up.  That's fair.

11  And the second page.

12  A.   Yes, I've seen that.

13  Q.   And I want to focus on the top portion.  You've seen those

14  numbers before?

15  A.   Yes.

16  Q.   And when you wrote your report, did you understand that

17  this is the information that John Lucken and Dick Dirks

18  discussed on November 3, 2011?

19  A.   I understand that that was discussed, yes, uh-huh.

20  Q.   And did you understand that as part of that discussion John

21  Lucken talked about all of those assets with Mr. Dirks?

22  A.   Yes.

23  Q.   And that he even asked about the life insurance to see if

24  he could get an assignment to be in a second position.

25  A.   Yes, I found that out through the deposition -- I

1   understood this exhibit after I sat through the deposition.

2   Originally when I saw it, I didn't quite understand it.

3   Q.   Be a little hard just taking a look at it.  And then on the

4   second page it outlines a couple of conditions.  Well, first of

5   all, has that second assignment of the life insurance policy I

6   mentioned.  Then it's got 225,000 to Ford, 250 to CD, then the

7   balance, 24,000 to Dirks Motors.  Did you understand those were

8   the conditions that were discussed?

9   A.   I understand that that was how the money was going to flow.

10  I wasn't aware of any conditions from this document that tied to

11  it.

12  Q.   How about from the depositions of John Lucken and Dick

13  Dirks?  You've read those.

14  A.   Yes.

15  Q.   And they both say that these were the two conditions that

16  the bank wanted in order to get floor plan financing.  Did you

17  understand that from their depositions?

18  A.   Yes.  That would have to happen for them to be able -- for

19  the bank to be able to do that.

20  Q.   But you didn't put that in your report.

21  A.   No.

22  Q.   I also noticed in your report you didn't have the meeting

23  that took place on November 8, 2011, between Mr. Dirks,

24  Mr. Lucken but also Mr. Crim at the bank.  You didn't put that

25  in your report, did you?

1    A.    And what meeting was -- when they --

2    Q.    This is the meeting where Mr. Crim said in effect, yes, if

3    those two conditions are met that we just talked about on

4    Exhibit 30, the bank will provide floor plan financing.

5    A.    Well, my understanding was the bank would facilitate the

6    floor plan financing, is really not provide it because they

7    actually had a loan with -- eventually with Mr. Lucken for the

8    floor plan.

9    Q.    And I'm going to ask you to make an assumption.  If both

10   Mr. Lucken and Mr. Dirks have testified in court here that

11   Mr. Crim said at that meeting that the bank would provide floor

12   plan financing, is that different than you understood?

13   A.    Well, it'd have to be in what context they're talking about

14   that because for them -- you kind of have to understand how

15   floor plan financing works in the auto business because that's a

16   very broad term I think without knowing the specifics of it.

17   Q.    Would you expect a banker to make that clear if that term

18   can be misunderstood to someone like Mr. Dirks and Mr. Lucken?

19   A.    I think Mr. Dirks totally understood what the floor plan

20   thing was.

21   Q.    How about Mr. Lucken?  Should the banker have made him

22   clear what the banker meant by floor plan financing?

23   A.    I really can't answer that question.

24   Q.    If Mr. Lucken's understanding was that the bank was going

25   to provide floor plan financing and that his CD was only going

1  to be backup collateral, do you think that would be reasonable

2  for him not to get a security interest in the vehicles?

3  A.    No, I don't think that would be reasonable.

4  Q.    Now, on floor plan financing as I understand it, the dealer

5  buys cars from a manufacturer with funds provided by a lender.

6  A.    Yes, yeah, basically.

7  Q.    And a lender may be Ford Motor Credit, or it may be a

8  separate bank.

9  A.    Correct.

10  Q.    And the way it's supposed to work is in effect the lender,

11  whether it's Ford Motor Credit, let's say, or a bank has a lien

12  on those vehicles.  And as they're sold, the proceeds from those

13  sales by the dealer should go to pay back the floor plan

14  financing; correct?

15  A.    Correct.

16  Q.    And as long as the price for the vehicles is at least as

17  much as the dealer paid and the dealer provides those funds to

18  the lender, the lender's going to be made whole; correct?

19  A.    Yes.

20  Q.    And if that's the case, if John Lucken's understanding was

21  all he was doing was putting up a CD that would be backup

22  collateral to that floor plan, it'd be reasonable for him to

23  think as long as the cars are sold at least at the price they're

24  bought and the monies are paid to the lender my CD should never

25  be drawn upon or needed.

1    A.   I don't think -- that's if you don't understand the car
2    business.  I mean, it doesn't quite work -- that's in the
3    perfect scenario you just gave there.  But if there's a
4    trade-in, for example, you wouldn't have the cash to pay off the
5    loan on the new vehicle that you sold.  So, you know, there is a
6    risk there for it.  So you have to have adequate working capital
7    to be able to handle all that.  So, you know, it's more
8    complicated than that.
9    Q.   And I appreciate that.  Let's just -- but if we're just
10   talking about new vehicles in a floor plan and the dealer once
11   again gets at least as much as the dealer paid for the vehicle
12   and when the vehicle's sold pays that back, in a perfect world
13   that should -- that should work.
14   A.   It should in a perfect world, but the dealer has the
15   obligation to pay it back.
16   Q.   I understand.  And would it also be reasonable for someone
17   like John Lucken if he was told the bank was going to provide
18   floor plan financing to Dirks Motors for him to think in effect,
19   well, if the bank's already vetted this, in other words, if the
20   bank's already done its due diligence and they're going to
21   provide a floor plan financing and I'm just providing a CD as
22   backup collateral, that's okay for me?
23   A.   Well, Mr. Lucken knew about him being out of trust with
24   Ford Motor Credit, so I don't think you can make that assumption
25   because you -- because that didn't happen with Ford Motor Credit

1    so that it would happen with Heritage.  I mean, from what he was

2    told where the position -- the reason Mr. Dirks approached him

3    was because he was out of trust with Ford Motor Credit and

4    hadn't been paying it which means that he was struggling with

5    his regular business is what was really happening, and the

6    financial statements indicate that.

7          And so to a -- again, to assume that without doing any

8    research on your part, to do some vetting, the bank didn't have

9    any obligation.  That was an assumption he's making is that,

10   well, if they vetted it, this must be okay.  But, you know, not

11   being involved in that conversation, generally an investor or a

12   lender, they're looking out for themselves to say, okay, I'm

13   going to do my own vetting, check this out at a minimum amount.

