IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

THE JOHN ERNEST LUCKEN
REVOCABLE TRUST and
JOHN LUCKEN and MARY LUCKEN,
Trustees and Individually,

       Plaintiffs,

    vs.

HERITAGE BANCSHARES GROUP,
INC., and HERITAGE BANK
NATIONAL ASSOCIATION,

       Defendants.
_____/

No. C16-4005-MWB

Sioux City, Iowa
April 12, 2018
8:23 a.m.

**Volume 4 of 4**


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
SENIOR UNITED STATES DISTRICT JUDGE, and a jury.

```
APPEARANCES:

For the Plaintiffs:        STANLEY J. THOMPSON, ESQ.
                           JASON RAY LAWRENCE, ESQ.
                           Davis, Brown, Koehn, Shors & Roberts
                           Suite 1300
                           215 Tenth Street
                           Des Moines, IA 50309


For the Defendants:        DAVID L. REINSCHMIDT, ESQ.
                           Munger, Reinschmidt & Denne
                           Terra Centre - Suite 303
                           600 Fourth Street
                           Sioux City, IA  51101

                           JEREMY J. CROSS, ESQ.
                           Cross Law Firm
                           Terra Centre - Suite 315
                           600 Fourth Street
                           Sioux City, IA 51101


Also present:              John Lucken
                           Bill Peterson
                           Robert Mathiasen


Reported by:               Shelly Semmler, RMR, CRR
                           320 Sixth Street
                           Sioux City, IA  51101
                           (712) 233-3846
```

```
1              (Proceedings reconvened outside the presence of the
2    jury.)
3              THE COURT:  Thank you.  Please be seated.  Anything we
4    needed to take up this morning?
5              MR. REINSCHMIDT:  No, Your Honor.
6              MR. THOMPSON:  No, Your Honor.
7              THE COURT:  Okay.  Thank you.  Do we have the witness
8    here?  Yes, he can just resume his place on the witness box.
9              (The jury entered the courtroom.)
10             THE COURT:  Good morning.  Please be seated.  And you
11   will recall that Mr. Harbison was on the stand, and we're
12   getting ready for the cross-examination by Mr. Lawrence; is that
13   correct?
14             MR. LAWRENCE:  Yes, Your Honor.  Thank you.
15             THE COURT:  Okay.  Thank you.  You may proceed
16   whenever you're ready.
17        THOMAS HARBISON, DEFENDANTS' WITNESS, PREVIOUSLY SWORN
18                          CROSS-EXAMINATION
19   BY MR. LAWRENCE:
20   Q.   Good morning, Mr. Harbison.
21   A.   Good morning.
22   Q.   Your expert disclosure in this case says that your review
23   of this file was conducted on June 11, 2012; correct?
24   A.   Correct.
25   Q.   Now, you knew nothing about these facts before that date,
```

1    did you?

2    A.    No.

3    Q.    And Ford Credit was already paid off by then, wasn't it?

4    A.    I believe it was.

5    Q.    I want you to assume that Ford Credit had not been paid

6    off.  At that point they would have had first access to at least

7    $225,000 worth of Dirks Motors' personal property before the

8    bank; right?

9    A.    That's right.

10   Q.    And Ford would have had more -- an interest in more than

11   just vehicles and parts bought on a floor plan, wouldn't it?

12   A.    Yes.

13   Q.    And that included accounts receivable in the Ford

14   franchise, didn't it?

15   A.    If there were any.

16   Q.    That also included the furniture, fixtures, and other items

17   of value, didn't it?

18   A.    Yes.

19   Q.    And the SBA loan authorization required Heritage to have

20   the first perfected lien interest in these things, didn't it?

21   A.    That's what the loan authorization said.

22   Q.    Now, the loan authorization, unless amended, means what it

23   says, doesn't it?

24   A.    Yes.

25   Q.    I'd like to pull up Exhibit 11, page 1.  Now, Mr. Harbison,

1    when you read contracts like this loan authorization, do you

2    read them, you know, front to back first page to last?

3    A.    Of course.

4    Q.    Okay.  Now, yesterday Mr. Reinschmidt asked you about this

5    section A, the guarantee fee.  And if you take a look at that

6    section, it says that the SBA will pay the fee; correct?

7    A.    Yes.

8    Q.    Okay.  Now I'd like to just quickly go ahead to page 2.

9    And I'd like to take a look at the contingencies.  Now, one of

10   these contingencies is -- you know, it says it's contingent upon

11   the lender having paid the full guaranteed fee.  Do you see

12   that, number 2?

13   A.    Yes.

14   Q.    Now, it also says that the fee has to be paid in the time

15   and manner required by this authorization; correct?

16   A.    Yes.

17   Q.    So having read that previous section that the SBA will pay

18   the fee, that wouldn't be inconsistent with this requirement

19   that the lender pay the fee, would it?

20   A.    No.

21   Q.    Now I want you to assume again that Ford Credit hadn't been

22   paid off by Heritage Bank after Mr. Lucken wired money to

23   Heritage Bank.  Ford's -- Ford would have had to have foreclosed

24   on Dirks Motor; correct?

25   A.    Correct.

1   Q.   And that would have required Ford to foreclose on Dirks

2   Motors' Ford franchise; correct?

3   A.   Correct.

4   Q.   And if Ford foreclosed on the franchise, do you think GM or

5   Chevrolet would have soon followed?

6   A.   I don't think they were involved in the thing.

7   Q.   Okay.  But Ford holding the franchise would have put Dirks

8   Motor out of business overnight, wouldn't it?

9   A.   Absolutely.

10   Q.   And then if Dirks Motor goes out of business overnight, the

11   bank would have had no choice but to foreclose on the loan

12   backed by the SBA guarantee; correct?

13   A.   That's right.

14   Q.   Now, I want you to assume that this happened in November,

15   December of 2011, Ford foreclosing on Dirks Motor and then it

16   going out of business.  Are you aware if Dirks Motor had any new

17   car inventory at this time?

18   A.   No.

19   Q.   You're not aware or --

20   A.   I'm not aware of it.

21   Q.   All right.  Now I want you to assume that Dirks Motor had

22   no new car inventory at this time.  At this point of Ford

23   foreclosing with no new car inventory, Heritage and Ford would

24   have both been claiming an interest in Dirks Motors' accounts

25   receivable, furniture, fixtures, general intangibles like the

1  franchise agreements, wouldn't they?

2  A.   Yes.

3  Q.   And Heritage would have lost that fight, wouldn't they?

4  A.   They would have been in second position.

5  Q.   Okay.  And the SBA, based on the terms of the

6  authorization, would have expected Heritage to be in first

7  position; correct?

8  A.   No, they would not have because the SBA, as I said

9  yesterday, does not take anything in terms of automobile

10 inventory.  In the --

11 Q.   Sir, I'm not talking about automobile inventory.  I'm

12 talking about the desks and the computers in the dealership

13 building.  I'm talking about the infrastructure, the lifts and

14 the other things in the service bay that aren't covered by the

15 floor plan financing.  I'm talking about accounts receivable,

16 and I'm talking about the franchises.

17 A.   Yes, they would have.

18 Q.   Okay.  The SBA would have expected Heritage to be in first

19 position on those things.

20 A.   According to the loan authorization.

21 Q.   Now, Heritage benefitted from the sale of Dirks Motor

22 because the principal balance on Heritage's loan was reduced by

23 proceeds of that sale; correct?

24 A.   Say that again.

25 Q.   Are you aware that Heritage -- or I'm sorry.  Are you aware

1    that Dirks Motor was ultimately sold to Total Motor?

2    A.    No.

3    Q.    Okay.  I want you to assume that Heritage -- that Dirks

4    Motor was sold to Total Motor and that $450,000 of that sale

5    went to pay down the SBA loan.  Heritage benefitted from that

6    $450,000, didn't it?

7    A.    I'm not sure I understand what you're asking me.

8    Q.    Okay.  Well, let's back up.  The SBA loan guarantee was for

9    84.5 percent of the total value of the SBA loan in this case;

10   correct?

11   A.    I thought it was 75 percent, but it may have been 84 1/2.

12   Q.    Okay.  Let's just assume that it was 84 1/2.  That means

13   for every dollar Heritage doesn't collect on the loan of the

14   loan principal the SBA would have paid Heritage 84.5 cents, and

15   Heritage would have been at risk for 15.5 cents; right?

16   A.    That's correct.

17   Q.    So for a hundred thousand dollars, the SBA would have paid

18   Heritage $84,500, and Heritage would have been at risk for

19   $15,500; correct?

20   A.    Yes, yes.

21   Q.    So if Heritage was able to get $450,000 from the sale

22   proceeds of Dirks Motor to pay down the principal, they would

23   have benefitted 15,000 times 4, 62,000 -- about $70,000;

24   correct?

25   A.    They would have.

```
1    Q.   Now, the SBA would view a large collateral shortfall on an
2    SBA guaranteed loan unfavorably, wouldn't it?
3    A.   Say that again.
4    Q.   You have the loan from Heritage to Dirks Motor.
5    A.   Yes.
6    Q.   It's backed by collateral.
7    A.   Yes.
8    Q.   Now, if that loan were to have a large collateral shortfall
9    where after Heritage collected all of the collateral available
10   to it there would still be a large principal balance, a
11   shortfall, the SBA would view that unfavorably, wouldn't it?
12   A.   Well, they had other collateral, the SBA did, that they
13   could liquidate, and that was a significant portion of the
14   collateral.  And they had taken that on the very beginning
15   between CDs, the real estate, and life insurance.
16   Q.   And after they took all of that, there was still a
17   shortfall of about $600,000, wasn't there?
18   A.   I don't know what the shortfall was.
19             MR. LAWRENCE:  Can we pull up Exhibit 145?  And go to
20   page 2.
21   Q.   Let's take a look at the collateral, this grid at the
22   bottom of the page.  Now, this is a bank document, a CAD report,
23   prepared by Heritage Bank.  But these are the CDs that you were
24   just talking about, Mr. Harbison; correct?
25   A.   Yes.
```

1  Q.   Can we go to page 3?  Now, up at the top here, these are

2  the cash value of the life insurance policies and then the first

3  lien on the commercial real estate you were just talking about;

4  correct?

5  A.   That's correct.

6  Q.   And I'll tell you this report was prepared at I believe the

7  end of September of 2011.

8         MR. LAWRENCE:  So, Rebecca, can you highlight the

9  excess collateral grid?

10 A.   Okay.

11 Q.   And you see that there was a collateral shortfall at this

12 point in time of nearly $600,000; correct?

13 A.   That's correct.

14 Q.   Now, this is -- I'll represent to you that this is before

15 Mr. Lucken wired the money to Heritage to pay off Ford.  And so

16 at this point Ford would have had access to the first $225,000

17 from Dirks Motor; correct?

18 A.   Correct.

19 Q.   So that would have potentially increased this, you know,

20 collateral shortfall, wouldn't it?

21 A.   Yes, it would have.

22 Q.   And the SBA on a 1.7-million-dollar loan would take a long,

23 hard look at a collateral shortfall of $600,000 of that 1.7

24 million dollars, wouldn't it?

25 A.   No, they wouldn't.

1    Q.    And the SBA would not consider reducing a guarantee if

2    there were a collateral shortfall of nearly $600,000 on a

3    1.7-million-dollar loan that was backed by an SBA guarantee,

4    would it?

5    A.    No, they wouldn't.

6    Q.    Now, it was your opinion that this loan was closed

7    correctly; right?

8    A.    Yes.

9    Q.    I'd like to go to Exhibit 13.  This is what's called a

10   Small Business Administration settlement sheet; correct?

11   A.    Yes.

12   Q.    And this is -- this settlement sheet is not submitted to

13   the SBA at the time the bank and the lender signs it, is it?

14   A.    This sheet here is not submitted to SBA when?

15   Q.    At the time --

16         MR. LAWRENCE:  Can we go down to the signature page or

17   the signature block?

18   Q.    So here when the loan is closing and the bank and the

19   borrower sign it, it's not submitted to the SBA at that time, is

20   it?

21   A.    It's held in the bank's files.

22   Q.    Okay.  And right below it where it says -- the signatures

23   where it says this certification must be signed and retained in

24   the lender's file after each disbursement, that just means the

25   bank has to hang on to it; correct?

1   A.   That's correct.

2   Q.   Okay.  Now I'd like to go back up to the part where it

3   shows the disbursement.  Now, we see there at the bottom the

4   name of the payee, Peoples Bank, the date, and the amount of the

5   payment, $279,000; correct?

6   A.   Correct.

7        MR. LAWRENCE:  Now, can we go to Exhibit 11, page 3.

8   I'm sorry.  One more page, up at the top here.

9   Q.   These are the use of the proceeds of the SBA loan as

10  required in the SBA loan authorization; correct?

11  A.   Correct.

12  Q.   So if Heritage Bank did not use the money in the SBA loan

13  consistently with these terms, it would have breached the SBA

14  loan authorization; correct?

15  A.   Not necessarily.

16  Q.   Would it need the SBA's approval to disburse monies

17  differently than what is listed here in this --

18  A.   They would have got -- they would have asked SBA for

19  approval.  That's right.

20  Q.   And if they didn't ask the SBA for approval and distributed

21  the monies differently than this, they would have been in

22  violation of this authorization; correct?

23  A.   Well, at that point in time.  But they may have -- if it

24  got to the point where they were questioning that, they could

25  have worked through that.

1   Q.   But at that point in time -- that's what I want to focus on

2   from what you just said.   At that point in time they would have

3   been in violation of the authorization.

4   A.   That's right.

5   Q.   Okay.   And we just saw Peoples, so I want to look at item

6   number 2, $276,000 to Peoples.   And now I want to go down to the

7   first sentence of this page, all amounts listed above are

8   approximate.   Would the $279,000 we just saw on the settlement

9   sheet be considered a reasonable approximation of this $276,000

10  by the SBA?

11  A.   Yes.

12  Q.   Okay.

13       MR. LAWRENCE:   I'd like to go back to Exhibit 13, page

14  2.   And can you highlight the top half?

15  Q.   So this is a distribution made from the SBA loan proceeds

16  to Dirks Motor to First American for $401,918; correct?

17  A.   Yes.

18  Q.   Okay.

19       MR. LAWRENCE:   And can we go back to Exhibit 11, page

20  4?   And highlight that top portion again.

21  Q.   And here we saw First American.   I believe that says --

22  it's a little fuzzy but down there on number 7, $400,000?

23  A.   Yes.

24  Q.   Would what we have just seen be a reasonable approximation

25  of this amount?

1    A.    Okay.

2    Q.    And I'd like to go back to Exhibit 13, page 2.  And, again,

3    at the bottom you see that this was signed by both Heritage Bank

4    and Mr. Dirks; correct?

5    A.    Yes.

6          MR. LAWRENCE:  Now can we go ahead to page 3.

7    Q.    And this is a distribution to First National Bank for

8    $756,000; correct?

9    A.    Yes.

10   Q.    Okay.  And can we look at the bottom of the page?  And we

11   see Heritage's signature here and Mr. Dirks' signature; correct?

12   A.    Yes.

13         MR. LAWRENCE:  Now can we go ahead to page 4.

14   Q.    Okay.  So that those are --

15         MR. LAWRENCE:  And now can we go back to Exhibit 11,

16   page 4.

17   Q.    Now we just saw First National, and they're listed a few

18   times here; correct?  110,000 --

19   A.    Correct.

20   Q.    225, 35, and down there on number 8, 340.

21   A.    Correct.

22   Q.    Okay.  And those amounts would be a reasonable

23   approximation of what was paid to First National; correct?

24   A.    Yes.

25   Q.    Okay.  I'd like to go back to Exhibit 13, page 8.  Now,

1   this shows that Heritage Bank was paid off $329,000; correct?

2   A.   Yes.

3   Q.   Okay.  Can we look at the bottom?  Heritage never signed

4   this, did it?

5   A.   No.

6   Q.   And the certification must be signed and retained in the

7   lender's file; correct?

8   A.   Correct.

9   Q.   This is an irregularity, isn't it?

10  A.   Yes.

11  Q.   Your report didn't identify this, did it?

12  A.   No.

13  Q.   Okay.

14       MR. LAWRENCE:  Can we go back to Exhibit 11, page 4?

15  Q.   Now I want you to look at line number 6.  $194,000 to pay

16  outstanding debt to Heritage Bank, do you see that?

17  A.   Yes.

18  Q.   That's not a reasonable approximation of $329,000, is it,

19  Mr. Harbison?

20  A.   No.  SBA had a 10 percent amount.

21  Q.   That's an irregularity then, isn't it?

22  A.   It is.

23  Q.   Your report didn't identify that irregularity, did it?

24  A.   No, it did not.

25  Q.   I want you to go up to number 1, $67,000 for working

1    capital.  Do you see that?

2    A.    Yes.

3    Q.    Do you know if Dirks Motors ever received that $67,000 for

4    working capital?

5    A.    No, I do not know.

6    Q.    You reviewed this entire SBA loan, sir, didn't you?

7    A.    I'm sorry?

8    Q.    You reviewed this entire SBA loan file.

9    A.    We reviewed the documents that were necessary when the loan

10   was closed.  That's the documents we reviewed.

11   Q.    And the settlement sheets were part of the documents that

12   you reviewed because those were necessary when the loan was

13   closed; correct?

14   A.    No.  Those are made when the funding is done.

15   Q.    Okay.  So you never reviewed the settlement sheets?

16   A.    No.

17   Q.    Okay.  Did you see anything in your review of the file that

18   suggested Dirks Motor received $67,000 in working capital?

19   A.    No.

20   Q.    If it did not receive the $67,000 in working capital, would

21   that have been an irregularity?

22   A.    No, it would not have.

23   Q.    So even though the loan authorization required Dirks Motor

24   to get money for working capital, it would not have been an

25   irregularity had it not received the money required by the loan

1    authorization?

2    A.    At any point in time when the loans are being funded like

3    that, S -- the bank can request that those amounts be cancelled.