14   I'm not saying he had to really bear down into it, but there

15   should have been some record of vetting that Dirks does have the

16   ability to pay these loans back.

17   Q.   Let me ask the question maybe a little differently.

18   A.   Okay.

19   Q.   That -- I want you to assume that the bank was going to

20   provide floor plan financing to Dirks Motors which would you

21   agree with me that if that was going to happen then you would

22   expect the bank to have done its due diligence before it decided

23   to make the floor plan loan?

24   A.   Not in this scenario because they had the collaterals.  The

25   bank had no risk.  They were requiring the collateral for the

1  loan, so the bank had no risk involved.  And for them to want

2  that, that's telling me that maybe they did do their vetting and

3  they didn't want to take that risk and have that 250 out there

4  for Dirks to pay back.

5  Q.    Let's take it out of the context of Heritage and Dirks

6  Motors and just talk about a general floor plan financing.

7  A.    Okay.

8  Q.    If a bank is going to provide floor plan financing to a

9  dealer, the bank is going to do due diligence before it makes

10  that commitment.

11  A.    Yes.

12  Q.    And if the bank does that due diligence and if this floor

13  plan works in the manner we've talked about, that is, sales come

14  in, the proceeds are applied, the bank's paid, it would be

15  reasonable for somebody who was putting up a CD as backup

16  collateral to believe and rely on that, well, if the bank's

17  already done the due diligence and the bank should get paid out

18  of the sales, I don't need to do my own due diligence because

19  that CD should be safe.

20  A.    Then why do you need the CD?  That's where I'm -- that

21  logic I'm having a hard time following because if the financial

22  strength was there in the company, you wouldn't need the CD as

23  collateral to back it up.

24        MR. THOMPSON:  I'd like to look at Exhibit 50 and

25  second page, please.

1  Q.   I think we've all agreed that this date is January 18,

2  2012.

3  A.   Yes.

4  Q.   And in your report in the middle of the first page, I think

5  you say on January 18, 2012, J.E.L. -- and that would be the

6  initials for John Lucken?

7  A.   That's the trust.  That's who actually was -- yes, the

8  J.E.L. was the trust.

9  Q.   On January 18, 2012, J.E.L. signed a letter acknowledging

10 it established a secured line of credit with Heritage Bank.  I'm

11 going to stop right there.  Was it -- when you looked at Exhibit

12 50, is that how you determined that John Lucken signed that

13 letter on January 8, 2012?

14 A.   Yes, I looked at -- yes.

15 Q.   And you would be someone with sophistication and expertise

16 in these matters, and you're reviewing this file.  And as you

17 look through the documentation, you see, okay, Lucken signed

18 this on January 18, 2012, and then the next day is when they

19 signed the assignment of the CD and the line of credit; correct?

20 A.   Correct.

21 Q.   And that's even what your report says happened; correct?

22 A.   Yes.

23 Q.   If the evidence showed that John Lucken signed that on

24 January 23, 2012, your report would not be accurate on that

25 point, would it?

```
 1   A.   What date?  I'm sorry.
 2   Q.   January 23, 2012.
 3   A.   Well, I went off the documentation is what I -- you know, I
 4   don't know when he actually physically signed it.  There is no
 5   signature date.  That's the date of the document so . . .
 6   Q.   I believe you were asked about the monthly statements.
 7   A.   Yes.
 8   Q.   And did you understand from your review of Mr. Lucken's
 9   deposition that he did look at those statements initially and
10   then would pass them on to the Dirkses?
11   A.   Yeah.  I'm not real clear on -- I know he got them and
12   passed them on.
13   Q.   Now, if we go back to Exhibit 50 on the --
14        MR. THOMPSON:  Yep, that page.  If you could, yeah,
15   blow that up.  Thank you.
16   Q.   I think the letter says it and so does your report that in
17   effect when Lucken signed the letter on the secured line of
18   credit the purpose of providing the funding was for the purchase
19   of inventory for Dirks Motor Company; correct?
20   A.   The primary purpose was, yeah.
21   Q.   Well, let's talk a little bit about that.  What does the
22   first sentence say?
23   A.   That he's established a secured line of credit for the
24   purpose of funding the purchase of inventory.
25   Q.   And that's exactly what your report says, doesn't it?
```

1  A.   Yes.

2  Q.   Your report doesn't mention anything about primary purpose,

3  does it?

4  A.   No.

5  Q.   Let's go to Exhibit 239 which is the line of credit.  Let's

6  go to the bottom right-hand corner.  Do you see where it says

7  purpose?

8  A.   Yes.

9  Q.   It does not say for the purpose of purchasing inventory for

10 Dirks Motors, does it?

11 A.   No.

12 Q.   It says the purpose is for operating expenses; right?

13 A.   That's what it says, yes.

14 Q.   And would you agree with me that operating expenses is a

15 broader term than just purchasing inventory?

16        MR. REINSCHMIDT:  Your Honor, I'm going to object.  I

17 think it's beyond the scope of direct.

18        THE COURT:  Sustained.

19 BY MR. THOMPSON:

20 Q.   When a lender prepares documentation, should the lender do

21 it properly?

22 A.   Yes.

23 Q.   And have you purchased a home before?

24 A.   Yes.

25 Q.   And you've gone to a closing?

1  A.   Yes.

2  Q.   And there's usually a lot of documents to sign.

3  A.   Yes.

4  Q.   And do you always read all through every document before

5  you sign?

6  A.   I have read quite a few of them actually, but that's the

7  accountant in me so . . .

8  Q.   Are you aware from your experience that some people don't

9  read every single thing and trust the lender to prepare it at

10  least based on what they discussed?

11  A.   Yes.

12         MR. THOMPSON:  Nothing further.

13         THE COURT:  Thank you, Mr. Thompson.

14         Mr. Reinschmidt?

15                    REDIRECT EXAMINATION

16  BY MR. REINSCHMIDT:

17  Q.   Mr. Welte, when you sign the documents involved in a

18  mortgage for your home, how many documents does that typically

19  encompass?