4    Q.    Okay.

5    A.    So I don't know if this was cancelled or not.

6    Q.    Do you know if Heritage made such a request?

7    A.    No.

8    Q.    Have you seen any evidence that suggests Heritage made such

9    a request?

10   A.    No.

11         MR. LAWRENCE:  Can we go to Joint Exhibit 20, please.

12   And can you zoom in on this top part?

13   Q.    This is a form from the SBA; correct?

14   A.    Yes.

15   Q.    And it shows information about the loan and the guarantee,

16   doesn't it?

17   A.    Yes.

18         MR. LAWRENCE:  Can we go down to the bottom part,

19   please?

20   Q.    And I want you to focus on this grid on the use of the

21   proceeds for the guarantee.  Do you see that?

22   A.    Yes.

23   Q.    And do you see that it says in the first part that there's

24   1.583 million dollars of this loan allocated to pay outstanding

25   debt?

1    A.    Yes.

2    Q.    And with all those banks, the settlement sheets, that's

3    what we just looked at, isn't it, Mr. Harbison?

4    A.    Yes.

5    Q.    Okay.  And you see the second part of this, working

6    capital, $192,000.

7    A.    Yes.

8    Q.    Now, based on this sheet on a form from the SBA -- and we

9    can see that, you know, it's talking about October 7, 2009 --

10   the SBA at that time would have expected Dirks Motor to get

11   $192,000 in working capital; correct?

12   A.    That's correct.

13   Q.    Now, if that money instead of going to Dirks Motor for

14   working capital went to Heritage Bank to pay off additional

15   loans that Heritage made to Dirks Motor, that's not what the SBA

16   expected, is it?

17   A.    Not at this point.

18   Q.    And Heritage would have been in breach of the

19   authorization, wouldn't it?

20   A.    At that point in time.

21   Q.    And your report didn't discover this irregularity, did it?

22   A.    No, it did not.

23          MR. LAWRENCE:  Nothing further, Your Honor.

24          THE COURT:  Thank you, Mr. Lawrence.

25          Mr. Reinschmidt?

```
1              MR. REINSCHMIDT:  Thank you, Your Honor.  Your Honor,
2    I'm fine when I'm here, but the sun is absolutely blinding --
3              THE COURT:  Well, there isn't anything I can do about
4    it.
5              MR. REINSCHMIDT:  Oh, you can't shut that shade?
6              THE COURT:  It is shut.
7              MR. REINSCHMIDT:  Oh, it is.  I couldn't tell.  Thank
8    you.
9                       REDIRECT EXAMINATION
10   BY MR. REINSCHMIDT:
11   Q.   Mr. Harbison, Mr. Lawrence spent quite some time talking to
12   you about supposed irregularities between the 329,000 and the
13   194,000.  Do you recall that, you just finished?
14   A.   Yes.
15   Q.   Okay.  Did this -- do you recollect -- and I'll help you
16   recollect -- do you recollect if this loan increased from the
17   original authorization, the total amount of the loan, not merely
18   the 329,000 disbursement to Heritage but the total amount?
19   A.   Yes.
20   Q.   Let's look at Exhibit 11 on the first page of Exhibit 11.
21   And as we blow that up, again, can you remind the jury what
22   Exhibit 11 is?  Can you tell the jury what that document is?
23   A.   Oh.  This is the loan authorization that was issued with
24   the approval on the loan.
25   Q.   And I'm going to ask my paralegal to blow up just that
```

1  first part, this area.  All right.  And if we look at this that

2  I've just put a box around, what was the original amount of the

3  loan?

4  A.    1,650,000.

5  Q.    And then there's a handwritten notation below it that says

6  1,775,000 attached.  Do you see that?

7  A.    Yes.

8  Q.    I did the math quickly on that.  I did that that's about

9  $125,000 difference?

10  A.    Correct.

11  Q.    Okay.  And when it says attached, does that mean that

12  there's some -- well, let me ask it this way.  Does there need

13  to be SBA approval to go -- to increase that loan to 1.775

14  million?

15  A.    Yes.

16  Q.    And was that indeed the amount that was ultimately

17  borrowed?

18  A.    Yes.

19  Q.    And I also subtracted 194,000 from 329,000, and that's

20  about 135,000.  Do you agree with my math or --

21  A.    Yes.

22  Q.    Okay.  Do you know what -- why Heritage was asking to be

23  paid the extra 135,000?

24  A.    No, I do not.

25  Q.    Okay.  Well, let's go to Exhibit -- Exhibit 12.  And

1    actually I need to go to Exhibit 12, page 3.  Well, can you tell

2    me on Exhibit 12, page -- we're flopping back and forth here.

3    On page 1, what is this document, Exhibit 12?

4    A.    This is a approval of a change in the loan issued by SBA.

5    Q.    Let's go to page 3 of Exhibit 12.

6          MR. REINSCHMIDT:  And I think all we need to do is

7    maybe the top -- the top part including the writing through the

8    X, yes, blow that up.

9    Q.    And this is saying -- is this a reference back to the same

10   Dirks 1.775 million loan?

11   A.    Yes.

12   Q.    And it has what I've circled -- I've written two circles.

13   And there's a check in the box that says, "Request that SBA

14   approve an increase in the loan amount."  Do you see that?

15   A.    Yes.

16   Q.    And that increases it from the 1.65 million to the 1.775

17   million?

18   A.    Yes.

19   Q.    And then -- and then I'm also going to circle the

20   handwriting -- now, would this be handwriting from Heritage, or

21   would this be from SBA?

22   A.    This would be from Heritage.

23   Q.    And -- but in terms of the approval, that would have to

24   come from SBA?

25   A.    Yes.  And that's what this form is.

1  Q.   And, in fact, let's go down a bit.  And if we go down

2  towards the middle of the document where it says -- this portion

3  here -- and actually I'll include this -- it says U.S. Small

4  Business Administration, a stamp.  Do you see that?

5  A.   Yes.

6  Q.   And then I -- oh, it looks like it says, "I do concur with

7  the request."  Is that what that stamp says?

8  A.   Yes.

9  Q.   And then there's a line for signature with -- where it says

10 recommending official below the line.  Do you see that?

11 A.   Yes.

12 Q.   So that means that Heritage -- somebody -- you think

13 somebody from Heritage has the handwriting about the -- saying

14 that the amount of the increase of 125,000 and then this person

15 from SBA has approved it.

16 A.   Yes.  This stamp on there would have been received by

17 Heritage before they wrote the other things on there.

18 Q.   So as you see this now -- and this is within $10,000 of

19 encompassing the $329,000.  Would -- does this document reflect

20 that there's going to be -- well, let me restate that.

21       Would SBA have been apprised of why the loan was

22 asking to be increased by $125,000?

23       MR. LAWRENCE:  Objection, Your Honor.  Foundation.

24       THE COURT:  Overruled.  You may answer.

25 A.   Absolutely.

1  Q.   And here SBA has approved it.

2  A.   Yes.

3  Q.   Just a couple more things.  I want to look at -- we were

4  talking about -- or Mr. Lawrence was talking to you about what

5  would happen if Ford Motor Credit had had to take inventory,

6  parts, equipment and they were ahead of Heritage on that.  Do

7  you remember that testimony?

8  A.   Yes.

9  Q.   Correct me if I'm wrong, but I believe your testimony was

10  by the ti -- there's been testimony in this case that Ford Motor

11  Credit was paid with Mr. Lucken's funds.

12  A.   Yes.

13  Q.   On approximately November 17, 2011.

14  A.   Uh-huh, yes.

15  Q.   Given that testimony, do you recollect if Ford had taken

16  all its cars prior to the time they were paid any arrearage?

17  A.   I do not.

18  Q.   If there's testimony in this case they had taken cars

19  October and early November, would you disagree with that?

20  A.   No.

21  Q.   So if the cars were gone, there was no inventory that Ford

22  could have gotten; correct?

23  A.   That's right.

24  Q.   So then if they went to parts and equipment, do you know

25  what the value of parts and equipment would have been to Ford

1   ahead of Heritage?

2   A.   I don't know what it would have been, but in almost all of

3   the dealership loans that I have worked on, it's 5 percent or

4   less of the value.

5   Q.   The value of what?

6   A.   The inventory, that they -- all the things that are on

7   their UCC.

8   Q.   All right.  Well, let's go ahead and look at Exhibit 1020.

9   And Exhibit 1020 is a -- internal Ford memorandums.  Let's go to

10  page 3 of Exhibit 1020.  And I'm going to have Ms. Liston just

11  focus on the November 2011 entry, the whole November 2011 entry

12  if she can.  And that says a number of things.  It says -- we

13  were talking about were things sold by then.  I think it says at

14  the very top the one remaining vehicle, a Malibu, was sold

15  Thursday, November 3, 2011.  Do you see that?

16  A.   Yes.

17  Q.   So according to Ford's own internal documents, there were

18  no more cars left by the time Ford Motor Credit would have -- if

19  they'd had to proceed after this point, there was no inventory

20  they had to get at; correct?

21  A.   Yes.

22  Q.   If we then continue on down into that next paragraph, on

23  this portion, it says parts and equipment are worth 43,900 to

24  65,000.  I blocked it out.  $65,800.  Do you see that?

25  A.   Yes.

1   Q.   So if Ford had proceeded on November 17 according to this
2   document and your testimony, there would be no cars to seize;
3   correct?
4   A.   Correct.
5   Q.   Parts would be in that range according to Ford.
6   A.   Correct.
7   Q.   And beyond that, what could they get if you know?
8   A.   I know of nothing.
9   Q.   One last thing.  I just want you to look at Exhibit 145.
10  And blow that up if you would.  When we're looking under --
11  actually on 145, I want to go to the collateral section if we
12  can.  And this is -- you talked about that with Mr. Lawrence.
13  This collateral, this is only Heritage's collateral on the SBA
14  loan guarantee; correct?
15  A.   Correct.
16  Q.   And that's dollar for dollar on those CDs.
17  A.   Yes.
18  Q.   Okay.  Let's go to the next page that finishes the
19  collateral analysis.  And you were being asked about what would
20  be left over.  This is -- this document I believe -- actually if
21  we go back to the first page to just identify the very top left
22  of the first page, I think it's been referenced that this is a
23  Heritage internal document.  It's called CAD management info.
24  Do you see that in the upper left?
25  A.   Yes.

1    Q.   All right.  So let's now go back to that page that had the

2    collateral.  So this is Heritage's calculation of life

3    insurance, and they've put down cash value, and that's what they

4    extend out to the right-hand column to get their total

5    collateral value.  Do you see that?

6    A.   Yes.

7    Q.   Is that how SBA for their purposes with life insurance

8    calculates that, or did they do -- do they do it on death

9    benefits, or do they do it on cash value?

10   A.   Cash value.

11   Q.   Okay.

12        MR. REINSCHMIDT:  That's all I have.  Or just a

13   moment.

14   Q.   At the end of the day after all your testimony, did SBA pay

15   the loan guarantee?

16   A.   They did.

17   Q.   These various alleged irregularities that plaintiff has

18   talked about, SBA still paid.

19   A.   Yes.

20   Q.   Regardless of those alleged claims.

21   A.   Yes.

22        MR. REINSCHMIDT:  That's all I have, Your Honor.

23        THE COURT:  Thank you, Mr. Reinschmidt.

24        Mr. Lawrence?

25        MR. LAWRENCE:  Very briefly, Your Honor.

1    RECROSS-EXAMINATION

2  BY MR. LAWRENCE:

3  Q.   Mr. Harbison, there's a difference between paying off prior

4  debt and paying off and working capital; correct?

5  A.   Paying off prior debt and working capital?

6  Q.   Yes.  Money allocated for working capital wouldn't be used

7  to pay off prior debt, would it?

8  A.   No.

9  Q.   Okay.  I'd like to go to Exhibit 20, page 2 and the bottom

10 e-mail.  I'm sorry.  Up above the text of the e-mail.  Now, if

11 you look at the bottom half of the page, this is from Mark

12 Danhoff, and he's with the SBA; correct?

13 A.   Correct.

14 Q.   And he says the attached article reflects -- and I believe

15 it says 12-28, 2009, as the date the additional funding hits the

16 SBA.  Do you see that?

17 A.   Yes.

18 Q.   And that's the additional funding that Mr. Reinschmidt was

19 just talking to you about; correct?

20 A.   Yes.

21 Q.   Okay.  What's 67 plus 192 -- or I'm sorry, 67 plus 125?

22 A.   Almost 190, around 190.

23 Q.   192.

24 A.   Okay.

25 Q.   Okay?  Now, you said that the SBA had to be told of a

1  reason for the increase in the loan value; correct?

2  A.   That's right.

3  Q.   You don't know -- you personally don't know what Heritage

4  told the SBA, do you?

5  A.   No, I do not.

6  Q.   So you don't know if Heritage told the SBA that extra money

7  was additional money to pay off a loan Heritage made to Dirks

8  Motor, do you?

9  A.   No.

10 Q.   Let's go back to page 1 of this document.  And let's look

11 at the bottom.  And again, let's look at this bottom grid.

12 There are two things, pay outstanding debt and working capital;

13 correct?

14 A.   Correct.

15 Q.   Now, if Heritage told the SBA that this additional $125,000

16 was to pay off outstanding debt to Heritage as we saw on the

17 settlement sheet, you would expect that $125,000 to be reflected

18 in that first part, pay outstanding debt, wouldn't you?

19 A.   If they told them that.

20 Q.   Okay.  If Heritage told the SBA that that additional

21 $125,000 was for Dirks Motor to have as working capital, you

22 would expect that to show up in the second part there, working

23 capital; correct?

24 A.   Yes.

25 Q.   And that says $192,000, doesn't it?

1    A.    Yes.

2    Q.    Now, in the original SBA authorization we looked at on my

3    examination, it allocated $67,000 for working capital, didn't

4    it?

5    A.    Yes.

6    Q.    And plus this extra $125,000 Mr. Reinschmidt talked to you

7    about, that would total exactly $192,000, wouldn't it?

8    A.    That's correct.

9    Q.    So would it be your conclusion that Heritage must have told

10   the SBA that money was for Dirks Motor to have as working

11   capital and not to pay off Heritage Bank's additional debt?

12   A.    I would say yes.  That would be reading what you're saying

13   if that's what it was.

14   Q.    Okay.  So do you believe at this point in time then that

15   Heritage misrepresented to the SBA the purpose of that

16   additional $125,000?

17   A.    No, because Heritage has the use of those proceeds to go

18   wherever they want to as working capital.

19   Q.    But paying off debt to Heritage you admitted is not working

20   capital.

21   A.    It could have been in their eyes.

22          MR. LAWRENCE:  Okay.  Nothing further.

23          THE COURT:  Thank you, Mr. Lawrence.

24          Mr. Reinschmidt?

25          MR. REINSCHMIDT:  Nothing, Your Honor.

```
 1              THE COURT:  Okay.  Members of the jury, do we have any
 2    questions for Mr. Harbison?  Looks like we might.  We'll see.
 3    No?
 4              JUROR BYL:  I'm just curious about something.
 5              THE COURT:  Would you like -- you have a question?
 6    Yeah.  Okay.  Why don't you pass it forward.
 7              Thank you, Denise.  Thank you.
 8              Counsel?
 9              (At sidebar off the record.)
10              THE COURT:  Mr. Harbison, I'm going to ask you a
11    question.
12              THE WITNESS:  Okay.
13              THE COURT:  And then the lawyers will have an
14    opportunity to ask a follow-up question.  The question is is it
15    common practice for a company to receive an SBA loan that
16    primarily would be used to pay off lenders?
17              THE WITNESS:  I can answer that yes.
18              THE COURT:  Any follow-up questions, Mr. Reinschmidt?
19              MR. REINSCHMIDT:  No, Your Honor.
20              THE COURT:  Mr. Lawrence?
21              MR. LAWRENCE:  No, Your Honor.
22              THE COURT:  Okay.  Thank you.  You may step down.
23              THE WITNESS:  Thank you.
24              Everybody can take a stretch break.
25              And, Mr. Reinschmidt, are you ready to call your last
```

```
1    witness?

2              MR. REINSCHMIDT:  I am, Your Honor.

3              THE COURT:  Okay.  Thank you.  Good morning.  If you'd

4    please come forward, raise your right hand, I'll swear you in.

5              GREG BURGER, DEFENDANTS' WITNESS, SWORN

6              THE COURT:  Thank you.  Please be seated in the

7    witness box there.  You can adjust the chair and the microphones

8    so you can speak directly into the microphones.  And would you

9    please tell us your first and last name and spell your last

10   name.

11             THE WITNESS:  My name is Greg Burger, last name

12   spelled B-u-r-g-e-r.

13             THE COURT:  Thank you.

14             Mr. Reinschmidt.

15             MR. REINSCHMIDT:  Thank you, Your Honor.

16                         DIRECT EXAMINATION

17   BY MR. REINSCHMIDT:

18   Q.   Mr. Burger, how old are you?

19   A.   I am 67 years old.

20   Q.   And let's look just quickly at your résumé which is Exhibit

21   1033.  And you'll see that in front of you on the screen.  We're

22   not going to go through all of that.  I just want to understand

23   generally has your entire career been in the banking industry?

24   A.   It has.

25   Q.   Okay.  And basically if we look at that, it looks like
```

1  you've kind of worked up the chain of command, if you will,

2  primarily at Minnwest Bank in Luverne, Minnesota?

3  A.    That's correct.

4  Q.    And ultimately you became the CEO of that bank?

5  A.    Yes, I was previously CEO of Minnwest Bank, Montevideo and

6  then also then transferred to Luverne as a CEO in Luverne

7  so . . .

8  Q.    So pursuant to that -- so you were in the banking industry

9  how many years?

10  A.    Oh, something over 40.

11  Q.    And pursuant to that did you work on SBA loans, loan

12  guarantees, during your 40 or so years in the banking industry?

13  A.    Yes, I did.

14  Q.    And did you -- just generally speaking, was your -- was

15  your experience just in overseeing them, or did you do the

16  actual paperwork or not?