20  A.   Oh, it's quite a few documents.  Boy, any more it seems

21  like it's more and more every time you go do it and --

22  Q.   And -- go ahead.

23  A.   It's quite a few.

24  Q.   In this case on January 19, 2012, when Mr. Lucken executed

25  documents with the bank, how many documents did he sign?

```
 1   A.   Looks to me like it might have been three maybe.  On the

 2   12th?  Well, they're dated --

 3   Q.   On the 19th.

 4   A.   Excuse me.  On the 19th.  One document.

 5   Q.   What was that?

 6   A.   The loan agreement.

 7   Q.   Okay.  The promissory note?

 8   A.   Yes.

 9   Q.   And then also I do believe there was another one where he

10   signed an assignment of CD on that same day?

11           MR. THOMPSON:  Objection.  Leading, Your Honor.

12           MR. REINSCHMIDT:  I'll withdraw it, Your Honor.

13   BY MR. REINSCHMIDT:

14   Q.   Did he -- I'll just put it up for you, Exhibit 48.  I'm

15   just -- my paralegal just helpfully highlighted the date for us.

16   And when is that signed?

17   A.   The same day.

18   Q.   And that is -- what does this document purport to do?

19   A.   This one here is where he assigned the certificate of

20   deposit for 250,000, very -- right under that date, that

21   paragraph there where it says assignment of deposit and shares.

22   Q.   Other than this document you've just looked at now, Exhibit

23   48, and Exhibit 46 which was the promissory note, do you

24   recollect that Mr. Lucken signed any other documents relative to

25   this loan with Heritage Bank?
```

1  A.   Not to my knowledge.

2  Q.   And I think as you were talking with Mr. Thompson about car

3  deals, the perfect world is where, if I understood you

4  correctly -- what is the perfect world in terms of -- in terms

5  of floor planning and a person buying a car?

6  A.   Well, a perfect world is that they come in and they are a

7  cash buyer and they write you a check for the vehicle, you can

8  deposit the check, you turn around, and you pay off your floor

9  plan source, and you keep the profits.

10  Q.   And how often does that happen?

11  A.   Most of your deals anymore are financed.  There's a lot

12  more to it.  There's trade-ins.  It's usually a little more

13  complicated than that.

14  Q.   So it's not always if you owe 20,000 on the car you get

15  cash of 20,000 when that person buys that car.

16  A.   Right, that's correct, because you could have it where --

17  the trade-in is what really -- the -- the car business is a very

18  cash-intensive business.  You need a lot of cash to operate one

19  or a floor plan line to be able to operate it because you get

20  trade-ins.  In our example there, if it was a $30,000 vehicle,

21  you sold it for 30,000 and you owed 27 on the vehicle that you

22  sold, you need -- you'd get the 30,000 in, and you'd have

23  $27,000 to pay off the lender.  But if you took a $10,000

24  trade-in so if you had the thirty thou -- you're only going to

25  get $20,000 worth of cash from the buyer, and so you have to

```
 1   come up -- but you need to pay off the lender at 27, so you
 2   need -- you have a cash requirement of $7,000.  You need to
 3   honor your commitment to the floor plan lender to pay them off.
 4   Q.   By the way, Mr. Thompson was talking to you.  A lot of his
 5   focus was about that second 250 and what would have been fair or
 6   reasonable for Mr. Lucken to do relative to that second 250.  On
 7   the first 250 where he paid off Ford Motor Credit, what
 8   collateral did he have there?
 9   A.   There was no collateral because Dirks had sold the
10   vehicles, kept the money, and didn't pay off Ford Motor Credit.
11   Q.   So if Mr. Dirks in this -- if it had been a perfect world
12   for Mr. Dirks and he had gotten paid cash for a car and paid it
13   back to that credit line of Mr. Lucken's, then Mr. Lucken
14   wouldn't have been out any money.  Am I correct in that?
15   A.   Yes.
16   Q.   But it didn't work out that way.
17   A.   No, because I believe even at the end there were no cars
18   to -- left over when he was out of -- when he was out of
19   business.  I don't believe there was any vehicles left to pay
20   off the promissory note, the 250,000.
21           MR. REINSCHMIDT:  That's all I have, Your Honor.
22           THE COURT:  Thank you.
23           Mr. Thompson, anything else?
24           MR. THOMPSON:  Nothing further.
25           THE COURT:  Okay.  Do we have any questions from the
```

1   jurors for Mr. Welte?  Okay.  I don't see any.  Thank you.

2   You're excused.

3            Everybody can take a stretch break.

4            And do you have another witness to call,

5   Mr. Reinschmidt?

6            MR. REINSCHMIDT:  Mr. Harbison.

7            THE COURT:  Okay.  Thank you.  Good afternoon.  Would

8   you raise your right hand, please.

9             THOMAS HARBISON, DEFENDANTS' WITNESS, SWORN

10           THE COURT:  Thank you.  Please be seated in the

11  witness box there.  You can adjust the chair and the two

12  microphones so you can speak directly into the microphones.  And

13  when you're ready, would you tell us your first and last name

14  and spell your last name, please.

15           THE WITNESS:  My first name is Thomas, T-h-o-m-a-s.

16  My last name is Harbison, H-a-r-b-i-s-o-n.

17           THE COURT:  Thank you.

18           Mr. Reinschmidt?

19           MR. REINSCHMIDT:  Thank you, Your Honor.

20                      DIRECT EXAMINATION

21  BY MR. REINSCHMIDT:

22  Q.   Mr. Harbison, can you hear me?

23  A.   Yes, I can.

24  Q.   Okay.  And I'm not sure if you've slid up enough so we can

25  hear you well in those microphones.

1  A.    Can you hear me better now?

2  Q.    I do, so hopefully everybody else does too.

3  A.    Okay.

4  Q.    Can you just tell me a little bit about your background in

5  terms of where'd you graduate from college?

6  A.    Sure.  I actually grew up in Arkansas, and I went to school

7  at Oklahoma State.  And then from there I went into -- my first

8  job was with the Chicago Mercantile Exchange.  And from there I

9  went into banking for pretty much all the rest of my career with

10  the exception of the last half of it which was with the Small

11  Business Administration.  And I retired from them in December of

12  2010.

13         And then a good friend of mine started a little

14  company called HL Lender Resources of which we are still doing,

15  and we package SBA loans for lenders, for borrowers or

16  businesses, and we help the lender if they're in liquidation, or

17  we even do some training.

18  Q.    That's a lot of explanation.  Thank you.  I appreciate

19  that.  Can I just ask you what year you graduated from college?