17  A.    In both cases.  As a junior lender, I was involved in

18  originating SBA loans and then after I became a CEO obviously

19  overseeing SBA loans and the closing of the loans and so forth

20  so . . .

21  Q.    And pursuant to this case, did you -- did you get involved

22  in this case to overlook things in this case or review what had

23  happened in this case?

24  A.    Yes.  I was asked to provide consulting relative to review

25  of information and basically to give an opinion relative to the

1   outcome.

2   Q.   And did you sit in on a number of depositions in this case?

3   A.   I did.

4   Q.   And you've reviewed many documents in this case?

5   A.   Quite a few, yes.

6   Q.   All right.  Fair enough.  What facts -- as you looked at

7   documents and thinking about this case, what -- what facts were

8   most important to you to look at or ascertain?

9   A.   Well, I think the motivation behind the bank originating

10  the SBA loan originally and then where the bank found

11  themselves, the position the bank found themselves in later in

12  the transaction, and then obviously Mr. Lucken's involvement in

13  the transaction later as he injected capital into the business.

14  Q.   As you reviewed Dirks Motor Company's situation -- well,

15  let me back up.  Let's talk about the origination of the SBA

16  loan.  Prior to that origination, there had been OCC enforcement

17  actions in Minnesota and in Iowa.  Are you aware of that?

18  A.   I am aware.  I reviewed those documents.

19  Q.   And then ultimately there were also terminations of those

20  enforcement agreements as well.

21  A.   Correct.  Actually the termination agreements came before

22  the -- I think the actions were three-year actions, and the

23  terminations actually happened ahead of the three years.  So

24  they were -- they were taken off early.

25  Q.   Were these enforcement actions that were initiated -- I

1  think they were both in 2008, 2009 -- were those common or

2  uncommon during that period?

3  A.   As I think we all know, the economic situation at the time

4  was rather dire, and the housing bubble burst about that time

5  which created a lot of pressure on commercial real estate

6  lending per se.  And I would guess -- this is a guess but I

7  think a fairly close estimate -- I know in the state of

8  Minnesota where I was doing my banking there were probably in

9  the neighborhood of 20 percent or more of the banks in that

10  particular state that were under some type of enforcement action

11  at that time.

12  Q.   And ultimately when the OCC releases the enforcement

13  agreements, then what does that mean?  What triggers the

14  termination of the enforcement agreements?

15  A.   Well, the agreement provides for -- basically for

16  monitoring certain aspects of the bank.  There's reporting that

17  goes along with that, and if the bank has fulfilled stipulations

18  of the agreement and the reporting has been done properly and

19  promptly, then the federal regulators will step back and say

20  you've done your job and we release you from the agreement.

21  Q.   Let's move on then to the SBA -- the actual SBA loan

22  guarantee.  When the SBA loan guarantee was originated or as it

23  followed through, there's been a lot of testimony in this case

24  about the fact that Ford Motor Credit had a superior lien to

25  cars, primarily to cars and parts, also accounts receivable --

1    that's called chattel paper too -- but let's just focus on the

2    cars and the parts.  In your business as Minnwest Bank, did your

3    bank do floor planning for car dealers or anyone else?

4    A.   We did some minimal floor planing agreements with used car

5    dealers, but to my knowledge I was never involved in floor

6    planning for new dealership.

7    Q.   Why did you do even minimal amount for used car dealers?

8    A.   Why --

9    Q.   Or maybe not why.  Tell me about the rudiments of floor

10   planning.  I mean, what makes it a good thing for banks or a bad

11   thing for banks?

12   A.   Well, in general banks are not involved in floor planning

13   arrangements with car dealerships, equipment dealerships, that

14   sort of thing.  And it's primarily very advantageous for a

15   dealer to do business with the manufacturer, in this case Ford

16   Motor Credit.  They give probably better interest rates to the

17   dealer than a bank could charge.  They also -- if there are

18   units that they're trying to push to sell, they may give you 60

19   to 90 days' free interest to carry the inventory for them on

20   their lot.  So it's very hard for banks to compete for floor

21   plan-type agreements with the manufacturers.

22         So other than used cars where there obviously is not

23   that manufacturer laying out there willing to do that work for

24   you, most banks I think are not involved in floor planning for

25   new equipment.

1  Q.   Is it a labor intensive and administratively intensive type

2  of loan?

3  A.   It's very -- if done properly, it's very intense in terms

4  of monitoring process.  The line is set up so that advances are

5  made against the line as each unit is purchased.  And the

6  ownership documentation, title, statement of origin, whatever it

7  is, is held by the lender.  And that specific amount of money is

8  held against that unit until the unit is sold.  When the unit's

9  sold, then that money comes back in against the line and then

10 obviously repeats itself on a regular basis.

11          But in order to monitor that, I think most floor plan

12 arrangements -- they're sending people out to count cars, if you

13 will, or count equipment probably every 30 to 60 days to make

14 sure that dealer is remitting as he's selling the car, remitting

15 that money back to them on that specific unit.

16 Q.   Have you been directly involved in SBA loan guarantees

17 wherein there was an existing loan on something unrelated to

18 floor planning and then you also had a floor planner that was

19 out there who was loaning money to a car dealer or computer

20 dealer?

21 A.   As an SBA loan?

22 Q.   Yes.

23 A.   No.

24 Q.   How about like in this case where you've got the SBA loan

25 and you've also got Ford Motor Credit out there?  Have you seen

1  those situations in your bank?

2  A.   No, I guess I can't say that I've experienced --

3  experienced it with SBA.  We as a bank loan money to equipment

4  dealers, for instance, which is very similar to a car dealer

5  where we knew in this case John Deere Credit had a floor plan

6  agreement with a John Deere dealer, yet we loaned operating

7  money to that dealer knowing full well that there was a first

8  lien mortgage holder in the -- I'm sorry, first lien chattel

9  holder in the equipment that was on the lot.  That was part of

10  the -- just part of the deal, part of the understanding.

11  Q.   So you knew if you ever had to try to collect on your loan

12  John Deere would still be ahead of you relative to the parts and

13  equipment that they had sold to that dealership?

14  A.   Exactly.  They always took a blanket filing on all parts,

15  inventory, and contract rights, so forth and so on.

16  Q.   Like in that case you talked about with your bank, if you

17  took a priority interest to John Deere Credit, for example,

18  would you anticipate that John Deere Credit would finance

19  equipment and parts to that dealership?

20  A.   No, they would not.

21  Q.   Did you see -- as you looked at all the documents in this

22  case, did you see anything that led you to believe that any of

23  the -- that Mr. Mathiasen or Mr. Geiger who's one of the owners

24  of the bank, any one of those officers, did they do anything

25  improperly that you saw in this case?

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer-Aided Transcription
Case 5:16-cv-04005-MWB-KEM   Document 189   Filed 05/07/18   Page 37 of 117

1    A.    No, I didn't note any improper actions on their part.

2    Q.    Did you think -- and we'll get to Mr. Lucken's involvement,

3    but I'm talking about prior to Mr. Lucken's involvement, did you

4    see any actions they took pr -- well, actually let's just --

5    let's even back it up to summer of 2011.  In summer of 2011, up

6    to that point, had you seen anything relative to the Dirks Motor

7    Company loan that they had done improperly?

8    A.    No.

9    Q.    Or not customary?

10   A.    Everything that I reviewed from the bank's perspective was

11   within the boundaries of usual and customary business practices.

12   Q.    And are you aware that -- were you aware if Mr. Dirks or

13   Dirks Motor Company was having challenges in 2011?

14   A.    Yes.  It was obvious that the dealership had struggled for

15   a couple of years.

16   Q.    And there's been testimony in this case about the concept

17   of being out of trust, and we talked about -- I don't have to

18   have you explain that.  I think the jury's well aware what it

19   means by this point.  But how significant is that?

20   A.    It's very significant obviously.  The trust of the -- trust

21   is a huge issue between lenders and borrowers, and when one

22   sells equipment out of trust and basically is selling the unit

23   and using the money for something other than paying down the

24   note, it certainly erodes that trust big time.  So yeah, it's a

25   huge issue.

1  Q.   I think there's an exhibit that was Exhibit 138.  I'll just

2  pop it up to make sure my memory is accurate.  And I guess I am

3  accurate.  That's good.  July 14, 2011, and that was a letter

4  from Sterling Crim to Dirks, Mr. Dirks, saying, "Thank you for

5  your request, but we're not going to loan you any more money."

6  Did you see that letter in your review?

7  A.   Yes, I reviewed that document.

8  Q.   And did you see that comment about loan limits?  It'd be in

9  the first paragraph where he says -- at the end of the sentence

10 he says, "We have reached -- we have reached our current loan

11 limit to one borrower."

12 A.   Yes.

13 Q.   And what does that mean?

14 A.   It can mean several things, but I'm assuming that at this

15 point they're saying that their in-house lending limit has been

16 reached with one borrower.  All banks have lending limits within

17 their banks.  Some are regulated.  Some are based upon capital,

18 but some are just internal lending limits where they establish

19 with any specific type of loan or customer they'll go to a

20 certain level and then that's as far as they'll go.

21 Q.   Would that have -- I'm going to jump ahead to when Ford

22 Motor Credit was paid off through the use of Mr. Lucken's funds.

23 Would the loan limit have changed relative to Ford Motor Credit

24 being paid off?

25 A.   I don't think so, no.

1 Q. Okay. Are you aware that then as we move forward from July

2 14, 2011, that by September Ford was taking cars back and

3 selling cars?

4 A. Yes. I believe Ford basically took all the inventory out

5 at one point and sold that inventory at auction, what was left

6 at that time, so . . .

7 Q. I want you to look at -- I think it's Exhibit 27. And

8 that's been discussed as an internal memo in the bank

9 downgrading the Dirks Motor Company loan. Do you see that?

10 A. Yes.

11 Q. And we've talked with Mr. Mathiasen. I think we've talked

12 with Mr. Crim about this. There's three bullet points. Did you

13 see anything in here -- and they've also taken that charge. Do

14 you know what that is?

15 A. I'm pretty sure it's the unguaranteed portion of the SBA

16 loan.

17 Q. Well, that's what it says, but is there anything else that

18 you can add to that beyond what the document says?

19 A. Well, when you're in a workout -- a stressed loan

20 situation, a workout situation, on a guaranteed loan

21 irregardless of what agency guarantees it, it's pretty usual and

22 customary when you think there's going to be issues that you

23 charge off that unguaranteed portion because that's what you're

24 at risk for.

25 Q. Is that an internal charge-off that you're doing?

1    A.    That's internal, absolutely.  It's no longer on the books,

2    but it's still an asset of the bank.

3    Q.    Did you see anything at this point on September 29, 2011 --

4    when the bank is taking these actions of they're downgrading the

5    loan, they're charging off that portion -- the unguaranteed

6    portion of the SBA loan, and it looks like they're starting a

7    plan to exit the loan, do you see anything improper about what

8    was decided to -- 10 to 0 at that meeting?

9    A.    No.  I think the bank was acting in a very usual and

10   customary manner the way they handled the situation.

11   Q.    By the way, if in the course of exiting a loan, in this

12   case exiting an SBA-guaranteed loan, if the debtor somehow comes

13   up with some money, whether it's family, friends, sells

14   something, and he or she has been in arrears on the loan and now

15   brings it current, what typically would you as a banker do at

16   that point?  Would you continue with the foreclosure

17   proceedings, or would you stop given that they've now caught the

18   payments up?

19   A.    Well, I think taking a step back, normally in a work out

20   loan situation where you're not willing to loan any further

21   dollars to the operation, you explain to the customer that their

22   options are to sell out and pay the loan down or to inject

23   capital by whatever means they can.  More frequently than not

24   the capital normally comes from a relative or someone that is

25   known, and sometimes it's trade-offs.  Sometimes the capital

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer-Aided Transcription
Case 5:16-cv-04005-MWB-KEM   Document 169   Filed 05/07/18   Page 41 of 117

1  becomes part -- the person providing the capital becomes part

2  owner in the business or whatever.  There's all kinds of

3  arrangements that can be made.  But in short you certainly -- if

4  you can avoid the foreclosure on the business by whatever means,

5  you try and do that.  And if additional capital's offered, then

6  it would seem to be in the best interests of the customer and

7  the bank to try and make it work so . . .

8  Q.   And if they -- if they're able to bring -- under SBA loan

9  guidance, are you further restricted with how you can follow

10  through with closing down the business?

11  A.   I don't think SBA's restrictions differ much if at all from

12  what normal procedure would be in a banking business.  It's

13  pretty standard stuff.

14  Q.   Which is -- if I understand you, which means basically if

15  you can avoid foreclosure, do that.

16  A.   Well, sure.  SBA is simply a guarantor.  They provide no

17  money.  They're just guaranteeing the loan as provided by the

18  bank.  So most of the time, the vast majority of the time, as

19  long as the bank's consulting with them and telling them what's

20  going on, SBA's going to say, yeah, you handle it in your way.

21  Q.   Were you present for Mr. Crim's deposition in this case?

22  A.   I was not.

23  Q.   Were you present for Mr. Lucken's deposition?

24  A.   I was.

25  Q.   And are you aware that the bank's position via Mr. Crim is

1  that no floor planning was promised in that meeting?

2  A.    That's -- yeah, I think that's been documented.

3  Q.    And you understand Mr. Lucken's testimony that -- of the

4  two $250,000 injections?  Do you understand that, that that's

5  what he said?

6  A.    Yes, I do.

7  Q.    Did you see in your review of this bank file and any other

8  documents, whether it's Ford Motor Credit documents, the bank's

9  file, did you see any document that supported -- that supported

10  Mr. Lucken's testimony that he -- of this plan where if he did

11  these two $250,000 injections then Heritage would do a floor

12  plan?

13  A.    I saw nothing that would indicate that Heritage had backed

14  up on their original letter denying any further credit

15  extensions to Dirks Motor.

16  Q.    And given that Mr. Dirks had -- was having issues

17  attempting to obtain floor planning throughout -- throughout all

18  of 2011, what alternative did he have in order to buy cars?

19  Once Ford -- we know Ford Motor Credit was paid off.  Once that

20  happened, how was he going to buy cars?

21  A.    Obviously it would be very difficult.  And again, it would

22  depend on someone either providing the capital for him with a

23  direct injection of capital or borrowing money for him in order

24  for him to accomplish that.  He'd been -- I believe that the

25  documents indicated that he'd been to four or five different

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*Elmo's Computerized Realtime Transcription*
Case 5:16-cv-04005-MWB-KEM   Document 109   Filed 05/07/18   Page 43 of 117

1  banks or other financial people trying to get a floor plan and

2  was denied at all -- all turns.  So his options were very

3  limited.

4  Q.    In that context with limited options, do you find whether

5  or not the line of credit that was established by Mr. Lucken to

6  be customary or not customary in terms of how he then was able

7  to obtain cars?

8  A.    I don't know that it's customary to set up the line of

9  credit, although it's an option.  I think in a lot of cases when

10  capital comes in, it comes in in the form of cash directly to

11  the individual in the business.  But in this particular case

12  apparently the choice was to set up the line of credit at the

13  bank and to secure it with cash collateral.

14  Q.    And at that -- up to that point of that line of credit

15  being set up, had you seen numerous documents where Mr. -- where

16  Mr. Dirks was talking about the possibility of getting floor

17  planning including with GM Financial but nothing materialized?

18  A.    That's correct.  As I said, he applied to several financial

19  institutions as well as GM, and they all turned him down.

20  Q.    From what you could see from the file, do you think that

21  Mr. Dirks had any other options but seeking private financing?

22  A.    Not that I could see, no.

23  Q.    Is it normal when -- well, strike that.

24        I'm going to have you look at just Exhibit 46 which is

25  the promissory note that Mr. Lucken signed on January 19, 2012.

1  And we're just showing the top part of it to you.

2  A.   Okay.

3  Q.   As you see this, is this a standard promissory note?

4  A.   Yes.

5  Q.   When I say that -- you're up in Minnesota -- are promissory

6  notes pretty standard from state to state?

7  A.   They don't deviate much, no.

8  Q.   And as you see this, is it an actual form that you print

9  off your computer?

10  A.   Yes.

11  Q.   And as we see it and it gives -- like it gives the loan

12  amount, gives -- up in the top right it repeats it, in this

13  portion on the far right.  We talk about this as a line of

14  credit.  Sometimes people talk about revolving lines of credit.

15  Is there a difference between that?

16  A.   Not materially.  This is a revolving line of credit I

17  believe.

18  Q.   What is that?

19  A.   It's an open-ended revolving line of credit.  In other

20  words, it can be advanced against, paid down, and then

21  readvanced.  So it can flow up and down.

22  Q.   And if we go back to the full document and then go down to

23  the bottom, and it says -- by the way, it says that it's to be

24  used for operating expenses.  Do you see that on this section

25  right here?

Case 5:16-cv-04005-MWB-KEM Document 129 Filed 05/07/18 Page 45 of 117

1   A.   Yes.

2   Q.   That I've blocked out?

3   A.   Yes.

4   Q.   In your estimation as a banker, when it says operating

5   expenses, would that encompass the purchase of cars?

6   A.   It certainly could.

7   Q.   And, in fact -- oh, before I do that, it also -- before I

8   move on, it also says here's what the security for this loan is.

9   Is that typically that you would see that, a box that would have

10  that security?

11  A.   Yes.

12  Q.   And it would say what the -- what's going to secure that

13  loan.

14  A.   It is the primary security for the loan.

15  Q.   And this is signed by the Luckens?

16  A.   Yes.

17  Q.   Both in their individual and trustee capacity?

18  A.   Yes.

19  Q.   Now I want you to also look at Exhibit 50.  And this is

20  Mr. Crim on January 23, 2012, saying if you concur, please sign

21  this letter.  Then if we go to the letter on the next page --

22  we'll blow that up -- that's the attachment, and there's been --

23  multiple folks have testified that 2011 -- woops -- 2011 is

24  wrong, that it should be 2012.  So let's view that as January

25  18, 2012.