20  A.    1969.

21  Q.    And did you go to the service then or no?

22  A.    Yes.  I went to graduate school for a couple of years

23  there, and then I went to the service and was only in the

24  service for -- active service for three months.  They had a

25  program at the end of Vietnam called Active Duty For Training,

1   and I didn't want to make a career of the service.  So I stayed

2   in the reserves for eight years.

3   Q.   And so let's -- so the banking, were you with a pri --

4   private banking before you ended up with the SBA?

5   A.   Yes.  I started off with a bank in Chicago.  And there I

6   went to some finance company.  They were all agricultural

7   oriented.  And then I went with SBA -- before I went with SBA, I

8   worked for Farmers Hybrid Companies here in Iowa, which was a

9   hybrid breeding stock company, in finance with them.  And then

10  from there I went to Wells Fargo, and from there I went to the

11  SBA.

12  Q.   Let's just look briefly at Exhibit 1034 which is your

13  résumé.

14  A.   Yes.

15  Q.   And I see that from -- well, and actually it's a little out

16  of order.  You've got -- on the very bottom you've got 1985 to

17  1990 you mentioned with Farmer Hybrid.  But then if you go

18  nearly to the top you have 1990 to 2002 business development

19  specialist.  Whom was that with?

20  A.   With the Small Business Administration.

21  Q.   So this one here's with the SBA that I put a check by?

22  A.   Yes.

23  Q.   And then when I see then lead business development

24  specialist, 2002 to 2006, that's also the SBA?

25  A.   Yes.

```
1   Q.   And then finally the last one's obvious because you say it
2   right there.  You became deputy district director of the SBA?
3   A.   That's correct.
4   Q.   I'll just ask you a little bit about each of those roles
5   you played at SBA.  But just going to the last one, the deputy
6   district director -- oh, I don't know if we use a command
7   structure -- what layer of command were you at?  Were you --
8   A.   When I was the deputy district director?
9   Q.   Yes.
10  A.   I was the second in charge of the Iowa -- actually it was
11  the Des Moines district which covered about two-thirds of the
12  state.
13  Q.   Okay.  Okay.  And when you -- now let's just go back to the
14  very first one.
15              MR. REINSCHMIDT:  No, leave it up, please.
16  Q.   When you go back to this very first one right here,
17  business development specialist, what did that consist of doing
18  for the SBA?
19  A.   That was both working with loans and also marketing
20  services of the SBA, and I -- it was primarily to lenders, and
21  we also did a lot of training through a number of economic
22  development groups like the Chamber of Commerce, the Iowa --
23  Iowa Economic Development Agency.
24  Q.   Now, sometimes these SBA loan guarantees are sometimes
25  loosely called SBA loans.  In this -- are there SBA loans, and
```

1  are there SBA loan guarantees?

2  A.   There are only SBA loan guarantees.

3  Q.   So if I forget to add the word guarantee, it is a

4  guarantee.

5  A.   Yes.

6  Q.   Did you -- so when you're dealing with -- I'll just call it

7  the guarantees to shorten my phrase.  If you're dealing with

8  guarn -- were you dealing with guarantees then as a business

9  development specialist?

10 A.   Yes.

11 Q.   And then when you became a lead business development

12 specialist, what was the distinction between that and your prior

13 job?

14 A.   It was a step up gradewise.  I did basically the same kinds

15 of things that I did as a development specialist.  Lead

16 development was just a title.  I didn't have anybody that I

17 managed underneath me.

18 Q.   And then under -- then once you became deputy district

19 director, when you became deputy district director, you list

20 about five bullet points I can see there of things that you did.

21 Did you still work with SBA loan guarantees at that point?

22 A.   Yes, I did.  It was basically through a number of other

23 loan officers or business development specialists that they had.

24 Q.   Were you familiar with -- and we'll come back to this in a

25 minute in terms of the actual documents.  But I just want to

1  quickly have you look at Exhibit 11 and tell me when you look at

2  Exhibit 11 which is the loan authorization guarantee in this

3  case, is that -- is that a form that you were familiar with in

4  that period of time from -- well, that entire period of time

5  that you were at SBA?

6  A.   Yes.

7  Q.   Did those -- I can't remember the -- just tell me the total

8  dates you were at SBA from the beginning to the end.

9  A.   I came to SBA in 1990, and I retired in 2010.

10  Q.   That sure makes it easy.  Twenty years.  Okay.  Good.

11  Twenty years.  So in those 20 years that you were at SBA, did --

12  these documents, these authorization documents, did they change

13  during that period of time?

14  A.   Very little.  The only change that you typically saw in

15  those were the names of the borrowers and the interest rates.

16  Can I say something about the S -- the loan authorization?

17  Q.   Sure.

18  A.   The loan authorization in SBA is the document that mandates

19  everything that's done on a loan.  Every loan has a loan

20  authorization.  And that dictates how that loan would be

21  handled, structured, all of that.

22  Q.   And what's the level of input and interaction between an

23  individual at the SBA and a lender in terms of looking at a loan

24  and putting a loan guarantee into place?

25  A.   Yeah.  The lender has to request an SBA guarantee, and

1    that's the basis of the interaction.

2    Q.   Once that starts, is there interaction back and forth in

3    terms of understanding collateral, liabilities, and those

4    things?

5    A.   Of course.  There's a whole application that was sent in

6    when they initially requested the loan.

7    Q.   All right.  I want you to look for a minute -- we'll come

8    back to Exhibit 11, but for now -- for now I just want you to

9    look at Exhibit 17, and we'll just go to the first page of it so

10   you can understand what document I'm having you look at.

11           MR. REINSCHMIDT:  And actually what I'll do is have

12   you go to page 2, Ms. Liston, of Exhibit 17.

13   Q.   What is that?

14   A.   This is the note.  It's created when a loan is made.

15   Q.   So the Exhibit 11 was the authorization.  That's where SBA

16   authorizes a certain amount of monies?

17   A.   Yes.

18   Q.   And then 17 that we're looking at now, that's where the --

19   is that the lender who signs that or the borrower?

20   A.   The borrower.

21   Q.   Okay.  So if we go to the -- I presume if we go to the last

22   page on Exhibit 17 --

23           MR. REINSCHMIDT:  And maybe blow that up, Ms. Liston.

24   Q.   -- that shows both the Dirks sons signed it, Richard and

25   David, and then Dick Dirks Senior signed it as well; correct?

1   A.   Yes.

2   Q.   If we go to the prior page, Exhibit 7 -- excuse me, Exhibit

3   17, page 6, and that says what is the -- does that -- well, tell

4   me what that states.  What is that about?  What does that

5   section exist for?