1  A.   Okay.

2  Q.   Did you read this letter?

3  A.   I have reviewed the letter, yeah.

4  Q.   Why would that letter -- or strike that.

5        Does this letter explain the con -- both the

6  assignment of the CD and the promissory note?

7  A.   I believe it does.

8  Q.   Would it be normal to have this letter accompany a

9  promissory note and an assignment of CD?

10 A.   No.

11 Q.   Why do you think -- what's the value to having it here, to

12 have written that letter?

13 A.   Well, I think it's a letter outlining the understanding

14 between the borrower and the bank relative to lending to Dirks

15 Motor Company where the funds are being directed towards Dirks

16 Motor Company.  The bank is just saying you're giving your

17 permission, and I believe it says the trust agrees that any

18 request for advances via electronic or paper on behalf of Dirks

19 Motor Company may be funded from the line with no further notice

20 of the trustee.

21 Q.   What's the p -- I think I've talked about every sentence in

22 there, but now you get to talk about that sentence.  I've never

23 talked about that one.  Why did you talk about that?  What is

24 the significance of that?

25 A.   Well, it clearly states that Mr. Lucken and trust are

1  giving permission to the bank to advance on any request from

2  Dirks Motor Company.

3  Q.  So the bank doesn't have to every time -- if it was a car,

4  whatever it was, they don't have to every time call the trustees

5  or the individuals and say, Mary or John, can Dirks purchase

6  this vehicle or he needs -- it also says it can be used -- it's

7  primarily for autos, but also that means also for other things

8  too.  They don't have to call him; correct?

9  A.  Correct.

10  Q.  All right.  And then below it says that --

11      MR. REINSCHMIDT:  If you'll just highlight the "in the

12  event" sentence.

13  Q.  It doesn't talk about a deal between Heritage and Lucken or

14  Heritage and Dirks, does it?

15  A.  No.

16  Q.  And what did you understand the deal was from the review of

17  the documents between the trust and Dirks Motors?

18  A.  What did I understand that sentence to --

19  Q.  No, what'd you understand -- yeah, what'd you understand

20  the deal was that's alluded to in that sentence?

21  A.  Apparently there existed an agreement between the trust and

22  Dirks -- and Dirks Motors and if that was going to change, that

23  the bank would be notified of any change in writing.

24  Q.  Do you -- have you ever done lines of credit where it is

25  for the benefit of a third party such as in this case Dirks

1  being the third party?

2  A.   Yes.

3  Q.   And when has that happened?

4  A.   The one that comes to mind I guess was a -- it was a farm

5  situation.  A son was operating the farm, and the father stepped

6  in and did a line of credit under his name, and the advances

7  were done for the benefit of the son who was operating the farm.

8  Q.   Did you do -- in your case, the instance you gave with your

9  bank, did you do anything comparable to this letter in addition

10  to the promissory note?

11  A.   Yes.  We had a letter of understanding with the father that

12  the note was his and it was his responsibility to pay it and

13  that he was giving up any rights of monitoring, if you will, the

14  advances.  The bank was honoring advances at the request of the

15  son.

16  Q.   And why did you ask like in that case for the father to

17  give up the rights to monitor?

18  A.   Well, what we were asking him to do is so that we didn't

19  have to notify him every time the son came in and needed an

20  advance we didn't have to send him a notice indicating what it

21  was for and so forth.  And he agreed to that provision.

22  Q.   So would it be fair to say that that would be a cautious,

23  conservative thing for a bank to do to add -- to have this

24  add-on so there was no misunderstanding?

25  A.   Yeah.  Certainly need to err on the side of conservatism in

1  that sense.

2  Q.   As you read that letter, do you have any confusion or

3  misunderstanding as to what this line of credit was to be used

4  for?

5  A.   No.  Seems pretty clear to me.

6  Q.   You're a banker of 40 years.

7  A.   Yes.

8  Q.   That being said, do you think that the promissory note was

9  very clear regardless of whether one is a banker or not?

10 A.   Absolutely.  I'm assuming that these types of notes are

11 pretty universal and that they're signed all the time.  Now, are

12 they read thoroughly?  Maybe not.  But certainly the

13 obligation's there, and people are well aware of their

14 obligation after they sign a note.

15 Q.   And these are the same -- the promissory note we looked at

16 earlier, are those promissory notes you give to your customers

17 on a daily basis?

18 A.   Absolutely.

19 Q.   Or did before you retired?

20 A.   Did, yeah.  Couple of years ago.

21 Q.   Would there be -- and I think I may have asked you this

22 earlier, whether or not a CD would be a normal -- normal or --

23 collateral for a promissory note.

24 A.   Oh, certainly.  It's not out of the ordinary.

25 Q.   Did you see in this case -- and we've talked about it at

1    some length in this case -- that prior to Mr. Lucken's purchase

2    of that CD there was a request for Mr. Crim for financial

3    documents from Mr. Lucken?  Do you remember that?

4    A.    I guess I don't recall that.

5    Q.    Would there be a necessity for financial documents if he

6    was going -- if Mr. Lucken was going to purchase a CD?

7    A.    No, not just for the simple purchase of the CD you wouldn't

8    necessarily require those documents.

9    Q.    Right.  And could the bank, in this case Sterling Crim,

10   could they have alerted Mr. Lucken's -- Mr. Lucken with more

11   information than they knew about Mr. Dirks to alert him as to

12   the -- maybe more clarity on Dirks' financial situation?

13   A.    At this point you're getting into some pretty stringent

14   privacy laws that banks must adhere to.  That's federal

15   regulation.  Without Mr. Dirks' written permission, no, it would

16   be not advisable to discuss his situation in any way with a

17   third party.

18   Q.    Did you see -- as you looked at the file, did you see any

19   due diligence that Mr. Lucken took to ensure that the risk he

20   was taking was -- at least he knew what the risk he was taking;

21   whether it was a high risk or low risk, he knew what he was

22   getting into?

23   A.    No.  Amazingly, I saw nothing that would indicate that

24   there was any due diligence done prior to the advances.

25   Q.    Did you see anywhere in the documents -- there's been

1  reference by Mr. Lucken throughout this case to a phrase backup
2  collateral.  Did you ever see that phrase appear in any
3  documents, correspondence, or e-mails?
4  A.   No.  It's quite clear in my opinion that the CD was the
5  collateral for the note.  There was never any mention of any
6  backup.
7  Q.   Like, for example, you as a banker, if you were throwing
8  out terms to a borrower, is that a term that you would throw out
9  as backup collateral, or what would you typically say as a
10 banker if it wasn't primary?
11 A.   No.  I don't think we use backup collateral as a term.
12 Q.   What would your term be if it was secondary?
13 A.   Well, to give you an example of -- in commercial lending I
14 think it's very customary that you file a UCC agreement which in
15 banker terms becomes a boilerplate agreement in which you take
16 collateral on everything you possibly can.  You take a
17 collateral position.  In some instances that collateral position
18 may be in a second position, and you might consider that as
19 backup collateral in a sense that you're not holding primary
20 position, but at the same time you still have an interest, a
21 security interest, in that collateral.
22 Q.   If this CD was going to be secondary collateral, how would
23 it have been designated?
24         MR. LAWRENCE:  Objection, Your Honor.  Leading.
25         THE COURT:  Rephrase the question, please.  Sustained.

1    BY MR. REINSCHMIDT:

2    Q.   Is there -- how would you -- how would you -- if you were

3    going to have something as security on that promissory note

4    that's not primary -- primarily securing that promissory note,

5    how would you designate it?  What would you call it, or what

6    would you file?

7    A.   Well, number one, when you're designating security on a

8    promissory note, you're very specific as to what the security

9    is.  Now, the filing may encompass more than what's designated

10   on the note in the sense that if you're taking all farm chattel

11   assets, for instance, on a farm debt, you readily acknowledge

12   that there may be a combine or a tractor that John Deere's

13   financing and they hold first mortgage secured purchase money,

14   first mortgage security interest in that property, and you are

15   in a second position on that which entitles you to any equity

16   obviously if the equipment's sold once they're paid off any

17   other value.  So I suppose you could count that as backup

18   collateral, if you will, terminology.

19   Q.   But again, as you look at the portion of the promissory

20   note where it says assignment of CD, as you look at the Exhibit

21   48 which -- where there's the actual assignment of the CD, is

22   there anything there that is incomprehensible or one can't

23   understand that this CD is being assigned to secure this note?

24   A.   I can't see how that could be misinterpreted I guess.  It

25   is what it is.

1  Q.  Would -- I mean, I think we've walked through essentially

2  as we've gone through and summarized some of your conclusions.

3  But what conclusions did you reach within a reasonable degree of

4  certainty about this -- about this case, about Mr. Lucken's

5  actions, Heritage's actions, and Dirks' actions?

6  A.  I think in my disclosure some of the key issues here that I

7  pointed out was that I think Mr. Lucken's involvement in the

8  situation became -- it was a result of a direct conversation

9  with Mr. Dirks.  The bank had nothing to do with the origination

10  of that agreement if their agreement existed.  I know that

11  Mr. Lucken took great pride in being a benefactor for his

12  community and was trying to save the business.  The basis of his

13  involvement in this was his desire to save Dirks Motor Company

14  from going out of business.

15        MR. LAWRENCE:  Objection, Your Honor.  703.

16        THE COURT:  Overruled, but, you know, he's testifying

17  on a narrative now because you asked a compound question with

18  five different parts to it.  So why --

19        MR. REINSCHMIDT:  I'll break it into more questions,

20  Your Honor, quickly.

21  BY MR. REINSCHMIDT:

22  Q.  So you've said one was that he -- that he had a

23  conversation with Mr. Dirks; secondly, that he was a benefactor

24  of the community.  What other conclusions did you reach?

25  A.  Well, I think the primary conclusion was that the bank was

```
 1    in foreclosure when Mr. Dirks stepped into the act, and the bank
 2    stopped that foreclosure at the request of Mr. Dirks and
 3    Mr. Lucken on the promise that there was going to be capital
 4    injected into the business, and there was.  Effectively the
 5    payment to Ford Motor Credit had to happen because Ford Motor
 6    Credit was in the process of foreclosure of the business and
 7    seizing assets.  So without that, the business failed.  So to
 8    the point wanting to save the business, Mr. Lucken's funds went
 9    to pay off Ford Motor Credit and inject money into the operating
10    account.
11            So from -- from the inception I think the objective of
12    Mr. Dirks and Mr. Lucken was to save the dealership, and they
13    hoped to do that with the injection of cash.
14            If I'm a banker and sitting in the chair --
15            THE COURT:  Yeah, this is narrative, so -- but let
16    me -- I normally don't ask questions.  But you said the bank was
17    in foreclosure.  That's ambiguous.  You don't mean the bank was
18    in foreclosure.  The bank was --
19            THE WITNESS:  No, no.  I'm sorry. I'm sorry, sir.
20            THE COURT:  -- proceeding with foreclosure.
21            THE WITNESS:  The bank was foreclosing on the
22    business, yeah.
23            THE COURT:  Yes.  Thank you.
24            MR. REINSCHMIDT:  Thank you, Your Honor.
25    BY MR. REINSCHMIDT:
```

1    Q.   Well, let me ask you a last question, and that is, could

2    Mr. Lucken have taken efforts -- I'm talking about the line of

3    credit now.

4    A.   Okay.

5    Q.   And the line of credit with the letter says Dirks can draw

6    on this for the primary reason to purchase automobiles.  Could

7    Mr. Lucken have taken any legal steps to protect himself for

8    that?  Are there any documents he could have filed?

9              THE COURT:  Now you're compound --

10             MR. LAWRENCE:  Objection, Your Honor.

11             THE COURT:  You're compound questioning again.

12             MR. REINSCHMIDT:  I'm sorry, Your Honor.

13             MR. LAWRENCE:  Objection, Your Honor.  In addition to

14   being compound, exceeds the scope of the expert disclosure.

15             THE COURT:  Sustained.

16             MR. REINSCHMIDT:  That's all I have, Your Honor.

17             THE COURT:  Thank you.  Why don't we all take a

18   stretch break, and then we'll have the cross.

19             Thank you.  Please be seated.

20             Mr. Lawrence?

21             MR. LAWRENCE:  Thank you, Your Honor.

22                           CROSS-EXAMINATION

23   BY MR. LAWRENCE:

24   Q.   Mr. Burger, you're aware that Mr. Lucken and Mr. Dirks met

25   with Mr. Crim on November 8, 2011; correct?

1    A.   I believe so, yeah.

2    Q.   And you were at Mr. Lucken's deposition, so you would have

3    heard his testimony there about that; correct?

4    A.   Yes.

5    Q.   You haven't listened to audio of that meeting, have you?

6    A.   I have not.

7    Q.   You haven't watched a recording of that meeting, have you?

8    A.   I have not.

9    Q.   You don't know what happened at that meeting, do you?

10            THE COURT:  Just a second.  Are you implying that

11   there was --

12            MR. LAWRENCE:  No, I'm not.

13            THE COURT:  Well, why don't we clarify that.

14            MR. LAWRENCE:  Okay.

15            THE COURT:  Because it's impermissible to ask a

16   question . . .

17            MR. LAWRENCE:  I'm sorry.

18   BY MR. LAWRENCE:

19   Q.   I'll just ask you you don't know what happened at that

20   meeting, do you?

21   A.   I was not present, no.

22   Q.   Okay.

23            THE COURT:  You're not suggesting that there was any

24   audio or video recording of the meeting.

25            MR. LAWRENCE:  No, I'm not, Your Honor.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Transcription
Case 5:16-cv-04005-MWB-KEM   Document 169   Filed 05/07/18   Page 57 of 117

1          THE COURT:  Okay.

2          MR. LAWRENCE:  No.

3          THE COURT:  Okay.  I just want to make sure.

4          MR. LAWRENCE:  Absolutely not, Your Honor.

5     BY MR. LAWRENCE:

6     Q.   Would the bank be conducting itself in a usual and

7     customary fashion if it would just flat out lie to a customer or

8     a prospective customer?

9     A.   No.

10    Q.   Would a bank be conducting itself in a usual and customary

11    fashion if it would lie to a customer or prospective customer to

12    get them to invest in a business like Dirks Motor?

13    A.   That would not be usual and customary, no.

14    Q.   Now, would a bank be conducting itself in a usual and

15    customary fashion if it would make promises to a major car

16    manufacturer like Ford or GM that it knows aren't true?

17    A.   Repeat the question.

18    Q.   Would a bank be conducting itself in a usual and customary

19    fashion if it were to make promises to a major car manufacturer

20    like Ford or General Motors that it knew to not be true?

21    A.   No, they would not be.

22    Q.   Do you know if Heritage Bank made any promises to Ford or

23    General Motors based on your review of the file of this case?

24    A.   I don't believe they did, no.

25          MR. LAWRENCE:  Can we pull up Joint Exhibit 40.  Can

1  we highlight the top part including the letterhead?

2  Q.   Mr. Burger, do you recall seeing this document in your

3  review of the file?

4  A.   I believe I have seen it, yes.

5  Q.   Okay.  And would you agree that this is on Heritage Bank's

6  letterhead?

7  A.   Yes.

8  Q.   And is this a letter from Heritage Bank to General Motors

9  that is a commitment to pay General Motors for the sale of

10  certain vehicles?

11  A.   I believe that's right.

12       MR. LAWRENCE:   Okay.  And can we step out from this

13  and just blow up the two paragraphs?

14  Q.   Can you take a moment to read these, please?

15  A.   Yes.  Okay.

16  Q.   Would you agree that this letter is Heritage Bank

17  representing to General Motors that it has been asked by Dirks

18  Motor to finance Dirks Motors' purchase of new and used motor

19  vehicles?

20  A.   No.

21       MR. LAWRENCE:   Can we take a look at the -- highlight

22  this first sentence?  Then focus on this first part.

23  Q.   Mr. Burger, does this letter say, "We have been asked and

24  authorized by the above named dealer to finance the dealer's

25  purchase of new and used motor vehicles"?

1  A.   I believe what --

2  Q.   Does the letter say that, sir?

3  A.   I'm sorry?

4  Q.   Does the letter say that?

5  A.   Hold on.  Yes.

6  Q.   Okay.  Let's go to the next sentence.  Does this sentence

7  say that Heritage agrees to pay GM the full invoice amount of

8  all vehicles hereafter sold to dealer in accordance with the

9  terms of the sale agreement in effect between GM and the dealer?

10  A.   Yes, although I believe there's limitations in the second

11  paragraph as to amount.

12  Q.   Okay.  And that limitation is $250,000 in any one week;

13  correct?

14  A.   That's what it says, yeah.

15  Q.   So based on this letter, Heritage is representing to GM

16  that Dirks Motor can order up to a quarter million dollars of

17  vehicles every week and Heritage will pay for it.

18  A.   That's what those two paragraphs would indicate, yeah.

19  Q.   Now, would it be a usual and customary banking practice --

20  strike that.

21       I want you to assume at the time Heritage sent this

22  letter to GM that it had the intent to never pay -- to never let

23  Dirks Motor order more than one quarter million dollars,

24  $250,000, of vehicles, period, not in any one week, period.

25  Having made that assumption, would it be a usual and customary

1   banking practice to tell General Motors that it will pay

2   $250,000 for vehicles in one week instead of that it will pay

3   for just $250,000 in vehicles at any one time and no more?

4   A.   I believe what you're referring to is the bank is limiting

5   time frame of one week for 250,000.  It doesn't -- it doesn't

6   get to the limit as imposed by the limit on the face of the

7   note.  It just says they cannot order more than 250,000 in a

8   week's time.

9   Q.   Let me ask you this.  Would it be a usual and customary

10  banking practice for the bank to not inform General Motors that

11  really Dirks Motors just has $250,000 to use at any one point in

12  time and that Heritage won't pay for vehicles if Dirks Motors

13  has used up that $250,000?

14  A.   I don't think the bank violated any par -- I don't think

15  the bank lied to GM.  They were just explaining to them,

16  outlining what they would do.

17  Q.   Do you know if this is a letter that the bank wrote or if

18  this is a form letter from General Motors?