6   A.   This lists the fact that part of the documentation is the

7   personal guarantees of people that are mentioned there and an

8   assignment of accounts.

9   Q.   Well, first it lists -- it lists real estate; correct?

10  A.   Yes.

11  Q.   And then it lists -- you said assignment of accounts.  And

12  then it lists death benefit and cash value; correct?

13  A.   Yes.

14  Q.   Are you aware whether there are also CDs after looking at

15  the documentation that also appeared as collateral for this

16  loan?

17  A.   Yes.

18  Q.   Are you aware that under the section -- well, let's just --

19  we'll go to it.  Under Exhibit 11, page 4 --

20       MR. REINSCHMIDT:  And actually just go down to the

21  bottom under collateral conditions.  And go ahead and highlight

22  number 2.

23  Q.   Just so we don't have to pop back to the first page, I'll

24  tell you this is Exhibit 11, the authorization, the SBA

25  authorization for the Dirks Motors.

1   A.   Yes.

2   Q.   This says that one of the conditions, one of the collateral

3   conditions, is that the lender must have a hundred percent

4   perfected security interest in the following, and it lists

5   equipment, inventory, accounts, instruments, chattel papers, and

6   general intangibles.  Do you see that?

7   A.   Yes.

8   Q.   In this case Dirks Motors was a car dealer, a car

9   dealership.  Did you see whether the property of cars and parts

10  were listed as personal property for this loan?

11  A.   No.

12  Q.   Did that -- with your background and experience with the

13  SBA, did that cause the lender to violate that provision?

14  A.   No.

15  Q.   And what is the basis of your opinion that that did not

16  violate that?

17  A.   When we loan money to an auto dealership, the cars and that

18  type of inventory is financed by floor planning.  SBA has never

19  done floor planning.  And so this loan is not a floor plan loan.

20  Q.   And I just want to make sure the jury's clear.  What is the

21  significance of the fact that SBA's never done floor plan

22  loaning, lending?

23  A.   The reason they didn't do it is it's too -- I want to say

24  time consuming.  It's too much of a problem because of the fact

25  that you've got cars coming in or trucks or whatever they are

1  coming in and going out every day, and SBA would have had to

2  have been there to sign off on all of that.

3  Q.  Do you recall in your time at the SBA, have you ever dealt

4  with a car dealership loan guarantee?

5  A.  Yes.

6  Q.  And can you tell us about that?

7  A.  It was a car dealership.  I don't remember what kind of a

8  dealership.  But they had cars, and they were financed on a

9  floor plan, I believe, by whichever car maker they had.  I don't

10  remember specifically what it was.  And we had the same kind of

11  agreement with them as is here because we were finance -- in

12  fact, we financed real estate.  We financed some parts -- parts

13  is never a big part of that -- and the other sorts of things

14  like that.

15  Q.  In that case was -- the lender who had the SBA loan

16  guarantee, were they in a second position to the floor plan on

17  the -- whether it was cars or computers, whatever it was that

18  that -- or I think you said it was cars.  Were they in second

19  position to that car dealer's floor planner?

20  A.  Yes.

21  Q.  Do you recall in that case was the same document, this 7(a)

22  authorization, used in that case?

23  A.  Yes.

24  Q.  By the way, if we go to the very first page of Exhibit 11

25  and blow that up just a bit --

      1          MR. REINSCHMIDT:  Maybe if you could just blow that up

      2    a bit more.

      3    Q.    All right.  And the first thing I wanted to ask you about

      4    is this, and I've talked to a couple other witnesses about this.

      5    But do you know -- were you familiar while you were still there

      6    in 2010 with this law that Congress passed, the American

      7    Recovery and Reinvestment Act of 2009, that's in paragraph A on

      8    the first page of Exhibit 11?

      9    A.    Yes.

     10    Q.    And what was the -- I'm not going to repeat that law.  Just

     11    what was that law?  What was it about?  What was the purpose of

     12    it?  I'm looking right here.

     13    A.    Yeah.  Uh-huh.

     14    Q.    Do you recall what the purpose of that law was?

     15    A.    As far as I know, it was to get the fee for the loan that

     16    was being made that SBA collected.

     17    Q.    And what was going on in 2008 and 2009 in the American

     18    economy?

     19    A.    Bad.  It was down, in fact, a big recession.

     20    Q.    I now want to -- I now want to look at your -- your

     21    company, HL Lender Resources.  You came in and did an audit or

     22    review -- well, don't use my words.  What would you call what

     23    you did in June of 2012?

     24    A.    We did a review of the documentation for the Dirks Motor

     25    Company.

1    Q.   And let's just go to that Exhibit 64.  And we just redacted

2    or blacked out some things that were private to Dirks Motors in

3    this case.

4              THE COURT:  Mr. Reinschmidt, I'm glad you mentioned

5    that because I wanted to mention it to the jury.  And so the

6    jurors will note that in various documents there are things

7    blacked out.  The lawyers aren't trying to hide anything.

8    That's just part of our court process to protect privacy

9    information.  So, for example, parts of account numbers, parts

10   of some addresses, et cetera, are blacked out.  So it's because

11   we require the lawyers to do that, not because they're trying to

12   hide anything from you.  Thank you.

13             MR. REINSCHMIDT:  Thank you for that, Your Honor.

14   BY MR. REINSCHMIDT:

15   Q.   And actually that being said, I think I misspoke about why

16   that bottom portion was blacked out.  We might talk about that.

17   Were you hired to audit more than one loan?

18   A.   Yeah, we were hired to do a review on two.

19   Q.   And I don't want you to mention the name of the second one

20   or it will just ruin everything with the blackout.

21   A.   I can't remember it so . . .

22   Q.   Oh.  Well, that's helpful.  Is that what was blacked out,

23   though, your analysis on the other company?

24   A.   Yes, yes.

25   Q.   Okay.

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Shelly Semmler, RMR, CRR — United States Court Reporter*
Case 5:16-cv-04005-MWB-KEM   Document 168   Filed 05/07/18   Page 205 of 221

A.   That and right below the -- where the Dirks Motors is up by

re, that blacked out is the same thing.

Q.   Right.  Where it says -- you see it says, "Dirks Motors,"

and then below it says, "And," and then below it it's blacked

out?