19  A.   I do not -- I don't know.

20  Q.   I want you to assume that this is a form letter from

21  General Motors; okay?

22  A.   Okay.

23  Q.   If this is a form letter from General Motors and the bank

24  intended to do something differently than what was written in

25  this form, would it be a usual and customary banking practice

1 for the bank to modify the form letter so General Motors

2 accurately knew and understood the bank's intent at that point

3 in time?

4 A.   I'm not sure I understand the question.

5 Q.   Would it be a usual and customary banking practice for

6 Heritage Bank when presented with this form letter to modify,

7 change the terms of the form letter to reflect Heritage Bank's

8 true and accurate intentions at the time it was completing the

9 form letter?

10 A.   Normally on a form letter you don't change a provision of

11 the form letter coming from a dealership, no.

12 Q.   And why is that?

13 A.   I think the usual and customary way to handle that would be

14 to contact the person -- the outfit generating the form letter

15 and make modifications if need be.  But I don't think you would

16 want to modify the document.

17 Q.   The dealer has all the power, don't they, in this

18 situation, that either you accept the letter on their terms or

19 you don't agree to provide the financing; correct?

20 A.   Define dealer.  Are you talking about GM?

21 Q.   I'm talking about -- I'm sorry.  I'm talking about General

22 Motors.

23 A.   They're selling the cars.  Yes, they pretty well hold the

24 cards.

25 Q.   Okay.  So if General Motors requires the bank to allow the

Case 5:16-cv-04005-MWB-KEM   Document 169   Filed 05/07/18   Page 62 of 117

1   purchase of $250,000 of vehicles shipped in any one week, the

2   bank really doesn't have much room to negotiate that, does it?

3   A.    Chances are not.

4   Q.    Okay.  Now, the opinions you gave at the end of your

5   testimony, those are all based on assumptions that Mr. Crim did

6   not promise floor plan financing to Mr. Dirks or Mr. Lucken at

7   that November 8, 2011, meeting; correct?

8   A.    I find nothing that would indicate that there was any such

9   promise made.

10  Q.    If Mr. Lucken and Mr. Dirks testified to the contrary,

11  that's nothing to you?

12  A.    I have to believe that the bank was acting in a usual and

13  customary manner and they wrote a letter which basically denied

14  any further credit.  I can't believe that they would turn around

15  and change their mind on it.

16  Q.    Let me ask you this.  Assume Mr. Lucken and Mr. Dirks are

17  telling the truth.  Would your opinion still be valid if

18  Mr. Crim promised floor plan financing at that November 8, 2011,

19  meeting?

20  A.    Based on the documentation, I can't assume that.

21  Q.    I'm asking you to make this assumption just for the sake of

22  answering my question here.  So please make that assumption, and

23  then tell me if your opinions would still be valid if that

24  assumption were true.

25  A.    Some of the opinions would not be valid if I assume that

1   were true, but I don't.

2   Q.   Which opinions would not be valid specifically, sir?

3   A.   Which opinions on what?

4   Q.   You just said some of your opinions would not be valid.  I

5   want to know which ones.

6              MR. REINSCHMIDT:  Your Honor, objection.  Speculation.

7              THE COURT:  Overruled.

8              MR. REINSCHMIDT:  Lack of foundation.

9              THE COURT:  Overruled.

10  A.   Well, if the bank promised a floor plan to Dirks Motor,

11  then I guess my assumptions -- some of my assumptions regarding

12  how the bank handled themselves going forward would be invalid.

13  Q.   Would your opinion that this was a deal just between

14  Mr. Lucken and Mr. Dirks be invalid?

15  A.   No, I don't believe so.

16  Q.   Would your opinion that Mr. Lucken was injecting capital to

17  save Dirks Motor be invalid?

18  A.   No.

19  Q.   So which of your opinions then would be invalid?  Just help

20  me out with that.  You said some of them would be.  I just want

21  to know which ones.

22  A.   Well, I suppose it goes to the second $250,000 that was

23  held as collateral for the line of credit would make a

24  difference in that particular opinion.

25  Q.   Okay.

1    MR. LAWRENCE:  Nothing further, Your Honor.

2    THE COURT:  Thank you, Mr. Lawrence.

3    Mr. Reinschmidt?

4    MR. REINSCHMIDT:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. REINSCHMIDT:

7    Q.   Mr. Lawrence asked you to assume that the bank had lied and

8    what Mr. Lucken and Mr. Dirks said is true.  Let's do that.  If

9    the bank had promised a floor plan to Mr. Dirks and Dirks

10   Motors, would there be documentation to support that floor plan

11   between Mr. Dirks and Heritage Bank?

12   A.   Absolutely.  There'd have to be.

13   Q.   What kind of documentation would we have -- would you have

14   anticipated seeing in the bank's file if there had been a floor

15   plan between Heritage and Dirks Motor Company?

16   A.   Well, it would be rather extensive, probably starting out

17   with a letter, a commitment letter, to issue and then the rules

18   of engagement, if you will, or the rules relative to how they

19   were going to manage that entire line of -- floor plan line.

20   Q.   Did you ever see anything in the file such as -- maybe

21   those documents were never executed but even blank documents

22   that had been put together but then not executed?  Did you see

23   that in the file?

24   A.   There was nothing in the file that indicated there was any

25   commitment on the part of the bank to provide floor planning.

1  Q.   There's been testimony in this case that Exhibit 40 that

2  you were looking at, the GM -- and we'll put that up in a

3  moment.  But there's been testimony that no cars were purchased

4  by Mr. Dirks relative to that commitment until the Lucken line

5  of credit was put into place and cars were purchased on January

6  24, 2012, so nearly 2 months.  As you look at that document --

7  you've just looked at that document.  Now we have a promissory

8  note in place.  Does that make sense or not that no monies were

9  drawn until that line of credit was in place?

10          MR. LAWRENCE:  Objection, Your Honor.  Exceeds the

11  scope of cross.

12          THE COURT:  Sustained.

13  BY MR. REINSCHMIDT:

14  Q.   Did --

15          MR. REINSCHMIDT:  Let's put up Exhibit 40 for just a

16  moment, please.  Why don't we just focus on the two paragraphs.

17  Can you blow that up?  There we go.

18  Q.   When it talks about exceed $250,000 for vehicles shipped in

19  any one week, is that limitless?  In other words, as you read

20  that and under -- you were asked to interpret that document by

21  Mr. Lawrence.  Does that mean that they could purchase a million

22  dollars of cars a month times 12 so they could purchase arguably

23  12 million dollars worth of cars a year?  Is that what you

24  believe that the bank committed to in that document?

25  A.   No.

```
 1          MR. LAWRENCE:  Objection, Your Honor.  Leading.
 2   Mr. Reinschmidt is leading.
 3          THE COURT:  Overruled.
 4   A.   No, it does not.
 5   Q.   What do you think that means?
 6   A.   It means simply what it says, that they will not fund more
 7   than $250,000 for the purchases in any one week.
 8   Q.   So how would it -- how does that work relative to -- if
 9   they're drawing on monies from the bank and Mr. Lawrence was
10   talking about whether or not is this a lie to General Motors, if
11   the bank's limit is 250 internally -- the bank has said 250 --
12   what happens when -- if Dirks had bought more than 250 in that
13   second week?  So he bought 250 the first week and he bought more
14   the second week.  What would happen internally?
15   A.   Well, the bank established a 250 limit, and so they're not
16   obligated to go over that 250 limit at any given point in time.
17   Q.   And just so I -- or so the jury understands, are cars
18   shipped and then monies wired, or typically is money wired first
19   and then a car's shipped if you know?
20   A.   I'm not sure I know the answer to that question.
21   Q.   Okay.
22          MR. REINSCHMIDT:  That's all I have, Your Honor.
23          THE COURT:  Thank you, Mr. Reinschmidt.
24          Mr. Lawrence, anything else?
25          MR. LAWRENCE:  Very briefly, Your Honor.
```

1          THE COURT:  Okay.  Thank you.

2                    RECROSS-EXAMINATION

3  BY MR. LAWRENCE:

4  Q.   Now, this is the commitment letter to GM that we just

5  looked at.  I'd like to go to the second page and at the very

6  bottom the dealer acknowledgment.  I just have one question.  If

7  this is Mr. Dirks' signature, would it have been reasonable for

8  Mr. Dirks as a bank customer to have believed that the bank was

9  committing itself to providing $250,000 of floor plan financing

10 per week at the time November 25 he signed this letter?

11 A.   No, I don't think so.

12          MR. LAWRENCE:  Nothing further.

13          THE COURT:  Mr. Reinschmidt, anything further?

14          MR. REINSCHMIDT:  No, Your Honor.

15          THE COURT:  Members of the jury, any questions for --

16 okay.  We have some questions.  So why don't we pass the

17 questions down.  Thank you.  Would the lawyers like to see the

18 questions?

19          (At sidebar off the record.)

20          THE COURT:  Okay, Mr. Burger.  There are no objections

21 to these questions, so here's the first one.  How and when do

22 promissory note numbers get generated?

23          THE WITNESS:  How and when do the note numbers get

24 generated?  I believe they're in sequential order, and when the

25 note is generated, it's assigned a number by the computer, and

1    it's sequential.

2            THE COURT:  Okay.  Any follow-up questions from the

3    lawyers on that one?

4            MR. REINSCHMIDT:  No, Your Honor.

5            THE COURT:  Mr. Lawrence?

6            MR. LAWRENCE:  Yes, Your Honor.

7                    FURTHER RECROSS-EXAMINATION

8    BY MR. LAWRENCE:

9    Q.   Now, you said it was sequential, but to generate that

10   number, would you need to have identified a borrower on the note

11   to generate that number?

12   A.   I don't believe so, no.

13           MR. LAWRENCE:  Okay.

14           THE COURT:  And the second question is in regard to

15   the story of the father helping the son that you told, did the

16   father cosign a note, or did the father put money in as

17   backup -- in a backup collateral plan?  And was his collateral

18   applied as an open note, or was it a CD?

19           THE WITNESS:  Actually the story in question, the

20   father was of substantial means, and the line of credit we

21   established in his name was unsecured.

22           THE COURT:  Okay.  Any follow-up questions?

23           MR. REINSCHMIDT:  No.

24           MR. LAWRENCE:  No, Your Honor.

25           THE COURT:  Okay.  I normally don't ask questions, but

1    I can't help myself here.  So how long have you been in Luverne?

2            THE WITNESS:  I've been in Luverne for 30 -- 30 plus

3    years, 35 years almost.

4            THE COURT:  Okay.  Do they still talk about the 1964

5    state boys basketball team that beat Rochester in the state

6    finals?

7            THE WITNESS:  I hate -- I hate to say this, but --

8            THE COURT:  I'm sure they do.

9            THE WITNESS:  -- my daughter is married to the son of

10   one of those individual players, so yes, it gets discussed

11   quite --

12           THE COURT:  Well, I was at the game, so I remember.

13           THE WITNESS:  Were you really?

14           THE COURT:  I was 14.  Yeah.  So -- but it's a -- you

15   know, it's a small town.  They actually had great success from

16   that part of the state.  I think Edgerton won it in 1960, and I

17   think Marshall won it in maybe '62 or '65.

18           THE WITNESS:  Actually I think Edgerton won it twice.

19           THE COURT:  Twice, yeah.  Okay.  Great.  I was from

20   the Twin Cities but played high school basketball.  So thank you

21   very much.  You're excused.

22           MR. REINSCHMIDT:  I don't have any further questions.

23           THE COURT:  Okay.  I was going to -- yeah, right,

24   right, right, right.  I was trying to remember the players on

25   the team, but that's way beyond my memory.

```
1              THE WITNESS:  A couple of them are gone now.

2              THE COURT:  Yeah, I imagine.  Right.

3         Okay.  Mr. Reinschmidt, does the defense have any

4    additional evidence?

5              MR. REINSCHMIDT:  No, Your Honor.  We rest.

6              THE COURT:  Okay.  And are the plaintiffs planning on

7    any rebuttal testimony?

8              MR. THOMPSON:  Yes, Your Honor.

9              THE COURT:  Okay.

10             MR. THOMPSON:  John Lucken.

11        JOHN LUCKEN, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

12             THE COURT:  Okay.  Mr. Lucken, you're still under

13   oath, so you can just resume your position in the witness box.

14             THE WITNESS:  Yes, Your Honor.

15             THE COURT:  Mr. Thompson?

16             MR. THOMPSON:  Yes, Your Honor.

17                         REBUTTAL EXAMINATION

18   BY MR. THOMPSON:

19   Q.   Good morning, Mr. Lucken.

20   A.   Good morning, Stan.

21   Q.   Mr. Crim said that he thought the reason why you went to

22   Heritage Bank instead of going to Peoples Bank is because you

23   didn't want Peoples Bank to know you were doing business helping

24   out Mr. Dirks.  Did you hear that?

25   A.   Yes, I did.
```

1  Q.   Was that true?

2  A.   Absolutely not.

3  Q.   Would you have any reason not to have Peoples Bank know

4  that you're helping out Dick Dirks?

5  A.   No.

6  Q.   Mr. Crim talked about the line of credit, and there were

7  two instances when it went over the limit.  Once it went up to

8  515,000, and once it went up to 265,000.  Were you ever notified

9  by Mr. Crim or the bank either in writing, e-mail, or otherwise

10  that that had occurred?

11  A.   Not at the time I wasn't.  I wasn't aware of it, no.

12          MR. THOMPSON:  Nothing further.

13          THE COURT:  Thank you, Mr. Thompson.

14          Mr. Reinschmidt?

15                    REBUTTAL EXAMINATION

16  BY MR. REINSCHMIDT:

17  Q.   Just a moment, sir.  I'll just be quick.  When you say you

18  were not notified about the increase in the line of credit,

19  again, during that time -- I think that was in the March, April

20  of 2012 -- you were getting in -- you were getting statements

21  each month beginning after the line of credit was put into place

22  in January of 2012; is that correct?

23  A.   I was.

24  Q.   And I think your testimony on Monday of this week was that

25  either you -- either you opened them and just gave them to

1    Mr. Dirks or you simply wouldn't even open them, you would just

2    give them to Mr. Dirks; is that correct?

3    A.    Correct.

4            MR. REINSCHMIDT:  That's all I have, Your Honor.

5            THE COURT:  Thank you.

6            Anything further, Mr. Thompson?

7            MR. THOMPSON:  No, Your Honor.

8            THE COURT:  Okay.  Thank you.  Members of the jury,

9    that concludes the evidence, so here's what we're going to do.

10   Here's what we have remaining.  We have remaining the closing

11   arguments and then one final instruction from me and the verdict

12   form.  And it's always my practice to give the lawyers a break

13   to get ready for their closing arguments.  I find that if I give

14   them a break the closing arguments are actually shorter rather

15   than longer.  So we'll come back at 10 minutes to 11 for the

16   closing arguments of the lawyers.

17           Just -- I don't think I told you this, so I'll let you

18   know that because the plaintiff has the burden of proof in a

19   civil case, the plaintiff gets to go both first and last in the

20   closing arguments.  So there will actually be three, from the

21   plaintiffs, from the defense, and then what's called a rebuttal

22   closing argument from the plaintiff.  So we'll see you back here

23   at 10:50.  Thank you.

24           (The jury exited the courtroom.)

25           THE COURT:  I always bake cookies for the jury on

```
1    their last day.  Anything we need to take up?  Let's -- let's --
2    the Rule 50 motion will be deemed having been renewed at the
3    close of the defense case and same ruling, reserve ruling.  Any
4    other record anybody needs to make?  Anything we need to talk
5    about?
6              MR. REINSCHMIDT:  No, as long as -- and we're just
7    going to be filing a brief tomorrow I believe.
8              THE COURT:  Right.  Yeah.  Okay.  Great.  Thank you.
9              MR. THOMPSON:  No.
10             THE COURT:  Thank you.
11             (Recess at 10:21 a.m.)
12             THE COURT:  Everybody ready?
13             MR. THOMPSON:  Yes, Your Honor.
14             MR. REINSCHMIDT:  Yes, Your Honor.
15             THE COURT:  Shall we wait for Mr. Cross?
16             MR. REINSCHMIDT:  Sure.  If I can't find him in 30
17   seconds, we'll just start, Your Honor.
18             THE COURT:  Okay.
19             MR. REINSCHMIDT:  I can't find him.  Let's just start,
20   Your Honor.
21             THE COURT:  We can wait another -- we can wait till
22   ten of if you want.  It's up to you.
23             MR. REINSCHMIDT:  What time is it right now?
24             THE COURT:  We've got another minute.
25             MR. REINSCHMIDT:  Okay.
```

1            THE COURT:  Let's wait another minute.

2            MR. REINSCHMIDT:  Okay.  Let's wait that, and

3    hopefully he'll be here.

4            THE COURT:  Okay.  Let's have the jury brought in.

5    Thank you.

6            (The jury entered the courtroom.)

7            THE COURT:  Thank you.  Please be seated.

8            So I do want to tell you a funny story about the

9    cookies.  So I didn't leave the courthouse till about six last

10   night.  By the time I got home and made dinner and did some

11   reading I needed to do, I was really tired.  So I made the

12   cookies.  I made them, you know, tons of times, and they came

13   out.  They were like -- all ran together.  They were super flat.

14   They were burned around the edges and the middle.  And I kept

15   making, you know, more and more but out of the same batch of

16   dough that I had.  Nothing was turning out.

17           So I was really tired.  It was about ten at night.  So

18   I ran to Wal-Mart and bought some Wal-Mart cookies.  But then

19   when I got back home, I felt real guilty about passing off -- so

20   I'd actually taken the Wal-Mart cookies out of the containers

21   and got all the mismatched ones so they didn't look like they

22   were identical, and I thought, well, I'll just pass those off as

23   my own.  Then guilt hit me.

24           So I went back to Wal-Mart, bought some more baking

25   stuff, and then I got up at 4:00 this morning.  And I realized

1  what I had done wrong.  I had left out three quarters of a cup

2  of flour, and that's why they were -- I like them real flat, so

3  you put in a little bit less flour, a little bit more butter.