A.   Yes.

Q.   That was the other business?

A.   Yes.

Q.   And you were hired in June 11, 2012.  Do you recall who

hired you?

A.   Yeah.  It was the bank that hired us, and I think it was

Gail Frank who asked us to come and do this.

Q.   So when you write -- in the very first part here where you

write, "Dear Ms. Frank," that's to Gail Frank?

A.   Yes.

Q.   And if you know, was she an associate of Sterling Crim's?

A.   Yes.  She worked for the bank.

Q.   Okay.  In Sioux City.

A.   Yes.

Q.   And so when you came in on June 11, 2012, you came in in

your capacity as HL Lender Resources to do what exactly?

A.   To review the documentation based upon what the loan

authorization said that the things that were required there were

done.

Q.   And so how do you go about -- I mean, we've got this

1    multi-page document, Exhibit 11, that says a number of things

2    that's supposed to be done by the lender.  How do you go about

3    your job?  What do you do then?

4    A.    Most banks have credit files that they use to track the

5    loan.  And this had a credit file.  And we went to that file and

6    looked for the specific documents that we were looking -- that

7    were in the loan authorization such as the note, the guarantees.

8    There's a whole list of about 20 things that we were looking

9    for.

10   Q.    And is there a punch list that you have?

11   A.    Yes.

12   Q.    Okay.  We'll look at that in a moment.  Was your contact at

13   the bank Ms. Frank, or did you have contact with anybody else

14   other than Ms. Frank if you recall?

15   A.    I think she was the only one.

16   Q.    And as you look through the documentation, I see you've

17   noted four items here.

18   A.    Yes.

19   Q.    And can you -- can you just tell us -- well, maybe tell us

20   this without going into detail on each one.  Are these things

21   that you felt could be remedied, or were they going to be a

22   problem if this loan ever needed to be guaranteed?

23   A.    Yes.  We outline those, and then we give them to the bank,

24   and in this case all four of these we felt could be remedied

25   relatively simply.

1    Q.   Like, for example, I'm looking at one that I presume would
2    be very simple, number 4, the SBA form 912 statement of personal
3    history, missing.
4    A.   Yes, it could have been in another file that we didn't know
5    was there.  It could have been anywhere, or it could have been
6    just lost.
7    Q.   And let's just say it was lost.  Is this statement of
8    personal history of whom?
9    A.   Of the borrowers.
10   Q.   Okay.  So it would be the three Dirkses that were on the
11   promissory note?
12   A.   Yes.
13   Q.   Okay.  And then if we go to the second page, that is not
14   your signature, is it?
15   A.   No.
16   Q.   Is Mr. Langin your partner?
17   A.   Yes.
18   Q.   When I talked to you about this letter and the fact that it
19   was signed by Mr. Langin, did you participate in the preparation
20   of that letter?
21   A.   Yes, I did.
22   Q.   How is it decided on a particular project who signs?
23   A.   The way we did this one was I did all of the looking at the
24   files, and he had the documents that we were looking at.  He
25   was -- he's the one that filled out the documentation sheet that

1    we're going to see in a minute.  But I'm the one that looked in
2    the files for the particular documents we were looking at.  And
3    we did that together.
4    Q.   So you're -- I mean, you're -- so are you physically on
5    site in Sioux City?
6    A.   Yes.
7    Q.   And were you told by Ms. Frank or anyone else at Heritage
8    Bank that they had concerns about these two particular loans, or
9    just why did you understand that you'd been hired to look at
10   these two?
11   A.   Well, the reason that I understood it was because they
12   wanted to know if their documentation was in order in case they
13   had to do a foreclosure or something like that on the loan.
14   That's the only reason they'd want that done.
15   Q.   I'm going to now not hold us in suspense any longer.  I'm
16   going to show us that punch list which was not right attached
17   when we did depositions, and so it ended up separately.  It's
18   Exhibit 56.
19            MR. REINSCHMIDT:  And maybe just blow like half of it
20   up to start, Ms. Liston.
21   Q.   And this Exhibit 56, is that the attachment to Exhibit 64?
22   A.   Yes.
23   Q.   Whose handwriting is that?
24   A.   That's John's.
25   Q.   But that's literally with you physically sitting in the

1  same room?

2  A.   Yes, and me telling him that yes, that document was there

3  or no, it was not there.

4  Q.   So like you literally saying here's a note, and then he'd

5  check note?

6  A.   Yes.

7  Q.   And like there I see on the very first one, he wrote

8  note -- or X before note and then wrote 12, slash, 2009?

9  A.   Yes, which probably was the date on the note.

10  Q.   Okay.  And then you just keep going down the punch list,

11  correct, of what --

12  A.   Correct.

13  Q.   Okay.  And then let's go down a bit further.  And I'm going

14  to focus on this.  That is Xed, and as best you can, can you

15  tell us the two dates that you've written down there?

16  A.   Yes, 12-31-11 and 5-4-10.

17  Q.   And now, are you telling the jury that John has got the

18  punch list and you're physically finding -- well, what are you

19  physically finding that caused you to write down these two

20  dates?

21  A.   We physically found the UCC filed on Dirks Motors by the

22  bank.

23  Q.   On those two dates.

24  A.   On those two dates.

25  Q.   And when you looked at these documents that you're looking

1  at, would that reflect whether or not there were other UCC-1s

2  filed?

3  A.   Not this document.   There would be searches that we did.

4  We didn't keep track of the searches because the important

5  document to us was the UCC-1.

6  Q.   All right.   I just want to be clear on this document.

7          MR. REINSCHMIDT:   If you blow it up completely,

8  Ms. Liston.

9  Q.   Is there -- are any of these Xs -- so we're just a hundred

10 percent clear, are -- any of these Xs, do they show an X to

11 check for that there were other UCCs filed or not?

12 A.   No, it did not.

13 Q.   In this case there has been conversations or testimony by

14 witnesses that there were not only the one that you found on

15 5-4, 2010, but that there were UCC checks in -- a couple more in

16 2010.  Would that have -- and those would have shown Ford Motor

17 Credit.  Would that have concerned you to see after the loan

18 Ford Motor Credit UCC-1s?

19          MR. LAWRENCE:   Objection, Your Honor.   The question

20 misstates the witness's testimony and stated that on 5-24-10 --

21          THE COURT:   Well, that's kind of a speaking objection,

22 so if it misstates the testimony, you can point that out on

23 cross-examination.   Objection's overruled.