4  But I really screwed it up, and I was so embarrassed to call my

5  wife and asked her what I did wrong, and then I finally figured

6  out that I had misread the flour so . . .

7           JUROR EPPINGA:  They taste good.

8           THE COURT:  Well, I hope you enjoy them.  A lot of

9  sweat equity went into them.  I don't know if they're any good

10 or not.  But just goes to show you can screw up something you've

11 done a zillion times, you know.

12          Okay.  Mr. Thompson, are you ready to proceed?

13          MR. THOMPSON:  I am, Your Honor.

14          THE COURT:  Okay.

15          MR. THOMPSON:  Good morning.  I want to thank all of

16 you for your service.  I know some of you may have driven a long

17 way to be here.  I know you've been here early because I've seen

18 it.  And I know you've been attentive.  You've been engaged.

19 You've asked questions, and I appreciate that.  And I know John

20 Lucken does too.

21          At times some of this evidence may have been tedious,

22 and I apologize if you thought it was.  Hopefully I can tie that

23 together for you, put all these pieces of this puzzle together.

24          One of the tedious parts was I read a stipulation

25 about Mr. Crim.  And here's why that's significant.  It said

Case 5:16-cv-04005-MWB-KEM Document 169 Filed 05/07/18 Page 76 of 117

1    every act that he took in this case was in the scope of the
2    employment with the bank.  And what that means is anything he
3    did the bank did.  And whenever you're reading the instructions
4    that said the bank did this or the bank had to do that, you can
5    insert Mr. Crim's name for it, and it means the same thing.
6           Now, what happened?  This is actually I think the
7    pretty simple part of the case.  Crim told Dirks what the bank
8    needed.  Not going to go over all the -- pay off Ford, get a
9    backup CD.  Dirks gets ahold of Lucken, tells him that.
10          Lucken says, "Let me think about it.  I want to talk
11   to the banker."  They talk to the banker.  The banker says the
12   same thing.
13          November 8 meeting, Crim said, "John, if you provide
14   5 -- 250,000, pay off Ford, rest can go to Dick, put up a
15   250,000 CD as backup collateral, the bank will provide floor
16   plan financing."  That's what John said.
17          How about Dick Dirks?  I thought he was a very strong
18   witness.  He sat right there at 89, and he recalled those events
19   like they happened yesterday.  Think about that when you
20   deliberate.  Judge his credibility as a witness.  I welcome it.
21          Now, Crim told a lie at that meeting.  I'm not going
22   to sugarcoat it.  He flat out lied.  And what happened after he
23   lied at that meeting?  Well, John did what he was supposed to
24   do.  November 17, he puts up his quarter of a million dollars to
25   pay off Ford.  The rest goes to Dick.

1    A week later he buys that CD, puts up his 250,000 for

2    that.  He's done what he was supposed to do -- page 1, please --

3    just like he's supposed to do in the notes from that meeting,

4    just like Dick told him at the meeting, just like Crim told him

5    at the meeting, and then he performed.

6         So by November 23, John Lucken did everything he was

7    supposed to do.  And what did Crim do?

8         Two days later, two days later, Exhibit 40 tells you

9    what Crim did because on the second page, the second page, we

10   know the dates of it.  It's dated November 25 for Crim's

11   signature and the same date for Dick Dirks' signature.  Think

12   about that.  John performs by the 23rd.  Two days later this

13   commitment to GM comes out.  Not only does it come out, but Dick

14   Dirks signs it that day, November 25.  Dick read it and signed

15   it, and what did Dick read?

16        Let's go to page 1, second paragraph, please.

17        What did Dick read?  Dick read that the bank was going

18   to provide him $250,000 a week in floor plan financing just like

19   Crim had told him, just like Dick had told John, just like Crim

20   had told John and Dick.  Dick was probably like, ba da boo, ba

21   da bing, I am back in business.  And who wouldn't think that if

22   you read that letter?

23        And even Crim, even Crim, said, yeah, 250 per week

24   means if Dirks bought 250 in week 1 and in week 2 he bought

25   another 250, yep, we'd have to pay 500,000.  Same in week 3.

1        Don't let anybody fool you that this letter has a

2    period after 250,000.  I know some people might want to put a

3    period and use some judicial whiteout there and take that one

4    week out.  But that's not what was being told to people when

5    this was going down.  That wasn't being told to Dick Dirks.  And

6    it wasn't being told to GM.  Think about that.

7        Now, for fraud, Judge Bennett has told you what those

8    elements are.  And most of those are pretty simple.  Did Crim

9    misrepresent that the bank was going to provide floor plan

10   financing?  Sure.  That's a layup.  Was it false at the time of

11   the meeting?  You bet.  He had no intention that the bank was

12   going to put its money into a floor plan finance, no intention

13   for the bank to loan one pity -- penny.  So he knew it was

14   false.  And he knew it was false because he wanted to get the

15   bank out of a jam, and he could do it by using John's money.

16       Was it material what he said?  Sure, it was.  Sure, it

17   was.  John testified if Crim would have said at the meeting,

18   hey, oh, timeout, bank isn't putting any money into this deal,

19   John said, well, if that's the case, neither am I.  So, of

20   course, that lie by Crim was material.

21       Now we get to, one, did he know it was false when he

22   made it.  I'm going to ask you -- we're going to put up Judge

23   Bennett's instruction here, and I'm going to have Rebecca

24   highlight three of these that may help you when you deliberate.

25       Number one, did Heritage actually know or believe that

1    the representation was false?  I think it's overwhelming yes to

2    that one.  For me that's a layup.

3          Same with number two.  Heritage stated its intention

4    to do or not to do something when it did not actually have that

5    intention.  Once again, for me that's a layup.

6          Now, for some of you this next one might come into

7    play.  Some of you might think, well, yeah, I mean, Crim said

8    there'd be floor plan financing, but he didn't say whose money

9    it was going to be.

10         So I would ask you this if you haven't already

11    answered this one in John's favor.  If you go to a bank and the

12    bank says it's going to make a floor plan loan, who in the world

13    would think the loan's going to be of your own money?  You're

14    going to think the loan is from the bank's money.  And that's

15    where this one comes into play.  Heritage knew the

16    representation could be understood in both a true and a false

17    manner and it was made in reckless disregard.  So I think we've

18    got three grounds that show he knew it was false.

19         Let's go to intent to deceive.  Now, I think that's an

20    easy one too.  I think the bank knew it had a bad loan and Crim

21    wanted to get the money back for the bank.  I think that's a

22    very bad intention.

23         Let's contrast that with John's intention.  John was

24    acting for the best of motives.  He's trying to help out a local

25    business.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer-aided Transcription
Case 5:16-cv-04005-MWB-KEM   Document 169   Filed 05/07/18   Page 80 of 117

1    And given the lie that Crim told at that meeting to

2  get 500,000 out of John's pocket, who'd want to deal with a

3  banker like that?  Who'd want to deal with a banker like that?

4  Well, apparently no one in Siouxland does because Mr. Mathiasen

5  told us he fired Crim because no one in Siouxland would do new

6  loans with him.

7    Now, this loan was a big deal to the bank.  This

8  250,000 that they were looking at losing was a big deal.  And

9  let's look at the Ford financing statement.  And I want to

10  highlight A, B, and C.  Don't be misled that it just covered

11  motor vehicles.  You can see in black and white it covered

12  everything.  And that's called a blanket security interest.

13    And the bottom line is that before John's money paid

14  off Ford, if Ford would have foreclosed then, Ford would have

15  had dibs to the first 225,000, and because John's money paid off

16  Ford, the bank got that first 225,000.  That's where John got

17  swindled.

18    And if Ford wouldn't have paid off, I doubt the bank

19  at the end of the day would have got all of its money back.  And

20  nobody at the bank would be going down to Hard Rock because of

21  their good luck on this loan.

22    Let's talk about that SBA guarantee.  Now, I heard

23  Mr. Harbison, and I was thinking to myself, gosh, we should have

24  called him as a witness.  He was just about as good for us as he

25  was for them.  He talked about, I think, three or four

irregularities in the SBA loan. And whether the SBA would have
pulled the guarantee or not, I don't know if we know. We do
know from his testimony the SBA was cracking down in 2011.
That's what he told us. SBA was cracking down on these then.

But even if the SBA wasn't going to pull the
guarantee, that's really not our point. Our point is in the
mind of the banker was he worried about this? Was it a risk?
Was he worried that if the SBA loan got pulled the loss would be
even bigger?

Let's go to the next item we've got, justifiable
reliance. In the instructions Judge Bennett has told you that
that can be based on steps to conceal, covering your tracks
afterwards. He also tells you to consider the entire
transaction. I'm going to put up a PowerPoint, and I'm going to
go through these elements.

Here's all the reasons why there was justifiable
reliance: One, the bank sent that floor plan letter to GM just
to keep the franchise. Even Ford thought Heritage had provided
a floor plan. Look at Exhibit 141. The bank used the account
number 10881 when John hadn't even signed a loan application,
once again covering up their tracks when they told GM there's a
commitment for an account that didn't even exist, covering their
tracks.

Dirks signed Exhibit 40 on November 25, saw it, and
thought he had floor plan financing. Now we're hearing that he

1 didn't, once again covering their tracks.

2      Number 2, when the bank asked John to give tax

3 information, they didn't tell him what the purpose was.  They

4 didn't say, hey, we're getting this to make a loan.  Didn't tell

5 him that, once again covering their tracks.

6      Number 3, Crim testified that Dirks called and was

7 agitated about not getting vehicles.  You bet he was.  He read

8 Exhibit 40 and thought, great, I got 250 per week; I'm back in

9 business.  I believe the evidence can let you infer that Crim

10 thought, hey, if Dirks isn't getting vehicles, Dirks could call

11 Lucken, and Lucken could figure out that Heritage wasn't going

12 to provide any money for a floor plan and then John, when it

13 came time to sign this CD over, would say, huh-uh, not going to

14 do it; you, bank, haven't met your commitment.

15      But they didn't let John know that.  In fact, that's

16 why Crim called in a panic to tell John to come to Sioux City,

17 sign the assignment and the line of credit to get that all put

18 in place before John found out the bank wasn't going to put any

19 money in.

20      Let's go to ex -- the next one, Exhibit 50.  That's

21 the letter that's backdated.  Crim wanted the loan filed to look

22 like the authorization occurred prior to the assignment.  In

23 fact, their own expert Welte fell for it.  He testified in front

24 of you he thought the letter was signed on January 18, and you

25 all know it wasn't because he didn't even get it till the 23rd.

1    Last one, overdrafts on the line of credit, Dirks used

2    that line of credit like he had floor planning.  Remember Dick

3    went up to 515,000.  Well, of course, he did.  He thought he had

4    250 per week because that's what the bank told him and told GM

5    in the letter he signed.  Of course, he did that.

6    And the bank should have notified John and said, hey,

7    your line of credit went over by more than 265,000.  Didn't tell

8    him that.  And then it happened again, and they didn't tell him

9    that.

10   Steps to conceal, covering your tracks.  It is all

11   over this case.

12   Let's look at credibility.  I talked about the account

13   that had that number back when the line of credit was entered.

14   Crim was pretty clear there had to be a signature by the

15   customer to create the account.  John didn't sign anything until

16   two months later.  So how did that account come around?  Well,

17   Mr. Mathiasen took the stand.  Well, you know, you use the next

18   one in the chute, and maybe that's where the number comes from.

19   Let's grant him that.  What would have happened, what

20   would have happened, if when Crim calls in this panic two months

21   after the line of -- or the commitment letter to GM is sent and

22   says come in and sign this line of credit and CD, and what if

23   John said, ain't going to do it, not going to do it?  That bank

24   would be in a big jam because they had told GM there's an

25   account with that number, and there wasn't.  That would be a

1    problem.

2          And on the first page of this floor plan financing to

3    GM, you see there's an account number.  It's handwritten.  I

4    mean, isn't that a little weird?  Isn't that a little weird?

5          And then whenever you catch the bank in something, oh,

6    that's boilerplate.  That's just boilerplate.  Don't worry about

7    that.  Even though it's a contract and people sign it, that's

8    just boilerplate.

9          Well, look, if you're Mr. Crim and you're talking

10   about 250,000 a week, you darn well better read your agreement.

11   And if you don't want to put 250 a week on the line, you better

12   do something.  And he didn't.

13         Even Crim on the stand -- I asked him at the meeting

14   on November 8 with Dirks and John, I asked Crim, did you tell

15   them at the meeting there was no floor plan financing, and he

16   said, "No, I didn't say that."

17         So then I pull out his deposition which was his

18   testimony under oath earlier.  And in that deposition he said,

19   "I did tell him at the meeting there was no bank floor plan."  I

20   mean, get it straight.  This guy's on both sides.  Truth is he

21   did tell him at the meeting that there would be the floor plan.

22   And then he tried to get out of it in his deposition by saying

23   he didn't tell him.  Then at trial he came back and said, "I

24   didn't say that at all."

25         You can think about that when you deliberate.  Did it

1  cause damage?  Absolutely.  And the amount we're seeking is

2  500,000.  Give John his money back.  They lied to him.  It was a

3  fraud.  He wants his money back.

4  Punitive damages, punitives can be awarded if a person

5  in a managerial capacity for the bank acted in the scope of

6  employment.  Layup.  They stipulated to scope of employment.  He

7  was the branch manager, vice president.  Heritage is on the hook

8  for punitive damages.

9  And you can get punitive damages in Iowa if you have

10  reckless conduct towards an individual.  Lying as a banker, even

11  as Mr. Burger said, is something you don't do.  And Crim lied in

12  that meeting and said the bank would provide floor plan

13  financing.  That's about as blatant, well -- wanton and willful

14  disregard of somebody's rights as I can think of.

15  There's a question you're going to be asked, was that

16  fraud specifically directed at Lucken?  And once again, that's a

17  layup.  Yes.  I mean, that's what Crim told him at the meeting.

18  So when you get to punitive and mark yes, specially directed,

19  yes.

20  How much?  Well, Judge Bennett has told you the law,

21  and you can look at the wealth of the bank.  They have over 400

22  million in assets.  They made 2.5 million last year.

23  Some cases talk about punitives as smart money, money

24  that makes it sting to the party that did it.  And on punitives

25  you're not looking at John's injury by itself.  You're looking

1    at what's going to stop that bank from doing this in the future.

2    So you go back there, you award punitive damages in an amount

3    that you think's proper.

4            The last claim we've got is tying, four elements.

5    Three of them are layups. Was there tying? Way to think of

6    tying is bundling. Has to be a tied product, a desirable

7    product. That was the floor plan. That's what John wanted.

8    There has to be a tying product, the undesirable, which would be

9    the line of credit and the CD and the letter. That happened,

10   and there's no doubt about it. Bill Tank testified to that.

11           Bill Tank also said it was unusual. That's the second

12   element. And for unusual Bill Tank said it -- and I think

13   Burger did too -- that it would be unusual to have a line of

14   credit that covered motor vehicle financing that did not give a

15   secured interest to the person that put up the line of credit.

16   John didn't get a secured interest. The bank kept its secured

17   interest. And Bill Tank said that's unusual, and I think Burger

18   said that too. So that's proven.

19           The other one is an effect -- or it could lessen

20   competition. Sure. John banked at Peoples Bank. He would have

21   rather done business with Peoples Bank. They were shut out of

22   doing this deal.

23           And to try to explain why John didn't go to Peoples

24   Bank, Crim lied again. Well, John didn't want Peoples Bank to

25   know he was doing business with Dick Dirks. Really? That's all

1  you got?  What a crock.

2         The last one is was there benefit to the bank.  Sure,

3  there was.  The bank got a two hundred fifty dollar -- fifty

4  thousand dollar CD.  They got interest on that line of credit

5  paid by Dirks.  They used that CD to pay SBA payments, not to

6  buy cars, about 77,000.  Dirks lost three cars he could have

7  bought and sold so Heritage could line its pockets with John's

8  line of credit.

9         And they even -- out of that 77, part of it was a

10  48,000 -- and I think we even had a juror question on that.  Why

11  would a bank take that?  Good question.  Why would a bank take

12  that?

13         Tying damages, 250,000 for the loss of CD, and we want

14  45,000 on top of that for that life insurance policy that John

15  bought to get the assignment of it, and that money went to

16  Heritage too.  John still hasn't gotten anything under those

17  policies, so don't be deceived by any arguments that those

18  policies have anything to do with this.

19         I'm going to have about five minutes left to talk to

20  you after Mr. Reinschmidt, and I'm going to sit down now.  Thank

21  you.

22         THE COURT:  Thank you very much, Mr. Thompson.

23         Mr. Reinschmidt?

24         MR. REINSCHMIDT:  May I proceed, Your Honor?

25         THE COURT:  You may.  Thank you.

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computerized Court Transcription
Case 5:16-cv-04005-MWB-KEM  Document 189  Filed 05/07/18  Page 88 of 117

         MR. REINSCHMIDT:  Thank you.  Well, I also was up at
4:00.  I'm hopeful that I was working on my closing, and
hopefully I've put flour into my closing, so we'll see.  I hope
so.
         I always like to tie my closing back to my opening,
and in the opening I talked about that this is -- there were
going to be complexities in this case, but ultimately it was
really a simple case.  It was about John Lucken loaning money to
Mr. Dirks and Dirks not paying that money back, Dirks having a
handshake with Mr. Lucken and not following through on that
handshake.
         There were -- there's been so many things that have
been thrown out against the bank in this case up to the point of
that loan and during the period of that loan, things like the
OCC which were -- had no relevance to what happened with
Mr. Lucken.
         The OCC had an enforcement action.  It was handled.
It was terminated, and things went on fine during the course of
that loan.
         We heard about the disbursement of 329,000.  It was
fine.  It was approved by the SBA.  But again, they're trying to
pick apart everything they can because they have to try to show
to you, prove to you that somehow some way that something was
jeopardized with that SBA loan guarantee.  And if it's
jeopardized, then it gives Sterling Crim and Heritage the

motivation to make a promise in November of 2011.