24 BY MR. REINSCHMIDT:

25 Q.   You can answer the question, sir.

1    A.   Would you repeat it?

2    Q.   I was afraid you'd ask that.  Yes.  I think generally what

3    I said was -- or asked was if you saw prior 2010 UCC-1 filing

4    statements showing Ford Motor Credit, would that have concerned

5    you given that those were -- would have shown Ford even after

6    that SBA loan guarantee had been put into place?

7    A.   No, it didn't, and I can tell you that I remember we did

8    look at the other filings on that, and we knew that there were

9    Ford Motor Credit filings.  And it did not concern us at all.

10   And I go back to the statement that I made earlier that there

11   were no -- SBA did not do financing on an automobile dealer's

12   inventory.

13   Q.   Did anyone at the bank -- when they hired you to do this

14   audit, did anyone, whether it was Ms. Frank, Mr. Crim, anyone

15   else, did they ever express to you a concern or question

16   regarding Ford Motor Credit's lien that was superior to the

17   bank's?

18   A.   No.

19   Q.   After you did your audit, did you ever talk to anyone who

20   expressed a concern about that?

21   A.   No.

22   Q.   Do you think based upon your analysis and review that with

23   a reasonable degree of certainty you can say that this was an

24   enforceable guarantee?

25   A.   Yes.  Right in the letter it says in our opinion with those

1  four exceptions they were documented as they should have been.

2  Q.   If for some reason the SBA had felt that Ford's prior lien

3  was an issue, what are the -- I mean, is the only option that

4  the SBA has is just to say forget it, we are not guaranteeing

5  this loan at all?

6  A.   Ask that question again.  I want to make sure I understood

7  it.

8  Q.   Does the SBA have one or more options if they see -- if

9  they think there's an issue with a particular loan that they've

10 guaranteed and now the guarantee's being called upon?

11 A.   Not to my recollection at all.

12 Q.   Well, I mean -- what I'm trying to get at, is it all or

13 nothing?  Do they either guarantee the loan on the amount

14 they've said, or can they -- is there some sort of repair that

15 can be done or not?

16 A.   Probably not, no.  I would say there's not a repair that

17 can be done on this particular loan.

18 Q.   Did you see any need for repair on this loan?

19 A.   No.

20         MR. REINSCHMIDT:  Thank you.  That's all I have, Your

21 Honor.

22         THE COURT:  Mr. Lawrence?  How much cross do you think

23 you have?

24         MR. LAWRENCE:  Probably about 15 to 25 minutes, Your

25 Honor.

1        THE COURT:  Well, I guess we'll just come back

2 tomorrow morning.  We're not going to finish, so rather than

3 have you start and then go for four minutes, I think it's maybe

4 better to defer it.

5        So, members of the jury, that's going to conclude the

6 testimony for today.  I'm confident we are going to finish

7 tomorrow and the case will go to the jury tomorrow.  You have

8 some pressing things to think about including what do you want

9 to have for lunch because our jury clerk, Suzanne Carlson, will

10 be asking you that in the morning, and she'll go through a

11 variety of food vendors that we bring lunch in for.

12        Thanks for paying such careful attention.  Please keep

13 an open mind till you've heard all of the evidence.  Don't

14 discuss this case with anybody.  And keep an open mind until

15 tomorrow and you go back for your deliberations.

16        And thanks again for the cookies.  They were

17 excellent.  And we'll see you tomorrow at 8:30.  And just so you

18 know, once you get the case tomorrow, some judges say you can

19 only deliberate until 4:30 or a quarter to 5.  I don't do that.

20 I let you pick your own hours of deliberation.  So if you want

21 to go home early and come back Friday -- I'm sure you want to do

22 that -- you'll be able to do that.  But it's really up to you to

23 determine how late tomorrow you want to deliberate.  So thank

24 you.  We'll see you in the morning.

25        (The jury exited the courtroom.)

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer aided transcription
Case 5:16-cv-04005-MWB-KEM Document 168 Filed 05/07/18 Page 214 of 221

```
 1            THE COURT:  You can step down.  Thank you.

 2            Everybody else please be seated.

 3            Before we get to the Rule 50 motion, is there anything

 4  else we need to take up?

 5            MR. THOMPSON:  No, Your Honor.

 6            MR. REINSCHMIDT:  No.

 7            THE COURT:  Do you -- does the plain -- do the

 8  plaintiffs anticipate any rebuttal testimony that you're aware

 9  of?

10            MR. THOMPSON:  Yes.  I expect -- I've got at this

11  point -- I don't expect it to change -- three questions for John

12  Lucken that should be single-sentence responses.

13            THE COURT:  Okay.  Well, you'll get a gold star if you

14  can do it in three.  Two gold stars if you can reduce it to two.

15            MR. THOMPSON:  May I have a compound question?  No.

16            THE COURT:  Thank you for letting us know that.

17            So we're back to the Rule 50 motion.  You know, it's

18  going to go to the jury tomorrow.  So I know you've worked hard

19  on preparing your motion, Mr. Cross, but you've also indicated

20  you have a brief.  What do you want to do?

21            MR. CROSS:  It's 4:30.  I'm fine with taking off, and

22  if you want to do it while the jury's deliberating or I just

23  submit my brief, that's fine too.  I do -- with some of the

24  testimony from the witnesses added today, I would like to change

25  my brief a little bit.
```

```
 1              THE COURT:  Oh, sure.

 2              MR. CROSS:  Yeah.  So I'm fine submitting a brief if

 3  that's okay with the Court.  I just wanted to make sure we

 4  didn't waive any --

 5              THE COURT:  Oh, no, no, no, and I would never want you

 6  to unintentionally waive anything.  So yeah.  Why don't we do

 7  this.  Why don't we -- I will indicate that I'm reserving ruling

 8  on the Rule 50 motion and that you'll be able to file a brief.

 9  And if the jury comes back with a plaintiffs' verdict, we'll

10  definitely have an oral hearing probably by telephone so we

11  don't have to drag the plaintiffs' lawyers back up from

12  Des Moines.

13              I'm having an increasingly difficult time seeing the

14  merits of your case to be honest with you.  I think you've done

15  a really ni -- no reflection on the quality of work.  The

16  quality of lawyering has been absolutely superb.  To me it's

17  exceedingly thin.  I know what I would do if I was a lawyer in

18  either case.  I'd settle it for not a whole lot of money before

19  the jury comes back, but that's just my insight.  I just

20  don't -- I'd be very surprised if there was a plaintiffs'

21  verdict, and I think there's a good chance if there was it would

22  be against the weight of the evidence.

23              So that's just -- you know, I don't want to lock you

24  in because I'd want to read the whole transcript again.  But I

25  don't like mentioning the S word, so I'm -- that's settlement,
```

1    and I don't think you've heard me mention it.  So I don't expect

2    you to get it settled.  I think I've got some insight into the

3    dynamics of why it didn't settle which is fine.  Doesn't make

4    any difference to me.  I'd rather be in trial than sitting back

5    in my chambers.  So we'll see you back here a little bit before

6    8:30.