If you throw out the chaff and say no, those things didn't happen or aren't relevant, the OCC, the disbursement, the Ford first lien that witness after witness has said a floor planner has to have first lien -- and by the way, it's a misstatement to say when Ford was going to foreclose on -- and try to get their 225,000, Ford was going to get stuck.  They weren't going to get 225,000 and take 225 from the bank.  That -- one of those last exhibits I showed you showed that the only thing left -- the cars were gone, and this is before anything with Mr. Lucken happened.  The only thing left were parts and equipment that Ford valued between I think like about 49,000 to about 62,000.  That was it.  That's all that was left for Ford to get at.

I want to talk about this briefly, about this Exhibit 40, and then we're going to look at the two claims that they've made, fraud and anti-tying.  This Exhibit 40 and 41, the GM and the Ford, one of the things Mr. Thompson said was, well, by golly, Mr. Dirks, he knew -- he signed Exhibit 40.  He knew he had a floor plan when he signed that document, and off he went.  He didn't buy a car according to David Dirks and Dick Dirks until January 24, 2012, after the Lucken line of credit was put into place.

So if Mr. -- and let's keep this in mind.  We're in this courtroom.  Lucken and Dirks live in Akron.  Mr. Lucken is

driving by every day seeing there's no cars in that lot. Dirks
is there with no cars. He's not agitated back in November, back
in December, back in January until late January, and he's like,
it's time to get cars, get the line of credit in place so I can
start buying cars.

And the suggestion somehow that this -- that that
Exhibit 40 was some limitless amount of cars, it wasn't. It was
saying to GM, if a car's ordered, we'll pay it, but if there's
not enough, it will stop.

To me the moral of the story is when talking about --
like when Mr. Thompson's talking about punitive damages, the
moral of the story is not, you know, to sting the bank and so
forth. The moral of the story is if a third party -- if after
this case is over -- and, of course, we're asking for a defense
verdict in this case of zero. Even when you provide a zero
verdict to us as we hope for, the moral of the story is this
bank, if a third party ever comes along again when somebody is
having troubles, the bank will run from that third party. They
will not touch it with a ten-foot pole because they never, ever
want to find themselves in a position again where that -- where
one of those two parties said you did me wrong. In this case
the third party Mr. Lucken said you treated me wrong, you did
this, you did that even though the documents don't support any
of that. They just don't. But that's the moral of the story is
we'll deal with our debtor, and that's it.

1          Let's go ahead and just briefly look at -- briefly

2     look at some of the items here for fraud.  Go through the -- if

3     we start at the very first one, and it says fraudulent

4     misrepresentation.  It's -- fraud is the simple way of referring

5     to fraudulent misrepresentation.

6          And you can read that about basically that he -- that

7     Mr. Crim said that pay off Ford Motor Credit and buy a CD.

8          Well, let's talk about that.  This sequence of events

9     of the timing is just critical.  First of all, in that meeting,

10    you saw those notes in Exhibit 30.  The million dollars that

11    Crim brought to the meeting where he said million dollars with a

12    question mark on the second page of Exhibit 30, Mr. Lucken in

13    this trial said, well, that's what -- that's what Dirks hoped to

14    get from Heritage.  Then when I read him from his deposition, he

15    said, well, he didn't know what that million dollars meant.

16    Then when we went to the first page and it said $600,000, he

17    said again that's what Dirks hoped to get.

18          And if you read throughout the summer of 2011 and the

19    fall of 2011 various exhibits, particularly Ford Motor Credit

20    exhibits, they don't have a dog in the fight in this courtroom.

21    And in this court -- so their memos talk about all these hopes

22    that Dirks had.  He's a car salesman.  He's hoping this will

23    happen.  He's hoping that will happen.  None of it materialized,

24    none of it.

25          And by the way, when we're talking about Exhibit 40

1   and Dirks was just so confident he had a floor plan in place
2   because of Exhibit 40, interestingly, Mr. Thompson talks about
3   that Dirks just had this sharp memory.  But then when it came --
4   he had a sharp memory about the meeting, but then when it came
5   to, well, wait a minute, Mr. Dirks, you were looking for floor
6   planning in December of 2011, in January of 2012 talking about
7   trying to get a million dollars with General Motors, that he
8   couldn't remember.  Well, if he had floor plan in place, he had
9   no reason to go out there and try to find more floor planning,
10  absolutely no reason whatsoever.

11          But let's look really quickly at the timing.  So on
12  November 8, that's when Mr. Lucken says that's when these
13  promises were made, right there.  But nothing happens, and on
14  November 16, 2011, which is Exhibit 139, Dirks tells Ford Motor
15  Credit, "I don't have any payment plan in place.  I'm hoping
16  that I can pay you within the next ten days or so."  That's
17  November 16.  Then the next day on November 17, Mr. Lucken did
18  pay Ford Credit.  It's Exhibit 35.  He pays.

19          Well, what about the second part, the CD?  Buy that
20  CD.  He didn't buy it.  He had the money.  I mean, we can look
21  at his financials, knows he has the money.  Well, okay.  He just
22  doesn't get around to it.

23          Well, on Exhibit 38 Crim is asking for -- Mr. Crim is
24  asking for financials.  Again, various witnesses have testified
25  you don't need financials if it's a CD.

On November 18, on Exhibit 140, Mr. Dirks has reported to Ford Motor Credit that he's still in negotiations with Heritage on a floor plan. Now, keep in mind on November 18, that's 10 days after they supposedly walked out of the meeting and there was a floor plan in place.

Oh, and that reminds me, Mr. Dirks said he didn't say that he walked out of that meeting with a floor plan. He said, well, I thought I probably had a floor plan with Heritage when I walked out of that meeting on November 8, 2011, just like he prob -- he thought a lot of probable financing was going to occur in the summer of 2011, fall of 2011. And, oh, by the way, in Exhibit 1027 which is the letter that Mr. Lucken drafted to Dirks but didn't send -- he didn't have any legal advice at this point; it's just like these are my thoughts on what happened -- he said, Dick, you said you'd get a million dollars in financing, and you didn't do it. He didn't say you said you had a million dollars with Heritage; I'm mad about that; I'm agitated about that. He didn't say that.

Then on November 19 on Exhibit 38 and Exhibit 106, Lucken gives his financials, and they're very thorough financials. As Mr. Welte testified, they show that -- not only do they show that he's worth a lot of money and good for him and helps him be a benefactor for the community, but they're organized. I mean, he knows what he's doing. This is a very sophisticated, experienced businessman, and that is relevant as

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer-Aided Transcription
Case 5:16-cv-04005-MWB-KEM Document 169 Filed 05/07/18 Page 94 of 117

1  you'll see to the elements under fraud.  That's one of the many

2  elements is your level of sophistication, experience, and so

3  forth.  So it's critical.

4       Finally on November 21 in Exhibit 38 -- that's the

5  ongoing e-mail with Mr. Lucken -- Crim says let's get together

6  to discuss this further.  Well, again, if there's been an

7  agreement back on November 8 to buy a CD, what is there to

8  discuss?  Just write me a check or wire me money.  There's

9  nothing to discuss.

10       And then finally on November 23, Mr. Lucken does buy

11  the CD.  Again, you heard testimony from Mr. Crim as to the CD

12  resulted in a much lower interest rate.  It was a very low

13  interest rate, 3.7 percent on the note.  The CD's the same as

14  cash, so that's why it was cheaper.

15       You'll note in that letter that Mr. Lucken drafted to

16  Mr. Dirks, Exhibit 1027, there's nowhere in there that he

17  laments or complains or sets forth that there was a Heritage

18  floor plan.  He says nothing about that.  That would be a

19  critical part of how this all -- this all went south, this deal

20  went bad; he'd be telling Dirks.  And what about the Heritage

21  floor plan?  There's no mention of it, none.

22       About the line of credit, John Lucken has two stories.

23  One story is the bank duped me.  I didn't know what I was

24  signing.  I went to the bank, and I didn't hardly talk to

25  Mr. Crim.  He just said sign this, and I -- I didn't read it.  I

1    didn't understand what I was signing, so I didn't even know I

2    was signing a line of credit.

3            Then the next story is I had a line of credit.  Okay.

4    How do we know that that's the next story?  Well, we know that's

5    the next story because as Mr. Thompson's talking about the

6    monies that were taken out of the line of credit, some monies

7    that were taken out -- we dispute how much; he said 77,000; we

8    dispute it's that much -- that were used for the line of credit

9    to pay on the SBA loan, those monies that were paid on the SBA

10   loan Mr. Lucken was aware of.  And, in fact, if you recall there

11   was about $30,000 -- there were 2 payments that totalled

12   30,000 -- Lucken had a conversation with Mr. Crim and said --

13   this was in February of 2012 and said, hey, I don't want you

14   using -- I don't want you to use money out of there for that

15   purpose.  The purpose of that money is to buy cars for Dick

16   Dirks.  Any money that you take for the SBA loan cuts away from

17   that.  He knew he had a line of credit.  He knew it was to be

18   used for cars.

19           So he can't have it both ways either.  So I think I've

20   explained that pretty thoroughly.  So that deals with the first

21   element.

22           On the second element, the representation was falsely

23   made, well, we just -- we deny -- we deny that there was a

24   representation, so that's just denied.

25           Then the next one is -- the third element is the

Case 5:16-cv-04005-MWB-KEM   Document 169   Filed 05/07/18   Page 96 of 117

1     representation was material to the transaction. Well,

2     materiality means -- I don't -- you know, what's a simple

3     analogue? I suppose, you know, why do you decide to go to a

4     movie tonight and some -- you know, there's maybe five things

5     that -- somewhat relevant, but they're not the major reason you

6     went to the movie. You wanted to go to the movie because you

7     promised your husband or wife that, by golly, we'll go to a

8     movie on Friday night, not because of other reasons. So it's

9     gotta be the main reason.

10         They walk out of that meeting supposedly with a floor

11     plan. They don't know the amount of it. They don't know how

12     long it is. They don't know the interest rate.

13         Well, I mean, gosh, why do you have to know all those

14     details? Well, how about this? What if the bank had made a

15     promise and the promise was we'll floor plan $50,000? I think

16     we'd be in court with Mr. Lucken saying you knew that wasn't

17     enough to make him a viable business; it wasn't enough floor

18     plan, and you caused me to lose my 500,000 because your floor

19     plan was so tiny; it had to be bigger.

20         Okay. That's ridiculous. Not 50,000. Let's make it

21     500,000. Well, Dirks has said, "I needed at least a million."

22     So to know what the floor plan was was critical and material to

23     this event.

24         Next element, four, we can skip over th -- I mean, we

25     don't even have to really talk about it. Said that it was false

Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov
Computer-Aided Transcription
Case 5:16-cv-04005-MWB-KEM Document 169 Filed 05/07/18 Page 97 of 117

1   when made.  We say we didn't do it.

2           The next one, five, intended to deceive.  Well, their

3   own expert testified about the typical procedure for Ford and

4   how they liquidated and what they would need to do.  And he

5   understood that they'd take cars and then they'd take parts.

6   Every -- every one of our witnesses that has knowledge about

7   floor planning says, of course, Ford would be the first lien.

8   And so when we go through and show all those prior lien

9   searches -- and with all due respect to plaintiff, when we've

10  got documents where it's typed X and dates written, I mean, now

11  we're talking about the deception must have run so deep and the

12  corruption so bad that various people in the bank are making

13  dates up and Xing documents just because it's part of their

14  master plan to ensure that this SBA loan guarantee is adhered to

15  or is not jeopardized.

16          Again, at the end of the day when we're talking about

17  these various things that happened or are questioned about the

18  SBA loan guarantee, SBA is reviewing all this.  They review it

19  before.  They monitor it during.  And it's tough to get that

20  loan guarantee.  They are monitoring -- they're looking at

21  everything.  Not only now were they talking about the first

22  lien, they're bringing up all these other issues, and the SBA

23  didn't.  They paid it.  They ultimately paid it.

24          And by the way, if Heritage intended to deceive

25  Mr. Lucken, why in the world would they have created that

letter, Exhibit 50?  And it wasn't -- by the way, this is not a

letter where Crim wrote this letter and Mr. Crim signed it

saying, hey, here's what I understand it to be and sign it

because, you know, we can send letters.  I could send a letter

to someone and say this is what I think what happened, and if

they don't write back, what does that mean?  Does that mean they

agree with it?  Does that mean they disagree with my letter?

He sent it so the Luckens could read the letter and

they decide do we agree with this, and that letter says this is

a line of credit; it's secured.  Oh, it's secured.  That's right

because there's assignment of CD we also signed.  And then --

and then also it says, hey, and, by the way, you know, if your

deal ever changes, let us know.  Why?  Because the bank doesn't

want to get on the hook, be in a lawsuit, have people upset with

them saying, you know, what if Lucken said I didn't want that

deal anymore with Dirks?  He doesn't tell the bank, and suddenly

there they are in trouble.

So one thing that wasn't mentioned is Mr. Lucken is

asking for the $45,000 back on the life insurance, and he's

discounting that there's any value to that life insurance.  He

obviously thought there was a value.  He paid $45,000 for it.

He testified the one policy that was paid up for 250, there was

a loan against it he thought of about 150,000.  Dick Dirks who's

been referred to as having a sharp memory said I think there's a

loan of about 50 to -- I think he might have said 50 to 70, in

1  that range.  That's the loan against it.

2        The other one, the 300,000, there's no loan against

3  it; $5,000 a year premiums, $300,000.

4        And I don't mean to be morbid or mean spirited when I

5  say this, but these are elderly people.  Mr. Dirks is 89.  His

6  wife I think was -- he said was 84, 85, in that age range.

7  These are not people that are 20 years old and you hold a policy

8  thinking when will I ever get paid that policy?  I mean, he took

9  that because he -- again, he's not morbid, but he thought that

10  policy has a value; I want to buy that policy.  So that has a

11  value to it.

12        I just want to look at the next one.  Well, we talked

13  about that, whether they had any justification.

14        Actually go down for the -- go down to the next one,

15  the next after that.  I think there's eight.  Yes, I want to

16  look at that.  And this is -- Ms. Liston, just go back up so we

17  can see what number that is.

18        That's under number 6:  The Luckens justifiably relied

19  on the representation.  Now let's go down to those.

20        I put a quick mark by each one.  I mean, all of those

21  militate against Mr. Lucken.  Sophistication, expertise of the

22  Luckens.  Very sophisticated.  I mean, I think I've made that

23  point again and again.

24        There was no relationship between Heritage Bank and

25  Lucken.  This was a first-time thing, so he didn't have a

1    relationship that he'd established that he relied upon them for
2    certain things.
3            Their access, all he had to do was ask Dirks.
4    Couldn't ask the bank.  Bank has a relationship with Dirks.
5            Their opportunity to detect the fraud.  Well, that
6    again gets back to asking for information.  Whether they had
7    initiated the transaction, they did.  They came along.  Mr. Crim
8    didn't seek them out.
9            How general or specific, well, it appears to be,
10   according to Lucken, extre -- Mr. Lucken, extremely general.
11   We'll do floor planning, end of story.
12           Lack of any fiduciary relationship, and that's
13   explained in a prior instruction which says that there is no --
14   there was no fiduciary relationship between these parties.
15           Oh, by the way, when it's said as to was this unusual
16   to have this line of credit to buy cars with, yeah, it was real
17   unusual because you had a company that was -- this was a
18   last-ditch effort by Mr. Lucken to help this company.
19           The tied, I'll talk for just a moment about the tied,
20   if we look at that for a minute, Ms. Liston.  Just go down to
21   the -- just go down to the number one.  I only have -- no, I
22   want to talk about the bold-faced portion, and that's the only
23   time I have to talk or -- and my time will be up.
24           They conditioned its promise to provide floor plan
25   financing on the conditions the Luckens execute the Lucken line

of credit.  And do you see there that it says on January 19,
2012?  Mr. Lucken has testified all that happened on January 19,
2012, were here's a note, here's assignment of CD, sign these.
No -- he said there was no conversation.  It was just very
brief.

This claim fails.  He cannot prove that anything
happened on that date other than sign these documents.  That's
what he says, his own words.  That's what he says.  He says, "I
got them.  I didn't understand them."  He didn't say sign this
document; this is what this document means; and then we're going
to give you a floor plan in exchange for signing that document.
That conversation didn't happen.  By his own words it didn't
happen.

So at the end of the day -- if you'd put up the
verdict form, and I've checked -- it goes on for another page.
You don't -- we're asking that you never get to the other page
or the second page.  It just -- we ask that when you go through
and you check and decide is there liability by Heritage Bank,
you're asked was there fraud?  No.  It's Heritage.  It's for
Heritage.  Was there an unlawful tying arrangement, this event
that allegedly occurred on January 19, 2012?  And you'll mark
effectively -- you'll mark an X for Heritage saying no, there
wasn't.

I am not here to castigate Mr. Lucken.  From the times
I've spent with him in deposition and throughout this trial,

1    he's been a respectful person.  I think he is a wonderful

2    benefactor for his community.  I think what he did here is he

3    was so intent on being a benefactor for a business in the

4    community that he lost sight of the fact that Dick Dirks very

5    well may never be able to pay me back.  In fact, there's a

6    pretty good chance of it.  He knew that even without doing the

7    due diligence that Mr. Welte talked about that he should have

8    done.  I mean, he knew just by virtue of the fact that he

9    couldn't get money from a bank that he probably had significant

10   struggles.  But he did it anyway.

11            And now he's looking to point fingers and say, "Dick

12   Dirks didn't pay me back."  And Dick Dirks is up here, you know,

13   in a way kind of acting like I'm the victim in this case.  No.

14   You made a promise.  You had a struggling business.  Good for --

15   you know, good for you that you had a business, but it was

16   struggling, and then you -- in a last-ditch effort you reached

17   out to Mr. Lucken, and he lent you $500,000.