7            And, Mr. Cross, how much time would you like to file

8    your brief?  I don't want you staying up till three in the

9    morning, so if you want to file it, you know --

10           MR. REINSCHMIDT:  He seems to thrive on that, Your

11   Honor.  I've worked with him two years now.

12           THE COURT:  Well, I can tell from the objections on

13   the instructions.  You know, with great respect,

14   Mr. Reinschmidt, I was pretty sure it was Mr. Cross doing that

15   and not you.  So . . .

16           MR. REINSCHMIDT:  That's a little hurtful but . . .

17           THE COURT:  No, no.  It wasn't meant to be.  It's just

18   everybody -- you know, when I saw what your team was, I kind of

19   knew how you were going to divide it up a little bit.  It's not

20   a -- it's not a negative comment at all.  It's wise to be able

21   to delegate things, not that you couldn't have done it as well,

22   but you have a lot of other things to do.  So wasn't intended as

23   a criticism.

24           So how much time, Mr. Cross, would you like?

25           MR. CROSS:  You're talking in terms of tomorrow?

```
 1            THE COURT:  No, in terms of tomorrow, Saturday,
 2   Friday, Saturday, Sunday, Monday of next week.
 3            MR. CROSS:  Friday.  Tomorrow's my birthday so . . .
 4            THE COURT:  Well, you should take that off.
 5            MR. REINSCHMIDT:  No.
 6            THE COURT:  At least after it goes to the jury.  So
 7   Friday is fine.  You know, if it comes in over the weekend,
 8   that's fine too or even early next week so -- and then what I'm
 9   going to do is I'm not going to ask -- if he files the brief
10   Friday -- well, probably by Friday we'll know what the verdict
11   is, so I'd only have obviously the plaintiffs respond if you do
12   get a plaintiffs' verdict.
13            And I want you to make sure -- I'm just trying to -- I
14   share tentative thoughts, and sometimes that gets me in trouble
15   because I change my mind as I did in this case so -- when I was
16   convinced I made the wrong decision.  So -- but I think it's
17   sometimes helpful, maybe not, to let the lawyers know tentative
18   thoughts.  But they're only tentative.
19            Okay.  Thanks.  We'll see you tomorrow.
20            MR. LAWRENCE:  One more question, Your Honor.
21            THE COURT:  Yes, Mr. Lawrence.
22            MR. LAWRENCE:  Do you do an open verdict, or do you do
23   a sealed verdict where the lawyers don't need to be present when
24   it's announced?
25            THE COURT:  Actually it's a combination of the two.  A
```

1  sealed verdict as I understand it -- and I know some judges in

2  the Southern District do it, and I did it when I was a

3  magistrate judge, particularly over in Davenport.  We took

4  sealed verdicts which just meant we all left.  I mean, I stayed

5  at the courthouse in case there was a jury question, but if

6  there wasn't a question, the jurors did not come into open court

7  and just put it in an envelope and the CSO got it to me or the

8  other judges, and then they would -- when I took a look at that

9  quite a few years ago, I decided that violates Federal Rules of

10 Civil Procedure, so I don't do it, haven't done it for years.

11         So I'm going to take the verdict in open court because

12 I think that's what the rule requires.  But it doesn't require

13 the lawyers' presence.  So I don't have a problem if you want to

14 hit the road when it goes to the jury as long as we have your

15 cellphone information so if we do get a question we can just

16 dial you in on a conference call and do it by telephone.  So

17 does that -- is that responsive to your question?

18         MR. LAWRENCE:  Yes, it is, Your Honor.  Thank you.

19         THE COURT:  Yes.  And what happens is if we do get a

20 question, I rarely bring the jurors back up, and particularly if

21 the lawyers weren't present, I would never bring them back up to

22 see that.  So I would just respond, after I talked to the

23 lawyers, in writing.  So the only time they would know that the

24 lawyers or a party weren't here is when they came into open

25 court to deliver the verdict, and I would simply tell them that

1    the parties and lawyers don't have to be here.  I have to be

2    there, and they have to be here, but you all don't.  So I hope

3    that answers your question.

4            MR. LAWRENCE:  Thank you, Your Honor.

5            THE COURT:  And thanks for asking.  I really

6    appreciate how much you all are thinking ahead of things, so

7    that's really helpful to me.  Thank you.

8            We'll see you tomorrow morning.  I'll just check in

9    with you a few minutes before 8:30.  Thank you.

10           (The foregoing trial was

11            adjourned at 4:37 p.m.)

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21       I certify that the foregoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.

23

24

25    ___S/Shelly Semmler_____        4-28-18
      Shelly Semmler, RMR, CRR                Date

**INDEX**

**WITNESS:**                                                    **PAGE:**

WILLIAM TANK
            MR. LAWRENCE                        436
            MR. REINSCHMIDT                     444
            MR. LAWRENCE                        471
            MR. REINSCHMIDT                     476

RICHARD DIRKS, SR.
            MR. LAWRENCE                        479
            MR. REINSCHMIDT                     491

DAVID DIRKS
            MR. LAWRENCE                        525
            MR. REINSCHMIDT                     530

JENNIFER WHIPPLE
            Deposition designations            533

DAVE HEGARTY
            Deposition designations            534

RICHARD PALMATIER
            Deposition designations            534

ROBERT MATHIASEN
            MR. REINSCHMIDT                     542
            MR. THOMPSON                        578
            MR. REINSCHMIDT                     594
            MR. REINSCHMIDT                     596
            MR. THOMPSON                        597

KEVIN WELTE
            MR. REINSCHMIDT                     601
            MR. THOMPSON                        609
            MR. REINSCHMIDT                     622

THOMAS HARBISON
            MR. REINSCHMIDT                     626

\* \* \* \* \*