18            He did to Mr. Lucken what he'd done to Ford.  He

19   bought cars from Ford, sold them, didn't pay Ford back.  He did

20   the same thing to John Lucken.  He bought cars, got money for

21   those cars, and didn't pay it back.  He never paid a penny of it

22   back.  That's why -- this isn't -- on the second 250, it's not

23   Mr. Lucken's asking for 150 because Dirks did pay a hundred.  He

24   never paid a penny back of any of this money other than he did

25   assign -- he did assign the life insurance which does have a

1   value.  He never wrote a check for anything.  He did give those

2   life insurance policies which, as I'm telling you, do have

3   value, a great value, or Mr. Lucken who is a sophisticated,

4   savvy businessman would not have paid 45,000 for.  Thank you for

5   your time.

6          THE COURT:  Thank you.

7          Mr. Thompson, your rebuttal closing argument?

8          MR. THOMPSON:  Yes, Your Honor.  All right.  You're

9   about ready to go deliberate.  I don't want to get in your way.

10  I've got five points I want to make.

11         One, Mr. Reinschmidt talked about Mr. Lucken not

12  reading, you know, the line of credit document, Exhibit 46.  I

13  mean, think about your own experience on a mortgage closing.

14  You go in; you just sign the documents.  And the reason you do

15  is because you've already talked about the deal before you get

16  there; right?

17         Now, I would agree if you didn't talk to your bank

18  about the terms, you just plopped into a closing room and

19  started signing, yeah, that's probably pretty reckless.

20         But that isn't what happened here.  They had met with

21  Crim, July 8, 2 conditions, then floor plan.  So why would John

22  think the bank's going to create documents that don't reflect

23  what they talked about?  Just like when I go sign a mortgage,

24  the banker sneaks in more interest, I'm probably not going to

25  catch it, but you expect them to do the right thing.

1           This UCC search, you know, they seem to be really

2    sensitive about that.  The only record they ever checked with

3    the Secretary of State by the search record was in 2011.  And

4    they got a checklist.  But where's the proof?  I mean, it's

5    their files.  They don't have any proof in 2010 they did the

6    search other than chicken scratch.

7           And more importantly, they don't have even a chicken

8    scratch for checking in 2009 when they did the loan.

9           Let me go over Exhibit 50 just so everybody's clear on

10   why that was necessary.  So if on the 19th John signed a CD

11   assignment so he has a CD at the bank already, he assigns it

12   over to the line of credit so that line of credit when it's

13   drawn on is backed up by the CD, but at that point, without

14   Exhibit 50, the letter, Dirks can't use it because it's John's

15   line of credit.  John's the only one who could use it.

16          So Exhibit 50 was the necessary tool that allowed

17   Dirks to be able to draw on that line of credit.  And that's

18   what John -- you know, he doesn't have a problem with that, but

19   I want you to understand why the bank had to get that done and

20   why they wanted it done the day before John came in.

21          Let me talk about that life insurance.  Once again,

22   John has not got one penny on that yet.  I didn't see anything

23   in Judge Bennett's instructions that says his damages he

24   recovers is affected by the life insurance.  And, more

25   importantly, John testified that in -- later this year he's

*Contact Shelly Semmler at (712)233-3846 or shelly_semmler@iand.uscourts.gov*
*EM, RPR/Registered Professional Transcriber*
Case 5:16-cv-04005-MWB-KEM   Document 169   Filed 05/07/18   Page 105 of 117

```
1  gotta start paying additional premium if he wants to keep one of
2  those policies.  John may decide not to even do that, but even
3  if he does, he's got to start paying even more to keep it.
4          I'm going to end with what Mr. Reinschmidt started
5  with.  He came in here and said, well, trust us.  We aren't
6  going to do this again.  Really.  Let's make sure that doesn't
7  happen.  Best way to do that, little punitive damage.  Let's
8  just make sure this doesn't happen again.  Go back there and do
9  justice.  Thank you.
10         THE COURT:  Thank you.  Members of the jury, we just
11 have one final instruction which is number thirty -- I'm sorry,
12 on page 34, number 17, page 34, number 17.  So if you'd follow
13 along, it's entitled deliberations, number 17.
14         (The Court read instruction number 17 in open court.)
15         THE COURT:  And then if you'd turn the page, you'll
16 see the verdict form.  And I'm not going to read every word of
17 it, but I'm just going to cover it generally.  This is how we
18 know what your decision is.
19         Section 1 is on liability.  And there's a section for
20 each of the two claims, the fraudulent misrepresentation and the
21 unlawful tying arrangement.  And you just check who do you rule
22 for, the Luckens or Heritage.
23         If you rule for the Luckens on either one of those
24 claims, then you go to number 2, damages.  And there's a place
25 for compensatory damages for fraudulent misrepresentation and
```

1   the unlawful tying arrangement.

2           And then if you find in favor of the Luckens on the

3   fraudulent misrepresentation claim, then you may but certainly

4   are not required to decide whether or not punitive damages

5   should be awarded, and there's a place to check, a question that

6   you need to answer, and the amount a -- I'm sorry, the amount,

7   then the question you need to answer.  And then it's dated;

8   foreperson will sign it, and the other six jurors will sign it

9   as well.

10          I just wanted to tell you what happens if I get a note

11  from the jury.  I never respond as quickly as you would like me

12  to because I need to tell you the process.

13          So when we get a juror note, we have to contact the

14  lawyers.  They may or may not be in the building.  We may have

15  to contact them by cellphone.  I have to read the note to them.

16  We have to get Shelly, our court reporter.  I have to listen to

17  their views about how they think I should respond to the note.

18  Sometimes it's relatively easy, and all three of us agree.

19  Sometimes it's not so easy, and we have three different views of

20  how to respond.  I think you can figure out my view is the one

21  that prevails.  But I have to, you know, pay attention to the

22  lawyers because they a lot of times have really good reasons why

23  we ought to respond in a certain way.  And then I -- almost

24  always rather than calling you back into the courtroom, I

25  prepare a written response.

1    So that -- I don't tell you that to either encourage

2  or discourage a jury note.  I just tell you that so that you

3  won't be quite as frustrated with me as I would be in your shoes

4  if I didn't know the process that we're required to go through.

5    So again, you can deliberate as long as you'd like

6  today.  And just let the CSOs know when you're going to be going

7  home, particularly if you haven't reached a verdict today, and

8  when you'll be coming in tomorrow so that I can let the lawyers

9  and everybody else know.

10    We're going to have all the exhibits that have been

11  admitted brought down to you.  That will take a few minutes.  We

12  have to sort that out with the lawyers.  I think your lunch

13  probably hopefully will be here.  So enjoy your lunch.

14    Good luck in your deliberations.  And thank you very

15  much for being so attentive.  The lawyers -- on behalf of the

16  lawyers, I know they really appreciate it, and I do too.  So

17  good luck to you.  Thank you.

18    (Jury out at 11:52 a.m.)

19    THE COURT:  Thank you.  Please be seated.

20    So what about this other testimony on the equitable

21  matters?  What do you want to do about that?

22    MR. LAWRENCE:  Your Honor, I think that the

23  evidence -- from our point of view on unjust enrichment, I think

24  we have everything in the record between exhibits and testimony

25  that we need.  So I don't believe that we need to offer any

```
 1   additional testimony at this time.

 2           THE COURT:  Okay.  Well, you say at this time.

 3           MR. LAWRENCE:  I'm sorry.  I --

 4           THE COURT:  Does that lead you to believe there might

 5   be another time?

 6           MR. LAWRENCE:  No, Your Honor.

 7           THE COURT:  Okay.  That's a common thing that lawyers

 8   say, you know, always wanting to hedge; right?  I get that.

 9           Mr. Reinschmidt?

10           MR. REINSCHMIDT:  I know one thing I'm not going to

11   say.  I'm not going to say honestly to you, Judge.

12           THE COURT:  Really.

13           MR. REINSCHMIDT:  Frankly.  That's the only word I'll

14   use with you.  I'm always honest.  Frankly, I think that we

15   don't need to offer --

16           THE COURT:  Sometimes you're not frank?  You can't

17   win, can you?

18           MR. REINSCHMIDT:  Negative pregnant, no.  I won't use

19   any, any qualifier.

20           THE COURT:  Just say it.

21           MR. REINSCHMIDT:  I think we -- I think we've gotten

22   all the testimony that we need relative to those two claims.

23           THE COURT:  Okay.

24           MR. CROSS:  The only thing I would add, Judge, is

25   since they are now saying they rest we would do a Rule 50 motion
```

1  with respect to their unjust enrichment and contract rescission

2  claims.

3         THE COURT:  Okay.  I assume that's resisted.

4         MR. THOMPSON:  (Nodded head.)

5         THE COURT:  Okay.  Reserve ruling.

6         I wanted the clients to know -- and I don't often

7  actually get to say this -- it wasn't the sexiest or most

8  interesting case I've ever had, but I'll tell you this.  The

9  lawyers were as well prepared as any case I've ever had, and

10 I've had hundreds of jury trials.  And they were absolutely the

11 best of any trial I've ever had in dealing with the documents

12 and being able to show the documents and highlighting.  That was

13 done superbly.  And obviously the lawyers had total mastery of

14 the facts.  So the lawyers did an excellent job.  And I

15 understand your case a little bit better now.  So be reassured.

16        So all bets are off.  I generally try and uphold a

17 jury verdict if I can because that's why we have a Seventh

18 Amendment.  And just because I would reach a different result --

19 and I'm not saying that I -- I don't know what result I would

20 have reached.  But primarily in criminal cases I often would

21 find the defendant not guilty, but I rare -- I've only set

22 aside, I think, four guilty verdicts even though I've disagreed

23 with quite a few of them because, you know, in that case we have

24 a Sixth Amendment and try and honor the jury verdict whenever we

25 can.

1          So where are we on exhibits, Denise?  Are they kind of

2    ready to roll?

3          THE CLERK:  Yes, we're just going to finalize the

4    list.

5          THE COURT:  Okay.  And I just have a question for you

6    if you can -- oh, I'm sorry.

7          THE CLERK:  That's all right.

8          THE COURT:  Okay.  What percentage of the exhibits

9    that -- and they were all admitted -- were actually testified to

10   by a witness or talked about in opening or closing argument?

11   I'm just curious.

12         MR. THOMPSON:  Rebecca Bishop tells me about 25

13   percent.

14         MR. REINSCHMIDT:  Well, I was in the ballpark.  I was

15   going to say 20 to 30 percent was my estimate.  Yeah.  And if I

16   understand it -- Mr. Thompson and I haven't talked about this,

17   but kind of your admonition in pretrial about seems like a lot

18   of exhibits, guys, I mean, I think -- and I want to make sure

19   that you're agreed with this, that this is okay.  You know, our

20   thought is we're going to go through them now and we may not

21   offer all them.

22         THE COURT:  Well, they're all offered and admitted.

23   So it's too late for that.

24         MR. REINSCHMIDT:  Okay.

25         THE COURT:  But any -- any exhibits that you two

1  decide to withdraw, that's fine.  Anything you agree to with

2  regard to -- you want to send them all back, that's fine.  You

3  want to only send back the ones -- whatever you agree on.  If

4  you can agree, that's great.  I've got a conference call I'm

5  going to try and catch.

6           MR. LAWRENCE:  Your Honor?

7           THE COURT:  Yes.

8           MR. LAWRENCE:  Very briefly on the record?

9           THE COURT:  Yes.

10          MR. LAWRENCE:  I would like to make sure we have a

11  Rule 50 motion on their equitable defense of setoff on the

12  record for the reasons that we set forth in our last objections

13  to the Court's jury instructions, that it has been waived and

14  that the bank valued the policies at $45,000 and were paid that.

15  So anything else they would be getting in, you know, unclean

16  hands or unjust enrichment by counting any excess value and

17  their benefit and all the other reasons we set forward in that

18  filing with the Court.

19          THE COURT:  Okay.  Thank you, Mr. Lawrence.

20          Anything else before we adjourn?

21          Are you all -- you know, my experience generally is

22  that if we get a question it's usually in the first hour.  So I

23  don't know if you're planning on sticking around or you're all

24  taking off.  Just let Denise know, and then, you know, we'll

25  call you by cellphone.  But our local rule I believe says we can

     1    spend up to 15 minutes trying to contact you, and I've driven

     2    between here and Des Moines a lot, and there's not -- there's

     3    usually phone service.

     4            MR. THOMPSON:  Mr. Lawrence and I are going to stay

     5    here.

     6            THE COURT:  Oh, okay.

     7            MR. THOMPSON:  Throughout.

     8            THE COURT:  Okay.

     9            MR. REINSCHMIDT:  And I'll just be at my office a few

    10    blocks away.

    11            THE COURT:  Okay.

    12            MR. REINSCHMIDT:  So I'll leave Denise with both my

    13    cellphone and my office number.

    14            THE COURT:  Okay.  That's great.  Thank you.  Really,

    15    really well-tried case.  Thank you very much.

    16            Could I see counsel just up at a sidebar real briefly

    17    off the record?  I just want to point something out.

    18            (At sidebar off the record.)

    19            (Recess at 11:58 a.m.)

    20            THE COURT:  Okay.  You all ready?  Here's what we'll

    21    do.

    22            MR. THOMPSON:  The Luckens are.

    23            MR. LAWRENCE:  Mr. Lucken should --

    24            THE COURT:  Oh, is he coming?

    25            MR. THOMPSON:  They were at the hotel with us.

1    THE COURT:  We'll wait.

2    MR. REINSCHMIDT:  He's downstairs.

3    THE COURT:  Okay.  Yeah, we'll wait for him.  You bet.

4  Thank you for telling me that.

5    (A discussion was held off the record.)

6    THE COURT:  Okay.  Ready?  Are we ready now to have

7  the jurors brought in?

8    Let me -- before we do that, I'll just tell you the

9  procedure.  The foreperson -- we did get a note.  It says, We

10  have a verdict.  Karla Byl, fore -- she put foreman,

11  interestingly.  And so I'll just ask her if the jury's reached a

12  unanimous verdict.  Then I'll have her hand the verdict form to

13  Denise.  She'll hand it to me.  I'll read it to make sure

14  nothing's inconsistent.  I'll announce it in open court.  Then

15  I'll poll -- I always poll the jurors even though I have them

16  sign it just to make sure it's unanimous; okay?  Thanks.

17    (The jury entered the courtroom.)

18    THE COURT:  Thank you.  Please be seated.

19    So, Miss Byl, I have a note from you that you're the

20  foreperson and the jury has a verdict; is that correct?

21    JUROR BYL:  That's correct.

22    THE COURT:  Would you please hand the verdict form to

23  Denise, and then I'll review it.  Then I'll announce it in open

24  court.  And then I'll ask everybody if it's a true and correct

25  verdict.

```
 1           Okay.  On the verdict form on liability on both claims
 2    (a) and (b), the jury found for the plaintiffs.  On compensatory
 3    damages for fraudulent misrepresentation they awarded $500,000;
 4    on compensatory damages for unlawful tying agreement, $45,000.
 5    They found for Luckens on punitive damages and awarded four
 6    million dollars in punitive damages and found that the
 7    fraudulent conduct was directed specifically at the Luckens by
 8    checking yes.
 9           So I'm just going to poll each of the jurors starting
10    in the back row with Ms. Hansen.
11           Is this your true and correct verdict?  And the answer
12    is either yes or no.
13           JUROR HANSEN:  Yes.
14           THE COURT:  Next, please.
15           JUROR SPENCER:  Yes.
16           THE COURT:  Next, please.
17           JUROR CHAPMAN:  Yes.
18           THE COURT:  Next, please.
19           JUROR PEDERSEN:  Yes.
20           THE COURT:  Front row?
21           JUROR BYL:  Yes.
22           JUROR EPPINGA:  Yes.
23           JUROR HURLBURT:  Yes.
24           THE COURT:  Okay.  Thank you.  I'm going to meet with
25    the lawyers for a minute or two, and then I'll be down to the
```

```
1    jury room to give you these evaluation forms that you get to
2    take home and fill out and try and answer any questions that you
3    might have.  So I'll be down there in just a minute or two;
4    okay?  Thank you for your service, and I'll see you in just a
5    minute.  Thank you.
6                 (The jury exited the courtroom.)
7                 THE COURT:  Thank you.  Please be seated.
8                 Well, congratulations to the plaintiffs, and our work
9    has only just begun.  So why don't you all -- why don't both
10   sides get together and see if you can agree on kind of a
11   schedule for post-trial motions.  Whatever you agree to I assume
12   because the award was so large we'll probably have an in-person
13   hearing on it rather than by telephone.  But we can do it by
14   telephone.  But let's just make sure that we get that entered
15   before any time -- but whatever time frame -- I'm sure you two
16   can agree.  You've agreed on almost everything else, and we'll
17   go from there.
18                So just goes to show you what I know.  I didn't see
19   that coming, although maybe a little bit after the closings.  So
20   anyway, it was a super well-tried case, and we'll see what
21   happens on post-trial motions.  So anything else?
22                MR. CROSS:  So any post-trial motions you want us to
23   just do in writing and set a briefing schedule for rather than
24   make any motions now and follow it up with briefs?
25                THE COURT:  Yeah.  Yeah.  Okay?  Thank you.
```

1          And we'll have Denise make a copy of the verdict form,

2    and we'll get that filed.

3          (The foregoing trial was

4          concluded at 3:16 p.m.)

5

6                         CERTIFICATE

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10

11    _____S/Shelly Semmler_____          4-28-18
      Shelly Semmler, RMR, CRR               Date
12

13                            **INDEX**

14
      **WITNESS:**                                    **PAGE:**
15
          THOMAS HARBISON
16            MR. LAWRENCE                             656
              MR. REINSCHMIDT                          672
17            MR. LAWRENCE                             680

18        GREG BURGER
              MR. REINSCHMIDT                          684
19            MR. LAWRENCE                             709
              MR. REINSCHMIDT                          718
20            MR. LAWRENCE                             721
              MR. LAWRENCE                             722
21
          JOHN LUCKEN
22            MR. THOMPSON                             724
              MR. REINSCHMIDT                          725
23
                         *****
24

25